```
1  Paul Alan Levy (pro hac vice)
   Public Citizen Litigation Group
2  1600 20th Street NW
   Washington, D.C. 20009
3  (202) 588-7725
   plevy@citizen.org
4
   Stephen Kirby
5  Kirby Law Office, PLLC
   WSBA #43228
6  1312 N. Monroe St.
   Spokane, WA 99201
7  (509) 795 4863
   kirby@kirbylawoffice.com
8
```

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| PREPARED FOOD PHOTOS, INC., f/k/a ADLIFE MARKETING & COMMUNICATIONS CO., INC., a Florida for profit corporation, | No. 2:23-cv-00160-TOR |
| Plaintiff, | **AFFIRMATION OF PAUL ALAN LEVY SUPPORTING MOTION TO COMPEL** |
| v. | |
| POOL WORLD, INC., a Washington for profit corporation, | |
| Defendant. | |

1. My name is Paul Alan Levy. I am lead counsel for defendant Pool World. I make this affirmation in support of defendant's motion to compel discovery, showing information from our investigation that we believe provides a reasonable basis for believing that the discovery that Pool World seeks to compel will produce information that would support Pool World's defenses and rebut facts on which plaintiff's affirmative case is predicated.

2. I attach as Exhibit A the requests for production of documents and interrogatories that we served on plaintiff, and as Exhibit B the initial responses to those discovery requests.

3. My co-counsel and I met and conferred with plaintiff twice orally—first with its counsel Lauren Hausman on September 28, 2023, and then with Ms. Hausman and Daniel DeSouza, the partner in her law firm who has decisionmaking authority in the case, on

October 27, 2023. There were several substantive written exchanges between those dates. It appears that the parties were able to resolve many of their disagreements through this process; plaintiff committed to further responses to several requests.

4. The motion to compel addresses requests that defendant propounded to support its legal defenses and to cast light on certain factual disputes, but that plaintiff contends are irrelevant as a matter of law. It appears that there is no possibility of compromise between the parties on these requests because the parties' respective positions rest on a difference about the applicable law governing the merits. Mr. DeSouza said that plaintiff is unwilling to disclose the information being sought, even though he understands that defendant seeks to use it in moving for summary judgment, because once the information is disclosed it will not be possible to "put the toothpaste back in the tube." Plaintiff's counsel did not suggest that disclosure of this information could cause it any competitive harm. Although plaintiff's responses to Interrogatory 12 and Request for Production 6 also raise concerns about breadth and burden, when I tried to discuss ways to ameliorate those concerns, plaintiff's counsel indicated that the basic issue was his client's view that the discovery sought is not relevant to the case.

5. Using the Party Search mechanism on the United States PACER Case Locator, https://pcl.uscourts.gov/pcl/pages/search/findPartyAdvanced.jsf, I looked for copyright infringement actions filed by Prepared Food Photos, Inc., and by its corporate predecessor, AdLife Marketing and Communications, Inc. Exhibit C is a list of 260 such infringement actions. For a period of time in the past year, plaintiff was filing a dozen or more such lawsuits each month.

6. I have reviewed the dockets of a sample of the 260 cases. In almost all of the cases I reviewed, the lawsuits were dismissed voluntarily shortly after being filed, with the appearance that there had been a settlement: sometimes, plaintiff filed a document referring to a settlement; sometimes, the docket simply reflects a voluntary dismissal. In a few cases, the court entered a default, and then a default judgment based solely on the allegations in the complaint as well as the plaintiff's ex parte representations about its damages.

7. I have reviewed several cases in which default judgments were entered, reviewing plaintiff's filings and the ensuing court rulings. In each of the cases I reviewed, plaintiff sought statutory damages in excess of $10,000, citing its current policy of making photos available only for licensing by monthly subscription, without revealing that it formerly made its photos available for licensing one by one on iStock for very small amounts of money per photo, and without disclosing to the court the many decisions of courts of appeals stating that damages for a lost license fee must be based on what a reasonable user would have paid, not what the plaintiff would have charged. Instead, plaintiff's papers cited several cases in which damages were awarded to plaintiff based on its own damages calculations by default.

8. Mr. DeSouza told me in a January, 2023 exchange about a demand letter that he sent to a different small business that his client has never obtained a court ruling approving his subscription rate theory of damages in a contested case. Rather, he has only obtained court awards on that theory when he was seeking them ex parte, by way of default judgments. Since that time, I have not seen in the PACER dockets any court rulings on his damages theory following adversary presentations.

9. In response to Pool World's discovery requests, plaintiff admitted that, until 2016, plaintiff placed its photographs on the stock photograph website iStock, which is a subsidiary of Getty Images. Plaintiff's answers did not provide the amount that iStock charged for licenses to use its photos. Instead, the answer to Interrogatory 9 said only that iStock determined and changed the pricing from time to time, without specifying the actual prices. In response to a separate discovery request about plaintiff's income from licenses when it was using iStock (Interrogatory 13), plaintiff avoided the question by saying that its income from iStock was from commissions. In the final meet-and-confer, plaintiffs' counsel promised to confirm whether plaintiff retains records of its income from licensing via iStock. At the time I am filing this affidavit, plaintiff has not yet responded on this point.

