Paul Alan Levy (pro hac vice)
Public Citizen Litigation Group
1600 20th Street NW
Washington, D.C. 20009
(202) 588-7725
plevy@citizen.org

Stephen Kirby
Kirby Law Office, PLLC
WSBA #43228
1312 N. Monroe St.
Spokane, WA 99201
(509) 795 4863
kirby@kirbylawoffice.com

Phillip R. Malone (pro hac vice)
Juelsgaard Intellectual Property and Innovation Clinic
Mills Legal Clinic at Stanford Law School
Crown Quadrangle, 559 Nathan Abbott Way
Stanford, California 94305-8610
(650) 724-1900
pmalone@stanford.edu

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| PREPARED FOOD PHOTOS, INC., f/k/a ADLIFE MARKETING & COMMUNICATIONS CO., INC., a Florida for profit corporation,<br><br>Plaintiff,<br><br>v.<br><br>POOL WORLD, INC., a Washington for profit corporation,<br><br>Defendant. | No. 2:23-cv-00160-TOR<br><br>**THIRD AFFIRMATION OF PAUL ALAN LEVY**<br><br>Hearing September 30, 2024<br>6:30 PM |

1. My name is Paul Alan Levy. I am lead counsel for defendant Pool World. I make this affirmation in support of defendant's opposition to the motion of plaintiff Prepared Food Photos ("PFP") seeking leave to dismiss this case without prejudice. As explained in the opposition, defendant would be pleased to see this case dismissed so long as the dismissal is with prejudice. At that point, defendant intends to move for an award of attorney fees under 17 U.S.C. § 505.

Levy Affirmation Opposing to Dismissal Without Prejudice          -1-          Case No. 2::23-cv-00160-TOR

2. As shown by Pool World's responses to PFP's interrogatories and PFP's requests for admission, in August 2010, Pool World acquired the composite image that contains the photograph of grilled vegetables that is at issue in this copyright suit and posted that image to one of its websites shortly thereafter. Those responses are attached as Exhibit M. (The exhibit letter is sequential to the lettering of exhibits attached to my previous affirmations.)

3. In my first Affirmation, filed in support of Pool World's motion to compel discovery, I attached documentation showing that in 2010, when PFP (then called AdLife Marketing and Communications) was making its photos available for licensing through iStock, a subsidiary of Getty Images, licenses for its photos could be obtained for as little as a dollar. Since that time, we have obtained documents from iStock showing the amounts actually charged for the grilled vegetables image during the years 2009 to 2013. I attach that document as Exhibit N. It shows that licenses for multiple uses of that photo were sold for as little as ninety-five cents ($.95), and that more than fifty such licenses were sold in the period between January 2009 and August 2010, when Pool World acquired the composite image that includes the grilled vegetable image. The column showing the fractional amounts of those licensing fees that were paid to AdLife was redacted. Its license fee at the time was thus some fraction of 95 cents.

4. As indicated in the responses to PFP's discovery requests, Pool World has neither records nor recollections of the exact source for the composite image containing the grilled vegetable photos, But confirming what I had learned in dealing with its various demand letters, PFP's answers to interrogatories, attached to my first affirmation as Exhibit B,

indicated that it has no records of who did and did not license its photographs in 2010, because under its arrangements with iStock, AdLife was not given the names of licensees.

5. I attach as Exhibit O the standard license, produced by PFP in discovery, that iStock sold for use of AdLife's photos, which allowed use not only by the person buying the license but also by the buyer's clients. Under its current licensing arrangements, PFP demands that licensees identify their end users, see infra ¶ 14 and Exhibits T and U, but because of the arrangements AdLife made with iStock, it chose not to obtain that information about the end users of the licenses for which it was paid through 2016.

6. I attach as Exhibit P an email exchange between iStock and PFP in which iStock reminded PFP that even though its records do not reflect the sale of a license to Pool World, "it is quite possible that the use has been licensed accordingly by an agency or designer," that is, who might have purchased a license from iStock for the benefit of unidentified end-users. The email addresses are redacted.

