Paul Alan Levy (pro hac vice)
Public Citizen Litigation Group
1600 20th Street NW
Washington, D.C. 20009
(202) 588-7725
plevy@citizen.org

Stephen Kirby
Kirby Law Office, PLLC
WSBA #43228
1312 N. Monroe St.
Spokane, Washington 99201
(509) 795-4863
kirby@kirbylawoffice.com

Phillip R. Malone (pro hac vice)
Juelsgaard Intellectual Property and Innovation Clinic
Mills Legal Clinic at Stanford Law School
Crown Quadrangle, 559 Nathan Abbott Way
Stanford, California 94305-8610
(650) 724-1900
pmalone@stanford.edu

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| PREPARED FOOD PHOTOS, INC., f/k/a ADLIFE MARKETING & COMMUNICATIONS CO., INC., a Florida for profit corporation,<br><br>Plaintiff,<br><br>v.<br><br>POOL WORLD, INC., a Washington for profit corporation,<br><br>Defendant. | No. 2:23-cv-00160-TOR<br><br>**DEFENDANT'S MOTION TO COMPEL DISCOVERY**<br><br>Hearing November 22, 2024<br>6:30 PM |

Defendant Pool World, Inc., moves to compel plaintiff Prepared Food Photos, Inc. ("PFP") to respond to three document requests that bear on the validity and amount of PFP's damages claim. Repeated meet and confers have not resolved this dispute.

## FACTUAL BACKGROUND

Plaintiff PFP, formerly known as AdLife Marketing and Communications, maintains a large database of food photographs. In this case, PFP alleges that a composite image that Pool World posted to one of its websites in 2010 contained a photograph of grilled vegetables in which PFP held the copyright. PFP claims that Pool World's posting of the composite image infringed its copyright. Its Initial Disclosures indicate that PFP seeks damages in the amount of $11,992 per year of alleged infringement, totaling more than $100,000 for the twelve-year period.

For the first twenty-odd years of its existence, from about 1994 to 2016, AdLife provided its database of photos to stock photo services, including iStockPhotos.com ("iStock"), a subsidiary of Getty Images, which in turn made them available for licensing to customers on an individual, photo-by-photo basis. *See* Levy First Aff. ¶ 9.[1] During this time, iStock's licenses were "royalty-free," meaning that they allowed use of the image on multiple occasions and for an indefinite period of time. *See id.*, Exhibit E; Levy Third Aff. ¶ 5 & Exh. O, DN 55-4 at p. 93; https://en.wikipedia.org/wiki/Royalty-free. The charge for such individual-photo

---

[1] Levy First Affirmation was submitted with Pool World's first motion to compel, DN 21-1. Levy Second Affirmation was submitted with Pool World's Motion to Amend, DN 26-1. Levy Third Affirmation accompanies Pool World's Opposition to the Motion to Dismiss Without Prejudice, DN 55-1. The exhibit letters are sequential from one affirmation to the other.

licenses was a few dollars at most. *See* Levy Third Aff. ¶ 3 & Exh. N.

In 2016, PFP pulled all of its images from stock websites, registered them with the Copyright Office, and moved from a business model based on collecting licensing fees for use of its photos via stock services to a new business model that, as PFP's owner has candidly admitted in a blog post, is based on making money through copyright enforcement—sending demand letters and filing lawsuits for alleged infringement. *See* Levy Third Aff. ¶ 8 & Exh. R.  PFP now contends that its lost license fee from the infringement should be calculated based, not on its previous per-image licensing arrangements, but rather on the new licensing scheme that it adopted in 2016, whereby parties cannot buy licenses to use individual photographs. According to the demand letter that PFP sent to Pool World in 2022, PFP only makes its photos available to companies that are willing to pay $999 per month, for a minimum period of twelve months; on this theory, the actual damages recoverable for Pool World's use of a single photo are $11,992 per year. *See* Answer, Exhibit A, DN 7.  That theory was repeated in PFP's initial disclosures.  Levy Third Aff., Exh. Q.

