Paul Alan Levy (pro hac vice)
Public Citizen Litigation Group
1600 20th Street NW
Washington, D.C. 20009
(202) 588-7725
plevy@citizen.org

Stephen Kirby
Kirby Law Office, PLLC
WSBA #43228
1312 N. Monroe St.
Spokane, Washington 99201
(509) 795-4863
kirby@kirbylawoffice.com

Phillip R. Malone (pro hac vice)
Juelsgaard Intellectual Property and Innovation Clinic
Mills Legal Clinic at Stanford Law School
Crown Quadrangle, 559 Nathan Abbott Way
Stanford, California 94305-8610
(650) 724-1900
pmalone@stanford.edu

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| PREPARED FOOD PHOTOS, INC., f/k/a ADLIFE MARKETING & COMMUNICATIONS CO., INC., a Florida for profit corporation,<br><br>Plaintiff,<br><br>v.<br><br>POOL WORLD, INC., a Washington for profit corporation,<br><br>Defendant. | No. 2:23-cv-00160-TOR<br><br>**FIFTH AFFIRMATION OF PAUL ALAN LEVY** [REDACTED]<br><br>Hearing March 28, 2025<br>6:30 PM |

1. My name is Paul Alan Levy. I am lead counsel for defendant Pool World. I make this affirmation in support of defendant's motion to enforce the Court's order compelling plaintiff Prepared Food Photos ("PFP") to produce documents.

2. My co-counsel and I conferred by phone with Daniel DeSouza and Lauren Hausman, counsel for PFP, about the issues raised by this motion to enforce on

February 5, 2024, as well as other issues pertaining to adequacy of PFP's compliance with the Court's Order, and we have exchanged several detailed emails about these issues, beginning on January 10 and continuing past the February 5 meet and confer into the last few days of February.

3. Plaintiff produced a number of documents in purported compliance with the court's order to produce documents requested by Request 14 ("Produce all communications, and records of communications, with persons that entered into subscription agreements that were the subject of Requests for Production Nos. 4 and 5") and Request 15 ("Produce any and all documents reflecting payments pursuant to subscription agreements that were the subject of Requests for Production Nos. 4 and 5"). Requests 4 and 5 sought copies of the PFP subscription agreements on which it predicates its claim for roughly $145,000 in lost license fees. Although the response to Request 14 was incomplete (as discussed later in this affirmation), the response to Request 15 was so incomplete (and so heavily redacted) as raise issues under Rule 37(a)(4).

4. The initial response to Request 15 included a few large checks, as well as disbursement memoranda from PFP's counsel CopyCat Legal that reflected large lump sum payments by each of the "subscribers" whose agreements were signed in 2022 and 2023, indicating that these subscribers were settling infringement claims. The memoranda were heavily redacted without any explanation. An example of the redacted disbursement memoranda is attached as Exhibit DD. Beyond that, the

response to Request 15 consisted largely of a set of short excerpts of monthly statements from Bank or America dated from June 2020 to November 2024, also very heavily redacted (see infra ¶ 6). But because many of the subscription agreements date back to 2017, Request 15 called for payment records beginning then.

5. PFP's counsel supplied an affidavit from PFP's President, Douglas Fleurant, saying that PFP keeps its documents for only four years, and then routinely discards them. (A copy of that affidavit is attached as Exhibit EE). After I pointed out to PFP counsel that Bank of America provides online access to bank statements for seven years, PFP provided an additional tranche of bank statements going back to January 2018 (that is, seven years before the date of this additional compliance in January 2025). It appears that the bank statements from January 2017 through December 2017 were not preserved (that is, that PFP failed to download them from Bank of America's online customer portal as soon as Request 15 was served in January 2024; hence they likely disappeared from the online portal over the following year as the seven year window moved up, even though they were requested in time to preserve them).

