Paul Alan Levy (pro hac vice)
Public Citizen Litigation Group
1600 20th Street NW
Washington, D.C. 20009
(202) 588-7725
plevy@citizen.org

Stephen Kirby
Kirby Law Office, PLLC
WSBA #43228
1312 N. Monroe Street
Spokane, Washington 99201
(509) 795-4863
kirby@kirbylawoffice.com

Phillip R. Malone (pro hac vice)
Juelsgaard Intellectual Property and Innovation Clinic
Mills Legal Clinic at Stanford Law School
Crown Quadrangle, 559 Nathan Abbott Way
Stanford, California 94305-8610
(650) 724-1900
pmalone@stanford.edu

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| PREPARED FOOD PHOTOS, INC., f/k/a ADLIFE MARKETING & COMMUNICATIONS CO., INC., a Florida for profit corporation,<br><br>Plaintiff,<br><br>v.<br><br>POOL WORLD, INC., a Washington for profit corporation,<br><br>Defendant. | No. 2:23-cv-00160-TOR<br><br>**SIXTH AFFIRMATION OF PAUL ALAN LEVY**<br><br>Hearing March 28, 2025<br>6:30 PM |

1. My name is Paul Alan Levy. I am lead counsel for defendant Pool World. I make this affirmation in support of defendant's motion to enforce the Court's order compelling plaintiff Prepared Food Photos ("PFP") to produce documents.

2. The opposition to that motion raises several issues that PFP's counsel never addressed during our efforts to meet and confer in advance of filing the motion, and

makes several unsubstantiated statements of fact which are, in fact, misleading or incorrect. The main purpose of this affirmation is to provide the facts relating to those concerns.

3. As noted in my Fifth Affirmation, my co-counsel and I made many attempts to meet and confer with counsel for PFP before filing the motion to enforce the Court's order, including a Zoom call on February 5, 2025. Throughout that period, we explained to PFP's counsel that even though, under authority we cited to them, they could be held to have waived any claims of privilege or need for confidentiality, we were ready to engage in a discussion about the need to avoid disclosing any categories of redacted material to see if we could find a solution to the dispute. But counsel for PFP did not provide any specifics needs for confidentiality. At no time did counsel for PFP raise **any** of the allegations about need for confidentiality that are put forward in the opposition brief or its supporting affidavits. PFP's only objection was relevance.

4. Shortly before the motion to enforce was filed, PFP produced another tranche of documents, including, for example, the Stripe spreadsheet attached to my Fifth Affirmation as Exhibit KK. Because this production raised more questions about withheld material, we attempted to discuss those with counsel for PFP. For example, it became clear that there must have been another payment processor; I asked what company that was. My Fifth Affirmation alludes, in ¶¶ 17-18 and 22-24, to our efforts to engage on those issues. Similarly, we asked PFP counsel to identify

the other payment processor so that we could explore whether its records of subscriber payments were accessible.

5. PFP outright refused to engage in further discussions, saying that our only recourse to get more information would be to take oral depositions of PFP's officers pursuant to Rule 30(b)(6). As a result, the information about payment processor Payeezy discussed in the Fleurant Affirmation, and about PFP's failure to preserve its records of payments via Payeezy from subscribers, was disclosed to undersigned counsel for the first time in that affirmation.

6. We explained to PFP's counsel that we consider it imperative to get access to the pertinent documents **before** the oral depositions because it appeared from what we had seen that their clients' officers had been less than truthful in the past. Paragraph 19 of my Fifth Affirmation shows that Rebecca Jones, an officer of PFP, has submitted many false affidavits in support of default judgment motions (a context in which she had reason to believe that her false statements would not be exposed). Paragraphs 16 and 17 of that affirmation show that Douglas Fleurant, another PFP officer, misled his counsel about the accessibility of Stripe data.

7. PFP contends that Pool World "has not endeavored" to depose its officers. Opposition page 7. This is not correct. Pool World actively pursued the scheduling of depositions in a manner that will best suit the needs of PFP's counsel and its officers, who live in different parts of the East Coast. On March 14, PFP's counsel finally agreed that his client's officers would appear for depositions in Florida, where

he has his offices. At this writing, we are waiting for confirmation of the dates when the officers based in Rhode Island will be available in Florida.

8. Another false assertion in the Opposition, also on page 7, and also unsupported by a citation to the record, is that Pool World has not contended that PFP failed to provide subscriber agreements. To the contrary, my Fifth Affirmation, ¶ 23, mentions this problem, which we have repeatedly called to the attention of PFP counsel. In Exhibit KK, several of the entries showing monthly payments from subscribers for less than $999 are for companies whose subscription agreements have not been provided to Pool World. (The 2018 and 2021 subscription agreements from the two companies that the unredacted filing of Exhibit KK shows as paying $500 and $750, respectively, per month in 2023 and 2024, **have** been provided). And, because many of the subscribers have apparently renewed their initial subscription agreements, there must have been documents memorializing the renewals, which also have not been provided. Because the renewals could show whether monthly fees under $999 were continued, even though PFP failed to preserve records of monthly payments for most of its subscribers, it is important for Pool World to obtain these documents.

