Paul Alan Levy (pro hac vice)
Public Citizen Litigation Group
1600 20th Street NW
Washington, D.C. 20009
(202) 588-7725
plevy@citizen.org

Stephen Kirby
Kirby Law Office, PLLC
WSBA #43228
1312 N. Monroe Street
Spokane, Washington 99201
(509) 795-4863
kirby@kirbylawoffice.com

Phillip R. Malone (pro hac vice)
Juelsgaard Intellectual Property and Innovation Clinic
Mills Legal Clinic at Stanford Law School
Crown Quadrangle, 559 Nathan Abbott Way
Stanford, California 94305-8610
(650) 724-1900
pmalone@stanford.edu

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| PREPARED FOOD PHOTOS, INC., f/k/a ADLIFE MARKETING & COMMUNICATIONS CO., INC., a Florida for profit corporation, ) ) ) ) ) | No. 2:23-cv-00160-TOR |
| Plaintiff, ) ) | **STATEMENT OF MATERIAL FACTS ABOUT WHICH THERE IS NO GENUINE ISSUE** |
| v. ) ) | |
| POOL WORLD, INC., a Washington for profit corporation, ) ) ) | Hearing: September 2, 2025 6:30 PM |
| Defendant. ) | |

1. Plaintiff Prepared Food Photos ("PFP") is a company that purports to be in the business of licensing stock photographs of food to commercial users.

Complaint, ¶ 8, DN 1.

2. Since 2016, PFP's main source of revenue, and the main occupation of its staff, has been looking online for alleged infringements of its decades-old photo library, sending demand letters to the alleged infringers, and suing small companies seeking tens of

---

thousands of dollars in damages.

Infra ¶¶ 20-29.

**The Grilled Vegetable Photo and PFP's Licensing Until 2016**

3.    PFP claims ownership of a copyright of a stock photograph of vegetables on skewers sitting on a grill ("Grilled Vegetable Photo").   It claims that this is one of the "tens of thousands of professional images" that it offers for licensing in what it calls its "library."

Complaint ¶¶ 7-8, 11-12 (DN 1).

4.    In the summer of 2010, defendant Pool World created a website to advertise its sale of grills.  It posted a composite image to that website that included part of the Grilled Vegetable Photo as well as part of a photograph of shrimp sitting on a grill.

Flynn Affirmation ¶ 4 (DN 55-17 at 202); Answer, Exhibit A (DN 7)

5.    In 2010, and until 2016, PFP (then known as AdLife Marketing and Communications") had an arrangement with iStock, a subsidiary of Getty Images, under which a portion of the photos in its library, including the Grilled Vegetable Photo, were available to license from iStock for as little as $1.

Teal Expert Report; Seventh Levy Affirmation (filed with this motion) ¶ 2 and Exhibit LL.

6.    The licenses sold by iStock were "perpetual," meaning that the purchaser of the license could use the photo indefinitely in the future, and could provide the photo to its customers for use for any purpose.

Teal Expert Report; Levy Third Aff. ¶¶ 5-6 and Exhibits O & P (DN 55-1 at 30, 55-5, and 55-6)

7. iStock did not inform PFP of the identity of the customers who were buying licenses for the use of PFP's photos; thus PFP had no way of knowing whether any given user of its photos was licensed.

First Levy Aff. ¶ 15 (DN 21-1 at 19).

8. The Grilled Vegetable Photo was one of approximately 4700 photographs that PFP made available for licensing through iStock.

Seventh Levy Aff. ¶ 3.

9. Between 2010 and 2016, iStock sold hundreds of licenses for use of the Grilled Vegetable Photo.

Seventh Levy Aff. ¶ 2 and Exhibit LL.

10. The licensees for the Grilled Vegetable Photo were charged as little as ninety-five cents ($.95) for a single license, and PFP's share of those license fees was as little as twelve cents ($0.12) for a single license.

*Id.*

11. In each of the years from 2010 to 2016, iStock paid PFP the following amounts in total license fees for the thousands of PFP photos it was licensing:

| | |
|---|---|
| 2010 | $15,476.88 |
| 2011 | $10,346.00 |
| 2012 | $ 7,715.99 |
| 2013 | $ 9,716.09 |
| 2014 | $16,850.97 |
| 2015 | $13,596.97 |
| 2016 | $ 5,471.91 |

The annual average was slightly more than $11,300.

