UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

PREPARED FOOD PHOTOS, INC. F/K/A
ADLIFE MARKETING &
COMMUNICATIONS CO., INC.,

      Plaintiff,

v.

POOL WORLD, INC.,

      Defendant.

Civil Action No. 2:23-cv-00160-TOR

**Expert Report of Aaron M. Arce Stark, Stark.Law LLC**

# Table of Contents

1.  INTRODUCTION ...................................................................................................3

    1.1. Qualifications ..............................................................................................4

    1.2. Prior testimony ...........................................................................................4

    1.3. Compensation .............................................................................................4

    1.4. Basis of my opinions ..................................................................................4

2.  BACKGROUND ...................................................................................................5

    2.1. The Copyright Trolls' scheme ....................................................................6

3.  OPINIONS .............................................................................................................7

    3.1. Copyright Trolls send intimidating and misleading letters to their targets. .....................8

    3.2. Copyright Trolls' attorneys engage minimally in the scheme. ......................................11

    3.3. Targets who obtain knowledgeable counsel rarely settle, pay, or proceed to litigation................................................................................................13

    3.4. Copyright Trolls harm individuals and small businesses..............................................15

    3.5. Prepared Foods Photos, Inc, represented by Copycat Legal, appears to employ many of the Copyright Troll's tactics. ..........................................................17

    3.6. Prepared Foods Photos, Inc, represented by Copycat Legal, bases its demand on a questionable image subscription service. ..................................................21

4.  SUMMARY AND CONCLUSIONS....................................................................24

5.  AUTHORITIES ...................................................................................................26

6.  CERTIFICATION ...............................................................................................28

## 1. INTRODUCTION

I am Aaron M. Arce Stark. I am an attorney and owner of Stark.Law, LLC, a general services law firm in Washington, DC. I have practiced law for more than ten years, counseling individuals and small business owners on business formation, contracts, copyright, trademark, and disputes arising in these practice areas. One of my specialties is working with individual photographers to help them with developing and interpreting contracts, including developing contractual terms for compensation. My business address is 1701 Rhode Island Ave NW, Washington, DC 20036.

I have been retained by the Defendant, Pool World, Inc., to offer opinions and testimony on how the practice known as "copyright trolling"—the exploitation of the copyright law for financial gain through the filing (or threat of filing) of copyright infringement lawsuits against individuals or entities who may have allegedly used copyrighted material without proper authorization—has been manifested in this litigation.

Firms engaged in copyright trolling send intimidating—and misleading—demand letters to accused infringers. These demand letters present accused infringers with a choice: (a) settle and pay a monetary demand, typically ranging from a few hundred to several thousand dollars, or (b) face litigation and the risk of statutory damages, which can purportedly reach $150,000 per work infringed. Attorneys are minimally involved in this scheme, and accused infringers who obtain counsel rarely settle or pay. Accused infringers, typically individuals or small businesses (and often with limited means), experience a range of negative consequences after receiving these demand letters. The pursuit of these illegitimate claims undermines the integrity of the judicial process. The claim for infringement, and the pattern of exorbitant damages demands and threats of litigation exhibited by this plaintiff and its law firm, exemplifies some of the worst tendencies of copyright trolling.

### 1.1.  Qualifications

I am an attorney with active bar memberships in Illinois, New York, the District of Columbia, and several U.S. District Courts. I obtained my J.D. at Loyola University Chicago School of Law. My *curriculum vitae* is in **Attachment A**. I have been in private practice since 2014. I have represented more than 50 clients who received a demand letter from law firms, including Copycat Legal PLLC, that accused my clients of copyright infringement.

### 1.2.  Prior testimony

I have not offered expert testimony at a deposition or trial.

### 1.3.  Compensation

The Defendant, Pool World, Inc., compensated Stark.Law LLC at a flat rate of $3,000 for report preparation, deposition preparation, and trial preparation. For deposition testimony and court appearances I will charge an hourly rate of $650. Compensation for all work related to this matter is in no way tied to the outcome of this litigation.

### 1.4.  Basis of my opinions

The information I relied on in forming my opinions is of a type reasonably relied upon by experts in my field in forming opinions. Specific documents are cited throughout this Expert Report ("Report"). The types of information I relied on for this Report include the following:

- Observations gained from my experience investigating and negotiating resolutions on behalf of accused copyright infringers;
- Case-specific documents, including the pleadings and discovery materials;
- Publicly available documents, such as court filings and opinions, law review articles, and general media and literature; and
- My experience helping photographers create contracts and payment terms for their work.

This Report may be supplemented or revised as new information or data becomes available.

## 2. BACKGROUND

The U.S. Constitution grants Congress the power to create laws that protect authors' rights in their works.[1] When Congress enacted the Copyright Act of 1976, it sought to provide a framework that balanced the rights of creators with the public interest in accessing and benefiting from creative works.[2] Nearly 50 years later, a business model—copyright trolling—has emerged.[3] The operators of these business models, "Copyright Trolls," exploit the copyright system and seek profit by monetizing the threat of litigation—and the award of statutory damages—against individuals and (typically, small) businesses.[4]

Scholars have argued that Copyright Trolls are difficult to define.[5] One U.S. District Judge, however, has offered the following description:

---

[1] U.S. Const. art. I, § 8, cl. 8.

[2] Pub. L. No. 94-553, 90 Stat. 2541.

[3] *See, e.g., Design Basics, LLC v. Lexington Homes, Inc.,* 858 F.3d 1093, 1097 (7th Cir. 2017) ("In recent years, opportunistic holders of copyrights, patents, and other intellectual property have developed unsavory reputations for 'trolling,' bringing strategic infringement claims of dubious merit in the hope of arranging prompt settlements with defendants who would prefer to pay modest or nuisance settlements rather than be tied up in expensive litigation. Like the proverbial troll under the bridge, these firms try to extract rents from market participants who must choose between the cost of settlement and the costs and risks of litigation."). *See also* Matthew Sag, *Copyright Trolling, An Empirical Study,* 100 Iowa L. Rev. 1105, Sec. II (2015) (discussing the rise of copyright trolls).

[4] *See, e.g.,* Brief of Electronic Frontier Foundation, Authors Alliance, American Library Association and Association of Research Libraries in Support of Petitioners as Amici Curiae, Warner Chappell Music, Inc., et al., v. Sherman Nealy et al. (No. 22-1078), 2023 WL 8481981, at *4 ("The ubiquity of copyrighted works on the internet and the potential for statutory damages have fueled a business model—copyright trolling—that seeks profit through monetizing threats of litigation against thousands of internet users. Copyright trolling inhibits creativity rather than promoting it.").

[5] *See, e.g.,* Sag, *supra* note 3 at 1113 ("Copyright trolling cannot be defined by characteristics such as whether the plaintiff is the original owner of the copyright, or whether the plaintiff has attempted to license the work in the marketplace. … If there is a unifying characteristic of patent and copyright trolls, it is that they are systematic opportunists. Agreeing on an exact definition of trolls is difficult because there are many different manifestations of opportunism in IP litigation."). *See also* Brad Greenberg, *Copyright Trolls and Presumptively Fair Uses,* 85 U. Colo. L. Rev. 53, 58-59 (2014) ("The field, though, lacks a working definition of the copyright troll. The challenge is that 'troll' means different things to different people and, significantly, the label refers more to behavior than group membership—'troll is as troll does.'"); Brad Greenberg, *Copyright Trolls and The Common Law,* 100 Iowa L. Rev. Bull. 77, 79 (2015) ("The scope of the copyright troll problem remains unclear because trolls do not fit neatly into any definition. Trolls take a variety of forms …").

