Max K. Archer, WSBA # 54081
Riverside Law Group, PLLC
905 W. Riverside Ave., Ste. 404
Spokane, WA 99201
mka@riverside-law.com
(509) 504-8714
Attorney for Plaintiff

Daniel DeSouza, pro hac vice
Lauren Hausman, pro hac vice
CopyCat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065
dan@copycatlegal.com
lauren@copycatlegal.com
(877) 437-6228
Attorney for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| PREPARED FOOD PHOTOS, INC. f/k/a ADLIFE MARKETING & COMMUNICATIONS CO., INC., | Civil Action No. 2:23-cv-00160-TOR |
| Plaintiff, | |
| v. | **PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS** |
| POOL WORLD, INC., | |
| Defendant. | |

1. Plaintiff Prepared Food Photos ("PFP") is a company that purports to be in the business of licensing stock photographs of food to commercial users.

Complaint, ¶ 8, DN 1.

**RESPONSE:** Undisputed.

2. Since 2016, PFP's main source of revenue, and the main occupation of its staff, has been looking online for alleged infringements of its decades-old photo library, sending demand letters to the alleged infringers, and suing small companies seeking tens of thousands of dollars in damages.

Infra ¶¶ 20-29.

**RESPONSE:** Disputed. Undisputed that the main source of revenue has been pursuing infringements of Plaintiff's work. Disputed as to remainder. A large portion of Plaintiff's staff's time is dedicated to finding infringements, but Plaintiff's main goal remains attempting to license its library to willing subscribers. See Jones Decl. at ¶ 5.

**The Grilled Vegetable Photo and PFP's Licensing Until 2016**

3. PFP claims ownership of a copyright of a stock photograph of vegetables on skewers sitting on a grill ("Grilled Vegetable Photo"). It claims that this is one of the "tens of thousands of professional images" that it offers for licensing in what it calls its "library."

Complaint ¶¶ 7-8, 11-12 (DN 1).

**RESPONSE:** Undisputed.

4. In the summer of 2010, defendant Pool World created a website to advertise its sale of grills. It posted a composite image to that website that included part of the Grilled Vegetable Photo as well as part of a photograph of shrimp sitting on a grill.

Flynn Affirmation ¶ 4 (DN 55-17 at 202); Answer, Exhibit A (DN 7)

**RESPONSE:** Disputed to the extent that Defendant claims that only a part of the Work was used on defendant's website, as the entirety of photo was displayed thereon. See Jones Decl. at ¶ 26.  Undisputed as to the remainder.

5. In 2010, and until 2016, PFP (then known as AdLife Marketing and Communications") had an arrangement with iStock, a subsidiary of Getty Images, under which a portion of the photos in its library, including the Grilled Vegetable Photo, were available to license from iStock for as little as $1.

Teal Expert Report; Seventh Levy Affirmation (filed with this motion) ¶ 2 and Exhibit LL.

**RESPONSE:** Disputed. In 2010, iStock offered either a subscription model (similar to Plaintiff), whereby users would have to pay a monthly fee to iStock to download                    photographs                    see https://web.archive.org/web/20100922205305/http://www.istockphoto.com/compare-payment-plans.php; or, offered an individual credit system where a user could purchase credits and then apply those credits to purchase photographs. See e.g.,

https://web.archive.org/web/20101111123006/http://www.istockphoto.com/buy-stock-credits-pay-as-you-go.php; Per iStock's own website, for someone to license a photo for one dollar (which would only provide one extra small file size) that user would have to spend $5,000 to receive the 5,000 credits. See DeSouza Decl. at ¶¶ 28, 29.

6. The licenses sold by iStock were "perpetual," meaning that the purchaser of the license could use the photo indefinitely in the future, and could provide the photo to its customers for use for any purpose.

Teal Expert Report; Levy Third Aff. ¶¶ 5-6 and Exhibits O & P (DN 55-1 at 30, 55-5, and 55-6)

**RESPONSE:** Undisputed.

7. iStock did not inform PFP of the identity of the customers who were buying licenses for the use of PFP's photos; thus PFP had no way of knowing whether any given user of its photos was licensed.

First Levy Aff. ¶ 15 (DN 21-1 at 19).

**RESPONSE:** Disputed in part. Plaintiff has/had ways to know whether a given defendant/user (including Defendant in this case) was licensed to use Plaintiff's photographs. See Jones Decl. at ¶ 8.

8. The Grilled Vegetable Photo was one of approximately 4700 photographs that PFP made available for licensing through iStock.

Seventh Levy Aff. ¶ 3.

**RESPONSE:** Undisputed.

9. Between 2010 and 2016, iStock sold hundreds of licenses for use of the Grilled Vegetable Photo.

Seventh Levy Aff. ¶ 2 and Exhibit LL.

**RESPONSE:** Undisputed.

10. The licensees for the Grilled Vegetable Photo were charged as little as ninety-five cents ($.95) for a single license, and PFP's share of those license fees was as little as twelve cents ($0.12) for a single license.

*Id.*

**RESPONSE:** Disputed. See response to 5.

11. In each of the years from 2010 to 2016, iStock paid PFP the following amounts in total license fees for the thousands of PFP photos it was licensing:

| | |
|---|---|
| 2010 | $15,476.88 |
| 2011 | $10,346.00 |
| 2012 | $ 7,715.99 |
| 2013 | $ 9,716.09 |
| 2014 | $16,850.97 |
| 2015 | $13,596.97 |
| 2016 | $ 5,471.91 |

The annual average was slightly more than $11,300.

Levy Seventh Aff., ¶ 4 and Exhibit M.

**RESPONSE:** Undisputed.

12. The current market value of a license for the Grilled Vegetable Photo is

about ten to twelve dollars.

> Expert Report of Jessica Teal; First Levy Aff. ¶ 10 (DN 21-1 at 17).