10. On iStock's current website, https://www.istockphoto.com/, I searched for photographs of vegetables on a grill, comparable to the work whose copyright plaintiff

claims has been infringed. My search can be replicated using this URL: https://www.istockphoto.com/search/2/image-film?family=creative&phrase=skewered%20vegetables%20on%20grill. As shown in Exhibit D, reflecting the web page seen by clicking the "pricing" link on the iStock website, iStock's users can choose between a monthly subscription starting at $29 per month, supporting licenses of ten photos per month (the amount of the subscription depending on the number of licenses anticipated), or buying bundles of "credits" that can be used to download individual photos. A single credit costs twelve dollars; credits cost less as larger bundles of credits are purchased. It appears that single photos can be licensed for one credit.

11. Using the "Wayback Machine" feature of the Internet Archive, https://archive.org/, I have looked on iStock's website as it appeared in 2010, when the alleged infringement in this case took place. As shown in Exhibit E, it appears users similarly had a choice between buying bundles of credits or monthly subscriptions, but for lower prices. It appears that the standard price for licenses for photos was as low as one dollar per photo. Because plaintiff's discovery responses reflect that it has not kept records of the prices for licenses that prevailed at the time of the alleged infringement in this case, defendant will be seeking discovery from iStock to ascertain the actual prices charged.

12. Because I have litigated several cases against copyright holders making baseless or exorbitant copyright infringement claims, and written articles about the practices of such copyright enforcement schemes, I am often approached by the recipients of demand letters alleging copyright infringement. As a result, I became familiar with claims made on behalf of plaintiff and with the demand letters making those claims.

13. Based on the many demand letters that I have seen as a result of hearing from the targets of those demand letters, it appears that the demand letter that plaintiff sent to defendant, which was attached to the Answer as Exhibit A, is typical of the demand letters that the law firm Copycat Legal has been sending to alleged infringers in recent years (the one major difference is discussed below in paragraph 25). Defendant's discovery requests are directed at showing that the sample of demand letters and follow-up emails that I have

seen do in fact represent plaintiff's standard practice.

14. Exhibit A, like plaintiff's other demand letters from Copycat Legal that I have seen, contains several misrepresentations which, in my opinion, are designed to put the recipients of the letters in fear of being held liable for a very large amount of damages for alleged copyright infringement, as well as facing high legal costs.

15. For example, early in the standard demand letter, plaintiff's demand says that, "to their knowledge, [plaintiff] ***did not*** authorize you . . . to use or display the foregoing photograph. Notwithstanding this lack of authorization . . .." (emphasis in the original). I expect that most recipients of letters containing this language would assume that plaintiff knows who licensed its work, and that the absence of such information from plaintiff's records implies that the photo was never licensed. In fact, plaintiff has admitted in its discovery responses that, during the time when it was allowing its photos to be licensed by iStock, plaintiff was never informed who was licensing its works. (Answer to Interrogatory 11). Thus, at the time plaintiff sent this letter to Pool World, plaintiff could not have known whether the target had a license.

16. In fact, I am aware of many situations in which iStock, after being informed of a demand letter from the plaintiff, in a communication from a target that believed it had secured a license from iStock, spent a good deal of effort in confirming the existence of a license. Exhibit F is an email exchange I had with a staff member at iStock describing this situation. But a target that does not think to contact iStock, or a target that cannot remember where it got a photograph ten years ago, or a target whose web page was created by someone who is no longer available, would not find this out, while assuming that plaintiff knows who had licenses.

17. Further down that page, plaintiff's counsel warn defendant that it will incur attorney fees both to defend itself in the event litigation is filed, and to pay Prepared Food Photos, Inc.'s attorney fees that could be awarded under the copyright act.

18. Indeed, plaintiff's counsel have been known to be even more explicit about how much it might cost its targets to defend themselves. In one situation of which I am aware,

the demand letter recipient was able to find a local lawyer to respond on its behalf. That lawyer made a small offer representing nuisance value. One of the lawyers at Copycat Legal, James D'Loughy, warned that the target of that demand would likely have to pay between $15,000 and $30,000 to defend itself, describing the discovery that would be likely, citing a $17,500 minimum defense cost, and therefore saying that only a much higher offer equal to a two-year subscription would avoid litigation. At that point, the lawyer for the target withdrew his nuisance value offer and said that the target would pay nothing. A copy of this exchange of correspondence is attached as Exhibit G. To the best of my knowledge, plaintiff has not sued that alleged infringer. Mr. D'Loughy is one of the lawyers who signed the demand letter sent to Pool World (Exhibit A to the Answer).

19. So far as I have been able to determine, plaintiff files infringement actions against defendants that operate as corporations or LLC's, who thus cannot defend themselves pro se. Defendant has served discovery requests intended to establish that this is also true of plaintiff's demand letters.