7. I attach as Exhibit Q PFP's Initial Disclosures, indicating that PFP claims damages in the amount of $11,992 in lost license fees for each of the twelve years between 2010, when Pool World published the composite image containing the grilled vegetables photo, and 2022, when Pool World took down the composite image after receiving PFP's demand letter, as well as an unspecified share of Pool World's profits for each of those twelve years, to be determined by discovery.

8. I attach as Exhibit R a blog article posted by Joel Albrizio, the owner of plaintiff PFP, on the website of Bad-Adz, another company that he owns, explaining AdLife's 2016

decision to remove its photos from third-party stock services, register the copyrights in the photos, and focus its business activities on pursuing alleged infringers. The blog post is no longer online. It was removed after I contacted counsel for PFP, Daniel DeSouza, on March 7, 2024, to ask questions about the post. Exhibit R is a true and correct copy of the PDF document to which I printed the blog article before it was removed.

9. I attach as Exhibit S demand letters sent to two different small businesses by Joel Albrizio, demanding payments of $8,000 or $16,000 to avoid being sued for copyright infringement. To the best of my knowledge, these letters are typical of the demand letters that AdLife was issuing in the early years of its copyright enforcement business.

10. In its opposition to Pool World's first motion to compel answers to discovery, PFP stated that CopyCat Legal, the law firm representing it in this case had, since it was first retained in 2021, sent out 1,800 demand letters to companies identified by PFP's reverse image searches as having posted allegedly infringing copies of PFP's photos. That brief was filed in November 2023; to the best of my knowledge, CopyCat Legal continues to this day sending demand letters similar to the demand in the letter sent in 2022 to Pool World, DN 7, Exhibit A to the Answer. Those letters threaten to sue for copyright infringement unless the target pays $30,000 within 21 days. Over the past eight months, while this case has been stayed, I have continued to receive many requests for help from companies that have received demand letters from CopyCat Legal. Those companies (or their lawyers) have contacted me after doing online research and seeing my blog posts that explain the legal flaws that I perceive in PFP's claims in this case and in its threats against other companies.

I estimate that at this point PFP's law firm CopyCat Legal has sent well over 2,000 such demand letters since 2021.

11. In response to Pool World's second set of Interrogatories, attached to my Second Affirmation as Exhibit L, PFP did not identify the photographer who took the grilled vegetables photo at issue in this case; and it has identified Rebecca Jones as having personal knowledge about the techniques used to take the photo (which might be used to show that it has sufficient originality to merit copyright protection), even though her LinkedIn profile, located at https://www.linkedin.com/in/rebecca-jones- b4223358/, reveals that she did not come to AdLife as a paralegal until 2016, long after the photo was taken. And the copyright registration, attached to the Complaint as Exhibit A, states that the owner of the copyright is AdLife "As Employer for Hire of Joel Albrizio." We have told PFP's counsel that we have reserved judgment about whether we will challenge the validity of its copyright registration in this litigation, and whether we will ask the Court to query the Copyright Office pursuant to 17 U.S.C. § 411(b)(2), pending further discovery including depositions of PFP's principals.

12. In addition, we have told PFP's counsel that we are pursuing discovery to probe the veracity of its contentions that companies buy subscriptions to obtain access to its entire database of food photographs, and that the minimum amount that it charges companies for such subscriptions is $999 per month for a minimum subscription period of one year. We are pursuing that discovery because information obtained during this litigation has called the veracity of those claims into question, as explained below.

13. Pool World's first set of Document Requests, attached to my First Affirmation (DN 21-1) as Exhibit A (DN 21-3), included as Requests 4 and 5 a request for copies of any license agreements or subscription agreements for use of its photographs and in effect at any time since June 2, 2020. As reflected in Exhibit B to my First Affirmation (DN 21-4), before producing those documents, counsel for PFP asked Pool World to consent to a protective order limiting access to those agreements. Pool World declined to agree to a protective order but did agree to keep the names of the subscribers confidential. PFP produced the agreements on November 23, 2023.