In its first round of written discovery requests, Pool World sought production of the subscription agreements that form the basis for PFP's damages calculation and demands. Levy First Aff., Exh. A, Requests for Production 4 and 5.  PFP produced these agreements four months later, Levy Third Aff. ¶ 13, and it was apparent that many of them reflected substantially lower charges than $999 per month—as low as $99 per month.  Most of these agreements were entered for a period of one year,

subject to being renewed (or terminated) upon notice. *Id.* ¶ 17.

What's more, some of the agreements showed on their face that they had been entered, not in the course of a market-based licensing arrangement, but in settlement of a legal dispute over alleged infringement. *Id.* ¶ 19. Even for agreements that did not recite that they were part of a settlement, undersigned counsel was able to talk with staff or owners at several companies that had signed agreements, and each said that their company had subscribed to settle threatened litigation, not for the normal business purpose of getting access to photos in PFP's database. *Id.* ¶¶ 19-20.

Moreover, some of the agreements were entered after PFP asserted an infringement claim against the subscriber. *See*, *e.g.*, Levy Third Aff. ¶ 21 & Exhs. T and U. That timing further suggests that the agreements had been entered, not in the normal course of business to obtain access to PFP's database of photos, but rather as settlements to resolve infringement claims. If so, this fact would refute the basis for PFP's damages claims in this case that its "subscription agreements" reflect the market value that companies routinely attach to future access to its photos, that is, by paying for subscriptions of $999 per month and a minimum of twelve months.

The agreements produced thus far in discovery also call into question the accuracy of PFP's answer to Pool World's interrogatory asking PFP to reveal the amount of income made from its license subscriptions in the post-2017 period. The income projected by the one-year agreements provided in discovery was much lower than the amounts of subscription income that PFP has claimed in a response to Pool

World's interrogatory. Levy Third Aff. ¶ 18. It is possible that some of the agreements were extended for more than the initial one-year (or six month) term. From the agreements themselves, however, it was not possible to reconstruct which, if any, were extended for more than the initial period; nor was it possible to ascertain whether the income figures provided were accurate. *Id.*

In light of the discrepancies described above, Pool World served additional discovery to ascertain the real facts about PFP's supposed subscription business. The new document requests sought production of:

- all communications, and records of communications, with persons that entered into subscription agreements that were the subject of Requests for Production Nos. 4 and 5 [i.e., the requests for the agreements as noted on page 3].

- all documents reflecting payments pursuant to subscription agreements that were the subject of Requests for Production Nos. 4 and 5.

- all communications among your staff, or with your representatives, or with any other person, about subscription agreements (or proposed subscription agreements) that were the subject of Requests for Production Nos. 4 and 5.

Levy Third Aff. ¶ 22, Exh. V.

PFP refused to produce the documents, contending that they had no legitimate bearing on the issues in this litigation. *See id.* Pool World's counsel promptly asked to meet and confer about a proposed motion to compel, explaining in detail the intended basis for the motion. PFP then sent Pool World a proposed motion to mediate the case, in the meantime asking the Court to suspend the litigation schedule. *Id.* ¶¶ 24, 25. Following the unsuccessful mediation, Pool World renewed its request to meet and confer about this issue. That meet and confer was not successful.

## ARGUMENT

PFP seeks damages for each month of alleged infringement for a twelve-year period. *See Warner Chappell Music v. Nealy*, 144 S. Ct. 1135 (2024) (when the discovery rule is justified, plaintiff can seek damages for the entire period of infringement). The documents requested are sought to enable Pool World to defend itself against PFP's claim that it is entitled to $999 in actual damages for each of the 145 months from the 2010 posting of a single image to the 2022 removal of that image. As previously noted, one of the arguments that Pool World intends to make in support of a motion for summary judgment will challenge PFP's damages theory as contrary to well settled precedent in the Ninth Circuit and elsewhere holding that damages are based on "not what the owner would have charged, but rather what is the fair market value" of the infringed work, *Jarvis v. K2, Inc.*, 486 F.3d 526, 534 (9th Cir. 2007), *quoting On Davis v. The Gap*, 246 F.3d 152, 166 (2d Cir. 2001). The market value of one photograph is plainly far less than the value of an ongoing yearly subscription to a database of 20,000 photos.