6. But even the bank statements that were provided in discovery were not in compliance with the Court's order. As shown by the examples attached as Exhibit FF, PFP has provided two to four pages out of bank statements which, as pagination at the bottom of each statement reveals, were several pages long, some as long as 18 pages. (Exhibit FF also includes the list of filenames of the documents initially

provided on December 30 in response to Request 15, with company names redacted). And even the few pages from the bank statements that were produced are heavily redacted, with only one or more entries on each statement not redacted. And on some of the statements, every one of the entries was redacted. The document request included instructions specifically reminding PFP of the duty to assert and explain any withholding of documents or parts of documents. The request is attached as Exhibit GG. PFP did not object to that aspect of the document request. See DN 55-12, page 156. Nor did PFP argue, in opposition to Pool World's motion to compel, that the documents requested contained privileged or otherwise confidential information that needed to be protected from disclosure. This Court order did not authorize redaction.

7. The redactions to the bank statements are so extensive that counsel can barely make heads nor tails of them. We provided PFP counsel with a list of cases holding that documents must be produced in unredacted form. Neither in response to this email, nor during the February 5 telephonic meet and confer, did PFP counsel engage with the caselaw. PFP counsel Daniel DeSouza simply said that his client did not want to disclose the redacted information, which it claims is unrelated to the issues in this case.

8. During the meet and confer telephone conversation on February 5, Mr. DeSouza implied that many of the payments redacted from the Bank of America statements reflected disbursements from his firm, and from other firms that previously conducted PFP's demand letter practice, providing the fruits of their infringement

claims against companies that were **not** subscribers. Mr. DeSouza did not explain why PFP has a legitimate interest in concealing that information. He did not assert that any redacted material was privileged. Nor did he take up the offer from Pool World's counsel to discuss any reasoning about why PFP had a legitimate interest in keeping certain information in the bank statements confidential.

9. But Pool World can use the relevant information about PFP's total revenue from making copyright claims, which Mr. DeSouza has indicated would be reflected in the redacted disbursement memoranda and bank statements, as part of its defense of this case. PFP presents itself as being a company that takes photos and sells monthly licenses to those photos for $999 per month; Pool World intends to show that PFP's primary activity and primary source of revenue is settlements (and default judgments) extracted from alleged copyright infringers that cannot afford to defend themselves, rather than by selling prospective licenses for use of the photos in its database.

10. Across the complete set of Bank of America statements, four categories of entries have been left unredacted—transfers from different Bank of America accounts; transfers from an entity called "Stripe"; payments by BadAdz Digital, a fellow company of PFP which is owned by PFP's owner Joel Albrizio; and monthly payments in amount of $499 from a company shown in the bank statements as "*REDACTED*"

11. I am filing the public version of this affidavit in redacted form (with an unredacted version to be filed under seal), because when we received the set of subscription agreements requested in Document Requests 4 and 5, we agreed to keep the names of PFP's subscribers confidential. And the name "*REDACTED*" appears to correspond with a supermarket chain called "*REDACTED*," which signed a subscription agreement in 2017 requiring monthly payments of $499. (That agreement is attached, with the company name redacted, as Exhibit HH). In this case, Pool World has claimed for purposes of calculating damages that it charges a minimum $999 monthly subscription fee. Discovering whether other subscribers, like *REDACTED*, paid substantially less than the claimed minimum during the period of time for which PFP is seeking damages for lost license fees is essential to Pool World's defense that PFP's damages calculation is not only excessive but based on false representations about the minimum monthly fee that PFP demands for access to its database of photos.

12. One of the other Bank of America accounts from which payments were made into the Bank of America accounts whose statements **were** produced (the account name is not redacted) was from "Bank of America Merchant Services." The provided bank statements are so heavily redacted that we cannot tell whether statements from the Merchant Services account have also been provided. However, the Bank of America website shows that Bank of America Merchant services includes credit card processing. https://promotions.bankofamerica.com/paymentsolutions/

business-payment-processing. So far as we can see, no statements showing credit card payments have been provided from PFP's merchant services account, or from any account other than the payments from the company identified in ¶¶ 10 and 11. We have asked PFP counsel to clarify whether such an account is one way PFP has received subscription payments, and if so to produce the statements. PFP has not responded to that query; Pool World reserves judgment about whether a motion to enforce will be warranted until after that matter has been fully addressed.