9. Yet another false assertion on page 7, again not supported by any citation to the record, is that Pool World has not contended that the subscription payments that could be projected from the settlement agreements provided in discovery could not be reconciled with the amounts of annual licensing income in the period

beginning in 2017 to which Rebecca Jones attested in her interrogatory answers. In fact, that precise concern was raised in Pool World's motion to compel discovery. DN 60 at pages 4-5, citing my Third Affirmation, ¶ 18.

10.  The Opposition at pages 5-6, supported by the Declaration of Douglas Fleurant, refers in passing to the fact that PFP "shares a bank account with another corporation [Bad-Adz] (which shares the same princip[a]l, Joel Albrizio)." The Opposition mentions this in passing (at 5-6), without specifically arguing that there is a legitimate basis for redacting entries relating to Bad-Adz. So far as Pool Word is aware, PFP supplies content to Bad-Adz; but no subscription agreement with Bad-Adz has been provided, nor is there any documentation of Bad-Adz paying a monthly fee for access to PFP's images. Moreover, in the threads of email communications between PFP and subscribers produced pursuant to the Court's December 16, 2024 order, Rebecca Jones often writes to both Albrizio and Fleurant in their capacity as officers of Bad-Adz, and Albrizio writes back in the same capacity—for example, the Albrizio email directing Jones to cut off any subscriber who does not increase its monthly payment to $999, set forth in my Fifth Affirmation at ¶ 21, was written from "joel@badadz.com." Similarly, when Albrizio warned Pool World owner Grady Early that "this case has the potential to cost you a ton of money," he signed the threat as president of Bad-Adz. It is unclear what steps PFP takes to maintain separation from Bad-Adz, and Pool World reserves the possibility of asking the Court to pierce the corporate veil.

11. PFP also cites the fact that the Court has not issued a protective order in this case. PFP, however, has not moved for entry of a protective order. In the meantime, discovery has continued with Pool World agreeing not to disclose one category of information—the names of PFP's subscribers. On February 13, 2025, PFP counsel sent Pool World counsel a draft protective order (based on a draft discussed in 2023). Pool World counsel sent PFP counsel an edited version of the proposed protective order on March 5, 2025. Notably, each of the drafts offered by the parties provided for protecting from public disclosure the identities of companies shown in financial records as making either subscription payments or payments pursuant to settlements that they were induced to enter by PFP's grossly exaggerated assertions about the minimum payments needed to subscribe to PFP's database. Until an agreed protective order is presented to the Court and so ordered, Pool World intends to refrain from revealing publicly the categories of information that would be confidential under the proposed protective order that the parties have been discussing, including the names of companies that have paid settlements to PFP where PFP shows that the agreements include a confidentiality requirement.

12. PFP objects to disclosing aspects of its bank statements reflecting its payroll payments. The names of PFP's employees may be relevant in investigating an affidavit, filed in one of PFP's other infringement actions, in which one of PFP's former employees levelled accusations of fraud against PFP (then called AdLife), and reporting similar concerns on the part of other employees. Declaration of Sharon

Ferretti in *AdLife Marketing and Communications v. Fareway Stores*, No. 4:17-cv-04254-SLD-JEH (C.D. Cal. Oct. 15, 2019), DN 44-7. AdLife contested the veracity of the affidavit, Motion to Exclude Affidavit, DN 45, and the case settled without any ruling on that issue. If Ferretti's accusations were true, it could cast serious doubt on the validity of PFP's copyright registrations, which are a jurisdictional predicate for this lawsuit, and otherwise undermine its accusations of infringement as well as its reliance on the equitable discovery rule exception to the statute of limitations. Pool World is investigating Ferretti's claims and determining whether to rely on them in this case. Identifying PFP's employees from its bank records could aid that endeavor.

13. PFP objects to producing sections of statements from CopyCat Legal showing settlement payments received on behalf of clients other than PFP. When Mr. DeSouza indicated that the redacted material to whose disclosure PFP objected included amounts secured in settlement of infringement claims, he did not specify that some of the claims were those his firm had asserted on behalf of other clients. Had he told us that, we would have responded that recoveries for clients other than PFP need not be disclosed. Pool World consents to redaction of recoveries for clients other than PFP.

14. PFP now concedes (in the Fleurant Declaration) that it failed to preserve records showing the great bulk of monthly subscriber payments from 2017 to March 2023 in the database of the "Payeezy" company. The Retailer Check emails, one

example of which was attached to my Fifth Affirmation as Exhibit JJ, reflect that some subscribers whose subscriptions originated in 2019 and 2020 continued that status in 2024, after PFP stopped using Payeezy. No payments from those companies are reflected in the Stripe payment spreadsheets for 2023 and 2024 submitted to the Court as Exhibit KK. PFP has not explained why it has not produced any records of payments from those companies. The names of such companies have been provided to PFP counsel, who have simply refused to answer questions about the discrepancy or to meet and confer on this issue.

          Pursuant to 28 U.S.C. § 1746, I hereby certify under penalty of perjury that the foregoing is true and correct. Executed on March 18, 2025.

          /s/ Paul Alan Levy