Levy Seventh Aff., ¶ 4 and Exhibit M.

12.  The current market value of a license for the Grilled Vegetable Photo is about ten to twelve dollars.

Expert Report of Jessica Teal; First Levy Aff. ¶ 10 (DN 21-1 at 17).

13.  Not all of PFP's photos were licensed thrugh iStock.  The remainder were licensed through other companies, including a company called Multi-Ad.

Complaint in *Adlife Marketing & Communications Company, Inc. v. Multi-Ad Solutions, LLC*, No. 1:17-cv-01418, and Exhibits A and B.

14.  The licenses to use photographs sold through Multi-Ad were not "royalty free", but allowed the use of large numbers of photos for a single price.

Levy Fourth Aff. (DN 67-1) ¶¶ 11-13.

15.  The total income that PFP received from Multi-Ad and iStock combined in the years 2012 to 2016 was

```
2012  $  134,000
2013  $  124,493
2014  $  113,672
2015  $  104,428
2016  $  102,632
```

PFP stated that it had no records of income from licensing before 2012.

Levy Seventh Aff. ¶ 5 and Exhibit NN.

16.  Thus, the bulk of the licensing revenue that PFP received from these two companies combined was from licenses sold for the photos made available through Multi-Ad, not licenses sold for photos made available through iStock.

Supra ¶¶ 11 and 15.

**PFP's 2016 Change of Its Licensing Practices**

17.  In 2016, Plaintiff registered copyrights for all its images.  It stopped licensing the use of individual photographs through third-party vendors such as iStock and Multi-Ad, and instead began selling licenses itself, but only by subscription to its entire database.

Third Levy Aff. (DN 55-1), ¶ 8 and Exhibit R (DN 55-7).

18.  As described in a blog post by PFP's owner, he knew that PFP's images were being used without license, and one purpose of this change in business model was to enable PFP to begin making money from claims of copyright infringement.

*Id.*

19.  PFP has not registered copyrights in any photographs created after 2017.

Levy Third Aff. ¶ 48 (DN 55-1 at 46-47).

**PFP's Extensive Reverse-Image Search and Copyright Enforcement Efforts**

20.  PFP is a sophisticated and highly experienced repeat copyright litigant with an extensive enforcement operation.

*See generally infra.*

21.  Since 2016, Plaintiff has been systematically using "reverse image" searches to identify small businesses using its images on the internet and sending out demand letters seeking payments in the five figures or high four figures to avoid litigation.

First Levy Aff., Exhibit B (Answer to Interrogatories 10 and 16, DN 21-4 at B-60-61); Third Levy Aff., ¶ 15 (DN 55-1, at 33).

22.  PFP has used its own officers and other staff, and four outside search firms, including the outside law firm of Higbee and Associates, to conduct those searches.  Since

2016, this sophisticated enforcement team has been constantly "search[ing] the entirety of Plaintiff's image library via google reverse image search to identify" potential infringers.

> Seventh Levy Aff., Exhibit YY (Answer to Interrogatories 10 and 16); MyNewsFit Prepared Food Photos Article Mar. 27, 2023, Exhibit O, available at https://www.blog.preparedfoodphotos.com/food-photos/dod1pyoq9tv6f72ytumdh9p4moi5f5.

23.  Most of the work done by PFP's employees consists of conducting online searches for possible infringements.

> Levy Third Aff. ¶ 47 & Exhibit Z (DN 55-1 at 46, DN 55-15 at 196-197).

24.  In response to discovery requests to show records of its searches for infringing images, PFP produced records of searches that found potentially infringing images; it produced no records of unsuccessful searches.

> Levy Seventh Aff., ¶ 15

25.  PFP produced one set of spreadsheets showing reverse image searches in 2016, 2017 and early 2019, and another that showed searches that its own staff had conducted from April 2019 to early 2024.