> In common parlance, copyright trolls are more focused on the business of litigation than on selling a product or service or licensing their copyrights to third parties to sell a product or service. A copyright troll plays a numbers game in which it targets hundreds or thousands of defendants seeking quick settlements priced just low enough that it is less expensive for the defendant to pay the troll rather than defend the claim.[6]

Copyright Trolls typically come in two varieties: (1) copyright owners who are more interested in gaining income through litigation rather than licensing of works, and (2) attorneys who pursue quick settlements and conduct little due diligence to determine whether a copyright claim is appropriate.[7]

## 2.1.    The Copyright Trolls' scheme

The Copyright Troll's tactics are well documented.[8] A typical story goes something like:

> Leo, a small business owner promoting travel services, publishes posts on his company website chronicling the locations where his clients have travelled. This blog, with its modest readership, is a attracts a few thousand readers each month. Leo posts a picture he found online—and which he believed to be in the public domain—that showcases the beauty of a Costa Rican beach. The purpose of the picture was to make the article more engaging for readers.

> Several months (or years) later, Leo receives a letter from a law firm who states it represents the photographer of the photo Leo posted. The letter states that Leo's company may have infringed on its client's copyright under Title 17 of the U.S. Code and that the company may be liable for up to $150,000 under section 504(c)(2). The law firm is willing to enter a settlement and make the entire

---

[6] *McDermott v. Monday Monday, LLC*, No. 17CV9230 (DLC), 2018 WL 1033240, at *3 (S.D.N.Y. Feb. 22, 2018) (citations omitted).

[7] Michael Goodyear, *A Shield or a Solution: Confronting the New Copyright Troll Problem*, 21 Tex. Rev. Ent. & Sports L. 77, 83-86 (2020) (discussing copyright owners and attorneys).

[8] *See, e.g.*, Daniel Quinn, *One Person's Unsettling Experience With A $20k Higbee Copyright Troll Demand Letter*, TECHDIRT (Feb. 21, 2019), https://www.techdirt.com/2019/02/21/one-persons-unsettling-experience-with-20k-higbee-copyright-troll-demand-letter/ (https://perma.cc/H58W-6VY4). *See also* Carolyn Homer, *Investigating the Higbee & Associates Copyright Trolling Operation*, TECHDIRT (Feb. 22, 2019), https://www.techdirt.com/2019/02/22/investigating-higbee-associates-copyright-trolling-operation/ (https://perma.cc/PD2U-QNW6).

> matter go away if the company agrees to pay $2,200 for his use of the photo and agreement to take the photo down.
>
> Leo now finds himself in a predicament. Does he seek legal counsel? Copyright attorneys are notoriously expensive and could easily cost more than $2,200? Does he pay the $2,200? This amount is, after all, considerably less than $150,000. Does he fight the claim? Law firms have more resources than the typical litigant.

This story, though fictitious, is all too common in my copyright practice.[9] The Copyright Troll is looking for a quick settlement and payment for a thin case of infringement. As scholar Matthew Sag observed, "in the typical case, the plaintiff's claims of infringement rely on a poorly substantiated form pleading and are targeted indiscriminately at noninfringers as well as infringers. ... The plaintiffs bringing these cases target hundreds or thousands of defendants nationwide and seek quick settlements priced just low enough that it is less expensive for the defendant to pay rather than to defend the claim, regardless of the claim's merits."[10]

## 3. OPINIONS

In the opinions below, the term *target(s)* means a party targeted by a Copyright Troll and includes individuals, small businesses, and other Internet users. The term *Copyright Troll(s)* means systematic, opportunistic attorneys and copyright owners who seek financial gain by filing—or threatening to file—copyright infringement lawsuits against targets who may have allegedly used copyrighted material without proper authorization.[11]

Additionally, throughout the discussion, I refer to the demand letter, dated September 16, 2022, in *Prepared Food Photos, Inc. v. Pool World Inc.* as the **Pool World Letter**.[12] I refer to another

---

[9] *See, e.g.*, Goodyear, *supra* note 7 at 78-79 (describing a similar story of a blogger who received a demand letter).

[10] Matthew Sag & Jake Haskell, *Defense Against the Dark Arts of Copyright Trolling*, 103 Iowa Law Review 571 (2018).

[11] I offer this definition to aid in the discussion contained in this Report but acknowledge the limitations in defining Copyright Trolls generally. *See* discussion *supra* Sec. 2.

[12] Answer, Ex. A, Prepared Food Photos, Inc. F/K/A Adlife Marketing & Communications Co., Inc. v. Pool World, Inc., No. 2:23-cv-00160-TOR (E.D. Wash. Jun. 26, 2023), ECF No. 7 ("Pool World Letter").

EXPERT REPORT OF AARON M. ARCE STARK                                                                      7

demand letter, dated September 14, 2023, in *Prepared Food Photos, Inc. v. Pompano Pizza* as the **Pompano Letter**.[13] My analysis is not limited to these two demand letters; I refer to these letters to illustrate concepts I have observed in my copyright infringement defense work.

### 3.1.  Copyright Trolls send intimidating and misleading letters to their targets.

I begin with the first interaction between a Copyright Troll and its target: the demand letter. The demand letter exemplifies the coercive strategy employed by Copyright Trolls in their use of information asymmetry and fear (both legal and financial) to compel their targets into quick settlements. Copyright Trolls' demand letters have three notable features.

A.  Lack of Due Diligence

Demand letters often demonstrate a lack of due diligence by Copyright Trolls. In many cases, letters appear to be dispatched to suspected copyright infringers without a thorough investigation into the specifics of each case.[14] This lack of due diligence is evident in the generic nature of the letters, which seldom provide detailed evidence of the alleged infringement or consider the context in which the copyrighted material is used.[15] This approach suggests a prioritization of

---

[13] Levy Affirmation, Ex. I (Demand by Plaintiff to Pompano Pizza), Prepared Food Photos, Inc. F/K/A Adlife Marketing & Communications Co., Inc. v. Pool World, Inc., No. 2:23-cv-00160-TOR (E.D. Wash. Nov. 5, 2023), ECF No. 21-11 ("Pompano Letter").

[14] Firms appear to rely on automated software or algorithms to conduct reverse image searches that identify potential infringement targets. *See, e.g., Bell v. Wilmott Storage Servs., LLC,* 12 F.4th 1065, 1070 (9th Cir. 2021) ("A reverse image search is a search in which a user inputs a web address or copy of an image, and the search engine returns a list of locations on the Internet that contain a copy of the image or a similar but slightly modified one, e.g., the identical image with a person edited into the background. Thus, a reverse image search uses an image to find either copies of the image, or other similar images on the Internet, in much the same way that a search of a string of text finds webpages that include that string of text."). *See also* Brief of Amici Curiae, *supra* note 4 at 6 ("[B]ecause profitable copyright trolling 'depends on dispersing fixed costs over a large group of defendants and persuading a reasonable number of defendants to settle reasonably quickly,' and because these cases are rarely contested in court, copyright trolls' attorneys have an incentive to cut corners.").

[15] *See* discussion *infra* Sec. 3.2(A) (discussing the use of template letters). *See also* Pool World Letter, *supra* note 12 at 2 ("To our knowledge, our client **did not** authorize you or your company to use and/or display the foregoing photograph(s). ... "If our client is mistaken or if you believe the photograph(s) was previously licensed through our client or some other party, please contact us immediately with evidence of the prior licensing."); Pompano Letter, *supra* note 13 at 2 ("To our knowledge, our client **did not** authorize you or your company to use and/or display the

volume over precision, with the primary aim being to intimidate recipients into settling regardless of the merits of the claim. And this practice undermines the legal principle that attorneys should thoroughly investigate the facts before proceeding with legal action, casting a shadow on the ethical standards being upheld.[16]

## B. Generic Images

Copyright Trolls' infringement claims often concern generic photographs, which can be found on multiple websites.[17] This ubiquity makes it challenging to establish a clear line of copyright ownership, and the widespread distribution of these photographs casts doubt on Copyright Trolls' claims.[18] This situation is only exacerbated by the very nature of the internet—a forum in which content can be shared and republished across various platforms, often without clear attribution or adherence to copyright restrictions. Moreover, the generic quality of photographs often means they are neither distinctive enough to warrant the aggressive legal action nor is the value of the claim proportionate to the alleged infringement. The aggressive pursuit of claims over such widely available images suggests a strategy focused more on generating settlement fees than on protecting genuinely valuable intellectual property.