**RESPONSE:** Undisputed that the price of similar photographs on iStock photo are currently available to license for approximately $10-$12. Disputed that such constitutes the fair market value of the Work. See Jones Decl. at ¶ 18.

13. Not all of PFP's photos were licensed through iStock. The remainder were licensed through other companies, including a company called Multi-Ad.

> Complaint in *Adlife Marketing & Communications Company, Inc. v. Multi-Ad Solutions, LLC*, No. 1:17-cv-01418, and Exhibits A and B.

**RESPONSE:** Undisputed.

14. The licenses to use photographs sold through Multi-Ad were not "royalty free", but allowed the use of large numbers of photos for a single price.

> Levy Fourth Aff. (DN 67-1) ¶¶ 11-13.

**RESPONSE:** Undisputed.

15. The total income that PFP received from Multi-Ad and iStock combined in the years 2012 to 2016 was

> 2012 $ 134,000
> 2013 $ 124,493
> 2014 $ 113,672
> 2015 $ 104,428
> 2016 $ 102,632

PFP stated that it had no records of income from licensing before 2012.

> Levy Seventh Aff. ¶ 5 and Exhibit NN.

**RESPONSE:** Undisputed.

16. Thus, the bulk of the licensing revenue that PFP received from these two companies combined was from licenses sold for the photos made available through Multi-Ad, not licenses sold for photos made available through iStock.

Supra ¶¶ 11 and 15.

**RESPONSE:** Undisputed.

**PFP's 2016 Change of Its Licensing Practices**

17. In 2016, Plaintiff registered copyrights for all its images. It stopped licensing the use of individual photographs through third-party vendors such as iStock and Multi-Ad, and instead began selling licenses itself, but only by subscription to its entire database.

Third Levy Aff. (DN 55-1), ¶ 8 and Exhibit R (DN 55-7).

**RESPONSE:** Undisputed that Plaintiff began doing copyright registrations for its library of images in 2016 and that process continued into 2017.

18. As described in a blog post by PFP's owner, he knew that PFP's images were being used without license, and one purpose of this change in business model was to enable PFP to begin making money from claims of copyright infringement.

*Id.*

**RESPONSE:** Disputed. The Albrizio blog post is mischaracterized by Defendant. See August 15, 2025 Declaration of Joel Albrizio ("Albrizio Decl.") at ¶¶ 5, 6,

attached to Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment, as "Exhibit E" thereto; ECF No. 55-7.

19. PFP has not registered copyrights in any photographs created after 2017. Levy Third Aff. ¶ 48 (DN 55-1 at 46-47).

**RESPONSE:** Undisputed.

**PFP's Extensive Reverse-Image Search and Copyright Enforcement Efforts**

20. PFP is a sophisticated and highly experienced repeat copyright litigant with an extensive enforcement operation.

*See generally infra.*

**RESPONSE:** Disputed. Plaintiff is a small company consisting of both part-time and full-time employees. Plaintiff does not use sophisticated technology to search for infringements. See Jones Decl. at ¶¶ 4, 9.

21. Since 2016, Plaintiff has been systematically using "reverse image" searches to identify small businesses using its images on the internet and sending out demand letters seeking payments in the five figures or high four figures to avoid litigation.

First Levy Aff., Exhibit B (Answer to Interrogatories 10 and 16, DN 21-4 at B-60-61); Third Levy Aff., ¶ 15 (DN 55-1, at 33).

**RESPONSE:** Disputed. Plaintiff, since 2017, has been utilizing Google reverse image searches to search for potential infringements of its photographs. The size of a business is not a factor in determining an infringement. Upon discovery of

such, Plaintiff's general practice is to send a cease and desist/demand letter, through its attorney, which seeks payment subject to its violation of the Copyright Act and removal of the infringement from the infringer's website. See Jones Decl. at ¶ 11.

22. PFP has used its own officers and other staff, and four outside search firms, including the outside law firm of Higbee and Associates, to conduct those searches. Since 2016, this sophisticated enforcement team has been constantly "search[ing] the entirety of Plaintiff's image library via google reverse image search to identify" potential infringers.

> Seventh Levy Aff., Exhibit YY (Answer to Interrogatories 10 and 16); MyNewsFit Prepared Food Photos Article Mar. 27, 2023, Exhibit O, available at https://www.blog.preparedfoodphotos.com/food-photos/dod1pyoq9tv6f72ytumdh9p4moi5f5.

**RESPONSE:** Partially disputed insofar as it refers to plaintiff's sophisticated enforcement team. See response to 20.

23. Most of the work done by PFP's employees consists of conducting online searches for possible infringements.

Levy Third Aff. ¶ 47 & Exhibit Z (DN 55-1 at 46, DN 55-15 at 196-197).

**RESPONSE:** Disputed. Defendant's synthesization of what Plaintiff's employees work consists of is mischaracterized. See Jones Decl. at ¶ 5.

24. In response to discovery requests to show records of its searches for infringing images, PFP produced records of searches that found potentially infringing images; it produced no records of unsuccessful searches.

Levy Seventh Aff., ¶ 15

**RESPONSE:** Undisputed because Plaintiff does not save searches that yield no results and therefore does not have any documents to produce showing unsuccessful searches. See Jones Decl. at ¶¶ 15, 16.

25. PFP produced one set of spreadsheets showing reverse image searches in 2016, 2017 and early 2019, and another that showed searches that its own staff had conducted from April 2019 to early 2024.

*Id.*

**RESPONSE:** Disputed insofar as Defendant describes the spreadsheet as showing searches rather than the result of searches. See Jones Decl. at ¶¶ 15, 16.

26. The spreadsheet showing searches beginning April 2019 recorded the date of each search, the dates when PFP staff sent demand letters to each alleged infringer, and the amount collected on the successful claims (or, the ledger indicated that the matter had been referred to counsel).