20. The standard demand letter, including the letter sent to Pool World, contains an extensive discussion of statutory damages, stating that it would provide for a multiplier of two or three times the lost license fee so that the target is facing a statutory damages award of "$35,964 *(for each annualized licensing period)*." (emphasis in the original). The letter includes several cases, lending the letter an air of authority. That part of the letter is misleading because the plaintiff in a copyright infringement action can seek an award of statutory damages only if the copyright was registered in a timely fashion—generally speaking, if it is registered within 90 days of first publication in the United States or, at least, before the allegedly infringing use began. See 17 U.S.C. § 412. Because Pool World began using the composite image in question here in 2010, but the copyright was not registered until 2016, PFP could not seek an award of statutory damages attorney fees here, and its counsel must have known that when they wrote to Pool World.

21. The reference to the possibility of attorney fees in the standard demand letter is similarly misleading because, for the same reason that it could not seek an award of statutory

damages, PFP cannot seek an award of attorney fees against Pool World—its registration was not timely under 17 U.S.C. § 412. Its counsel must have known that when the letter was sent.

22. Indeed, the complaint in this case does not seek statutory damages (although the complaint asserts that its attorney fees can be awarded as a form of actual damages, that theory is contrary to the American Rule on attorney fees). When plaintiff's counsel filed this action, they knew that seeking statutory damages would be legally frivolous.

23. The standard demand letter cites legal precedent from the Eleventh Circuit, including a footnote purporting to show a basis for suing the target in Florida because plaintiff viewed the alleged infringement there; indeed, the letter warns that "[Our client], if forced to file a lawsuit, would proceed by filing in the United States District Court for the Southern District of Florida." In fact, plaintiff did not sue Pool World in Florida, and so far as I have been able to determine from reviewing the results of the PACER Party search, the only times when plaintiff sues in Florida is when the defendant is located there. A small business would reasonably be more nervous about having to defend itself in a far-away federal court where it does not know any lawyers.

24. Plaintiff's corporate predecessor, AdLife Marketing and Communications, also sent letters insisting that the targets pay a few thousand dollars to avoid being sued for infringement. I attach two examples as Exhibit H (with email addresses and phone numbers redacted), a demand that Curt Archambault pay $4525 for having used a photo of a Thanksgiving turkey to encourage donations for his church's annual drive to provide Thanksgiving meals to Seattle's homeless, and another demanding that Brian Kreuger pay $2525 because a user of a scientific discussion site that he had created posted an inline link to a photo of fruits and vegetables. In the latter case Krueger sought a declaratory judgment of noninfringement; plaintiff successfully opposed that on jurisdictional grounds but did not file suit after it learned that Krueger had counsel. After Copycat Legal assumed the representation of plaintiff in its demand letter scheme, plaintiff appears to have adopted the practice of demanding a $30,000 payment. I am aware of an instance in which plaintiff

demanded a minimum settlement payment of $60,000 on the ground that **that** target had used two of plaintiff's photos. A copy of that demand letter is attached as Exhibit I.

25. One difference between the demand letter sent to Pool World and the typical demand letters sent to other targets by Copycat Legal (such as Exhibit I) is that plaintiff normally includes a paragraph warning that many courts have awarded damages in excess of $20,000 based on its theory that the lost license fee is a multiplier of its monthly license fee extended over a period of years. The letters do not reveal that these are default judgments awarded with no adversary argument.

26. Intellectual property litigation, including copyright litigation, is a specialized practice, and is notoriously expensive. The American Intellectual Property Lawyers Association publishes a biennial survey of the costs of patent, trademark and copyright litigation. According to the 2023 survey, the median cost to litigate a copyright infringement action through the discovery and motion stage, in "low value" cases where the potential damages were less than a million dollars, is $100,000. To take the case through trial is significantly more expensive. A relevant portion of a chart from the 2023 Survey is attached as Exhibit J.

26. I have assisted several targets of demand letters from attorneys for plaintiff and its corporate predecessor. In each case arising before suit was filed, plaintiff dropped its demand entirely. I am aware of other situations in which, faced either with knowledgeable counsel, or indeed with pro se responses which reflected that the target was receiving informed legal advice (such as the responses from Archambault), the infringement claim was not pursued in litigation.

27. Exhibit A, and the standard letter sent by plaintiff's current counsel, instructs recipients to provide the demand letter to their insurance company and tell plaintiff the name of the company. Defendant, however, decided not to make a claim to its insurance company because defendant was concerned that an insurance company might decide that it was financially prudent to pay off the plaintiff rather than incurring the cost of a legal defense. Defendant objects to being bullied and prefers to defend itself.

28. Pursuant to the initial disclosure requirements, defendant told plaintiff who its insurers were, and on request sent the identified policies to the plaintiff, while telling plaintiff that defendant is not making a claim on the policies. I attach as Exhibit K a communication from plaintiff's counsel directly to defendant's insurance company, threatening to proceed against the insurer if plaintiff recovers a judgment.

> Pursuant to 28 U.S.C. § 1746, I hereby certify under penalty of perjury that the foregoing is true and correct. Executed on November 3, 2023.
>
> /s/ Paul Alan Levy