14. In this affidavit and the accompanying memorandum, consistent with the confidentiality agreement, I am not mentioning the names of specific companies, and have included only redacted versions of documents reflecting the names of the subscribers. Two of those redacted agreements are included in Exhibit T and U, respectively. (PFP has the unredacted originals of the documents).

15. The response to Pool World's Second Interrogatories (which were attached to my Second Affirmation, filed in support to the since-withdrawn motion for leave to amend, as Exhibit L, DN 26-1) included a statement that PFP maintained a spreadsheet reflecting "hits" when PFP's reverse image searches located the use of one of its copyrighted photos. On February 8, 2024, PFP produced one such spreadsheet, with data that began in late April 2019 and ran into early 2024. Some excerpts from those spreadsheets are included in Exhibits T and U, respectively, again with redactions to remove the names of subscribers. (Again, PFP has the unredacted originals of the documents). I am not filing the entire

spreadsheet because it contains more than 300 pages of reverse image search "hits" not needed for this opposition.

16.  As explained in my First Affirmation, DN 21-1, ¶ 9, when PFP was asked how much money it had made by selling licenses through third party services, it responded by stating it had not made any sales but rather had earned commissions.  Instead of moving to compel a non-evasive answer to that interrogatory, defendant posed an interrogatory in its second set of interrogatories asking about the receipt of commissions.  That answer to Interrogatory 21 providing the amounts beginning in 2012 (but saying PFP did not have that information for previous years) was included in Exhibit L attached to my Second Affirmation.

17.  Upon examining the subscription agreements produced by PFP as described above, I determined that many of them required monthly payments considerably lower than the $999 per month on which PFP's damages calculation is based.  One agreement provided for a monthly payment of $99, another required $300 per month, and several others required payments of $499 or other amounts lower than $999.  Each of the agreements provided that it could be renewed, but no renewal documents were provided.  Thus, it was not possible to tell from examining the agreements whether the payments lower than $999 per month had continued into years later than the original one-year term (in one agreement, the initial term was only six months).

18.  I also noticed an apparent discrepancy between the annualized monthly subscription amounts reflected in the agreements that had been produced and the amounts

of subscription income reported in the answer to Interrogatory 13 in our first set of interrogatories (Exhibit B to my First Affirmation).  I had our office manager create a spreadsheet showing the amount produced each year by the various agreements, and the annual totals in the spreadsheet were significantly lower than the asserted income figures in the interrogatory answer.  Moreover, it did not appear that mere renewal of the agreements beyond their initial (mostly one-year) terms would produce enough income to match the figures claimed in the interrogatory answer.

19.  Some of the agreements reflected on their face that they had been entered in settlement of a dispute about infringement.  In addition, I was able to speak with a number of owners or employees of some of the companies that had signed the subscription agreements.  Each of the individuals to whom I spoke told me that their companies had agreed to subscribe only after they, or end-users to whom they had furnished photos, had been threatened with suit for copyright infringement, and claims for large amounts of damages. Each of these subscribers told me that their companies had subscribed, not for the normal business purpose of gaining future access to photos in the PFP database of photos, but rather as a settlement of claims for past infringement and protection against suit and extreme damages.  Many of the subscribers said that they had never downloaded photos pursuant to the subscriptions and expressed considerable resentment at having been coerced into entering these subscription agreements.

20.  Some of the subscribers told me that their companies had previously downloaded a number of AdLife's images pursuant to licenses from a third-party source and had made

those images available for their own clients' use on the understanding that the licenses they had bought allowed this arrangement.  The photos apparently did not contain copyright management information that would have enabled the subscribers to ascertain which of the photos in their databases had come from AdLife.  Not all of the subscribers mentioned the name of the third-party image service from which they had purchased licenses and downloaded photos, but at least one subscriber mentioned the name Kwikee.