But Pool World is also entitled to contest the factual basis for PFP's claim that $999 is the market value of access to its entire database of photos. To do so, Pool World needs to ascertain the periods of time during which PFP accepted subscription payments as low as $99 per month, $300 per month, or other amounts below $999. Documents responsive to Request 15 will show the months when amounts lower than $999 were accepted, and documents responsive to Requests 14 and 16 will show

communications about the availability and continuation of such lower monthly payments.

Moreover, to respond to PFP's damages claim, Pool World needs to learn whether any of the subscription agreements were entered for the alleged business purpose of obtaining access to PFP's database of photos, or whether all or most of the subscription agreements on which PFP relies for its measure of damages were entered into as a way of making payments to settle claims of past infringement or avoid future claims for the use of photographs downloaded during the pre-2017 period when PFP was making its images available through stock photo services such as iStock.

Pool World can use this information to argue, as a matter of fact, that such subscription agreements do not provide probative evidence of the market value of obtaining **future** access to PFP's individual photos. Documents responsive to Requests 14 and 16 would both reveal the circumstances in which each subscription agreement was entered and shed light on the reasons why each subscriber chose to enter an agreement—whether to get future access to the photos for its business or to remedy past infringing use of the photos.

Document Request 15 also bears on this question. Documents showing that subscribers dropped their "subscriptions" immediately at the end of the initial period could help establish that marketplace access to the photos was not the real reason for the subscription. In other words, these documents would help determine whether PFP's contention that it sells future access to even a single one of its images only by

an expensive monthly subscription to 20,000 images is a pretense.

The fruits of this discovery may also bear on the credibility of Rebecca Jones, a PFP officer who was identified in PFP's Initial Disclosures as one of its two witnesses in support of PFP's damages claims. Jones signed the interrogatory answers in this case, and she has filed many affidavits in support of PFP motions for default judgments in other cases, attesting to the subscription agreements, stating that they are the only way PFP markets its images, and claiming that they were only offered for $999 per month during the relevant periods in those cases. But the information Pool World has obtained by interviewing PFP subscribers suggests that Jones may have made false statements in these sworn documents. The documents showing how PFP actually obtained its subscription agreements, and what levels of monthly subscription payments PFP was willing to accept during the damages periods to which Jones was attesting in these other cases, might well be a basis for impeaching her credibility as a witness in this case.

Ultimately, these issues may have to be pursued by deposing the officer at PFP who negotiated with subscribers and by Rule 45 discovery directed to some subscribers. But Pool World seeks to focus its potential deposition questions, and avoid imposing needlessly on subscribers who are not parties to this litigation, by seeking relevant documents from PFP itself.

## CONCLUSION

The motion to compel discovery should be granted.

Respectfully submitted,

  /s/    Paul Alan Levy
Paul Alan Levy (pro hac vice)
Public Citizen Litigation Group
1600 20th Street NW
Washington, D.C. 20009
(202) 588-7725
plevy@citizen.org

  /s/ Stephen Kirby
Stephen Kirby
Kirby Law Office, PLLC
WSBA #43228
1312 N. Monroe St.
Spokane, Washington 99201
(509) 795-863
kirby@kirbylawoffice.com

  /s/ Phillip R. Malone
Phillip R. Malone (pro hac vice)
Juelsgaard Intellectual Property
 and Innovation Clinic
Mills Legal Clinic at Stanford Law School
Crown Quadrangle, 559 Nathan Abbott Way
Stanford, California 94305-8610
(650) 724-1900
pmalone@stanford.edu

Attorneys for Defendant

October 23, 2024

## CERTIFICATE OF SERVICE

I hereby certify that, on this 23rd day of October, 2024, I am filing this motion to compel discovery by the Court's ECF system, which will effect service on counsel for plaintiff, Max Archer and Lauren Hausman.

                    /s/   Paul Alan Levy
Paul Alan Levy (pro hac vice)
Public Citizen Litigation Group
1600 20th Street NW
Washington, D.C. 20009
(202) 588-7725
plevy@citizen.org

October 23, 2024