13. Most of the subscription agreements provide that the monthly payments are to be made by credit card. Thus, it is important to be able to have access to the statement from credit card processors, including the Bank of America Merchant Services Account, whose payments into another PFP Bank of America account apparently reflect payments by subscribers.

14. The company Stripe is also a payment processor; its website is www.stripe.com. Moreover, among the documents initially provided in response to Request 15 were a pair of spreadsheets showing the gross amount of "monthly subscription receipts" received from a "third party vendor" during two periods of time in 2020 and 2023-2024. Because it appeared that Stripe is a third party vendor through which PFP's subscribers are making their monthly subscription payments, Pool World have asked PFP to produce the monthly detail of payments that all payment processors, including Stripe, received from each subscriber.

15. This information could be very significant in assisting Pool World's response to PFP's damages claims because it would show how many other subscribers are paying less than $999 per month, perhaps even less than the $499 a month apparently received from *REDACTED*. For example, one of subscription agreements produced in discovery, signed in May 2019, provided for an annual subscription payment of $1188 (that is, $99 per month). A copy of that agreement, with *REDACTED* located in Alabama, signed by its ad manager *REDACTED*, is attached as Exhibit II. And several of the documents provided in response to Request 14 are emails to representatives of current subscribers, one of which is *REDACTED*. One such email is attached as Exhibit JJ. The domain name *REDACTED* resolves to the website of a company called *REDACTED*, located at the same address in Alabama as the signer of Exhibit HH. The implication is that the company that signed the $99 per month agreement is still a subscriber. The payment detail from Stripe would reveal whether that company continued to pay an annualized $99 per month throughout the period during which PFP contends that the lost license fee that it is entitled to recover from Pool World is $999 per month. Based on scrutiny of the emails to subscribers and comparing the domain names to the subscription agreements, counsel concluded that revealing the discrete payment information from payment processors such as Stripe could identify other subscribers that may be paying less than $999 per month.

16. PFP initially refused to produce documents showing the monthly payment detail from Stripe on the ground that Stripe is a third party whose records are outside PFP's possession, custody or control. Undersigned counsel pointed out in response that Stripe's own website indicates that users "own" their data on Stripe, that Stripe "make[s] sure that you have access to this data," and that Stripe "makes all your transactional data available within an interactive SQL environment in the Stripe Dashboard." See https://docs.stripe.com/get-started/data-migrations/pan-export; https://docs.stripe.com/stripe-data/access-data-in-dashboard. But during the meet and confer on February 5, PFP counsel Lauren Hausman related that she had discussed access to Stripe with her client's officer Douglas Fleurant that very day, just before our call, and that Fleurant "swore up and down" that he had no access to account detail at Stripe, and had no idea how to get it. Counsel also represented that their client had said that they did not need subscriber-by-subscriber payment data because they knew what total payments were expected each month, and if that total were not met, then they would know that someone wasn't paying.

17. Since that meet and confer, counsel for PFP acknowledged that their client's granular data is, in fact, available on Stripe's database, and on the evening of February 21, they produced spreadsheets showing Stripe payment data for each month from 2017 to 2024. The spreadsheets are attached as Exhibit KK (with names and email addresses redacted). They reveal monthly payment data for only **one** subscriber in most of the months from 2017 to 2020, for no subscribers in 2021 and 2022, and