> *Id.*

26.  The spreadsheet showing searches beginning April 2019 recorded the date of each search, the dates when PFP staff sent demand letters to each alleged infringer, and the amount collected on the successful claims (or, the ledger indicated that the matter had been referred to counsel).

> Levy Seventh Aff. ¶ 16.

27.  In the first set of spreadsheets, an entry showed that on September 30, 2016, PFP found an allegedly infringing use of "ProduceVegetableGrilled002," PFP's file name for the photo at issue in this case.   That spreadsheet did not show any other searches for ProduceGrilledVegetable002.

Levy Seventh Aff. ¶ 17.

28.  The second spreadsheet recorded search hits on ProduceGrilledVegetable002 on July 10, 2019, April 17, 2020, March 30, 2022, and May 3 and June 1, 2022.  The latter two search hits were from Pool World's website.

*Id.*

29.  PFP    produced    no    documents    reflecting    any    other    searches    for "ProduceVegetableGrilled002" before June 2020 (three years before the complaint was filed).

*Id.*

**PFP's Post-2016 Licensing Model**

30.  After registering its copyrights, PFP took the position that the Multi-Ad licenses that users had previously purchased were not "royalty-free" but rather had terminated, and that when Multi-Ad customers used PFP photos that they had obtained from Multi-Ad, they were infringing PFP's copyrights.   PFP accordingly sent demand letters to former Multi-Ad customers, alleging infringement,

Levy Fourth Aff., ¶¶ 11-12 (DN 67-1 at 16-17).

31.  Several former Multi-Ad customers entered subscription agreements with PFP

following those PFP claims and demand letters.

*Id.*; Fleurant Declaration (DN 71-1) ¶ 8; Levy Third Aff. ¶ 19 (DN 55-1, at 35).

32.  PFP secured its first subscription under its new licensing model in 2017 with a supermarket chain that subscribed at the rate of $499 per month.  That subscription has apparently been renewed repeatedly since, and that subscriber continued to pay $499 per month through 2024.

Levy Fifth Aff. ¶ 11 and Exhibit HH (DN 67-1 at 16-17 and 70-3 at 62-67; Seventh Levy Aff ¶ 7 and Exhibit OO.

33.  PFP produced a total of only twenty-two subscription agreements in discovery, revealing several agreements providing for monthly payments of $1188 per year ($99 per month), $300 per month, $499 per month, $500 per month, and higher amounts).

Levy Seventh Aff. ¶ 7 and Exhibit OO.

34.  Most of these subscription agreements were with businesses of two types – supermarket chains and advertising companies that service grocery stores and supermarkets.

*Id.*

35.  Most of the subscription agreements required the subscribers to provide credit cards to which the monthly subscription payments could be charged automatically.

*Id.*

36.  The two subscription agreements that were with other businesses – one a hospital chain, and one a single grocery store — were entered after PFP threatened the businesses with suit for infringement.

*Id.*

37. Pre-subscription communications produced in discovery, as well as payments in a ledger supplied by CopyCat Legal, reflect that each of the subscription agreements entered in 2021 or later was entered following claims of infringement directed to the subscriber or to one or more clients of the subscriber.

*Id.* See also Levy Fourth Aff. ¶ 12 (DN 67-1 at 17).

38. PFP follows a policy of destroying documents after four years.

Levy Fifth Aff. ¶ 5 (DN 69-1 at 13) and Exhibit EE DN 69-3 at 29-30.

39. PFP has produced no pre-subscription communications with subscribers whose agreements were signed before 2021.

Levy Seventh Aff. ¶ 7 and Exhibit OO.

40. PFP has produced no bank records from January through May, 2020.

Levy Seventh Aff. ¶ 20.

41. PFP produced no bank records from 2017.

Levy Seventh Aff. ¶ 20.

42. PFP's subscription agreements are not intended for small businesses that need and used access to only a single photograph.

Nygard Aff. ¶ 10 (reporting admission by PFP representative).

43. PFP produced a spreadsheet showing monthly subscription payments during calendar years 2023 and 2024 that included monthly payments of $99 per month, $299 per month and other amounts lower than $999 per month.

Levy Fifth Aff. and Exhibit KK (DN 70-3, pages 83-84).