---

foregoing photograph(s). ... "If our client is mistaken or if you believe the photograph(s) was previously licensed through our client or some other party, please contact us immediately with evidence of the prior licensing."

[16] *See, e.g.*, MODEL RULES OF PROF'L CONDUCT r. 3.1 (Am. Bar Ass'n 2024) ("A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous ...").

[17] For example, using TinEye (https://tineye.com), an image search and recognition software, I conducted a query on February 16, 2024, for the image at issue in this present matter: Grilled Vegetable Kabobs, https://www.preparedfoodphotos.com/downloads/grilled-vegetable-kabobs-food-picture/. *See* discussion *supra* note 14 (discussing reverse image software). TinEye returned 12 different websites where this image has been used. A copy of these results is available at https://tineye.com/search/81da636451bb65116d9aeaa9ef1f10b45354f708 (https://perma.cc/BWY8-FPMG).

[18] In the present matter, the Plaintiff accused the Defendant of using one of its photographs. The screenshot of the Defendant's alleged use is distinct in that it is two photos combined side by side. *See* Pool World Letter, *supra* note 12 at 2. This combination is identical to one of the results returned by TinEye. *See id.* While it is plausible, it seems highly unlikely that two different parties combined these two exact images in the same manner.

EXPERT REPORT OF AARON M. ARCE STARK                                                                 9

### C. Exorbitant Damages Claims

Copyright Trolls often threaten to sue over generic or stock photographs that were available for licensing for some nominal sum (typically $50-$100, or via redemption through a stock image subscription service), or for which equivalent photos could be obtained for such prices. But Copyright Trolls demand payments of a thousand dollars or more, counting on their targets' lack of knowledge of how much could realistically be recovered, or their inability to find counsel whose services would cost less than the amount of money being demanded.

### D. Threats and Misrepresentations

Copyright Trolls often misrepresent the law to appear to intimidate their targets. Copyright Trolls claim their targets may be liable for statutory damages up to $150,000 for each work infringed.[19] But this is often inaccurate.

The Copyright Act provides for two primary types of damages in copyright infringement cases: actual damages and statutory damages.[20] Actual damages are calculated based on the actual harm suffered by the copyright owner, including any lost profits resulting from the infringement, and any profits the infringer gained from using the copyrighted material.[21] Statutory damages, however, offer an alternative to actual damages and are available even when it is hard to prove specific financial loss. Statutory damages range from $750 to $30,000 per work infringed, at the discretion of the court, and can increase to $150,000 per work for willful infringement.[22] But statutory damages are available to copyright owners only when they register their work with the

---

[19] *See, e.g.*, Pool World Letter, *supra* note 12 at 2-3 ("Assuming our client prevails in court, 17 U.S.C. § 504(c)(1) provides our client the right to recover statutory damages (for each work that was infringed) 'in a sum of not less than $750 or more than $30,000 as the court considers just.' Further, if the infringement was committed 'willfully,' the court may increase the award of statutory damages (for each work that was infringed) 'to a sum of not more than $150,000.'").

[20] 17 U.S.C. § 504(a).

[21] 17 U.S.C. § 504(b).

[22] 17 U.S.C. § 504(c).

EXPERT REPORT OF AARON M. ARCE STARK                                                          10

Copyright Office either within three months of publication of the work, or before the infringement starts.[23] Without this timely registration, copyright holders are not entitled to statutory damages or attorney's fees; they are limited to actual damages.[24]

Copyright trolls overlook—or deliberately omit—this detail when calculating and demanding exorbitant settlement amounts.[25] And by doing so, they suggest that potential damages in litigation are significantly greater than what would legally be permissible.[26] This tactic seems merely an attempt to create fear and urgency in targets to settle out of court.[27]

### 3.2.    Copyright Trolls' attorneys engage minimally in the scheme.

The business model employed by Copyright Trolls is designed for scale. By sending out many demand letters, these entities aim to maximize their reach—and financial returns—with minimal effort and time investment.

   A.  Template Letters

---

[23] 17 U.S.C. § 412.

[24] *Id.*

[25] In this matter, for example, the Plaintiff provided a copyright registration with an effective registration date of September 29, 2016, for photographs captured more than 15 years earlier. *See* Answer, Ex. B, Prepared Food Photos, Inc. F/K/A Adlife Marketing & Communications Co., Inc. v. Pool World, Inc., No. 2:23-cv-00160-TOR (E.D. Wash. Jun. 26, 2023), ECF No. 7 ("Copyright Registration, VA 2-019-412"). The image is question was published online many years prior to the copyright registration. *See* discussion *supra* note 17 (TinEye result showing the photograph was used online as early as 2010). Despite this information, the Plaintiff states it will elect a damage calculation that is more beneficial. *See* Pool World Letter, *supra* note 12 at 3 ("Section 504 of the Copyright Act provides for the recovery of statutory damages (as explained above) or (at our client's election) actual damages plus 'any additional profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages.' Of course, if forced to litigate this matter, we will fully explore the damages issue and make an election that is most beneficial to our client.'").

[26] *See, e.g.*, Pool World Letter, *supra* note 12 at 3 ("Consistent with the above legal authority, we believe a 3x multiplier (as punishment/deterrent effect) is appropriate, resulting in statutory damages of $35,964.00 (for each annualized licensing period). If your display of the aforementioned Work was for more than 1 year, then each month thereafter would increase our client's actual damages by $999.00 which, when trebled, would result in additional statutory damages of $2,997.00. Note that the above does not take into account any award of costs or prevailing party attorneys' fees).").

[27] *Id.* at 5 ("[A] lawsuit will be filed and our client will pursue the above-described damages against you. You should give this matter your immediate attention.").

Copyright Trolls rely heavily on the use of template letters. By using such templates, Copyright Trolls can scale their operations significantly, reaching many targets while expending fewer resources on individual case preparation.[28] These template letters typically identify the copyright owner, describe the infringed work, and assert the client does not believe the target procured a license. These templates later discuss the negative and costly consequences the target may experience if they do not remove the infringed work and remit payment. Some Copyright Trolls even include a link to submit the settlement payment via credit card. These template letters are often crafted to be sufficiently vague yet intimidating, creating a sense of urgency and compelling recipients to settle quickly, even if the claims against them might not hold up under closer scrutiny in a legal setting.[29]

The reliance on template letters also serves the other purpose of streamlining and standardizing the end-to-end process of making the legal threat and entering a settlement. It ensures a consistent approach to every case, reducing the likelihood of errors or inconsistencies that could arise from drafting individualized communications for each target, and allows firms to rely more heavily on professional support staff.

### B. Professional Support Staff

Copyright Trolls rely significantly on professional support staff. These non-attorney staff members—paralegals, legal assistants, claims resolution specialists—play a crucial role in managing the large volume of infringement claims. Non-attorney staff appear to handle the day-to-day communications between the firm and opposing parties, minimizing the time attorneys

---

[28] The use of templates and model forms is neither prohibited nor problematic *per se*. Indeed, attorneys routinely (and in some instances, are expected to) use templates, forms, and especially boilerplate language in their pleadings and transactional documents. The use of templates becomes problematic when attorneys have not conducted the necessary due diligence in bringing claims. *See* discussion *supra* Sec. 3.1(A).