Levy Seventh Aff. ¶ 16.

**RESPONSE:** Disputed. See response to 25.

27. In the first set of spreadsheets, an entry showed that on September 30,

2016, PFP found an allegedly infringing use of "ProduceVegetableGrilled002," PFP's file name for the photo at issue in this case. That spreadsheet did not show any other searches for ProduceGrilledVegetable002.

Levy Seventh Aff. ¶ 17.

**RESPONSE:** Disputed. See response to 25.

28. The second spreadsheet recorded search hits on ProduceGrilledVegetable002 on July 10, 2019, April 17, 2020, March 30, 2022, and May 3 and June 1, 2022. The latter two search hits were from Pool World's website.

*Id.*

**RESPONSE:** Undisputed.

29. PFP produced no documents reflecting any other searches for "ProduceVegetableGrilled002" before June 2020 (three years before the complaint was filed).

*Id.*

**RESPONSE:** Undisputed because, as explained above, Plaintiff only logs on the spreadsheet when it actually finds an infringement of a particular photograph, not every search it does for that photograph which yields no results.

**PFP's Post-2016 Licensing Model**

30. After registering its copyrights, PFP took the position that the Multi-Ad

licenses that users had previously purchased were not "royalty-free" but rather had terminated, and that when Multi-Ad customers used PFP photos that they had obtained from Multi-Ad, they were infringing PFP's copyrights. PFP accordingly sent demand letters to former Multi-Ad customers, alleging infringement,

Levy Fourth Aff., ¶¶ 11-12 (DN 67-1 at 16-17).

**RESPONSE:** Undisputed.

31. Several former Multi-Ad customers entered subscription agreements with PFP following those PFP claims and demand letters.

*Id.*; Fleurant Declaration (DN 71-1) ¶ 8; Levy Third Aff. ¶ 19 (DN 55-1, at 35).

**RESPONSE:** Undisputed.

32. PFP secured its first subscription under its new licensing model in 2017 with a supermarket chain that subscribed at the rate of $499 per month. That subscription has apparently been renewed repeatedly since, and that subscriber continued to pay $499 per month through 2024.

Levy Fifth Aff. ¶ 11 and Exhibit HH (DN 67-1 at 16-17 and 70-3 at 62-67; Seventh Levy Aff ¶ 7 and Exhibit OO.

**RESPONSE:** Undisputed.

33. PFP produced a total of only twenty-two subscription agreements in discovery, revealing several agreements providing for monthly payments of $1188 per year ($99 per month), $300 per month, $499 per month, $500 per month, and

higher amounts).

Levy Seventh Aff. ¶ 7 and Exhibit OO.

**RESPONSE:** Undisputed.

34. Most of these subscription agreements were with businesses of two types – supermarket chains and advertising companies that service grocery stores and supermarkets.

*Id.*

**RESPONSE:** Undisputed.

35. Most of the subscription agreements required the subscribers to provide credit cards to which the monthly subscription payments could be charged automatically.

*Id.*

**RESPONSE:** Undisputed.

36. The two subscription agreements that were with other businesses – one a hospital chain, and one a single grocery store — were entered after PFP threatened the businesses with suit for infringement.

*Id.*

**RESPONSE:** Undisputed as to the fact that the subscription agreement with the two subject entities Defendant references were entered after Plaintiff made an allegation of infringement. However, in each such instance, it was the alleged

infringer, rather than PFP, who requested and/or insisted on a subscription to Plaintiff's photo library. See DeSouza Decl. at ¶ 5.

37. Pre-subscription communications produced in discovery, as well as payments in a ledger supplied by CopyCat Legal, reflect that each of the subscription agreements entered in 2021 or later was entered following claims of infringement directed to the subscriber or to one or more clients of the subscriber.

*Id.* See also Levy Fourth Aff. ¶ 12 (DN 67-1 at 17).

**RESPONSE:** Undisputed.

38. PFP follows a policy of destroying documents after four years.

Levy Fifth Aff. ¶ 5 (DN 69-1 at 13) and Exhibit EE DN 69-3 at 29-30.

**RESPONSE:** Undisputed.

39. PFP has produced no pre-subscription communications with subscribers whose agreements were signed before 2021.

Levy Seventh Aff. ¶ 7 and Exhibit OO.

**RESPONSE:** Undisputed.

40. PFP has produced no bank records from January through May, 2020.

Levy Seventh Aff. ¶ 20.

**RESPONSE:** Disputed. PFP obtained and produced those records subsequent to the filing of the motion. See DeSouza Decl. at ¶ 6.

41. PFP produced no bank records from 2017.

Levy Seventh Aff. ¶ 20.

**RESPONSE:** Undisputed.

42. PFP's subscription agreements are not intended for small businesses that need and used access to only a single photograph.

Nygard Aff. ¶ 10 (reporting admission by PFP representative).

**RESPONSE:** Disputed. In general, Plaintiff's subscribers are larger grocery stores and/or advertising companies who design weekly ads. Plaintiff's photo library is intended for anyone who wants to license the library, but usual subscriber is as described above. See Jones Decl. at ¶ 17.

43. PFP produced a spreadsheet showing monthly subscription payments during calendar years 2023 and 2024 that included monthly payments of $99 per month, $299 per month and other amounts lower than $999 per month.

Levy Fifth Aff. and Exhibit KK (DN 70-3, pages 83-84).

**RESPONSE:** Undisputed, but Defendant purposefully leaves out the fact that most of Plaintiff's subscriptions are for $999.00 per month or above. See Jones Decl. at ¶ 18.

44. PFP was unable to produce documentation of the amounts of monthly payments received from most of its subscribers before 2023, who paid by credit card, because PFP failed to preserve the document before the company providing credit card services went out of business.