21.  In addition, I noticed that some of the companies identified in PFP's spreadsheet of reverse image search "hits" produced in discovery had later signed subscription agreements that PFP also furnished in discovery.  For example, Exhibit T contains a page showing two consecutive lines reflecting search "hits" on October 28, 2022, at the websites of two hospitals (as noted above, the names are redacted), as well as a subscription agreement signed on November 2, 2023, by a company whose name reflects that it is a hospital chain; the two hospitals whose names are redacted in the search hit listings in Exhibit T appear in the redacted lines of the subscription agreement in Exhibit T.  Exhibit U also contains a search hit on October 25, 2021, on the website of a well-known marketing company (one of several hits on that company's website), as well as a subscription agreement dated October 2023, signed by that same company.

22.   To address these apparent anomalies, as well as to identify third parties who could best be deposed, defendant served a third set of document requests that included a request seeking all documents reflecting payments for the subscriptions, and a request for all communications with the subscribers, expecting that these documents might include

relevant documents about renewals, which might help resolve the discrepancy in income amounts. A copy of these document requests and PFP's answers is attached as Exhibit V.

23. Document Requests 14 and 16 asked PFP to produce communications with subscribers, and communications within PFP and with its representatives about the subscribers, to determine how many of the subscription agreements were obtained in settlement of threats of infringement litigation rather than signed by companies whose only purpose was to obtain future marketplace access to PFP's database of photos—or, indeed, whether any of the subscription agreements were legitimate marketplace license agreements.

24. It was after Pool World served these discovery requests that PFP counsel Lauren Hausman first wrote to me (on January 29, 2024) to ask whether Pool World would consent to a stay of the litigation to allow her client to seek mediation.

25. As reflected in Exhibit V, on February 19, 2024, PFP refused to provide the requested documents on relevance grounds. On February 21, 2024, we asked to meet and confer about a motion to compel discovery, explaining what we had discovered on reviewing the subscription agreements and talking to many subscribers. Rather than addressing the discovery dispute in a meet and confer, on February 22, 2024, counsel for PFP sent us a draft motion to stay the case pending mediation.

26. We were worried that the request for mediation was no more than an effort to postpone further discovery into the basis for PFP's claims and our eventual motions for summary judgment, buying time for PFP to continue to send demand letters to other small businesses and file lawsuits that would lead to quick settlements or default judgments. We

told PFP's lead counsel, Daniel DeSouza, during a meet and confer that Pool World would not agree to settle this case unless PFP agreed to dismissal with prejudice, which would allow Pool World to move for an award of attorney fees, or a settlement of the fees issue, and that mediation would be a waste of time unless his client was prepared for such a settlement. Mr. DeSouza assured us that mediation would not be a waste of time because his client needed to hear a candid evaluation of its prospects from a neutral mediator.

27. During the mediation, the magistrate judge's offices reached out on several occasions to identify dates when the mediation could be held. On most of those occasions, we responded to those inquiries promptly, but PFP's counsel did not respond until I reminded her that a response was needed.

28. We provided a detailed settlement offer letter to PFP, containing a discussion of our intended merits arguments, and an even more detailed letter to the Magistrate Judge, describing the legal arguments on the merits and disclosing the evidence obtained in discovery to date. Nearly a hundred hours of attorney time was devoted to the mediation. But during the mediation, PFP was not amenable to any of Pool World's alternative settlement proposals. Meanwhile, PFP has continued to send demand letters to small businesses, requesting monetary settlements from companies and emphasizing the damage awards they supposedly face if they do not pay money, as well as the cost to defend themselves.

29. Just before the date scheduled for the mediation, the officers of PFP created a blog criticizing Public Citizen for representing Pool World in this case, calling out by name

various Public Citizen staff members having nothing to do with the litigation, urging members of the public not to donate to Public Citizen, and including confidential information that we had revealed in the mediation. The officers sent several emails to a large number of Public Citizen staff members promoting the blog and criticizing this litigation. Shortly after PFP filed its motion to dismiss without prejudice, the blog was taken down.