for several subscribers in 2023 and 2024. The monthly payment amounts in the latter years including monthly payments of $95, $299, $499 (not *REDACTED*.), $500 and $750.  In sum, no individualized payment data regarding each subscribing company has been provided for any period from 2017 to 2022, other than the one subscriber per month data in 2017 to 2020, and payments to Bank of America from the supermarket chain discussed in paragraphs 8 and 9, above.  PFP counsel represented that their client has no access to data from other (unidentified) "prior" payment processors for other years.  Considering that PFP told its counsel the same thing about Stripe, until we were able to show PFP counsel that their client's representation was wrong, Pool World cannot take PFP's representations about access at face value,  but will continue to confer about getting access to individualized payment data.  Until that process is completed, Pool World reserves judgment about whether a further motion to enforce, or a motion for spoliation remedies for failure to preserve relevant documents, will be warranted.

18.  In this regard, none of the documents produced show the amount of payments received from *REDACTED*.  Considering that Exhibit JJ implies that this company remains a subscriber, it beggars belief that PFP would have no documents showing its periodic payments.

19. The complaint in this case, dated June 2, 2023 alleges, in the present tense, that PFP "charges its clients . . . a minimum monthly fee of $999.00." It appears that this allegation was false at the time.  And throughout 2023 and 2024, PFP's Director

of Intellectual Property Rebecca Jones submitted affidavits in support of default judgment motions in other PFP infringement lawsuits, and PFP submitted briefs that it knew would be considered ex parte, asserting that $999 is the minimum subscription fee. These averments appear to conflict with the Stripe payment data now provided.

20. There are also serious reasons to doubt that PFP has fully complied with the Court's December 16 order to respond fully to Request 14. For example, many of the subscription agreements provide that the agreements terminate after one year (or some other period) unless they are expressly renewed. Review of the domain names of the recipients in a number of the emails provided in compliance with Request 14 resolve to the email addresses of known subscribers. But PFP has not produced any correspondence about renewal, nor any renewal agreements for companies whose initial monthly fees were under $999 (which would reveal whether the rates were still under $999). Moreover, a February 2024 email included a thread between PFP owner Joel Albrizio and Rebecca Jones and Douglas Fleurant, including the following:

> joel albrizio <joel@bad-adz.com>                                   Fri, Feb 2, 2024 at 8:18 PM
> To: Rebecca Jones <rebecca@preparedfoodphotos.com>, Doug Fleurant <doug@bad-adz.com>
>
> This price must move to $999 upon expiration or they are out! Give them proper notice.......Let me know the date of expiration, Joel

21. Plainly, all of PFP's principals are aware that some subscribers are paying less than $999 per month, despite PFP's contrary representations in this case and others. But the email, or two emails, that produced Albrizio's reaction have not been produced. ("[Quoted text hidden]" appears in very faint grey, repeated twice, below Albrizio's emphatic direction), have not been produced. Nor has the email to the subscriber, "giv[ing] proper notice," been produced; nor have any responses from the subscriber been produced. Nor have **any** other emails giving notice about contract extensions or terminations been produced. But the Albrizio email implies that there is a standardized approach to such notices. The implication here is that there is a whole category of emails that may have been missed.

22. During the February 5 telephonic meet and confer, counsel for PFP Mr. DeSouza provided a detailed explanation of how his email records had been searched for responsive documents (noting that his firm deletes all email after one year), but there was no explanation about how PFP's own emails had been searched. PFP counsel had not responded to questions about how that search was conducted.

23. Moreover, a number of the domain names of the recipients of the emails provided in response to Request 14 (including Exhibit JJ) resolve to websites of companies for which no subscription agreements were provided in response to Requests 4 and 5.

24. Pool World reserves judgment about whether a further motion to compel or to enforce the Court's December 2024 order regarding these missing

communications requested by Request 14 is warranted until PFP has fully addressed these concerns, or declined to address them.

        Pursuant to 28 U.S.C. § 1746, I hereby certify under penalty of perjury that the foregoing is true and correct. Executed on February 25, 2025.

        _____/s/ Paul Alan Levy_____