44. PFP was unable to produce documentation of the amounts of monthly payments received from most of its subscribers before 2023, who paid by credit card, because PFP failed to preserve the document before the company providing credit card services went out of business.

Fleurant Declaration ¶¶ 8-10 (DN 71-1 at 2-3).

45. PFP did not produce subscription agreements from most of the companies whose monthly payments were reflected in the 2023 / 2024 ledger.

Levy Sixth Aff., ¶ 8 (DN 72-1 at 14).

46. The customer whose subscription payments were $1188 per year, pursuant to a subscription agreement signed in 2019, continued to pay that amount annually.

Levy Seventh Aff. ¶ 8.

47. The advertising company whose subscription payments were $500 per month if it used Bad-Adz services, but $999 per month if it does not, pursuant to a subscription agreement signed in 2020, in fact has been accorded access to the database of photos without paying anything to PFP because it buying services from a different company, Bad-Adz, that is owned by the same man who owns PFP.

Levy Seventh Aff. ¶ 9.

**PFP's Income from Subscriptions and from Copyright Enforcement**

48. Most of PFP's photo-based income during the period 2018 through 2024 was provided by settlements of claims for copyright infringement.

Infra ¶ 49-51.

49. The amounts of claimed subscription income in each of the years from 2018 to 2024, as revealed in redacted bank records produced in discovery, was as follows:

| | |
|---|---|
| 2018 | $79,728 |
| 2019 | $91,639.07 |
| 2020 | $59,766.38 |
| 2021 | $88,984.20 |
| 2022 | $59,833.64 |
| 2023 | $79,584 |
| 2024 | $67,583.62 |

The amounts reported for 2018, 2019 and 2021 included bank statements on which it appears that PFP added a legend to the original documents indicating that the sums included funds commingled with Bad-Adz or "agency receipts"

Levy Seventh Aff. ¶ 23 and Exhibit TT; examples of the added legends appear at DN 70-3, pages 34 and 41.

50. The amounts of subscription income in each of the years from 2018 to 2023, claimed in response to an interrogatory in 2023, was as follows:

| | |
|---|---|
| 2018 | $ 78,828 |
| 2019 | $192,879 |
| 2020 | $180,345 |
| 2021 | $ 71,162 |
| 2022 | $ 94,157 |
| 2023 | $ 70,484 |

Exhibit B to First Levy Aff., Answer to Interrogatory 13, DN 21-4 at page B-60

51. PFP documents produced in discovery show the following amounts having been secured through claims for copyright infringement in each of the years 2018, 2019, 2022, 2023 and 2024. These amounts are dramatically higher than PFP's income from subscriptions in the same years:

| | |
|---|---|
| 2018 | $ *REDACTED* |
| 2019 | $ *REDACTED* |
| 2022 | $ *REDACTED* |
| 2023 | $ *REDACTED* |

2024        $ *REDACTED*

Levy Seventh Aff. ¶¶ 9, 13, 19, 21 & Exhibits PP, RR, SS; Solt Aff. & Exhibits S1 and S2 .[1]

**PFP's Deceptive and Coercive Demand Letter to Pool World**

52.  PFP sent a demand letter to Pool World dated September 16, 2022, stating that PFP had detected the Grilled Vegetable Photo on Pool World's website.

Answer to Complaint, Exhibit A (DN 7).

53.  The demand letter to Pool World demanded, in bold letters and blocked text, that Pool World pay $30,000 in damages within twenty-one (days) to avoid being sued.

Answer to Complaint, Exhibit A (DN 7).

54.  This bold-lettered demand (or similarly worded versions) is standard in demand letters sent by PFP's current law firm, CopyCat Legal.

Levy Seventh Aff., ¶ 27; Levy Third Aff. ¶ 10 (DN 55-1 at 32-33).

55.  The demand letter to Pool World claimed that PFP makes its photographs available only by subscription to its entire database of photos, and for $999 per month for a minimum period of one year.   PFP "charges its clients . . . a minimum monthly fee of $999.00 for access to its library of professional photographs" and "does not license individual photographs or otherwise make individual photographs available for purchase . . . [but] relies on its recurring monthly subscription service.")