[29] *See, e.g.*, Sag & Haskell, *supra* note 10 at 573 ("The plaintiffs play a numbers game, targeting hundreds or thousands of defendants and seeking quick settlements priced just low enough that it is less expensive for the defendant to pay than to defend the claim.").

spend on each matter. They often remind opposing parties—be it in an email signature or in the written email text itself—that they are working under the direction of an attorney. But non-attorney staff are rarely able to engage directly on the merits and facts of the case; instead, they appear to parrot stock language that may—or may not—be relevant to the inquiry at issue. By delegating these responsibilities to non-attorney staff, Copyright Trolls can maintain a consistent and persistent pressure on target accused of infringement, optimizing both time and resources within their scaled operations.

### 3.3.  Targets who obtain knowledgeable counsel rarely settle, pay, or proceed to litigation.

When a Copyright Troll's target obtains legal counsel, weaknesses in the case are often uncovered, and the dynamic of the situation can shift significantly. In my experience, rarely do these sorts of cases proceed far into the litigation process.

A.  Copyright Registrations

Copyright registrations presented by Copyright Trolls often contain weaknesses or are outright problematic. A common weakness is a mismatch between the copyright owner listed in the registration and the represented party. This discrepancy can occur for several reasons, such as errors in the registration process or changes in ownership that were not properly documented or updated with the Copyright Office. Targets can leverage these inconsistencies to challenge the validity of the Copyright Troll's claim, arguing that the party pursuing the claim may not have the legal standing to enforce the copyright. Another common problem relates to the timing and completeness of the copyright registration. Works being pursued by Copyright Trolls often were not registered before the infringement occurred or within three months of its first publication.

Rather, the works at issue were registered long after the first publication.[30] This weakness lowers the damages available to plaintiffs.

B. Licenses

Targets often have legitimate defenses. Targets may have obtained a Creative Commons license, which allow for the legal use of copyrighted works under specific conditions set forth by the copyright holder.[31] Or they may have purchased a license from a stock image website (e.g., Getty Images and iStock, Shutterstock, Adobe Stock) which offer a range of licensing options. Indeed, many photographs pursued by Copyright Trolls were once made available in one or more of these commercial stock image catalogs.[32]

Targets who possess a valid license and yet are accused of copyright infringement underscore the failure of Copyright Trolls to adequately review each case before sending out their demand letters.[33] If Copyright Trolls conducted reasonable due diligence (e.g., determining whether the photograph was made available in a stock catalog or offered under the Creative Commons license), they would have far fewer targets and far fewer profits. Copyright Trolls, instead, are seemingly comfortable targeting individuals and entities without a thorough investigation based on a predisposition towards assuming infringement. Their lack of due diligence undermines the

---

[30] *See, e.g.*, discussion *supra* note 25 (discussing how, in the present matter, Plaintiff provided a copyright registration with an effective registration date of September 29, 2016, for photographs captured more than 15 years earlier.").

[31] *See, e.g.*, Creative Commons, *About CC Licenses*, https://creativecommons.org/share-your-work/cclicenses/ (last visited Feb. 16, 2024) ("Creative Commons licenses give everyone from individual creators to large institutions a standardized way to grant the public permission to use their creative work under copyright law.").

[32] *See* Levy Affirmation, Ex. B (Plaintiff's Responses to Defendant's First Set of Interrogatories to Plaintiff), Prepared Food Photos, Inc. F/K/A Adlife Marketing & Communications Co., Inc. v. Pool World, Inc., No. 2:23-cv-00160-TOR (E.D. Wash. Nov. 5, 2023), ECF No. 21-4 ("From January 1, 2009 to December 31, 2016, Plaintiff maintained a contractual relationship with Getty Images/iStock that allowed Getty/iStock to sell individual photographs of Plaintiff's."). *Compare* Pompano Letter, *supra* note 13 "First Photograph," *with* photograph in news story with a "Getty Images" photo credit, https://www.cnbc.com/2016/02/02/buffalo-wild-wings-needs-a-super-bowl-boost.html (last visited Feb. 16, 2024).

[33] *See* discussion *supra* Sec. 3.1(A) (discussing a lack of due diligence).

EXPERT REPORT OF AARON M. ARCE STARK                                                                              14

legal and ethical framework that supports the economy and the lawful exchange of creative works.

## C. Threats of Litigation

Copyright Trolls are reluctant to proceed to litigation when they know their target will be defended by knowledgeable counsel. Copyright Trolls typically operate on a model that relies on the intimidation and settlement of claims out of court, preferring the easy way out and lowest cost. When faced with the prospect of litigation, especially against a target with competent legal representation, the cost-benefit analysis changes drastically. This is especially true when opposing counsel has identified weaknesses in copyright registrations, pointed to copyright principles that make the recovery of excessive damages unlikely, or identified potential defenses such as the existence of a license, expiration of the statute of limitations, or fair use. Under these circumstances, it is often more advantageous for the Copyright Troll to abandon their claim rather than take on the time and expense of a suit. As a result, when a target is represented by counsel who can effectively challenge the Copyright Troll's assertions, these cases often do not proceed to—or far past—the pleading stage. Indeed, among my more than 50 copyright defense cases with Copyright Trolls, Copyright Trolls have discontinued efforts without a settlement payment in nearly all matters. This outcome underscores the Copyright Troll's primary interest in easy settlements rather than engaging in the substantive legal battles necessary to prove copyright infringement in court.

## 3.4.    Copyright Trolls harm individuals and small businesses.

Copyright Trolls exert a significant negative effect on their targets: financial, psychological, and emotional. Copyright Trolls also foster a coercive atmosphere that not only undermines trust in the judicial process but also uses the judicial process as a tool of coercion. These effects are

EXPERT REPORT OF AARON M. ARCE STARK

15

detrimental on individuals and small businesses, raising serious questions about the fairness and integrity of copyright and its enforcement mechanisms.[34]

## A. Financial

The financial strain Copyright Trolls place on their targets is perhaps the most immediate and quantifiable impact. Targets often face demands for settlement that can range from a few hundred to several thousand dollars, or more. For many, paying these fees is financially burdensome, if not crippling, especially when the demands are baseless or inflated beyond the actual value of the alleged infringement. The choice between settling and facing the prospect of expensive and protracted litigation places undue financial pressure on targets.[35] This economic burden can be exacerbated for those who choose to obtain legal representation to navigate the complexities of copyright law, adding legal fees to their potential financial obligations. Some targets, worried about a large court judgment, contemplate the need to file for bankruptcy or shut down their business.

## B. Psychological and Emotional

Beyond the financial implications, the psychological and emotional toll on individuals and small business owners targeted by Copyright Trolls is significant. Receiving a legal notice accusing one of copyright infringement, especially when unfounded, can induce significant stress, anxiety, and fear. The prospect of being involved in legal proceedings, coupled with the potential for public embarrassment and reputational damage, can lead to further emotional distress.[36] This is

---

[34] *See, e.g.*, Sag & Haskell, *supra* note 10 at 637 (calling on attorneys, district court judges, the U.S. Copyright Office to take on the issue of copyright trolling). *See also* Goodyear, *supra* note 6 at 99-111 (recommending revisions to copyright damages).

[35] *Id.* at 604 (discussing reasons why people settle).

[36] James DeBriyn, *Shedding Light on Copyright Trolls: An Analysis of Mass Copyright Litigation in the Age of Statutory Damages*, 19 UCLA Ent. L. Rev. 1, 99 (2012) (discussing the embarrassment factor of litigation in mass copyright litigation, especially when the subject of the copyright is pornographic in nature). *See also* Sag & Haskell, *supra* note 10 at 581 (discussing social embarrassment).

EXPERT REPORT OF AARON M. ARCE STARK                                          16

particularly true for targets that are unfamiliar with the legal system and may feel overwhelmed by the complexity and perceived aggressiveness of the claims against them. The fear of financial ruin, loss of reputation, and the possibility of a legal judgment can have long-lasting effects on an individual's mental health and well-being.