1

Fleurant Declaration ¶¶ 8-10 (DN 71-1 at 2-3).

**RESPONSE:** Disputed. The Fleurant Declaration makes clear that Plaintiff did not fail to preserve documents, but rather that the documents were deleted as a part of the shutdown of credit card processor. See ECF No. 71-1, pp. 2–3, ¶¶ 8–10 ("If a subscriber's payment is not identified by a line item directly from the Bank of America statement, that would mean the subscriber's payment would be encompassed in either a Stripe payment line item or in records that were maintained by Payeezy (unless such subscription was negotiated as part of an infringement settlement agreement whereby the settlement/subscription payment(s) were received by a law firm on Plaintiff's behalf). As noted above, Plaintiff ceased using Payeezy in approximately April 2023. I have since learned that Payeezy formally shut down by March 2024 with Clover acquiring its assets and/or accounts. In connection with Defendant's discovery requests, I attempted to gain access to the Payeezy credit card processing records for Plaintiff. I was unable to log into Payeezy (likely given its shut down) and therefore unable to retrieve any records therefrom. Following this, I called Clover, described the records I was seeking, and was told by Clover that it was unable to provide access to Payeezy's records to Plaintiff. I have searched Plaintiff's own paper and electronic records and have confirmed, to the best of my knowledge, that Plaintiff has not maintained any of Payeezy's records/reports other than what was available logging into

Payeezy's portal (which Plaintiff no longer has access to)."

45. PFP did not produce subscription agreements from most of the companies whose monthly payments were reflected in the 2023 / 2024 ledger.

Levy Sixth Aff., ¶ 8 (DN 72-1 at 14).

**RESPONSE:** Disputed to the extent Defendant is generalizing/synthesizing its belief as to document product. See Jones Decl. at ¶ 25.

46. The customer whose subscription payments were $1188 per year, pursuant to a subscription agreement signed in 2019, continued to pay that amount annually.

Levy Seventh Aff. ¶ 8.

**RESPONSE:** Undisputed.

47. The advertising company whose subscription payments were $500 per month if it used Bad-Adz services, but $999 per month if it does not, pursuant to a subscription agreement signed in 2020, in fact has been accorded access to the database of photos without paying anything to PFP because it buying services from a different company, Bad-Adz, that is owned by the same man who owns PFP.

Levy Seventh Aff. ¶ 9.

**RESPONSE:** Disputed. Bad-adz is a commonly owned sister company to Plaintiff, which designs weekly ads and other advertisements for its customers. The subject company subscribes to Bad-Adz, and Bad-Adz (not the customer) has

access to Plaintiff's library to use such photographs for creating ads for that subject customer. The customer itself does not have any access to Plaintiff's photos. See Jones Decl. at ¶ 19.

**PFP's Income from Subscriptions and from Copyright Enforcement**

48. Most of PFP's photo-based income during the period 2018 through 2024 was provided by settlements of claims for copyright infringement.

Infra ¶ 49-51.

**RESPONSE:** Undisputed.

49. The amounts of claimed subscription income in each of the years from 2018 to 2024, as revealed in redacted bank records produced in discovery, was as follows:

| | |
|---|---|
| 2018 | $79,728 |
| 2019 | $91,639.07 |
| 2020 | $59,766.38 |
| 2021 | $88,984.20 |
| 2022 | $59,833.64 |
| 2023 | $79,584 |
| 2024 | $67,583.62 |

The amounts reported for 2018, 2019 and 2021 included bank statements on which it appears that PFP added a legend to the original documents indicating that the sums included funds commingled with Bad-Adz or "agency receipts"

Levy Seventh Aff. ¶ 23 and Exhibit TT; examples of the added legends appear at DN 70-3, pages 34 and 41.

**RESPONSE:** Undisputed.

50. The amounts of subscription income in each of the years from 2018 to 2023, claimed in response to an interrogatory in 2023, was as follows:

2018        $ 78,828
2019        $192,879
2020        $180,345
2021        $ 71,162
2022        $ 94,157
2023        $ 70,484

Exhibit B to First Levy Aff., Answer to Interrogatory 13, DN 21-4 at page B-60

**RESPONSE:** Undisputed.

51. PFP documents produced in discovery show the following amounts having been secured through claims for copyright infringement in each of the years 2018, 2019, 2022, 2023 and 2024. These amounts are dramatically higher than PFP's income from subscriptions in the same years:

2018 $ *REDACTED*
2019 $ *REDACTED*
2022 $ *REDACTED*
2023 $ *REDACTED*
2024 $ *REDACTED*

Levy Seventh Aff. ¶¶ 9, 13, 19, 21 & Exhibits PP, RR, SS; Solt Aff. & Exhibits S1 and S2 .1[1]

**RESPONSE:** Undisputed.

**PFP's Deceptive and Coercive Demand Letter to Pool World**

---

[1] The Levy Seventh Affirmation explains why available data from 2020 to 2021 is incomplete.

52. PFP sent a demand letter to Pool World dated September 16, 2022, stating that PFP had detected the Grilled Vegetable Photo on Pool World's website.

Answer to Complaint, Exhibit A (DN 7).

**RESPONSE:** Undisputed.

53. The demand letter to Pool World demanded, in bold letters and blocked text, that Pool World pay $30,000 in damages within twenty-one (days) to avoid being sued.

Answer to Complaint, Exhibit A (DN 7).

**RESPONSE:** Disputed in part. The bold, blocked text specifically (and only) reads "You shall pay Thirty Thousand Dollars ($30,000.00) within twenty-one (21) days of the date first written above and shall immediately cease and desist from any further use of our client's work(s)." See ECF No. 86.

54. This bold-lettered demand (or similarly worded versions) is standard in demand letters sent by PFP's current law firm, CopyCat Legal.

Levy Seventh Aff., ¶ 27; Levy Third Aff. ¶ 10 (DN 55-1 at 32-33).