30. A part of my practice for the past five years has been devoted to the representation of individuals, non-profits and small businesses that have received demand letters from law firms claiming copyright infringement and demanding damages payments far in excess of what a court would likely award under the legal precedents fixing the damages theories applicable in such cases.

31. Generally, it has been Public Citizen's view that alleged infringers facing valid claims over valid copyrights ought to pay damages, but that many firms specializing in mass infringement claims use intimidation tactics to extract payments far in excess of what they would likely win in contested litigation against knowledgeable counsel. It is also our view that alleged infringers with sound defenses ought to be able to assert them.

32. Over the past five years, I have published many articles about demand letters sent by firms specializing in mass infringement claims, analyzing their contentions, pointing out their flaws, and explaining what tactic might be effective in responding to their claims. At the same time, many of my articles also warn about the potential financial consequences of using photographs found on the internet without buying a proper license and expressing

sympathy for photographers who make legitimate efforts to enforce their copyrights by seeking a reasonable amount of damages.

33. In the course of that practice, I had occasion to help clients respond to demands from AdLife. In addition to the Krueger case, discussed in my first affirmation, ¶ 24, I ghost-wrote responses for Curt Archambault, a member of a Seattle-area church who had used a photo of a turkey and fixings to solicit donations for the church's program of providing Thanksgiving meals to the local homeless population; the ghostwritten responses discussed the applicable law, included a check for $750 (the minimum amount of statutory damages recoverable under 17 U.S.C. § 504), and dared AdLife to sue if it insisted on more. AdLife neither cashed Archambault's check, nor sued him. It was apparent to me that AdLife was only interested in easy money, and did not want to engage in contested litigation against knowledgeable counsel, but at the same time did not want to establish a record of accepting payments as low as $750. (Many such firms make confidentiality of the settlement an essential condition. I do not believe that they do this to protect the privacy of their victims).

34. I next had dealings with AdLife in 2023, under its current name as PFP, after it retained CopyCat Legal as its counsel, and started sending demand letters similar to the demand letter sent to Pool World (Exhibit A to the Answer). I found the letters deceptive and excessive (for reasons explained in my First Affirmation), and in my view the damages theory that it invoked as a basis for demanding a payment of $30,000 within twenty days was contrary to well-settled law, again for the reasons explained in my First Affirmation,

in the motion to compel discovery filed last year, and in the brief opposing dismissal without prejudice. I therefore undertook to represent a few clients responding to the demand letters, and to advise several others.

35. What I found in each of these situations was that PFP did not file suit against any of these clients, despite its excessive damages claims; I believe that its reason for not suing is that it is unwilling to put its damages theory at risk by submitting it to adversary litigation. I have communicated as well with other lawyers representing the targets of PFP's demand letters, and their conclusions are the same: PFP does not prosecute a lawsuit when the defendant is represented by knowledgeable counsel, for the apparent reason that it is unwilling to put its damages theory at risk of an adverse ruling.

36. Hoping to provide useful information to the targets of PFP's enforcement scheme, I have published a few articles on Public Citizen's Consumer Law and Policy blog specifically devoted to PFP's claims and what strategies appear to work to minimize the damage. The main reason for the articles is to provide information to members of the public who receive PFP's demand letters about what the recipients' actual financial exposure is for claims of infringement, so that they can better protect their rights while also providing a fair amount of compensation to PFP when the targets of the demands have infringed and have no reasonable defenses. The articles include the following:

https://clpblog.citizen.org/is-prepared-food-photos-running-a-scam-not-just-a-scheme-to-extract -excessive-rents/.

https://clpblog.citizen.org/resistance-to-extortionate-copyright-infringement-claims-by-prepared-food-photos/

https://clpblog.citizen.org/new-trolls-on-the-block-prepared-food-photos-and-daniel-desouza-copycat-legal/

https://clpblog.citizen.org/open-letter-to-copycat-legal-about-a-prepared-food-photos-infringement-claim/

https://clpblog.citizen.org/prepared-food-photos-faces-financial-repercussions-from-copyright-trolling/