Answer to Complaint, Exhibit A (DN 7).

---

[1] The Levy Seventh Affirmation explains why available data from 2020 to 2021 is incomplete.

56.    The demand letter then claimed that, because of this supposed subscription model and minimum fee and one-year subscription requirement, PFP's lost license fee, and thus the damages that a court could award, would be $11,988, but that PFP also "believe[d] a 3x multiplier . . . is appropriate, resulting in statutory damages of $35,964" for each year's licensing period that the photo had been on Pool World's website

*Id.*

57.  At the time the demand letter was sent, PFP's officers knew the actual monthly payments that were being paid by their relatively few subscribers, and consequently they knew that $999 per month was not PFP's actual minimum subscription fee, and had never been the minimum subscription fee.

Levy Fifth Aff. ¶ 16 (DN 69-1 at 13).

58.  During the period from 2021 through 2023, PFP had sent thousands of demand letters containing this knowingly false statement about a $999 minimum monthly fee.

Levy Third Aff. ¶ 10 (DN 55-1 at 31).

59.  The demand letter to Pool World stated that, if the use of its photo continued for more than one year, the damages would include an additional $999 per every additional month of use.

Answer to Complaint, Exhibit A (DN 7).

60.  The demand letter to Pool World stated that Pool World could be liable for statutory damages instead of actual damages, and that statutory damages awards are

generally three to five times the lost license fee.   In particular, the letter stated that "[a]ssuming our client prevails in court, 17 U.S.C. § 504(c)(1) provides our client the right to recover statutory damages . . . [up to] a sum of not more than $150,000."

*Id.*

61.  The demand letter also stated that courts "have not hesitated (where appropriate) to impose substantial statutory damages against copyright infringers."

*Id.*

62.   The demand letter further threatened that a "3x multiplier (as punishment/deterrent) was appropriate, resulting in statutory damages of $35,964 (**for each annualized licensing period**)." (emphasis in original).

*Id.*

63.  PFP made these statements despite the fact that it could not recover statutory damages against Pool World because Pool World's use began in 2010, long before PFP's copyright was registered in 2016.

Levy First Aff. ¶ 20 (DN 21-1at 20); Flynn Aff. ¶ 4 (DN 55-17); Stark Expert Report; 17 U.S.C.  § 412.

64.  PFP should have known that its statements in the demand letter about statutory damages were false, and that statutory damages were unavailable because the presence of the image on  Pool World's website before 2016 was shown in the Internet Archive.

https://web.archive.org/web/20110208085952/https://poolworld-grillworld. com/ (showing use in 2011); Teal Expert Report.

65.  PFP is familiar with the Internet Archive. When PFP seeks default judgments against accused infringers who do not hire counsel to defend themselves, it commonly uses the Internet Archive to show the length of the allegedly infringing use, thus justifying awards of actual damages at $999 per month for more than one year.

> Motion for Default Judgment in *Prepared Food Photos v. EatFood Distributors*, Case No. 1:23-cv-08036-JLR (S.D.N.Y. Jan. 5, 2024), at 13 n.5 available at https://storage.courtlistener.com/recap/gov.uscourts.nysd.606093/gov.uscourts.nysd.606093.15.0.pdf. See also *Prepared Food Photos, Inc. v. Trip Rest. LLC*, 2023 WL 2955298, at *4 (S.D.N.Y. Apr. 14, 2023) (citing Wayback Machine); *Prepared Food Photos v. Chicago-Mkt.-Distributors*, 2023 WL 3570673, at *6 (D. Colo. Apr. 18, 2023), report and recommendation adopted, 2023 WL 3568164 (D. Colo. May 19, 2023) (same).

66.  As of late 2023, some 1800 demand letters similar to the demand letter to Pool World had been sent to accused infringers by CopyCat Legal, and more were sent in 2024.

Levy Seventh Aff., ¶¶ 26-27; Levy Third Aff. ¶ 10 (DN 55-1 at 31-32).

67.  The demand letter to Pool World stated that PFP would be able to get its attorney fees awarded against Pool World.  In particular, it stated, "[k]eep in mind that attorneys fees include . . . potentially the attorneys fees/costs we will incur to pursue the matter (which may be awarded) if our client prevails in court."  It also stated that "the above amounts do not account for attorneys' fees which are also recoverable under the Copyright Act."