C. Coercive Effects

Copyright Trolls employ tactics to create a coercive environment that pressures targets into paying settlement fees, regardless of the merits of the claim. This coercion stems from the deliberate strategy of setting settlement amounts that are often small enough or just below the cost of legal defense, presenting a seemingly rational economic choice to settle rather than fight the claim in court.[37] This approach preys on their targets' fear of the unknown, effectively cornering them into paying to make the issue go away. The coercive nature of these tactics undermines the principle of voluntary and informed resolution of disputes, instead fostering an atmosphere of intimidation and exploitation.

### 3.5. Prepared Foods Photos, Inc, represented by Copycat Legal, appears to employ many of the Copyright Troll's tactics.

Over the years, Prepared Foods Photos, Inc. has been represented by a series of law firms that are notorious for their work as Copyright Trolls: Richard Liebowitz[38], Higbee & Associates[39], and most recently CopyCat Legal, which prides itself for its reputation as an aggressive Copyright

---

[37] *See, e.g.*, Sag & Haskell, *supra* note 10 at 573 ("The plaintiffs play a numbers game, targeting hundreds or thousands of defendants and seeking quick settlements priced just low enough that it is less expensive for the defendant to pay than to defend the claim. This game is profitable, whether the lawsuits are targeted at actual infringers or not. It is difficult to overstate the extent to which copyright trolling has come to dominate the federal copyright docket.").

[38] *See, e.g.*, Blake Brittain, *Embattled copyright lawyer suspended from practice in New York*, REUTERS (Nov. 3, 2021), https://www.reuters.com/legal/legalindustry/embattled-copyright-lawyer-suspended-practice-new-york-2021-11-03/.

[39] *See, e.g.*, Mike Masnick, Calling Out Copyright Troll Mathew Higbee, TECHDIRT (Feb. 15, 2019), https://www.techdirt.com/2019/02/15/calling-out-copyright-troll-mathew-higbee/.

Troll.[40] CopyCat Legal has considerably increased the size of the pre-litigation demands—insisting on a prompt payment of $30,000 or else face litigation—and filed lawsuits against businesses that appear not to have counsel. One such claim, *Prepared Food Photos, Inc. v. Pool World, Inc.*, is the subject of this litigation.

The present matter has the markings of a Copyright Troll's scheme:

- CopyCat Legal sent a demand letter on behalf of Prepared Food Photos to Pool World, Inc. (the "Defendant"), alleging infringement of a seemingly generic photo (the, "Photo") that has been published at least a dozen or more times online and was available to license for a nominal sum on at least one commercial stock photo's website for some time.[41]

- CopyCat Legal and its clients appear to have conducted little due diligence, carefully couching their language in non-definitive terms.[42] For example, rather than conducting an exhaustive search to determine whether the Defendant licensed the Photo, CopyCat Legal's demand letter states, "To our knowledge, our client ***did not*** authorize you or your company to use and/or display the foregoing photograph(s)."[43] Indeed, it is likely that Prepared Food Photos and its lawyer did not know which businesses possessed a legitimate license because the stock site through which Prepared Food Photos made its catalog available did not keep Prepared Food Photos informed about who was buying licenses.[44]

---

[40] *See, e.g.*, Daniel DeSouza, *Is CopyCat Legal a Copyright Troll?*, CopyCat Legal Blog, https://www.copycatlegal.com/blog/is-copycat-legal-a-copyright-troll/ ("[T]rust me, as a 'troll,' I'm always looking for a few good meaty bones!").

[41] *See* discussion *supra* notes 17 and 32.

[42] *See* discussion *supra* Sec. 3.1(A).

[43] *See* Pool World Letter, *supra* note 12 at 2.

[44] *See* Levy Affirmation, Ex. D (Email correspondence between iStock and Paul Levy, Public Citizen), Prepared Food Photos, Inc. F/K/A Adlife Marketing & Communications Co., Inc. v. Pool World, Inc., No. 2:23-cv-00160-TOR (E.D. Wash. Nov. 5, 2023), ECF No. 21-8 (discussing how Prepared Food Photos has been pursuing Getty Image customers for several years).

- The demand letter, following a template that I have seen several times in CopyCat Legal's demand letters for this client and others, misrepresents the damages available in this copyright infringement claim. For example, the letter claims the Defendant may be liable up until $150,000 in statutory damages if the matter goes to court.[45] This is not true. Pool World's discovery responses indicate that the use began in 2010. The Photo, captured in 2001, was not registered until 15 years after its capture and six years after Pool World used the photo.[46] Prepared Food Photos is, therefore, limited to actual damages—not statutory.[47] CopyCat Legal knew or should have known this at the time the demand letter was issued. A straightforward search using the Internet Archive reveals that the Defendant's alleged use of the images in question as early as 2013, three years prior to the registration of the images, rendering statutory damages unavailable.

- The letter warns that, if Pool World does not pay and Prepared Food Photos is forced to file suit, the lawsuit will be filed in federal court in Florida where Prepared Food Photos is located—far away from Pool World's location of Spokane, Washington. This threat appears calculated to increase the target's apprehension because they are unlikely to know lawyers outside of their immediate geographic area, they are unlikely to know that a lawyer can appear *pro hac vice*, and they are likely to view defending a lawsuit across the country as more expensive. But, in actuality, this suit was filed in Spokane, making the threat to sue in Florida nothing more than an intentional falsehood.

- The case citations in support of the damage calculation are misleading. The demand letter cites to three cases, asserting courts "have not hesitated" imposing statutory damages for copyright infringers.[48] The letter cites another four cases in support of the proposition that

---

[45] *See* Pool World Letter, *supra* note 12 at 2-3.

[46] *See* Copyright Registration, VA 2-019-412, *supra* note 25.

[47] *See* discussion *supra* Sec. 3.1(C).

[48] *See* Pool World Letter, *supra* note 12 at 3 (citing *Reiffer v. World Views LLC*, No. 6:20-cv-786-RBD-GJK, 2021 U.S. Dist. LEXIS 38860 (M.D. Fla. Mar. 1, 2021); *Corson v. Gregory Charles Interiors, LLC*, No. 9:19-cv-81445,

"courts generally award plaintiffs statutory damages of between three and five times the cost of licensing fees ..."[49] Again, because statutory damages are unavailable to Prepared Food Photos, these cases are irrelevant. Moreover, five out of seven cases cited by the letter were the result of default judgments where a defendant did not mount any defense.

- The demand letter claims the Defendant may be liable for attorney's fees. This is also not true. Attorney's fees are not available with an untimely registration.[50]

- One of the most telling features of the demand letter is its blocked, single-spaced and bolded text commanding the recipient to pay $30,000 within 21 days. This language appears in substantially the same form in most, if not all, of CopyCat Legal's demand letters that I have reviewed. Both the amount and the peremptory deadline are plainly intended to instill fear in the recipient, and it is fair to assume that CopyCat Legal uses this format regularly because it has found this format to be effective. In my experience, people who get letters like this assume the stated deadlines are real, increasing their level of panic and their willingness to pay.

Finally, not apparent from the demand letter itself are the common targets of Prepared Food Photos. In the U.S. District Courts, local rules often stipulate that corporations and other business entities must appear in court through licensed attorneys. This requirement is consistent with the Supreme Court's ruling in *Rowland v. California Men's Colony, 506 U.S. 194, 202 (1993)*, which reaffirmed that corporations and other artificial entities may only appear in federal court through

---

2020 U.S. Dist. LEXIS 142932 (S.D. Fla. Aug. 7, 2020); and *CCA & B, LLC v. Toy*, No. 1:19-CV-01851-JPB, 2020 U.S. Dist. LEXIS 248303 (N.D. Ga. Dec. 14, 2020)).