**RESPONSE:** Undisputed that in 2022, the above quoted language appeared generally in demand letters sent by CopyCat Legal.

55. The demand letter to Pool World claimed that PFP makes its photographs available only by subscription to its entire database of photos, and for $999 per month for a minimum period of one year. PFP "charges its clients . . . a

minimum monthly fee of $999.00 for access to its library of professional photographs" and "does not license individual photographs or otherwise make individual photographs available for purchase. . . [but] relies on its recurring monthly subscription service.")

Answer to Complaint, Exhibit A (DN 7).

**RESPONSE:** Undisputed.

56. The demand letter then claimed that, because of this supposed subscription model and minimum fee and one-year subscription requirement, PFP's lost license fee, and thus the damages that a court could award, would be $11,988, but that PFP also "believe[d] a 3x multiplier . . . is appropriate, resulting in statutory damages of $35,964" for each year's licensing period that the photo had been on Pool World's website

*Id.*

**RESPONSE:** Undisputed.

57. At the time the demand letter was sent, PFP's officers knew the actual monthly payments that were being paid by their relatively few subscribers, and consequently they knew that $999 per month was not PFP's actual minimum subscription fee, and had never been the minimum subscription fee.

Levy Fifth Aff. ¶ 16 (DN 69-1 at 13).

**RESPONSE:** Disputed. While Plaintiff's officers of course knew what payments

were being made by its subscribers, those subscribers paying less than $999.00 per month at the time were legacy subscribers that had been subscribers for many years and/or were afforded special treatment/rates due to prior existing relationships. See Jones Decl. at ¶ 18.

58. During the period from 2021 through 2023, PFP had sent thousands of demand letters containing this knowingly false statement about a $999 minimum monthly fee.

Levy Third Aff. ¶ 10 (DN 55-1 at 31).

**RESPONSE:** Undisputed that Plaintiff, through counsel, sent approximately 1700 cease and desists/demand letters between 2021-2023. Disputed with respect to the false statement about its monthly fees. See response to 57.

59. The demand letter to Pool World stated that, if the use of its photo continued for more than one year, the damages would include an additional $999 per every additional month of use.

Answer to Complaint, Exhibit A (DN 7).

**RESPONSE:** Undisputed.

60. The demand letter to Pool World stated that Pool World could be liable for statutory damages instead of actual damages, and that statutory damages awards are generally three to five times the lost license fee. In particular, the letter stated that "[a]ssuming our client prevails in court, 17 U.S.C. § 504(c)(1) provides

our client the right to recover statutory damages . . . [up to] a sum of not more than $150,000."

> *Id.*

**RESPONSE:** Undisputed.

61. The demand letter also stated that courts "have not hesitated (where appropriate) to impose substantial statutory damages against copyright infringers."

> *Id.*

**RESPONSE:** Undisputed.

62. The demand letter further threatened that a "3x multiplier (as punishment/deterrent) was appropriate, resulting in statutory damages of $35,964 (for each annualized licensing period)." (emphasis in original).

> *Id.*

**RESPONSE:** Undisputed.

63. PFP made these statements despite the fact that it could not recover statutory damages against Pool World because Pool World's use began in 2010, long before PFP's copyright was registered in 2016.

> Levy First Aff. ¶ 20 (DN 21-1at 20); Flynn Aff. ¶ 4 (DN 55-17); Stark Expert Report; 17 U.S.C. § 412.

**RESPONSE:** Undisputed that because Defendant's infringement began in 2010, statutory damages are not available in this case as reflected by both the original and first amended Complaint. Disputed in so far as this paragraph suggests that at

time of the demand letter plaintiff knew the infringement began in 2010. See Jones Decl. at ¶ 20.   See DeSouza Decl. at ¶¶ 8, 9.

64. PFP should have known that its statements in the demand letter about statutory damages were false, and that statutory damages were unavailable because the presence of the image on Pool World's website before 2016 was shown in the Internet Archive.

https://web.archive.org/web/20110208085952/https://poolworld-grillworld.com/ (showing use in 2011); Teal Expert Report.

**RESPONSE:** Disputed. Plaintiff did not know whether statutory damages were available, as that information was not readily/clearly available. It is not within Plaintiff's standard procedure to refer to the Wayback Machine at demand stage. See Jones Decl. at ¶ 20.

65. PFP is familiar with the Internet Archive. When PFP seeks default judgments against accused infringers who do not hire counsel to defend themselves, it commonly uses the Internet Archive to show the length of the allegedly infringing use, thus justifying awards of actual damages at $999 per month for more than one year.

Motion for Default Judgment in Prepared Food Photos v. EatFood Distributors, Case No. 1:23-cv-08036-JLR (S.D.N.Y. Jan. 5, 2024), at 13 n.5 available at https://storage.court l i s t ene r .com/ r e cap/gov.us cour t s.nysd.606093/gov.uscourts.nysd.606093.15.0.pdf. See also Prepared Food Photos, Inc. v. Trip Rest. LLC, 2023 WL 2955298, at *4 (S.D.N.Y. Apr. 14,

2023) (citing Wayback Machine); Prepared Food Photos v. Chicago-Mkt.-Distributors, 2023 WL 3570673, at *6 (D. Colo. Apr. 18, 2023), report and recommendation adopted, 2023 WL 3568164 (D. Colo. May 19, 2023) (same).

**RESPONSE:** Disputed. While Plaintiff understand that internet archival systems exist (such as the Wayback Machine), Plaintiff did not utilize any internet archival system in 2022 at the time that the demand letter went to Defendant (nor does it utilize any such system currently). As describer above, Plaintiff simply lacks the time and/or resources to perform such searches given the substantial number of infringements it staff discover on an annual basis. See Jones Decl. at ¶¶ 20, 21.