I also mentioned PFP in passing in the following article about a different firm that specializes in mass demand letters alleging copyright infringement.

https://clpblog.citizen.org/higbee-threatens-copyright-enforcement-of-stale-claims-and-other-turns-for-the-worse/

37. I talk to several of PFP's targets each month, often more than one in each week, who have learned about the flaws in PFP's claims from reading the articles and who want my suggestions about how to respond. Most of them have no idea what copyright law provides in the way of remedies and no idea about how to find a copyright lawyer whose services they can afford. I also talk to a number of lawyers with no experience in copyright law who want advice about how they can help their clients (or a friend, or a family member) who have received demand letters. In each situation, I explain what the law is, help the recipient assess its financial exposure, and suggest courses of action, often including the suggestion that the alleged infringer send plaintiff a check reflecting its minimum financial exposure, such as a check for $750 if PFP has a valid claim for statutory damages. I never charge for this advice. When a target does not have a lawyer and does not feel comfortable following a recommended course of action pro se, I try to recommend a lawyer whom they can afford and whose cost is significantly lower than what PFP insists that they should pay to PFP as compensation for the alleged infringement. To the best of my knowledge, none

of the PFP targets whom I have referred to other lawyers, or to whom I have offered information about how copyright law bears on the demand letters they received, have been sued, or had to pay more in settlement than the figure I suggested to them. The reason is that, so far as I have been able to discern, PFP only sues when it thinks the target will not retain counsel to litigate in defense.

38. I attach as Exhibit W several examples of demands made by CopyCat Legal on behalf of PFP during the stay of litigation that PFP obtained by asking for mediation, and responses from Justin Nygard, a meat farmer in western Washington; Marshall Black, a banker in southwestern Alabama; and Sigmund Schutz, a lawyer in Maine, showing how lay owners of small businesses and their counsel have been able to use the information provided in my blog posts to protect their rights. On the third page of the exchange of emails between PFP's counsel and Mr. Schutz. I have marked a clause that is quoted in the opposition brief. I have also redacted phone numbers, email addresses and the identity of Marshall Black's employer.

39. In most of the cases, my interlocutors—lay as well as lawyers—express gratitude for the suggestions and say that they found them effective. Putting information in the hands of the victims, so that they can protect themselves, is why I publish the articles.

40. I never charge the people who call me for advice on dealing with plaintiff (just as I never charge clients whom I represent in litigation against plaintiff or other copyright enforcers).

41. I believe that plaintiff is engaged in unjustified bullying of small businesses that

have made a mistake, usually an innocent mistake, and that are being extorted for unjustifiably high settlements which, I believe, the businesses often pay because they do not find competent counsel who charge less than a few thousand dollars. In the absence of knowledge, and in the absence of insurance that provides coverage for advertising injury (which, in my experience, many of PFP's targets lack), paying a strike settlement is their only reasonable course. It is my opinion that the only way plaintiff has been able to get away with this practice is that it avoids having to defend its contention about the damages it can collect in a contested case.

42. I concluded, however, that publishing articles and talking to victims who saw them was not sufficiently effective in putting a stop to PFP's excessive enforcement scheme—it was continuing to file lawsuits, sometimes more than once a week, and presumably continued to extract excessive settlements. In addition, I had to assume it was still sending demand letters to many victims who never figured out the flaws in its arguments, and who may therefore have acceded to PFP's demands in order to prevent the filing of a lawsuit that they felt they could not afford to defend. I concluded that the only way to bring a halt to these abuses was to represent a defendant that had actually been sued, and that was willing to risk defending itself in court instead of settling for a sum that was unjustified in light of the governing law of copyright damages. Following the tradition established in such cases as *In re Primus*, 436 U.S. 412 (1978), I contacted a few of the companies that PFP sued, hoping to provide them with information about their rights, and hoping as well to find a good case in which PFP would have to justify the legal theories

about the discovery rule and copyright damages on which its enforcement campaign was credited. My conversation with the management of defendant Pool World persuaded me that theirs would be a good test case in which to force PFP to justify both its damages claims and its lawsuits against targets who obtained images during the period when they were available for licensing on iStock.