Answer to Complaint, Exhibit A (DN 7).

68. PFP made these statements despite the fact that it cannot be awarded attorney fees against Pool World for the same reason it cannot be awarded statutory damages – Pool World's use of the image began in 2010, long before PFP's copyright was registered in 2016.

Stark Expert Report; Levy First Aff. ¶ 21 (DN 21-1 at 20-21); 17 U.S.C. § 412.

69. The demand letter to Pool World warned that it would be expensive to defend against PFP's lawsuit, stating in part "[c]opyright infringement is a serious matter that potentially exposes you to substantial damages/attorneys fees . . . includ[ing] those you will be forced to incur to mount a defense."

Answer to Complaint, Exhibit A, DN-7.

70. In fact, during the course of this litigation, PFP's owner has contacted Pool World's owner directly, without the consent of counsel, to explicitly threaten the high cost of litigation as a reason for Pool World to accept PFP's settlement terms.

Early Aff., ¶¶ 2-6 and Exhibits E1 to E-4.

71. In addition, in followups to other demand letters, PFP's representatives cite the cost of defending against its lawsuits to set the minimum amount that those targets should be willing to pay in settlement.

Rimer Aff., ¶¶ 4-5 and Exhibit R2; See also Exh. W (DN 53-13), at page 170.

72. PFP can afford to rely on the imposition of costs on its targets to compel high settlements because its counsel, CopyCat Legal, takes cases on "pure contingency" meaning that "CopyCat Legal absorb[s] all costs (taxable and non-taxable)."

Declaration of Daniel DeSouza in *PFP v Nofal LLC,* No. 2:22-cv-00642-JPS (E.D. Wis.), available at https://storage.courtlistener.com/recap/gov.uscourts .wied.99393/gov.uscourts.wied.99393.64.2.pdf; Affirmation of Daniel DeSouza in *Harrington v. Dugar*, No. Blaine Harrington, III v. Deepak Dugar (2:22-cv-08230), DN 201-1, ¶ 29, available at https://storage.courtlistener .com/recap/gov.uscourts.cacd.868192/gov.uscourts.cacd.868192.201.1.pdf.

73. PFP can afford to rely on the imposition of litigation costs on its targets to compel

high settlements because as of last summer, its counsel, CopyCat Legal, having handled more than 5000 copyright matters for its clients, had never had to take a case to trial with the single exception of *Harrington v. Dugar*.

   *Id.*, ¶ 30.

74.   The demand letter to Pool World stated that, if PFP had to file a lawsuit to get paid the demanded amount, it would file in federal court in the Southern District of Florida.

   Answer to Complaint, Exhibit A (DN-7).

75.   In fact, as of late 2023, PFP had consistently sued for infringement in the federal court for the district where the defendant is located, not in Florida.

   Levy First Aff. ¶ 23 (DN 21-1 at 21).

76.   The demand letter to Pool World implies that it knows who has or has not licensed its works. "[T]o their knowledge, [Plaintiff] did not authorize you . . . to use or display the foregoing photograph. Notwithstanding this lack of authorization, our client has [found your use.]" (emphasis in the original) Exhibit B.

   Answer to Complaint, Exhibit A (DN-7).

77.   PFP's June 2, 2023 complaint against Pool World alleged unequivocally and without reservation (as a fact, not on information and belief) that Pool World "is not and has never been licensed to use or display the [Grilled Vegetable] Work."

   Complaint ¶ 18.

78.   In fact, when PFP wrote to Pool World, and when it filed its complaint, those allegations were false, in that PFP had no way of knowing whether Pool World had a proper

license to use the Grilled Vegetable photo, because iStock did not share with PFP the

identity of the buyers of licenses for PFP's photos, and in any event the licenses were not

limited to the licensees but included the licensees' customers.

First Levy Aff. ¶ 15 (DN 21-1 at 19).