[49] *See* Pool World Letter, *supra* note 12 at 4 (citing *Broad. Music, Inc. v. George Moore Enters., Inc.*, 184 F. Supp. 3d 166 (W.D. Pa. Apr. 25, 2016); *Broad. Music, Inc. v. Prana Hosp'y, Inc.*, 158 F. Supp. 3d 184 (S.D.N.Y. 2016); *Joe Hand Promotions, Inc. v. Alburl*, No. 5:18-cv-1935-LCB, 2020 U.S. Dist. LEXIS 29309 (N.D. Ala. Feb. 20, 2020); *Broad. Music, Inc. v. N. Lights, Inc.*, 555 F. Supp. 2d 328 (N.D.N.Y. 2008)).

[50] *See* discussion *supra* Sec. 3.1(C).

EXPERT REPORT OF AARON M. ARCE STARK                                                    20

licensed counsel.[51] The specific provision typically stems from the general principle that a corporation, being a separate legal entity, cannot appear *pro se*. Business entities are attractive targets because they are compelled to obtain counsel to mount a defense, rather than appearing themselves. Obtaining counsel can be cost prohibitive for a business. Prepared Food Photos seems to take advantage of this rule and, as a result, businesses targeted by Prepared Food Photos are forced to choose between obtaining counsel and not mounting a defense in copyright cases. This is purposefully designed to pressure businesses into settlements that far exceed the actual value of a licensing fee. Their demand letters and follow-up emails are crafted as scare tactics, often inflating the potential damages by citing statutory damages of up to $150,000 or including estimations of defense costs as starting points for settlement discussions.[52] These tactics are neither fair nor just and demonstrate that the goal is not to secure legitimate licenses but rather to extract money based on irrelevant metrics. This approach underscores a profit-driven strategy that prioritizes settlements over the actual enforcement of copyright protections.

### 3.6.   Prepared Foods Photos, Inc, represented by Copycat Legal, bases its demand on a questionable image subscription service.

Unlike other firms, CopyCat Legal's demand letters include one notable innovation in the Copyright Troll's playbook: large demands based on a questionable image subscription service.

---

[51] *See, e.g.*, Loc. R. Civ. P. 83.6 ("A corporation, including a limited liability corporation; a partnership, including a limited liability partnership; an unincorporated association; a trust; or any entity other than a natural person may not appear in any action or proceeding pro se.").

[52] For example, the Pool World Letter, *supra* note 12 at 2; email from CopyCat attorney to attorney for Healthy Solutions, ECF No. 21-9, page G-112; email from CopyCat attorney to attorney for Inn at Tanglewood Hall, ECF No. 55-12, page 170., In this very case, Prepared Food's owner attempted to contact Pool World owner directly during the litigation, leaving a voicemail and sending an email warning about the costs of the litigation and suggesting that Pool World offer a settlement to avoid that

Most Copyright Trolls price their demands "just low enough that it is less expensive for the defendant to pay rather than to defend the claim."[53] Prepared Food Photos, at least since retaining CopyCat Legal, aims for a much more lucrative payment. Specifically, the letter demands $30,000—the maximum amount allowable under the Copyright Act for infringement that is not willful.[54] To justify these demands, the Parties point to a subscription model—with its collection of dated food imagery—priced at $999 per month.

In the present matter, the demand letter begins with a description of Prepared Food Photos:

> This law firm represents Prepared Food Photos, Inc. Our client is in the business of licensing high-end, professional photographs for the food industry. Through its website (www.preparedfoodphotos.com), our client offers a monthly subscription service which provides access to/license of tens of thousands of professional images. The rights associated with these images are exclusively owned by our client, and it has spent countless hours and substantial monies in building a business that relies on such exclusive subscription service. The unauthorized use of our client's work deprives our client of much-needed income and forces our client to incur substantial costs (monetary and time) in identifying violators and enforcing its rights.[55]

That letter then goes on to argue that Prepared Food Photos, operating solely on a subscription model, is entitled to a minimum license fee of $11,988.00 annually—the product of multiplying the monthly rate of $999 by 12 months.[56] The Parties then apply a 3x multiplier, which they believe is appropriate and consistent with their cited—say nothing of, problematic—legal authorities. This multiplier results in "statutory damages of $35,964.00 (*for each annualized licensing period*)."[57]

---

[53] *See* Sag & Haskell, *supra* note 10 at 573.

[54] 17 U.S.C. § 504(c).

[55] *See* Pool World Letter, *supra* note 12 at 1.

[56] *Id.* at 4.

[57] *Id.*

There are several problems with this damage calculation. First, under the Copyright Act:

> The copyright owner is entitled to recover the actual damages
> suffered by him or her as a result of the infringement, and any profits
> of the infringer that are attributable to the infringement and are not
> taken into account in computing the actual damages. In establishing
> the infringer's profits, the copyright owner is required to present
> proof only of the infringer's gross revenue, and the infringer is
> required to prove his or her deductible expenses and the elements of
> profit attributable to factors other than the copyrighted work.[58]

Courts, including courts in the Ninth Circuit, have calculated actual damages by determining
"the extent to which the market value of a copyrighted work has been injured or destroyed by an
infringement."[59] Market value is "what a willing buyer would have been reasonably required to
pay to a willing seller for plaintiffs' work."[60] In appropriate circumstances, actual damages may
be taken to be a reasonable license fee—that is, the fair market value of a license authorizing
defendants' use of the copyrighted work.[61] This inquiry is a fact intensive analysis, which the
Parties have not conducted. Instead, the Parties indiscriminately apply an advertised subscription
fee to all instances of alleged infringement and overlook the factors that a court would
reasonably consider, inflating the perceived damages beyond reality.

Second, the alleged infringement of the Photo occurred *before* the publication of the Prepared
Food Photos' subscription rate of $999 per month. As noted above, the Defendant began using
the Photo in 2010. At that time, Prepared Food Photos had not registered the Photo with the
Copyright Office.[62] Prepared Food Photos had not licensed its images through its subscription
model, nor had it published its subscription rates. The parties appear to be basing their damage

---

[58] 17 U.S.C. § 504(b).

[59] *See, e.g., Getty Images (US), Inc. v. Virtual Clinics*, 2014 U.S. Dist. LEXIS 12449, 2014 WL 358412, at *6 (W.D.
Wash. Jan. 31, 2014) (citations omitted).

[60] *See, e.g., Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157 (9th Cir. 1977).

[61] *See, e.g., Barrera v. Brooklyn Music, Ltd.*, 346 F. Supp. 2d 400, 409 (S.D.N.Y. 2004) (using fair market value of
license to calculate actual damages on default judgment).

[62] *See* Copyright Registration, VA 2-019-412, *supra* note 25.

EXPERT REPORT OF AARON M. ARCE STARK                                                          23

calculation on a retroactive application of a $999 monthly subscription rate. However, they claim this rate is standard, despite discovery revealing instances where the subscription rate is significantly lower. I have reviewed the subscription agreements produced in discovery). Both in a deposition and in conversation with targets of demands, Prepared Food representatives have admitted that these subscription agreements are not intended for small businesses making a single use, and that $12,000 is too much to pay for use of a single image.[63] Additionally, a subpoena to iStock produced a document showing that AdLife's license fees for the same image were as little as twelve cents.

In short, this calculation is neither grounded in law nor facts.

## 4. SUMMARY AND CONCLUSIONS

Based on my professional experience and my review of this matter, it is my opinion that the present matter, *Prepared Food Photos, Inc. v. Pool World, Inc.*, mirrors other matters pursued by Copyright Trolls.

Copyright Trolls send intimidating—and misleading—letters to individuals and small businesses. These generic letters often (a) demonstrate little due diligence by an attorney, (b) reference generic images that can be found in multiple places online, and (c) contain misleading statements of the law, including mischaracterizations of the damages for the alleged infringement permissible under U.S. Copyright law.