66. As of late 2023, some 1800 demand letters similar to the demand letter to Pool World had been sent to accused infringers by CopyCat Legal, and more were sent in 2024.

Levy Seventh Aff., ¶¶ 26-27; Levy Third Aff. ¶ 10 (DN 55-1 at 31-32).

**RESPONSE:** Undisputed.

67. The demand letter to Pool World stated that PFP would be able to get its attorney fees awarded against Pool World. In particular, it stated, "[k]eep in mind that attorneys fees include . . . potentially the attorneys fees/costs we will incur to pursue the matter (which may be awarded) if our client prevails in court." It also stated that "the above amounts do not account for attorneys' fees which are also recoverable under the Copyright Act."

Answer to Complaint, Exhibit A (DN 7).

**RESPONSE:** Undisputed.

68. PFP made these statements despite the fact that it cannot be awarded attorney fees against Pool World for the same reason it cannot be awarded statutory damages – Pool World's use of the image began in 2010, long before PFP's copyright was registered in 2016.

Stark Expert Report; Levy First Aff. ¶ 21 (DN 21-1 at 20-21); 17 U.S.C. § 412.

**RESPONSE:** Disputed. See response to 64.

69. The demand letter to Pool World warned that it would be expensive to defend against PFP's lawsuit, stating in part "[c]opyright infringement is a serious matter that potentially exposes you to substantial damages/attorneys fees . . . includ[ing] those you will be forced to incur to mount a defense."

Answer to Complaint, Exhibit A, DN-7.

**RESPONSE:** Undisputed.

70. In fact, during the course of this litigation, PFP's owner has contacted Pool World's owner directly, without the consent of counsel, to explicitly threaten the high cost of litigation as a reason for Pool World to accept PFP's settlement terms.

Early Aff., ¶¶ 2-6 and Exhibits E1 to E-4.

**RESPONSE:** Disputed. Plaintiff's owner has reached out to Defendant's ownership/management in an effort to discuss potential resolution of this case on multiple occasions, but never to threaten the high cost of litigation. See Albrizio Decl. at ¶ 4.

71. In addition, in followups to other demand letters, PFP's representatives cite the cost of defending against its lawsuits to set the minimum amount that those targets should be willing to pay in settlement.

Rimer Aff., ¶¶ 4-5 and Exhibit R2; See also Exh. W (DN 53-13), at page 170.

**RESPONSE:** Disputed. See DeSouza Decl. at ¶ 18.

72. PFP can afford to rely on the imposition of costs on its targets to compel high settlements because its counsel, CopyCat Legal, takes cases on "pure contingency" meaning that "CopyCat Legal absorb[s] all costs (taxable and non-taxable)."

Declaration of Daniel DeSouza in PFP v Nofal LLC, No. 2:22-cv-00642-JPS (E.D. Wis.), available at https://storage.courtlistener.com/recap/gov.uscourts.wied.99393/gov.uscourts.wied.99393.64.2.pdf; Affirmation of Daniel DeSouza in Harrington v. Dugar, No. Blaine Harrington, III v. Deepak Dugar (2:22-cv-08230), DN 201-1, ¶ 29, availabl e a t ht tps : / / s tor age .cour t l i s t ene r.com/recap/gov.uscourts.cacd.868192/gov.uscourts.cacd.868192.201.1.pdf.

**RESPONSE:** Undisputed that CopyCat Legal PLLC took this case and others on a contingency basis. Disputed that Plaintiff is imposing costs on its targets to

compel high settlements. See DeSouza Decl. at ¶ 19.

73. PFP can afford to rely on the imposition of litigation costs on its targets to compel high settlements because as of last summer, its counsel, CopyCat Legal, having handled more than 5000 copyright matters for its clients, had never had to take a case to trial with the single exception of *Harrington v. Dugar.*

*Id.*, ¶ 30.

**RESPONSE:** Disputed. See response to 72. Undisputed that <u>Harrington v. Dugar</u> was the ***first*** copyright infringement case that CopyCat Legal PLLC took to trial.

74. The demand letter to Pool World stated that, if PFP had to file a lawsuit to get paid the demanded amount, it would file in federal court in the Southern District of Florida.

Answer to Complaint, Exhibit A (DN-7).

**RESPONSE:** Undisputed.

75. In fact, as of late 2023, PFP had consistently sued for infringement in the federal court for the district where the defendant is located, not in Florida.

Levy First Aff. ¶ 23 (DN 21-1 at 21).

**RESPONSE:** Disputed. While plaintiff has generally filed copyright lawsuits in the jurisdiction where the defendant is located, it has also filed lawsuits in Florida utilizing Florida's long arm statute. See Jones Decl. at ¶ 22.

76. The demand letter to Pool World implies that it knows who has or has

not licensed its works. "[T]o their knowledge, [Plaintiff] did not authorize you . . . to use or display the foregoing photograph. Notwithstanding this lack of authorization, our client has [found your use.]" (emphasis in the original) Exhibit B.

Answer to Complaint, Exhibit A (DN-7).

**RESPONSE:** Undisputed.

77. PFP's June 2, 2023 complaint against Pool World alleged unequivocally and without reservation (as a fact, not on information and belief) that Pool World "is not and has never been licensed to use or display the [Grilled Vegetable] Work."

Complaint ¶ 18.

**RESPONSE:** Undisputed.

78. In fact, when PFP wrote to Pool World, and when it filed its complaint, those allegations were false, in that PFP had no way of knowing whether Pool World had a proper license to use the Grilled Vegetable photo, because iStock did not share with PFP the identity of the buyers of licenses for PFP's photos, and in any event the licenses were not limited to the licensees but included the licensees' customers.

First Levy Aff. ¶ 15 (DN 21-1 at 19).