43. We have been clear with PFP's counsel from the outset of this litigation that, if does not want to defend its claims in this case in adversary litigation on the merits, it will have to dismiss the lawsuit and either settle the issue of attorney fees or litigate that issue, defending the reasonableness of its legal position in that context. *See Kirtsaeng v. John Wiley & Sons*, 579 U.S. 197 (2016).

44. In the course of our communications with PFP's counsel during the course of this litigation, and from the outset of the litigation, we have explained that Pool World is ready to litigate the merits to the finish, both in this Court and on appeal if necessary, and that if PFP is unwilling to litigate the merits it will need to dismiss with prejudice and either settle Pool World's claim for attorney's fees and costs, or litigate that issue after dismissal. We have described in detail the legal and factual arguments we expect to make both on the statute of limitations issue and on its damages theory and we have warned PFP's counsel that if it loses on either of these arguments the ruling rejecting its arguments may be used by other litigants invoking non-mutual offensive collateral estoppel. I believe it is the risk of incurring adverse rulings on these matters, not to speak of an award of statutory attorney fees, that impelled PFP to seek a lengthy stay of the litigation pending mediation, giving it

six more months to send more demand letters and file more lawsuits invoking the legal theories that it seeks to avoid justifying to this Court, and that now has led PFP to seek a dismissal without prejudice.

45.  After filing its motion to dismiss without prejudice, PFP asked Pool World to agree to a further stay of the litigation.  Pool World declined to agree to a further stay but indicated that it would not seek further action from the Court until the scheduled hearing date on the motion to dismiss.  See Exhibit X.

46.  I attach as Exhibit Y two excerpts from the transcript of the deposition of Rebecca Jones in *Prepared Food Photos v. WeNeedaVacation.com*, No. 1:23-cv- 11085 (D. Mass.).  She acknowledged that $12,000 is more than a single PFP photograph is worth, and she identified a company in addition to iStock through which PFP sold licenses in the period before 2016; licensing income from that company was omitted from PFP's interrogatory responses in this case, apparently deliberately.

47.   I attach as Exhibit Z an excerpt from the transcript of the deposition of Douglas Fleurant in *Prepared Food Photos v. WeNeedaVacation.com*, No. 1:23-cv- 11085 (D. Mass.), in which he indicated that searching for infringements is the main work on which PFP's staff spend their time.

48.  I conducted a search of the Copyright Registry maintained online by the United States Copyright Office.  It reveals that in the years 2016 and 2017, under its former AdLife name, plaintiff registered its copyright in thousands of photographs allegedly taken by its staff in the years from 1994 to 2017, the vast majority taken in the 1990s.  No registrations

of photographs taken after July 2017 appear on the Copyright Registry.  No photos have been registered under the name Prepared Food Photos.

49.  The dockets for three recent lawsuits brought by Prepared Food Photos against small businesses that were able to afford counsel to defend against its claims can be accessed on CourtListener as follows:

*Prepared Food Photos v. Arcadia Academy*, No. 4:23-cv.00163 (E.D. Mo.), https://www.courtlistener.com/docket/66809127/prepared-food-photos-inc-v-arcadia-academy-llc/)

*Prepared Food Photos v. WeNeeda Vacation.com*, No. 1:23-cv-11085 (D. Mass.), https://www.courtlistener.com/docket/67388642/prepared-food-photos-inc-v-weneedavacationcom-llc/

*Prepared Food Photos v. Clyde's Chicken King*, No. 6:24-cv- 00351 (W.D. La.), https://www.courtlistener.com/docket/68323529/prepared-food-photos-inc-v-clydes-chicken-king-inc/

Pursuant to 28 U.S.C. § 1746, I hereby certify under penalty of perjury that the foregoing is true and correct. Executed on August 30, 2024.

_____/s/ Paul Alan Levy_____