**PFP Amended Complaint Drops False Allegations After Pool World Serves It with a Rule 11 Motion**

79.  In the complaint in this case, filed on June 2, 2023, PFP alleged that it

"charges its clients a minimum monthly fee of $999.00 for access to its library of

professional photographs."

Complaint ¶ 8.

80.  At the time PFP filed its complaint, it knew that this statement was false.

Levy Seventh Aff. ¶ 10.

81.  PFP amended its complaint to drop its allegation of a $999 minimum monthly

payment only after Pool World obtained discovery showing that the allegation was false,

and after Pool World served a motion for Rule 11 sanctions.

Levy Seventh Aff. ¶ 29 and Exhibit UU.

82.  In its June 2, 2023 complaint in this case, PFP alleged, "Plaintiff is in the

business of licensing high-end, professional photographs for the food industry."

Complaint ¶ 6.

83.  PFP amended the complaint to drop this characterization of its business as

licensing photographs only after Pool World obtained discovery showing that PFP's main

business is making claims of copyright infringement, and served a motion for Rule 11 sanctions, beginning the running of the twenty-one day safe harbor period under Rule 11(c)(2).

Levy Seventh Aff., ¶ 29 and Exhibit UU.

84.  In its initial disclosures in this case, dated August 15, 2023, PFP stated that it was seeking $11,988 in actual damages for its lost license fee for each year the Grilled Vegetable Photo was published "prior to the date of copyright registration for the photograph," that its "entire library [of photos] is offered at a starting price of $999.00/month with a 12-month minimum commitment," and that it "would calculate its actual damages by multiplying the license it would have charged (a minimum of $999.00/month) by the number of years the photograph was published."

Levy Third Aff. ¶ 7 and Exhibit Q (DN 55-1 at 30 and 53-7 at 116-118).

85.  At the time these initial disclosures were served, PFP knew that its assertion about the minimum subscription fee was false.

Levy Seventh Aff. ¶ 10.

86.  At the time these initial disclosures were served, PFP knew that it had not entered into its first subscription agreement until 2017, seven years after the allegedly infringing use had begun.

Levy Seventh Aff., Exhibit OO.

**PFP Studiously Avoids Contested Litigation Over Damages in Cases About the Infringement of a Single Photo, but Lost in a Recent Trial of That Issue**

87.  For several years, PFP avoided testing its damages theory in adversarial litigation over alleged infringements of a single photo.

First Levy Aff. ¶ 8 (DN 26-1); Levy Third Aff. ¶ 35 (DN 53-1, at p. 41). See also Levy Third Aff., Exhibit W (DN 53-13), at page 174 (PFP counsel Megan Medacier email stating that there are no rulings in contested cases on damages "as no one has thought it wise to litigate one of these things to the end").

88.  In October, 2024, PFP went to trial for the first time how its damages theory applied to alleged infringement of a single photo.  PFP sought $23,976 in actual damages; the jury awarded $200 in damages.  The defendant in that case did not present evidence of the  actual market value of PFP's individual stock photos, or challenge the veracity of the testimony of Rebecca Jones about actual minimum monthly fees.

*Prepared Food Photos v. Jaber*, 2025 WL 1025174, at *6 (E.D. Wis. Apr. 7, 2025) (denying PFP's motion to amend judgment); *Prepared Food Photos v. Jaber*, Trial Transcript at pages 291-293, available at https://storage. courtlistener.com/recap/gov.uscourts.wied.99393/gov.uscourts.wied.99393.58.0.pdf (showing request for actual damages); see generally Trial Transcript in That Case.

**PFP's Citation to Uncontested Default Judgments in Other Cases**

89.  The initial disclosures cited ten court rulings adopting PFP's damages theory to award actual and statutory damages in multiples of $11,988.

Levy Third Aff. ¶ 7 and Exhibit Q (DN 55-1 at 30 and 53-7 at 116-118).

90.  Each of the court rulings cited in the Initial Disclosures was a default judgment.  Revealed by the Westlaw citations to each.

91.  Each of those default judgments was obtained based on, among other things, complaints containing the false allegation about PFP's minimum monthly subscription fee,

and the principle that factual allegations in a complaint must be taken as true in ruling on default judgments.

Levy Seventh Aff. ¶ 30.