Copyright Trolls' attorneys engage minimally in the scheme. Copyright Trolls' attorneys employ a system that is optimized for scale with heavy reliance on the use of template letters with little

---

[63] *See, e.g.*, Ex. Y (Deposition of Rebecca Jones) at p. 192, Prepared Food Photos, Inc. F/K/A Adlife Marketing & Communications Co., Inc. v. Pool World, Inc., No. 2:23-cv-00160-TOR (E.D. Wash. Jun. 26, 2023), ECF No. 55-14; *see also* Ex. W (Affirmation of Justin Nygard) at pp. 178-179, ¶ 4, Prepared Food Photos, Inc. F/K/A Adlife Marketing & Communications Co., Inc. v. Pool World, Inc., No. 2:23-cv-00160-TOR (E.D. Wash. Jun. 26, 2023), ECF No. 55-12.

customization, and communications handled by professional staff purportedly under their guidance and direction.

Targets who obtain knowledgeable counsel rarely settle, pay, or proceed to litigation. Knowledgeable attorneys can successfully defend against Copyright Trolls by identifying weaknesses in claims. There are often defects with the copyright registrations, such as a mismatch between the copyright owner and the plaintiff pursuing a claim. Targets may also have a license, providing even more evidence of a lack of due diligence. Copyright Trolls also appear often unwilling to pursue litigation to its conclusion.

Copyright Trolls harm individuals and small businesses. Individuals report financial stress incurred through entering settlements with Copyright Trolls or hiring legal counsel. Additionally, individuals report psychological and emotional stress, as well as being coerced into settlement to avoid statutory damages—a sum that, if ever obtained, would create cascading financial consequences and potential bankruptcy.

Copycat Legal PLLC, acting on behalf of Prepared Foods Photos, Inc. is now pursuing a copyright infringement claim against Pool World, Inc. This infringement claim is flawed in many ways. But the exorbitant damage calculation with its reliance on a dubious subscription model is especially problematic. In their demand letter, Copycat Legal PLLC and Prepared Foods Photos, Inc. suggest they are entitled to statutory damages when they are not. Furthermore, the damage calculation is neither consistent with courts' interpretation of the Copyright Act nor is it reasonable to calculate damages based on a retroactive application of a subscription model.

## 5. AUTHORITIES

### CASES

*Barrera v. Brooklyn Music, Ltd.*, 346 F. Supp. 2d 400, 409 (S.D.N.Y. 2004).

*Bell v. Wilmott Storage Servs., LLC,* 12 F.4th 1065, 1070 (9th Cir. 2021).

*Design Basics, LLC v. Signature Construction, Inc.,* 994 F.3d 879 (7th Cir. 2021).

*Getty Images (US), Inc. v. Virtual Clinics*, 2014 U.S. Dist. LEXIS 12449, 2014 WL 358412
(W.D. Wash. Jan. 31, 2014).

*McDermott v. Monday Monday, LLC*, No. 17CV9230 (DLC), 2018 WL 1033240 (S.D.N.Y. Feb.
22, 2018).

*Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157 (9th Cir. 1977).

### STATUTES

17 U.S.C. § 412

17 U.S.C. § 504

### OTHER AUTHORITIES

Balganesh, Shyamkrishna, *The Uneasy Case Against Copyright Trolls*, 86 S. Cal. L. Rev 723
(2013).

Brief of Electronic Frontier Foundation, Authors Alliance, American Library Association and
Association of Research Libraries in Support of Petitioners as Amici Curiae, Warner
Chappell Music, Inc., et al., v. Sherman Nealy et al. (No. 22-1078), 2023 WL 8481981.

Blake Brittain, *Embattled copyright lawyer suspended from practice in New York*, REUTERS
(Nov. 3, 2021), https://www.reuters.com/legal/legalindustry/embattled-copyright-lawyer-
suspended-practice-new-york-2021-11-03/.

Creative Commons, *About CC Licenses*, https://creativecommons.org/share-your-
work/cclicenses/.

Daniels, Jeff, *Buffalo Wild Wings needs a Super Bowl boost*, CNBC (Feb. 2, 2016),
https://www.cnbc.com/2016/02/02/buffalo-wild-wings-needs-a-super-bowl-boost.html.

DeBriyn, James, *Shedding Light on Copyright Trolls: An Analysis of Mass Copyright Litigation in the Age of Statutory Damages*, 19 UCLA Ent. L. Rev. 1 (2012).

DeSouza, Daniel, *Is CopyCat Legal a Copyright Troll?*, CopyCat Legal Blog, https://www.copycatlegal.com/blog/is-copycat-legal-a-copyright-troll/ (https://perma.cc/A2D6-HR2T).

Goodyear, Michael, *A Shield or a Solution: Confronting the New Copyright Troll Problem*, 21 Tex. Rev. Ent. & Sports L. 77 (2020).

Greenberg, Brad, *Copyright Trolls and Presumptively Fair Uses*, 85 U. Colo. L. Rev. 53 (2014).

Greenberg, Brad, *Copyright Trolls and The Common Law*, 100 Iowa L. Rev. Bull. 77 (2015).

Homer, Carolyn, *Investigating the Higbee & Associates Copyright Trolling Operation*, TECHDIRT (Feb. 22, 2019), https://www.techdirt.com/2019/02/22/investigating-higbee-associates-copyright-trolling-operation/ (https://perma.cc/PD2U-QNW6).

Masnick, Mike, Calling Out Copyright Troll Mathew Higbee, TECHDIRT (Feb. 15, 2019), https://www.techdirt.com/2019/02/15/calling-out-copyright-troll-mathew-higbee/.

Quinn, Daniel, *One Person's Unsettling Experience With A $20k Higbee Copyright Troll Demand Letter*, TECHDIRT (Feb. 21, 2019), https://www.techdirt.com/2019/02/21/one-persons-unsettling-experience-with-20k-higbee-copyright-troll-demand-letter/ (https://perma.cc/H58W-6VY4).

Sag, Matthew, *Copyright Trolling, An Empirical Study*, 100 Iowa L. Rev. 1105 (2015).

Sag, Matthew and Haskell, Jake, *Defense Against the Dark Arts of Copyright Trolling*, 103 Iowa Law Review 571 (2018).

## 6. CERTIFICATION

I certify under penalty of perjury that the opinions expressed in this expert report are true and correct to the best of my knowledge, and if called as a witness I would testify competently thereto.

_____          January 30, 2025
                                          _____

Aaron M. Arce Stark                       Date

Stark.Law LLC

# Attachment A

# Aaron M. Arce Stark

1701 Rhode Island Avenue NW
Washington, DC 20036
(202) 643-1773 • aaron@stark.law • www.stark.law

---

**PROFESSIONAL EXPERIENCE**

### Stark.Law LLC, Washington, DC                                      Apr. 2014—Present
*Formerly known as Arce Stark Law LLC and Arce Stark & Haskell LLP*

Aaron M. Arce Stark is the founder and attorney for a general services firm serving businesses, artists, consumers, and others across a range of practice areas. Mr. Stark manages the operation of the firm, including directing all client interactions, supervising contractors, and ensuring compliance with rules of professional conduct.

Mr. Stark has represented clients in state and federal litigation and before federal regulatory bodies, including the U.S. Patent & Trademark Office (USPTO), in areas including business formation, copyright, trademark, contract, defamation, domain dispute, and general litigation.

Representative matters include:

- Represented business owner in defamation, unfair competition, false promotion, tortious interference, and breach of contract claims
- Represented business owner in copyright infringement and removal of copyright management information claims
- Represented business in trademark infringement dispute
- Represented individual in breach of contract claim
- Represented prospective tenant in false advertising claim against multi-national corporate defendants
- Successfully defended more than 50 individual and corporate defendants in copyright infringement claims
- Conducted due diligence, submitted trademark applications, and responded to substantive office actions for more than 100 marks (both standard and stylized)
- Advised business owners on corporate formation, vendor management, and contract management
- Drafted cease-and-desist and settlement demand letters to alleged trademark infringers

---

**EDUCATION**

### Loyola University Chicago School of Law                           May 2013
Juris Doctor

- Leadership & Service Recognition Award, 2013
- Public Interest Recognition Award, 2013
- Moot Court National Finalist, 2012
- Comparative Advocacy Program, London, England, Winter 2013

### San Francisco State University                                    May 2009
Master of Arts in Special Education

University of Oregon                                                          May 2004
Bachelor of Arts, emphasis in Psychology

---

**JUDICIAL EXTERNSHIPS**

Honorable Michael Mason, U.S. District Court, N.D. of Illinois        Feb. 2013—May 2013

- Drafted opinion on claimant's motion for summary judgment seeking judicial review of administrative court's final decision to deny claim for disability insurance benefits

Honorable Ruben Castillo, U.S. District Court, N.D. of Illinois        May 2011 – Aug. 2011

- Drafted opinion on a motion to dismiss a lawsuit alleging false patent marking under 35 U.S.C. § 292.
- Drafted opinions on motions for a new trial, judgment as a matter of law, and sanctions in a lawsuit alleging false arrest pursuant to Section 1983.