**RESPONSE:** Disputed. Prior to filing this lawsuit, Plaintiff obtained written confirmation from Getty that it had not provided a license to defendant. See Jones

Decl. at ¶ 8.

**PFP Amended Complaint Drops False Allegations After Pool World Serves It with a Rule 11 Motion**

79. In the complaint in this case, filed on June 2, 2023, PFP alleged that it "charges its clients a minimum monthly fee of $999.00 for access to its library of professional photographs."

Complaint ¶ 8.

**RESPONSE:** Undisputed.

80. At the time PFP filed its complaint, it knew that this statement was false.

Levy Seventh Aff. ¶ 10.

**RESPONSE:** Disputed. See response to 57.

81. PFP amended its complaint to drop its allegation of a $999 minimum monthly payment only after Pool World obtained discovery showing that the allegation was false, and after Pool World served a motion for Rule 11 sanctions.

Levy Seventh Aff. ¶ 29 and Exhibit UU.

**RESPONSE:** Disputed. Plaintiff's allegation is not false for the reasons explained above. See response to 57. In an effort to avoid further motion practice in this case, and because inclusion of the allegation in the Complaint was immaterial, Plaintiff's counsel agreed to amend and drop the allegation therefrom. See DeSouza Decl. at ¶ 21.

82. In its June 2, 2023 complaint in this case, PFP alleged, "Plaintiff is in

the business of licensing high-end, professional photographs for the food industry."

Complaint ¶ 6.

**RESPONSE:** Undisputed.

83. PFP amended the complaint to drop this characterization of its business as licensing photographs only after Pool World obtained discovery showing that PFP's main business is making claims of copyright infringement, and served a motion for Rule 11 sanctions, beginning the running of the twenty-one day safe harbor period under Rule 11(c)(2).

Levy Seventh Aff., ¶ 29 and Exhibit UU.

**RESPONSE:** Disputed. See response to 81

84. In its initial disclosures in this case, dated August 15, 2023, PFP stated that it was seeking $11,988 in actual damages for its lost license fee for each year the Grilled Vegetable Photo was published "prior to the date of copyright registration for the photograph," that its "entire library [of photos] is offered at a starting price of $999.00/month with a 12-month minimum commitment," and that it "would calculate its actual damages by multiplying the license it would have charged (a minimum of $999.00/month) by the number of years the photograph was published."

Levy Third Aff. ¶ 7 and Exhibit Q (DN 55-1 at 30 and 53-7 at 116-118).

**RESPONSE:** Undisputed.

85. At the time these initial disclosures were served, PFP knew that its

assertion about the minimum subscription fee was false.

Levy Seventh Aff. ¶ 10.

**RESPONSE:** Disputed. See response to 57.

86. At the time these initial disclosures were served, PFP knew that it had

not entered into its first subscription agreement until 2017, seven years after the

allegedly infringing use had begun.

Levy Seventh Aff., Exhibit OO.

**RESPONSE:** Undisputed.

**PFP Studiously Avoids Contested Litigation Over Damages in Cases About
the Infringement of a Single Photo, but Lost in a Recent Trial of That Issue**

87. For several years, PFP avoided testing its damages theory in adversarial

litigation over alleged infringements of a single photo.

First Levy Aff. ¶ 8 (DN 26-1); Levy Third Aff. ¶ 35 (DN 53-1, at p. 41). See
also Levy Third Aff., Exhibit W (DN 53-13), at page 174 (PFP counsel
Megan Medacier email stating that there are no rulings in contested cases on
damages "as no one has thought it wise to litigate one of these things to the
end").

**RESPONSE:** Disputed to the extent Defendant characterizes Plaintiff as avoiding

testing its damages theory. From January 1, 2021 through December 31, 2023,

Plaintiff filed approximately 250 lawsuits for copyright infringement in courts

across the country. In every case Plaintiff files, it intends to proceed to final

judgment. That a defendant does not appear, or does appear and wishes to settle

the matter, is beyond Plaintiff's control. See Jones Decl. at ¶ 23.

88. In October, 2024, PFP went to trial for the first time how its damages theory applied to alleged infringement of a single photo. PFP sought $23,976 in actual damages; the jury awarded $200 in damages. The defendant in that case did not present evidence of the actual market value of PFP's individual stock photos, or challenge the veracity of the testimony of Rebecca Jones about actual minimum monthly fees.

> Prepared Food Photos v. Jaber, 2025 WL 1025174, at *6 (E.D. Wis. Apr. 7, 2025) (denying PFP's motion to amend judgment); Prepared Food Photos v. Jaber, Trial Transcript at pages 291-293, available at https://storage.courtlistener.com/recap/gov.uscourts.wied.99393/gov.usco urts.wied. 99393.58.0.pdf (showing request for actual damages); see generally Trial Transcript in That Case.

**RESPONSE:** Undisputed.

**PFP's Citation to Uncontested Default Judgments in Other Cases**

89. The initial disclosures cited ten court rulings adopting PFP's damages theory to award actual and statutory damages in multiples of $11,988.

> Levy Third Aff. ¶ 7 and Exhibit Q (DN 55-1 at 30 and 53-7 at 116-118).

**RESPONSE:** Undisputed.

90. Each of the court rulings cited in the Initial Disclosures was a default judgment.

> Revealed by the Westlaw citations to each.

**RESPONSE:** Undisputed.

91. Each of those default judgments was obtained based on, among other things, complaints containing the false allegation about PFP's minimum monthly subscription fee, and the principle that factual allegations in a complaint must be taken as true in ruling on default judgments.

Levy Seventh Aff. ¶ 30.

**RESPONSE:** Disputed with respect to the false allegation of Plaintiff's monthly subscription fee. See response to 57.

92. Many if not all of those default judgments were obtained by submitting briefs containing the false allegation about PFP's minimum monthly subscription fees, as well as affidavits from Rebecca Jones, PFP's "Director of Intellectual Property," including the false assertion about PFP's minimum monthly subscription fees, an allegation that PFP as an entity, and Jones as the affiant, knew to be false.