92.  Many if not all of those default judgments were obtained by submitting briefs containing the false allegation about PFP's minimum monthly subscription fees, as well as affidavits from Rebecca Jones, PFP's "Director of Intellectual Property," including the false assertion about PFP's minimum monthly subscription fees, an allegation that PFP as an entity, and Jones as the affiant, knew to be false.

*Id.*; Levy Fourth Aff. ¶ 7 (DN 67-1 at 15).

93.  None of the briefs and affidavits PFP submitted in support of these default judgments addressed the cases that calculate actual damages based on fair market value, not the licensing fee that the copyright holder would have preferred to charge.   *Id.*

94.  Many of the default judgments cited in PFP's initial disclosures in this case were also cited in many demand letters signed by counsel for PFP that were sent after the September 2022 demand letter that PFP sent to Pool World.

Levy First Aff., ¶ 25 (DN 21-1 at 22); Levy Fifth Aff. Exhibit W (DN 55-13); Exhibits to the Rimer, Lingerfelt and Nygard Affirmations.

95.  None of the ten default judgments cited in the Initial Disclosures and demand letters was ever collected.

Levy Seventh Aff. ¶ 32 and Exhibit SS.

**Other Undisputed Facts**

96.   Between August 2016 and December 2024, PFP filed nearly 300 copyright infringement lawsuits.

Levy First Aff. Exhibit C (DN 21-5 at 53-84).

97.   Inspection of the dockets reveals that most of the lawsuits have ended in a dismissal without any attorney having entered an appearance for the defendant, often after the time for answering is postponed

Levy First Aff. ¶ 6 (DN 21-1 at 16).

98.   Sometimes the docket reflects that the parties have reached an agreement; sometimes the docket is silent on the reason for dismissal.

*Id.*

99.   Both PFP's current law firm, CopyCat Legal, and the firm of Higbee and Associates, which previously represented PFP in sending demand letters and litigatng cases, typically required that settlement agreements be kept confidential.

Seventh Levy Aff. ¶ 35; Lingerfelt Aff., Exh. L4; Archambault Aff., Exh. A1.

100.   When the targets of copyright infringement claims have unilaterally sent payments of $750 (the minimum award of statutory damages) in response to PFP claims of copyright infringement, PFP's counsel neither accepted the payment nor filed suit for infringement.

Archambault Aff.; Nygard Aff.; Lingerfelt Aff.; Levy Aff. ¶ 35.

101.   Pool World deliberately did not make an insurance claim because it did not want an extortionate settlement paid in its name.

Flynn Aff. ¶ 7, DN 55-17.

102.  PFP counsel contacted Pool World's insurance company directly, after it was identified in Pool World's initial disclosure, threatening to sue the insurance company directly to collect any awarded damages and attorney fees.

Levy First Aff. ¶¶ 27-28 and Exhibit K (DN 21-1 and 21-13).

103.  Despite having withdrawn its allegation that it only makes access to its database of photos available for a minimum monthly fee of $999, PFP is still seeking actual damages of $11,988 per year.

Levy Seventh Aff. ¶ 38 and Exhibit XX.

104.  PFP collected $10,000 in 2023 from one or more targets of claims that  its copyright in the Grilled Vegetable Photo had been infringed.

Levy Seventh Aff. ¶ 13 and Exhibit PP.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

/s/   Paul Alan Levy
Paul Alan Levy (pro hac vice)
Public Citizen Litigation Group
1600 20th Street NW
Washington, D.C. 20009
(202) 588-7725
plevy@citizen.org

/s/ Stephen Kirby
Stephen Kirby
Kirby Law Office, PLLC
WSBA #43228
1312 N. Monroe Street
Spokane, Washington 99201
(509) 795 4863
kirby@kirbylawoffice.com

/s/ Phillip R. Malone
Phillip R. Malone (pro hac vice)
Juelsgaard Intellectual Property
 and Innovation Clinic
Mills Legal Clinic at Stanford Law School
Crown Quadrangle, 559 Nathan Abbott Way
Stanford, California 94305-8610
Telephone: (650) 724-1900
pmalone@stanford.edu

Attorneys for Defendant