---

**PUBLICATIONS**

- What Proposed Copyright Clause Restoration Act of 2022 Means for Photographers, RANGEFINDER MAGAZINE (May 2022)
- Fair Use or Copyright Infringement? Analysis of the LeBron James Social Media Lawsuit, RANGEFINDER MAGAZINE (Jan. 2021)
- Is it Legal to Take Photos on Private Property?, RANGEFINDER MAGAZINE (Jan. 2021)
- Wedding Photographer Fired for Black Lives Matter Support, RANGEFINDER MAGAZINE (Jun. 2020)
- Do You Give Up Exclusive Licensing Rights When You Post on Instagram?, RANGEFINDER MAGAZINE (Apr. 2020)
- Photo Business Branding & Trademark Protection, RANGEFINDER MAGAZINE (Mar. 2020)
- COVID-19 Legal Take: 3 Things To Help Your Business, RANGEFINDER MAGAZINE (Mar. 2020)
- What Happens When You or Your Photography Clients Have to Cancel a Shoot?, RANGEFINDER MAGAZINE (Mar. 2020)
- 5 Legal Issues Photographers Must Know to Protect Business, RANGEFINDER MAGAZINE (Feb. 2020)
- What To Do If Someone Has Stolen Your Photograph, RANGEFINDER MAGAZINE (Dec. 2019)
- The Paparazzi Sued a Supermodel For Posting a Photo of Herself to Instagram, RANGEFINDER MAGAZINE (Nov. 2019)
- Is Sending Marketing Messages Via Text to Your Photo Clients Legal?, RANGEFINDER MAGAZINE (Oct. 2019)
- Who Should Sign Your Wedding Photography Contract?, RANGEFINDER MAGAZINE (Sep. 2019)
- Dealing with a Client With Infinite Follow-Up Photo Requests, RANGEFINDER MAGAZINE (Aug. 2019)
- Are You Properly Using Music for Wedding Films and Highlight Reels?, RANGEFINDER MAGAZINE (Jun. 2019)
- How to Protect Your Photos on Social Media, RANGEFINDER MAGAZINE (May. 2019)
- Controlling Your Liability When Your Photo Gear Fails at a Wedding, RANGEFINDER MAGAZINE (Apr. 2019)

- 4 Crucial Tax Tips for Photographers Who Live and Work in Different States, RANGEFINDER MAGAZINE (Mar. 2019)
- 5 Simple Ways to Lock Down and Protect Your Photography Brand, RANGEFINDER MAGAZINE (Feb. 2019)
- Reclaim Your Domain: How to Take Back Your URL When Another Business Nabs It, RANGEFINDER MAGAZINE (Jan. 2019)
- Understanding Copyright's Technical Distinction Between Published and Unpublished Photos, RANGEFINDER MAGAZINE (Jan. 2019)
- What If Your Photo Partnership Breaks Up?, RANGEFINDER MAGAZINE (Nov. 2018)
- Licensing and Protecting Your Invention Against Competitors Can Get Hairy, RANGEFINDER MAGAZINE (Nov. 2018)
- Do I Need Permission to Include That in My Photo?, RANGEFINDER MAGAZINE (Sep. 2018)
- 6 Lame Copyright Excuses Photographers Should Watch Out For, RANGEFINDER MAGAZINE (Aug. 2018)
- A Photographer's Survival Guide to Meme Madness, RANGEFINDER MAGAZINE (Jun. 2018)
- Navigating the Satisfaction Clause in Contracts with Portrait Clients, RANGEFINDER MAGAZINE (May 2018)
- The Sticky Business of Trademarking Your Own Name, RANGEFINDER MAGAZINE (Apr. 2018)
- Are Your Ideas Copyrightable?, RANGEFINDER MAGAZINE (Mar. 2018)
- What Photographers Need to Know About Copyright Law, RANGEFINDER MAGAZINE (Feb. 2018)
- Should You Really Be Shooting Portraits Inside Retail Stores?, RANGEFINDER MAGAZINE (Jan. 2018)
- Getting Cozy with Copyright Again, RANGEFINDER MAGAZINE (Dec. 2017)
- What You Can (and Cannot) Do When Your Photo Goes Unexpectedly Viral, RANGEFINDER MAGAZINE (Nov. 2017)
- What Happens When Your Clients Want the RAW Files?, RANGEFINDER MAGAZINE (Oct. 2017)
- The Legalities of Photographing School Sports, RANGEFINDER MAGAZINE (Sep. 2017)
- How To Avoid Trouble With Airport Customs Abroad, RANGEFINDER MAGAZINE (Jul. 2017)
- How to Reason With an Unreasonable Venue Contract, RANGEFINDER MAGAZINE (Jul. 2017)
- Should You Turn Your Business Into an LLC?, RANGEFINDER MAGAZINE (Jun. 2017)
- Second Shooter Authorship: Who Owns The Photos?, RANGEFINDER MAGAZINE (Apr. 2017)
- Street Photography: Knowing Your Rights and Risks, RANGEFINDER MAGAZINE (Mar. 2017)
- Does Photographing Street Art Violate the Artist's Copyright?, RANGEFINDER MAGAZINE (Mar. 2017)
- Why Registering Your Copyrights is More Essential Than You Think, RANGEFINDER MAGAZINE (Jan. 2017)

## PRESENTATIONS

- Legal Essentials for Photographers, WPPI (2022)
- Contracting Essentials for Photographers, WPPI (2022)
- Photography Contracts and Copyright: What You Need to Know, RANGEFINDER + WPPI (2021)
- Copyright and Contracts, AFRICAN AMERICAN PHOTOGRAPHERS ASSOCIATION: THE EXPOSURE GROUP (2019)

AARON M. ARCE STARK                    3

- Government Agency Photographers Meeting, Washington, D.C. (2019)
- Washington Area Lawyers for the Arts, Washington, D.C. (2018)
- Fearless Conference (2018)
- Capital Area Photographers (2018)
- International Monetary Fund/World Bank Photography Society, Washington, D.C. (2017)
- I bought a Photo Booth, So Now What? The Legal Foundation You Need for a Successful Photo Booth Business, FEARLESS CONFERENCE (2017)
- Privacy and Liability Issues of Using Images for Art and Marketing, ARTOMATIC (2016)
- Copyright, Contracts and Consent, CAPITAL AREA PHOTOGRAPHERS (2016)
- From Click to Copyright, FEARLESS CONFERENCE (2015)

## PROFESSIONAL SERVICE & COMMUNITY INVOLVEMENT

- Washington Area Lawyers for the Arts
- Children's Law Center
- Copyright Society of the U.S.A.
- Hispanic National Bar Association

## BAR ADMISSIONS

District of Columbia Bar (admitted November 2014, active member)
Illinois State Bar (admitted October 2013, active member)
New York State Bar (admitted December 2016, active member)

## COURT ADMISSIONS

U.S. District Court: District of Columbia
U.S. District Court: Northern District of Illinois
U.S. District Court: Eastern District of New York
U.S. District Court: Southern District of New York