*Id.*; Levy Fourth Aff. ¶ 7 (DN 67-1 at 15).

**RESPONSE:** Disputed. See response to 57 and 91.

93. None of the briefs and affidavits PFP submitted in support of these default judgments addressed the cases that calculate actual damages based on fair market value, not the licensing fee that the copyright holder would have preferred to charge. *Id.*

**RESPONSE:** Disputed. To Plaintiff's knowledge, every default judgment motion

filed by Plaintiff when discussing actual damages includes case law with respect to fair market value. See DeSouza Decl. at ¶ 22.

94. Many of the default judgments cited in PFP's initial disclosures in this case were also cited in many demand letters signed by counsel for PFP that were sent after the September 2022 demand letter that PFP sent to Pool World.

> Levy First Aff., ¶ 25 (DN 21-1 at 22); Levy Fifth Aff. Exhibit W (DN 55-13); Exhibits to the Rimer, Lingerfelt and Nygard Affirmations.

**RESPONSE:** Undisputed.

95. None of the ten default judgments cited in the Initial Disclosures and demand letters was ever collected.

> Levy Seventh Aff. ¶ 32 and Exhibit SS.

**RESPONSE:** Disputed. Plaintiff has collected on numerous of the default judgments it has obtained. See DeSouza Decl. at ¶ 15.

**Other Undisputed Facts**

96. Between August 2016 and December 2024, PFP filed nearly 300 copyright infringement lawsuits.

> Levy First Aff. Exhibit C (DN 21-5 at 53-84).

**RESPONSE:** Undisputed.

97. Inspection of the dockets reveals that most of the lawsuits have ended in a dismissal without any attorney having entered an appearance for the defendant, often after the time for answering is postponed

Levy First Aff. ¶ 6 (DN 21-1 at 16).

**RESPONSE:** Undisputed that many of lawsuits have settled or otherwise resolved prior to an attorney appearing for the defendant.

98. Sometimes the docket reflects that the parties have reached an agreement; sometimes the docket is silent on the reason for dismissal.

*Id.*

**RESPONSE:** Undisputed.

99. Both PFP's current law firm, CopyCat Legal, and the firm of Higbee and Associates, which previously represented PFP in sending demand letters and litigatng cases, typically required that settlement agreements be kept confidential.

Seventh Levy Aff. ¶ 35; Lingerfelt Aff., Exh. L4; Archambault Aff., Exh. A1.

**RESPONSE:** Disputed. Plaintiff generally requests confidentiality in its settlement agreements in such term is likewise requested by infringers, their attorneys, and/or their insurance companies. See DeSouza Decl. at ¶ 23. See Jones Decl. at ¶ 24.

100. When the targets of copyright infringement claims have unilaterally sent payments of $750 (the minimum award of statutory damages) in response to PFP claims of copyright infringement, PFP's counsel neither accepted the payment nor filed suit for infringement.

Archambault Aff.; Nygard Aff.; Lingerfelt Aff.; Levy Aff. ¶ 35.

**RESPONSE:** Disputed. Counsel for Defendant has, in a small handful of cases, instructed alleged infringers to send Plaintiff a check for $750.00 without any agreement to accept such or agreement on other terms. Plaintiff has not deposited such checks as it did not agree to accept $750.00 to resolve its infringement allegation. And whether Plaintiff has filed – or intends to file – a lawsuit against such alleged infringers is frankly both irrelevant and protected by the attorney-client privilege. See DeSouza Decl. at ¶ 24.

101. Pool World deliberately did not make an insurance claim because it did not want an extortionate settlement paid in its name.

Flynn Aff. ¶ 7, DN 55-17.

**RESPONSE:** Neither disputed nor undisputed. Plaintiff is not in possession of information that would support why Pool World would or would not do something.

102. PFP counsel contacted Pool World's insurance company directly, after it was identified in Pool World's initial disclosure, threatening to sue the insurance company directly to collect any awarded damages and attorney fees.

Levy First Aff. ¶¶ 27-28 and Exhibit K (DN 21-1 and 21-13).

**RESPONSE:** Disputed to the extent Defendant characterizes Plaintiff's counsel as threatening Defendant's insurance company. See DeSouza Decl. at ¶ 25.

103. Despite having withdrawn its allegation that it only makes access to its

database of photos available for a minimum monthly fee of $999, PFP is still seeking actual damages of $11,988 per year.

Levy Seventh Aff. ¶ 38 and Exhibit XX.

**RESPONSE:** Undisputed, but see response to 81.

104. PFP collected $10,000 in 2023 from one or more targets of claims that its copyright in the Grilled Vegetable Photo had been infringed.

Levy Seventh Aff. ¶ 13 and Exhibit PP.

**RESPONSE:** Undisputed that PFP collected $10,000.00 in 2023 pursuant to a settlement agreement with an alleged infringer in relation to the Work.

1

RIVERSIDE LAW GROUP, PLLC

2

Max K. Archer, WSBA #54081

905 W. Riverside Ave., Ste. 404

3

Spokane, WA 99201

Telephone: (509) 504-8714

4

Email: mka@riverside-law.com

5

Attorney for Plaintiff

6

Daniel DeSouza, *pro hac vice*

7

Lauren Hausman, *pro hac vice*

CopyCat Legal PLLC

8

3111 N. University Drive, Suite 301

9

Coral Springs, FL 33065

lauren@copycatlegal.com

10

dan@copycatlegal.com

(877) 437-6228

11

Attorneys for Plaintiff

12

By: /s/ Daniel DeSouza

13

Daniel DeSouza, Esq.

14

Lauren Hausman Esq.

15

16

17

18

19

20

21

22

23

24

25