EXHIBIT "A"

Max K. Archer, WSBA # 54081
Riverside Law Group, PLLC
905 W. Riverside Ave., Ste. 404
Spokane, WA 99201
mka@riverside-law.com
(509) 504-8714
*Attorney for Plaintiff*

Lauren Hausman, *pro hac vice*
CopyCat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065
lauren@copycatlegal.com
(877) 437-6228
*Attorney for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| PREPARED FOOD PHOTOS, INC. f/k/a ADLIFE MARKETING & COMMUNICATIONS CO., INC., <br><br> Plaintiff, <br><br> v. <br><br> POOL WORLD, INC., <br><br> Defendant. | Civil Action No. 2:23-cv-00160-TOR <br><br> DECLARATION OF DANIEL DESOUZA |

Daniel DeSouza does hereby declare pursuant to 28 U.S.C. § 1746:

1.     I am over the age of 18 and otherwise competent to testify. I make the following statements based on personal knowledge.

1

2.     I am the managing attorney of CopyCat Legal PLLC, a law firm headquartered in Florida that serves as co-counsel to plaintiff Prepared Food Photos, Inc. ("Plaintiff") in this lawsuit.

3.     I submit this declaration in support of Plaintiff's memorandum in opposition to defendant Pool World, Inc.'s ("Defendant") Motion for Summary Judgment (the "Motion") [D.E. 90].

4.     Both the Motion and Defendant's Statement of Material Facts (the "SMF") assert that Plaintiff's subscription agreements from 2022 going forward were entered as a result of infringement claims handled by CopyCat Legal. Defendant's assertion here is partially true. CopyCat Legal has handled a large number of infringement cases on behalf of Plaintiff (approximately 1,800 through December 31, 2023). In an extraordinarily small number of such infringement matters, Plaintiff has entered into a subscription agreement with the alleged infringer as part of the overall settlement of Plaintiff's infringement claim.

5.     In at least three (3) such matters (and likely more), it was not Plaintiff but rather the alleged infringer (or its counsel) who requested and/or demanded that Plaintiff offer a license/subscription to Plaintiff's library of photographs as part of the overall settlement consideration. In such scenarios, CopyCat Legal acted as an intermediary in assisting to negotiate the terms of any such license/subscription agreement. But Plaintiff has not – at least to my knowledge

and/or through CopyCat Legal – made a regular practice of offering to license its library to alleged infringers as part of the settlement of an infringement claim.

6.    The SMF (which was filed on July 11, 2025) likewise contends that Plaintiff did not produce bank statements for the period from January through May 2020.  See SMF, at ¶ 40.  While this assertion was true at the time the SMF was filed, Plaintiff subsequently was able to obtain such statements from its bank and each of which was produced (in unredacted form) to Defendant on July 31, 2025.

7.    For as long as CopyCat Legal PLLC has been representing Plaintiff, the standard practice at CopyCat Legal has been to **_exclude_** from pre-suit cease and desist/demand letters references to statutory damages, fee awards under § 505, and/or judgments entered in post-registration cases when it is known that the infringement pre-dated Plaintiff's date of registration (e.g., blog articles and/or Facebook posts where the date of infringement is clear from the face of the subject page).  For example, on January 5, 2023, Plaintiff (through CopyCat Legal) sent a pre-suit demand letter to Vitals Consumer Services, LLC and, on January 6, 2023, to Kalmbach Media Co.[1]  In both circumstances, Plaintiff and/or CopyCat Legal had determined, prior to sending the demand letter, that the alleged infringement

---

[1]    Attached hereto as Exhibits "1" and "2" are true and correct copies of pre-suit letters, sent by CopyCat Legal on behalf of Plaintiff to Vitals Consumer Services, LLC and Kalmbach Media Co.

occurred pre-registration.  As a result, there are no references therein to statutory damages or the imposition of fees under § 505.

8.      CopyCat Legal handles approximately 2,000 – 3,000 infringement matters annually on behalf of its hundreds of clients.  With respect to the small percentage of those alleged infringements that ultimately result in the filing of a lawsuit, the attorneys and staff at CopyCat Legal utilize (prior to drafting a Complaint for filing) the Internet Archive's Wayback Machine (a resource that captures and displays historical screenshots of certain websites on particular days, though has only archived a very small portion of the internet) and other resources to determine, as best as possible, the date of alleged infringements to determine whether statutory damages/attorneys' fees are available under the Copyright Act.

9.      But given the volume of alleged infringements matters it handles, CopyCat Legal generally limits the use of such resources until it is determined that a lawsuit is necessary and/or in connection with discovery in those pending lawsuits. In this case, I conducted a Wayback Machine search (consistent with CopyCat Legal's general practice), prior to filing the Complaint in this matter, to ensure that due diligence was exercised with respect to the allegations in the Complaint.  As a result of that search and/or the other resources our firm consulted, it was determined that the alleged infringement here occurred prior to Plaintiff's copyright registration of the photograph (meaning that Plaintiff would not be

entitled to statutory damages and/or attorneys' fees under the Copyright Act). Because of this, the Complaint and First Amended Complaint do not assert entitlement to either relief and plainly allege the infringement occurred "[o]n a date prior to Plaintiff's above-referenced copyright registration of the Work."

10.    I am familiar with the Public Access to Court Electronic Records ("PACER") service which provides electronic public access to federal court records.  On or about August 14, 2025, I performed several searches on PACER with respect to copyright lawsuits filed since January 1, 2020 (which can easily be identified by selecting "820 – Copyright" in the "Nature of Suit" field thereon) and with respect to copyright lawsuits filed by two of the most prolific copyright plaintiffs (neither of which my firm has previously represented) – Malibu Media, LLC ("Malibu Media") and Stike 3 Holdings, LLC ("Strike 3"), each of which hold the copyrights to various pornographic films and pursue copyright infringement actions on a mass scale.

11.    Malibu Media and Strike 3's tactics of suing 'John Doe' defendants, using subpoenas to ISPs to identify bittorrent users who downloaded their films, and then negotiating settlements with such users while using the threat of public exposure/embarrassment are well documented.[2]  My search on PACER shows that

---

[2]    See, e.g., https://mcinnesiplaw.com/what-is-a-malibu-media-case/; https://www.cashmanlawfirm.com/malibu-media/; https://shuttleworth-law.com/strike-3-holdings/what-is-strike-3-holdings/; https://mcinnesiplaw.com/guide-to-strike-3-holdings-lawsuits-2025/.

Strike 3 has filed 15,980 copyright cases since January 1, 2020 while Malibu Media has filed 6,384 copyright cases over a similar period from 2014 – 2019 (when it appears to have ceased filing new cases).

12.     The Motion likewise refers to oft-sanctioned and ultimately disbarred copyright attorney Richard Liebowitz[3] who previously represented Plaintiff (and thousands of other copyright holders) in multiple copyright matters.  My search on PACER shows that Mr. Liebowitz filed over 2,000 copyright lawsuits on behalf of his clients.

13.     I also searched on PACER for the total number of copyright cases filed in federal court from January 1, 2020 through the date of my search (August 14, 2025).  That search showed there were 5,204 copyright cases filed in 2025 (through August 14, 2025), 7,225 copyright cases filed in 2024, 6,599 copyright cases filed in 2023, 5,352 copyright cases filed in 2022, 4,217 copyright cases filed in 2021, and 3,162 copyright cases filed in 2020.

14.     The Motion also asserts that Plaintiff has never collected on any of its default judgments and that the only purpose for obtaining such "appears to have been to secure judicial rulings that PFP could then use to further its inequitable

---

[3] See https://petapixel.com/2024/03/22/hero-or-villain-prolific-copyright-troll-laywer-disbarred-in-ny/.

operation to extract future settlements of excessive damages payments."[4]  Such statements are patently untrue.

15.    Plaintiff **has** collected on several default judgments as evidenced by satisfactions of judgments filed in at least three (3) such cases.  See, e.g. Prepared Food Photos, Inc. v. Juniata Supermarket, Inc., Case No. 2:23-cv-01294 (E.D. Penn.); Prepared Food Photos, Inc. v. Shadowbrook Farm LLC, Case No. 1:22-cv-00704 (N.D.N.Y.); Prepared Food Photos, Inc. v. Chicago-Market-Distributors, Inc., Case No. 1:22-cv-03299 (D. Colo.).  Plaintiff will likewise shortly be filing a satisfaction of judgment in yet another default judgment case – Prepared Food Photos, Inc. v. Agewellsolutions, LLC et al., Case No. 6:23-cv-00453 (M.D. Fla.).

16.    The notion that Plaintiff obtains default judgments and does not attempt to collect on such (or files lawsuits solely to obtain default judgments) is absurd.  CopyCat Legal has actively attempted to collect on each and every default judgment obtained by Plaintiff during CopyCat Legal's representation thereof.  That any existing judgment has not been collected is not a function of a lack of trying but rather due to the uncollectable nature of the judgment (i.e., a defendant that has ceased operations, declared bankruptcy, etc.).

17.    CopyCat Legal represents Plaintiff in this and other matters on a contingency basis, meaning CopyCat Legal is not paid unless and until Plaintiff

---

[4] MSJ Motion, 18

recovers monies via settlement and/or collecting on a judgment. Without divulging attorney-client communications, CopyCat Legal has never filed a lawsuit on behalf of Plaintiff (or any other client) with the assumption and/or intention that such would result in a default judgment. Such a suggestion is nonsensical, especially given the contingency relationship with Plaintiff. Rather, one or more attorneys at CopyCat Legal review the facts of each case prior to its filing to determine its viability and/or whether further pre-suit communications are warranted. If CopyCat Legal believes a particular matter is fit for filing as a lawsuit, it then seeks its client's input on the matter (as it did here). At no time does CopyCat Legal predict whether an alleged infringer will actually appear/defend a lawsuit, and I am not aware of any such conversation occurring between anyone at CopyCat Legal and any representative of Plaintiff. There are a variety of reasons why a lawsuit may or may not be pursued, but none of those reasons involve any sort of prediction that

18.    The SMF states that PFP's representatives (referring to one or more attorneys at CopyCat Legal) "cite the cost of defending against its lawsuits to set the minimum amount that those targets should be willing to pay in settlement." See SMF, at ¶ 71. This is again untrue. It is certainly the practice of my staff to attempt to follow up with infringers if the infringer does not respond to the demand letter. My staff does so in an attempt to resolve matters without them being

escalated to litigation. I have reviewed the exhibits attached to the SMF and discussed such with my staff – none of these reflect anyone at CopyCat Legal attempting to "set the minimum amount" that an infringer should pay. It is no secret that the cost of litigating a matter in federal court can be high (as this case evidences). The fact that litigation costs may have been mentioned by any of my staff attorneys was not to set a 'minimum' settlement amount (as Plaintiff and the subject infringer are free to negotiate the terms of any settlement) but rather in an effort to avoid litigation in the first place. Importantly, even though CopyCat Legal represents Plaintiff and others on a contingency basis, the fact remains that litigation is extremely taxing on counsel's time/resources and the amounts at issue in copyright matters usually does not justify a heavy expenditure of either in litigating a matter to conclusion. In short, litigation results in substantial costs to both sides in any lawsuit.

19.    Regardless of whether CopyCat Legal PLLC takes a case for Plaintiff on a contingency basis, that has no bearing on Plaintiff 'imposing costs on its targets to compel high settlements.'

20.    Defendant continually, and without basis, alleges that it believes it received and/or was authorized to use the Work from one of its vendors. Per Defendant's responses to Plaintiff's interrogatories, the "vendors" being referenced are Traeger and Weber (grill/barbeque equipment manufacturers/sellers). Given

Defendant's stated belief, Plaintiff issued subpoenas to Traeger and Weber for production of any documents indicating the license of the Work and/or communications with Defendant. Both vendors communicated to counsel, through written responses and document production (where available) that they either had no records demonstrating a license or provision of the Work to Defendant.

21.    In its original Complaint, Plaintiff included an allegation that "Plaintiff charges its clients (generally, grocery stores, restaurant chains, food service companies, etc.) a minimum monthly fee of $999.00 for access to its library of professional photographs." ECF No. 1 ¶ 8. Defendant took issue with this allegation and served Plaintiff with a letter/draft Rule 11 motion, providing the necessary 21-day safe harbor.  Defendant asserted that such allegation in the Complaint was false (given that discovery in this case showed Plaintiff has certain legacy subscribers paying less than $999.00 per month).  In discussing the matter with Defendant's counsel (as the parties should do), I proposed various revisions to the paragraph to note Plaintiff's current pricing model, the fact that certain subscribers paid less than $999.00 per month, the fact that certain subscribers paid more than $999.00 per month, etc. – each of which was rejected by Defendant's counsel.  Ultimately, because inclusion of Plaintiff's pricing in the Complaint is immaterial to the issue of whether Defendant committed copyright infringement, I

made the decision to drop the allegation altogether in an effort to avoid even more motion practice in a case plagued by an already clogged docket.

22.    The SMF also asserts that "[n]one of the briefs and affidavits PFP submitted in support of these default judgments addressed the cases that calculate actual damages based on fair market value…." See SMF, at ¶ 93.  I do not know the basis for this assertion.    I have reviewed Plaintiff's motions for default judgment that were filed by CopyCat Legal.  Each motion, when discussing actual damages, specifically cites caselaw providing that actual damages are based on the fair market value of the subject photograph(s) and/or provides relevant legal authority from within the subject Circuit.  Plaintiff did not mis-quote this legal authority… it simply quoted what courts in the subject Circuit have stated on the matter.

23.    Plaintiff has consistently directed CopyCat Legal PLLC to include a confidentiality provision in Plaintiff's proposed settlement agreements. CopyCat Legal PLLC adheres to Plaintiff's direction with respect to including the agreement term. Generally speaking, confidentiality is requested in settlement agreements not only by Plaintiff, but by infringers, their attorneys and/or their insurance companies.  I can think of only three (3) attorneys (one of which is Defendant's counsel) that has not likewise wanted settlement terms to be confidential.  This, of

course, excludes public entities (i.e., cities, municipalities, etc.) bound by public records laws for which no confidentiality can be afforded to settlement agreements.

24.     The SMF likewise asserts that, "when the targets of copyright infringement claims have unilaterally sent payments of $750 (the minimum award of statutory damages) in response to PFP claims of copyright infringement, PFP's counsel neither accepted the payment nor filed suit for infringement." See SMF, at ¶ 100.  This assertion is misguided at best.  Counsel for Defendant has, in a small handful of cases, instructed alleged infringers to send Plaintiff a check for $750.00 without any agreement to accept such or agreement on other terms.  Plaintiff has not deposited such checks as it did not agree to accept $750.00 to resolve its infringement allegation.  And whether Plaintiff has filed – or intends to file – a lawsuit against such alleged infringers is frankly both irrelevant and protected by the attorney-client privilege.   As discussed above, there are dozens of considerations that go into evaluation of each and every prospective lawsuit CopyCat Legal files on behalf of Plaintiff and its other clients.  Defendant should not read much into the fact that, in a small handful of cases, Plaintiff has not *yet* filed a lawsuit… especially given that CopyCat Legal has handled (or is still handling) over 2,000 cases for Plaintiff.

25.     The SMF also asserts that Plaintiff's counsel (Ms. Hausman) dared to contact Defendant's insurance carrier directly, "threatening to sue the insurance

company" to collect any awarded damages.  See SMF, at ¶ 102.  Again, Defendant

misstates the facts.  Under my guidance, Ms. Hausman (co-counsel on this case)

reached out to both insurance companies that Defendant identified in its initial

disclosures.  The communications between Ms. Hausman and the respective

insurance companies were not threatening.  The emails simply informed the

insurance companies that, "in the event of an adverse judgment, our client will seek

to recover against whatever insurance policy may have been in place at the time."

The statement was to put the insurance companies on notice, and potentially

explore amicable (and early) resolution.

26.     The Motion repeatedly refers to Plaintiff's 'inflated' damages,

referencing the fact that iStock (a Getty subsidiary) was offering Plaintiff's

photographs to license "for 95 cents and up."  See Motion, at pp. 6, 14, 19.  Here

again, the Motion greatly misstates the facts.  On this point, I personally reviewed

Wayback Machine archives of www.istockphoto.com in the 2010 timeframe to

determine the pricing being offered by iStock/Getty at the time.

27.     A review of the Wayback Machine reveals that, in 2010, iStock

offered a subscription model (similar to Plaintiff)[5] whereby users would have to

pay a monthly fee to iStock to download photographs.  The pricing for such

---

[5]     See https://web.archive.org/web/20100922205147/http://www.istockphoto.com/royalty-free-subscriptions.php.

13

subscription model (which iStock touted as the better option for consumers) is as

follows:[6]





---

6      I cannot adjust the "daily credits" number on the Wayback Machine site so the numbers shown are the default when loading the site.

14

28.    iStock likewise offered an individual credit system where a user could purchase credits and then apply those credits to purchase photographs.[7]  Per iStock's own website, for someone to license a photo for one dollar (which would only provide one extra small file size), that user would have to spend $5,000 to receive the 5,000 credits:

### Pay-as-you-go

#### Give yourself credit

Buy Pay-as-you-go credits whenever you need them. Use your credits to download royalty-free stock photography, vector illustrations, video footage, audio tracks and Flash files. Credits cost as little as 95¢ USD/credit.

#### Pay-as-you-go credit packages

| Credits | Price (USD) | iStock donation (USD) |
|---------|-------------|------------------------|
| 12 | $18.25  ($1.52/credit) | |
| 26 | $39.50  ($1.52/credit) | |
| 50 | $75.00  ($1.50/credit) | |
| 120 | $175.00  ($1.46/credit) | |
| 300 | $420.00  ($1.40/credit) | |
| 600 | $780.00  ($1.30/credit) | $5 |
| 1000 | $1,200.00  ($1.20/credit) | $10 |
| 2000 | $2,200.00  ($1.10/credit) | $20 |
| 5000 | $5,000.00  ($1.00/credit) | $50 |
| 10000 | $9,500.00  ($0.95/credit) | $75 |

iStock Cares donates to one charity per transaction. *More info.*

**Buy now**

---

[7]    See https://web.archive.org/web/20101111123006/http://www.istockphoto.com/buy-stock-credits-pay-as-you-go.php

15

29.     It is thus somewhat disingenuous for Defendant to suggest that, a business such as Pool World could have obtained the Work from iStock for as low as $.95 or $1.00.  Which that statement is somewhat true, it ignores that such consumer would need to either spend $5,000.00 upfront or subscribe to a plan requiring the expenditure of at least $700.00 per the information available on the Wayback Machine.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: August 15, 2025                        /s/ Daniel DeSouza
                                                        Daniel DeSouza

EXHIBIT "I"



Copycat Legal PLLC
3111 N. University Drive
Suite 301
Coral Springs, FL 33065

T    877-HERO-CAT (877-437-6228)
E    help@copycatlegal.com

FRE 408 SETTLEMENT COMMUNICATIONS

January 5, 2023

**VIA FEDERAL EXPRESS AND ELECTRONIC MAIL (support@vitals.com):**

Vitals Consumer Services, LLC
Office of Privacy
1201 Peachtree Street NE
400 Colony Square
Suite 2100
Atlanta, GA 30361

***RE:    Prepared Food Photos, Inc. v. Vitals Consumer Services, LLC d/b/a MedHelp***

To whom it may concern:

This law firm represents Prepared Food Photos, Inc.  Our client is in the business of licensing high-end, professional photographs for the food industry.  Through its website (www.preparedfoodphotos.com), our client offers a monthly subscription service which provides access to/license of tens of thousands of professional images.  The rights associated with these images are exclusively owned by our client, and it has spent countless hours and substantial monies in building a business that relies on such exclusive subscription service.  The unauthorized use of our client's work deprives our client of much-needed income and forces our client to incur substantial costs (monetary and time) in identifying violators and enforcing its rights.

In 2007, our client created a photograph titled "SoupAlphabet001" (the "Work").  A copy of the Work is exhibited below:



The Work was registered by our client with the Register of Copyrights on August, 26 2016 and was assigned Registration No. VA 000-201-4921. A true and correct copy of the Certification of Registration pertaining to the Work is attached hereto as **Exhibit "A."**

To our knowledge, our client **_did not_** authorize you or your company to use and/or display the foregoing photograph. Notwithstanding this lack of authorization, our client has identified the subject photograph currently published by MedHelp for commercial purposes (at https://www.medhelp.org/heart-disease/slideshows/8-Surprisingly-Bad-Foods-for-Your-Heart/333/4):



A true and correct copy of the screenshot from MedHelp's website, displaying the copyrighted Work, is attached hereto as **Exhibit "B."**

If our client is mistaken or if you believe the photograph was previously licensed through our client or some other party, please contact us immediately with evidence of the prior licensing. If we do not hear from you *within fourteen (14) days from the date of this letter*, we will be forced to assume that the photograph was *not* properly licensed and will take appropriate legal action to enforce our client's rights.

If the above-described use of our client's photograph was not properly licensed, please understand that such unauthorized use may constitute federal copyright infringement under 17 U.S.C. § 501.  In such event, I encourage you to discuss the foregoing with your attorney and/or your insurance carrier as copyright infringement is a serious matter that potentially exposes you to substantial damages/attorneys' fees if we are forced to file a lawsuit on behalf of our client.

Please note that Section 504 of the Copyright Act provides for the recovery of actual damages plus any additional profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." Of course, if forced to litigate this matter, we will fully explore the damages issue and make an election that is most beneficial to our client.

While this is a serious matter, it is not particularly complex. The subject photograph(s)was either properly licensed or it was not.  If it was, you should notify us immediately of such licensing so that we may inform our client of such.  If it was not properly licensed, then the utilization of our client's work(s) without proper authorization constitutes copyright infringement.  In that case, we will either resolve this issue in court (allowing a court to decide the matter) or privately between the parties.  If the subject use was not authorized, our client hereby makes the following demand:

*You shall pay Thirty Thousand Dollars ($30,000.00) within fourteen (14) days of the date first written above and shall immediately cease and desist from any further use of our client's work(s).*

Please contact us within the above-stated period to either provide evidence of licensing or to discuss resolution of this matter. If we do not hear from you or are otherwise unable to resolve the matter on amicable terms, please be aware that our client does not shy away from enforcing his rights in court. It has done so many times before and secured awards commensurate with the above examples.  See, e.g. Prepared Food Photos, Inc. f/k/a Adlife Marketing & Communications Co., Inc. v. Patriot Fine Foods LLC, Case No. 9:21-cv-92129-DMM (S.D. Fla. 3/22/2022) (awarding $26,001.00 where *single* photograph was infringed for a period of approximately four months); Prepared Food Photos, Inc. f/k/a Adlife Marketing & Communications Co., Inc. v. 193 Corp. d/b/a Bella Lukes, Case No. 1:22-cv-03832 (N.D. Ill. 9/21/2022) (awarding $36,491.00 where *single* photograph was infringed for a period of three years).

Using the above cases as a guide, please keep in mind that our client exclusively operates on a subscription basis.  This means that access to one (1) photograph costs the same as access to the entire library of photographs.  Our client makes its library available for $999.00 per month (https://preparedfoodphotos.com/featured-subscriptions/) with a minimum subscription of twelve (12) months https://preparedfoodphotos.com/terms.of.use.php.  Thus, irrespective of how long you utilized the subject photograph, the *minimum* license fee that would have been owed is $11,988.00 ($999.00 x 12 months).

Further, you should provide a copy of this letter to your general liability insurance carrier (if one exists), notify them of our client's demand, disclose the identity of such insurer to us, and provide a copy of the subject insurance policy to us. If you believe we are mistaken as to the allegations of copyright infringement made herein, then we encourage you to provide us with copies of any license or other evidence supporting your authorized use of the subject work(s).

Finally, while removing the unlicensed photograph(s) from commercial display is required, please understand that ***removal alone is insufficient to end this matter***.  If your use of the subject photograph(s) is unauthorized, you must contact us to discuss payment for your existing/past use. Otherwise, a lawsuit ***will*** be filed and our client ***will*** pursue the above-described damages against you.

You should give this matter your immediate attention.

Very truly yours,

Daniel DeSouza, Esq.
For the Firm

Encl.

Exhibit "A"

## Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Maria A. Pallante*

United States Register of Copyrights and Director

**Registration Number**

# VA 2-014-921

**Effective Date of Registration:**
August 26, 2016

---

### Title

**Title of Work:** ADLIFE-COLLECTION-082416

**Previous or Alternate Title:** Group registration of photos published in 2007.

**Content Title:** TaffySaltWater002, 01-12-2007; ChexMix001, 08-07-2007; PopcornCaramelPeanut001, 07-10-2007; IceCreamChocolateChip001, 07-25-2007; ChowderClam001, 10-24-2007; ChowderClam004, 04-20-2007; SoupAlphabet001, 08-07-2007; SoupBlackBean001, 07-10-2007; SoupBlackBean002, 09-07-2007; SoupBlackBeanJalapeno001, 01-25-2007; SoupChickenNoodle003, 03-20-2007; SoupFrenchOnion005, 05-07-2007; CheeseBall004, 04-20-2007; SoupSalad001, 08-07-2007; SoupTurkeyGumbo001, 04-20-2007; SoupVegetable002, 05-07-2007; StewBeef002, 08-07-2007; StewBeef006, 10-02-2007; StewBeef007, 02-15-2007; PotatoChip005, 08-07-2007; PotatoChip006, 06-04-2007; PretzelSoft001, 12-20-2007; CheeseGoat002, 12-20-2007; SaladBean003, 12-20-2007; SaladBean006, 08-07-2007; SaladCaesar004, 04-20-2007; SaladChef002, 04-20-2007; CheeseMozzarella015, 04-20-2007; CheeseMuenster005, 04-20-2007; CheesePepperoni003, 04-20-2007; ColdCutAsst014, 07-02-2007; ColdCutAsst027, 07-02-2007; ColdCutAsst031, 08-29-2007; ColdCutAsst040, 12-06-2007; ColdCutAsstFootball001, 12-20-2007; ColdCutItalianAsst002, 12-20-2007.

---

### Completion/Publication

**Year of Completion:** 2007
**Date of 1st Publication:** January 12, 2007
**Nation of 1st Publication:** United States

---

### Author

- **Author:** ADLIFE Marketing & Communications Co., Inc., Employer-for-Hire of David Ciolfi
  **Author Created:** photograph
  **Work made for hire:** Yes
  **Domiciled in:** United States

---

### Copyright Claimant

**Copyright Claimant:** Adlife Marketing & Communications Co., Inc.
38 CHURCH ST, PAWTUCKET, RI, 02860, United States

Exhibit "B"



EXHIBIT "2"



Copycat Legal PLLC
3111 N. University Drive
Suite 301
Coral Springs, FL 33065

T   877-HERO-CAT (877-437-6228)
E   help@copycatlegal.com

FRE 408 SETTLEMENT COMMUNICATION

January 6, 2023

**VIA U.S. MAIL AND ELECTRONIC MAIL** (mlundin@kalmbach.com)

Kalmbach Media Co.
d/b/a *Discover* Magazine
Attn: Martha Lundin
P.O. Box 1612
Waukesha, WI 53187

**RE:    *Prepared Food Photos, Inc. v. Kalmbach Media Co. d/b/a Discover Magazine***

Dear Ms. Lundin,

This law firm represents Prepared Food Photos, Inc. Our client is in the business of licensing high-end, professional photographs for the food industry. Through its website (www.preparedfoodphotos.com), our client offers a monthly subscription service which provides access to/license of tens of thousands of professional images.  The rights associated with these images are exclusively owned by our client, and it has spent countless hours and substantial monies in building a business that relies on such exclusive subscription service. The unauthorized use of our client's work deprives our client of much-needed income and forces our client to incur substantial costs (monetary and time) in identifying violators and enforcing its rights.

In 1998, our client created a photograph titled "Shrimp005" (the "Work").  A copy of the Work is exhibited below:



The Work was registered by our client with the Register of Copyrights on October 23, 2016 and was assigned Registration No. VA 2-022-051. A true and correct copy of the Certification of Registration pertaining to the Work is attached hereto as **Exhibit "A."**

To our knowledge, our client **did not** authorize you or your company to use and/or display the foregoing photograph(s). Notwithstanding this lack of authorization, our client has identified the subject photograph(s) currently published by *Discover* Magazine for commercial purposes (at https://www.discovermagazine.com/the-sciences/shrimp-its-whats-for-dinner):



A true and correct copy of the screenshot(s) from *Discover* Magazine's website, displaying the copyrighted Work, is attached hereto as **Exhibit "B."**

If our client is mistaken or if you believe the photograph(s) was previously licensed through our client or some other party, please contact us immediately with evidence of the prior licensing. If we do not hear from you **within fourteen (14) days from the date of this letter**, we will be forced to assume that the photograph(s) was **not** properly licensed and will take appropriate legal action to enforce our client's rights.

Please note that Section 504 of the Copyright Act provides for the recovery of actual damages plus "any additional profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." Of course, if forced to litigate this matter, we will fully explore the damages issue and make an election that is most beneficial to our client.

While this is a serious matter, it is not particularly complex. The subject photograph(s) was either properly licensed or it was not.  If it was, you should notify us immediately of such licensing so that we may inform our client of such.  If it was not properly licensed, then the utilization of our client's work(s) without proper authorization constitutes copyright infringement.  In that case, we will either resolve this issue in court (allowing a court to decide the matter) or privately between the parties.  If the subject use was not authorized, our client hereby makes the following demand:

> ***You shall pay Seven Thousand Five Hundred Dollars ($7,500.00) within twenty-one (21) days of the date first written above and shall immediately cease and desist from any further use of our client's work(s)***.

Please contact us within the above-stated period to either provide evidence of licensing or to discuss resolution of this matter. If we do not hear from you or are otherwise unable to resolve the matter on amicable terms, please be aware that our client does not shy away from enforcing his rights in court.

Please keep in mind that our client exclusively operates on a subscription basis.  This means that access to one (1) photograph costs the same as access to the entire library of photographs.  Our client makes its library available for $999.00 per month (https://preparedfoodphotos.com/featured-subscriptions/) with a minimum subscription of twelve (12) months https://preparedfoodphotos.com/terms.of.use.php.  Thus, irrespective of how long you utilized the subject photograph, the ***minimum*** license fee that would have been owed is $11,988.00 ($999.00 x 12 months).

Further, you should provide a copy of this letter to your general liability insurance carrier (if one exists), notify them of our client's demand, disclose the identity of such insurer to us, and provide a copy of the subject insurance policy to us. If you believe we are mistaken as to the allegations of copyright infringement made herein, then we encourage you to provide us with copies of any license or other evidence supporting your authorized use of the subject work(s).

Finally, while removing the unlicensed photograph(s) from commercial display is required, please understand that ***removal alone is insufficient to end this matter.*** If you do not contact us to discuss payment for your existing/past use of the photograph(s), a lawsuit ***will*** be filed and our client ***will*** pursue the above-described damages. You should give this matter your immediate attention.

Very truly yours,

Lauren Hausman, Esq.

For the Firm
Encl.

Exhibit "A"

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Kay Perlz Clayett*

Acting United States Register of Copyrights and Director

**Registration Number**

## VA 2-022-051

**Effective Date of Registration:**
October 23, 2016

---

## Title

| | |
|---|---|
| **Title of Work:** | ADLIFE-COLLECTION-101916-PUBL-1998 |
| **Previous or Alternate Title:** | Group of photos published 01-11-1998 thru 12-14-1998; about 220 photos total. |
| **Content Title:** | CookieAlmond0001, 11-11-1998;<br>CrabBoil001, 07-13-1998;<br>SwordfishSteak005, 05-13-1998;<br>SurfTurf007, 05-07-1998; |
| | SurfTurf009, 11-14-1998;<br>SurfTurf018, 08-09-1998;<br>SurfTurf026, 06-09-1998;<br>SurfTurf027, 06-09-1998;<br>SoleStuffed003, 09-14-1998; |
| | SweetPotato003, 07-23-1998;<br>CrabCake004, 07-16-1998;<br>SweetPotatoRoastedBowl002, 09-15-1998;<br>Shrimp002, 03-24-1998; |
| | Shrimp003, 08-14-1998;<br>Shrimp005, 09-13-1998;<br>Shrimp025, 01-22-1998;<br>Shrimp029, 01-14-1998; |
| | ShrimpCocktail003, 11-16-1998;<br>ShrimpCocktail023, 11-16-1998;<br>CrabCake007, 02-08-1998;<br>CrabLeg001, 10-16-1998;<br>CrabLeg002, 10-16-1998;<br>CrabShrimpPlatter001, 09-15-1998; |
| | ShrimpCocktail028, 04-09-1998;<br>ShrimpCocnut003, 01-16-1998;<br>ShrimpLarge002, 10-12-1998;<br>ShrimpPasta002, 11-20-1998; |
| | ShrimpPasta009, 02-12-1998;<br>FruitGrilled001, 04-06-1998;<br>Crawdad001, 08-21-1998;<br>FruitKabob002, 11-17-1998; |
| | Crawdad004, 05-19-1998; |

CrawdadCrab001, 05-19-1998;
StrawberryRhubarb001, 05-12-1998;
ShrimpPopcorn001, 12-13-1998;
FlounderFillet004, 11-11-1998;

ShrimpRing001, 07-27-1998;
ShrimpRing006, 11-20-1998;
ShrimpSalad004, 08-09-1998;
FishChip010, 04-14-1998;
ShrimpScampi003, 06-22-1998;

ShrimpStuffed005, 02-08-1998;
SeaBassChilean002, 11-08-1998;
FishSandwich003, 08-12-1998;
HaddockFillet015, 02-09-1998;

HaddockGrilled001, 08-12-1998;
HaddockRoasted001, 06-18-1998;
HaddockFillet007, 03-07-1998;
ScallopBacon002, 05-20-1998;
ScallopBacon007, 04-15-1998;

ScallopBacon008, 06-13-1998;
ScallopCake002, 04-21-1998;
ScallopGrilled001, 11-20-1998;
ScallopSkewer002, 01-14-1998;

ShortcakeStrawberry004, 08-13-1998;
ShortcakeStrawberry003, 08-13-1998;
ShortcakeStrawberry001, 11-15-1998;
ShortcakeBlueberry001, 08-13-1998;
CakeYellow002, 11-23-1998;

CakeYellow001, 06-06-1998;
CakeVanilla001, 01-19-1998;
CakeValentine002, 02-10-1998;
CakeValentine001, 02-10-1998;

CakeTurtlePudding001, 11-09-1998;
CakeTiramisu002, 07-14-1998;
CakeTiramisu001, 09-16-1998;
CakeStrawberryMouse001, 04-26-1998;
CakeStrawberryCreme003, 04-26-1998;

CakeStrawberryCreme002, 12-13-1998;
CakeStrawberryCreme001, 08-13-1998;
CakeStrawberry003, 11-08-1998;
CakeStrawberry002, 04-16-1998;
CakeStrawberry001, 08-13-1998;

CakeSponge001, 04-22-1998;
CakeSpice002, 10-26-1998;
CakeSpice001, 11-08-1998;
CakeSpanishBar001, 11-10-1998;

CakeSourCreamCoffee001, 08-13-1998;
CakeSnickers001, 11-09-1998;



CakeSlice001, 11-27-1998;
CakeSingleLayerYellow001, 05-11-1998;

CakeSingleLayer005, 12-06-1998;
CakeSingleLayer004, 12-06-1998;
CakeSingleLayer003, 05-11-1998;
CakeSingleLayer002, 03-05-1998;

CakeSingleLayer001, 08-13-1998;
CakeSheet001, 06-06-1998;
CakeRum001, 08-13-1998;
CakeRose002, 04-20-1998;
CakeRose001, 06-17-1998;
CakeRedWhiteBlue003, 06-15-1998;

CakeRedWhiteBlue001, 11-08-1998;
CakeRedVelvet004, 06-16-1998;
CakeRedVelvet003, 12-08-1998;
CakeRedVelvet002, 12-08-1998;

CakeRedVelvet001, 06-16-1998;
CakeRaspberrySlice001, 02-24-1998;
CakeRaspberry002, 02-24-1998;
CakeRaspberry001, 02-24-1998;
CakePoundStrawberry001, 11-15-1998;

CakePoundBlueberry002, 10-06-1998;
CakePound010, 03-17-1998;
CakePound009, 06-07-1998;
CakePound006, 04-11-1998;

CakePound005, 04-09-1998;
CakePound004, 02-09-1998;
CakePound003, 02-12-1998;
CakePound002, 08-13-1998;

CakePound001, 08-10-1998;
CakePineappleUpsideDown, 08-13-1998;
CakePinaColada001, 08-13-1998;
CakePhoto005, 04-24-1998;

CakePhoto004, 04-24-1998;
CakePhoto003, 04-24-1998;
CakePhoto002, 04-24-1998;
CakePhoto001, 04-24-1998;


CakePeanutButterFrosting001, 08-13-1998;
CakePeanutButterCup003, 12-08-1998;
CakePeanutButterCup002, 08-13-1998;
CakePeanutButterCup001, 08-13-1998;
CakePatriotsFootball001, 02-18-1998;


CakeOreoSingleLayer002, 04-26-1998;
CakeOreoSingleLayer001, 08-13-1998;
CakeOreoLayer002, 12-08-1998;

CakeOreoLayer001, 08-13-1998;

CakeOrangeLayer001, 08-13-1998;
CakeMothersDay003, 01-16-1998;
CakeMothersDay002, 04-20-1998;
CakeMothersDay001, 08-13-1998;

CakeMini001, 08-13-1998;
CakeMarblePound001, 08-13-1998;
CakeMapleWalnut001, 11-09-1998;
CakeLouisianaCrunch001, 08-13-1998;
CakeLemonPudding001, 08-13-1998;

CakeLemonPoppySee001, 08-13-1998;
CakeLemonLayer001, 11-09-1998;
CakeLemonGlazed001, 08-13-1998;
CakeLemon002, 04-14-1998;
CakeLemon001, 02-28-1998;

CakeItalianRum002, 08-13-1998;
CakeItalianRum001, 11-08-1998;
CakeHalloween001, 08-10-1998;
CakeGrasshopper001, 11-09-1998;

CakeGraduation002, 05-11-1998;
CakeGraduation001, 06-11-1998;
CakeGingerbread002, 12-08-1998;
CakeGingerbread001, 08-13-1998;
CakeGermanChocolateSlice001, 02-10-1998;

CakeGermanChocolate005, 08-13-1998;
CakeGermanChocolate004, 07-14-1998;
CakeGermanChocolate003, 02-09-1998;
CakeGermanChocolate002, 11-14-1998;
CakeGermanChocolate001, 02-10-1998;

CakeFudgeMM001, 08-13-1998;
CakeFruit001, 10-06-1998;
CakeFootballField001, 12-14-1998;
CakeFathersDay002, 06-08-1998;

CakeFathersDay001, 06-05-1998;
CakeDevilsFood002, 10-15-1998;
CakeDevilsFood001, 11-14-1998; CakeCrumbSlice001 11-05-1998;
CakeCrumb00?, 11-05-1998;

CakeCrumbCut001, 11-05-1998;
CakeCrumb003, 11-05-1998;
CakeCrumb002, 08-13-1998;
CakeCrumb001, 07-14-1998;
CakeCranberryPudding001, 08-13-1998;

CakeCoffeePistachio001, 06-17-1998;
CakeCoffeeCinnamon001, 03-05-1998;
CakeCoffeeBlueberry002, 09-25-1998;
CakeCoffeeBlueberry001, 08-13-1998;
CakeCoffee011, 07-14-1998;
CakeCoffee010, 08-08-1998;



CakeCoffee005, 07-14-1998;
CakeCoffee003, 08-13-1998;
CakeCoffee002, 01-11-1998;
CakeCoffee001, 08-14-1998;
CakeCoconut001, 01-27-1998;
CakeChristmas002, 11-08-1998;
CakeChristmas001, 11-20-1998;

CakeChocolateTriple001, 08-13-1998;
CakeChocolateTorteSlice001, 05-14-1998;
CakeChocolateStrawberry003, 03-18-1998;
CakeChocolateStrawberry002, 05-10-1998;
CakeChocolateSlice002, 07-15-1998;

CakeChocolateSlice001, 07-15-1998;
CakeChocolateRum001, 11-14-1998;
CakeChocolateMolten001, 10-15-1998;
CakeChocolateMocha001, 08-13-1998;
CakeChocolateMint002, 05-11-1998;

CakeChocolateMint001, 08-13-1998;
CakeChocolateHalf002, 12-10-1998;
CakeChocolateHalf001, 12-05-1998;
CakeChocolateFudge001, 08-13-1998;

CakeChocolate017, 03-15-1998;
CakeChocolate016, 04-20-1998;
CakeChocolate015, 04-26-1998;
CakeChocolate014, 10-12-1998;

CakeChocolate013, 11-08-1998;
CakeChocolate012, 12-08-1998;
CakeChocolate011, 12-08-1998;
CakeChocolate010, 11-14-1998;

CakeChocolate009, 06-15-1998;
CakeChocolate008, 06-15-1998;
CakeChocolate007, 11-14-1998;
CakeChocolate006, 11-14-1998;

CakeChocolate005, 08-13-1998;
CakeChocolate004, 02-21-1998;
CakeChocolate003, 12-05-1998;
CakeChocolate002, 08-13-1998;

CakeChocolate001, 08-09-1998;
CakeCheeseVanilla001, 03-19-1998;
CakeCheeseStrawberry002, 04-15-1998;

CakeCheeseStrawberry001, 08-13-1998;
CakeCheeseSauce001, 07-05-1998;
CakeCheeseRaspberry002, 03-19-1998;
CakeCheeseRaspberry001, 06-23-1998.

ShrimpPasta009, 02-12-1998;
FruitGrilled001, 04-06-1998;
Crawdad001, 08-21-1998;
FruitKabob002, 11-17-1998;

Page 5 of 7

Crawdad004, 05-19-1998;
CrawdadCrab001, 05-19-1998;
StrawberryRhubarb001, 05-12-1998;
ShrimpPopcorn001, 12-13-1998;
FlounderFillet004, 11-11-1998;

ShrimpRing001, 07-27-1998;
ShrimpRing006, 11-20-1998;
ShrimpSalad004, 08-09-1998;
FishChip010, 04-14-1998;
ShrimpScampi003, 06-22-1998;

ShrimpStuffed005, 02-08-1998;
SeaBassChilean002, 11-08-1998;
FishSandwich003, 08-12-1998;
HaddockFillet015, 02-09-1998;

HaddockGrilled001, 08-12-1998;
HaddockRoasted001, 06-18-1998;
HaddockFillet007, 03-07-1998;
ScallopBacon002, 05-20-1998;
ScallopBacon007, 04-15-1998;

ScallopBacon008, 06-13-1998;
ScallopCake002,  04-21-1998;
ScallopGrilled001, 11-20-1998;
ScallopSkewer002, 01-14-1998;

SalmonFillet019, 11-20-1998;
SalmonFillet025, 08-13-1998;
SalmonFillet048, 11-21-1998;
SalmonFilletCrusted001, 04-19-1998;
SalmonFilletGrlMark007, 05-19-1998;

SalmonFilletGrlMark008, 07-19-1998;
SalmonGrlMrk001, 02-15-1998;
MelonAthena001, 06-10-1998;
MelonCantaloupe014, 04-15-1998;
Jambalaya001, 11-16-1998;

SalmonSteakGrlMrk006, 09-13-1998;
FishChip001, 05-06-1998;
SeafoodStew001, 04-13-1998;
MahiMahi004, 06-13-1998;

MahiMahi005, 04-09-1998;
Jambalaya008, 04-09-1998;
MahiMahiFillet002, 04-09-1998;
Jambalaya009, 07-15-1998;
CookieAlmondChinese001, 11-11-1998;

CookieAppleFilled001, 04-12-1998;
CookieAsst002, 08-14-1998;
CookieAsst001, 08-14-1998;
CookieAsst003, 08-14-1998;

CookieAsst004, 08-14-1998;
CookieAsst005, 11-11-1998;



CookieAsst006, 08-21-1998;
CookieAsst007, 08-14-1998;
ShortcakeStrawberry009, 05-07-1998;

ShortcakeStrawberry008, 12-14-1998;
ShortcakeStrawberry007, 09-22-1998;
ShortcakeStrawberry006, 09-23-1998;
ShortcakeStrawberry005, 06-08-1998;

## Completion/Publication

| | |
|---|---|
| **Year of Completion:** | 1998 |
| **Date of 1st Publication:** | January 11, 1998 |
| **Nation of 1st Publication:** | United States |

## Author

| | |
|---|---|
| • **Author:** | ADLIFE Marketing & Communications Co. Inc., employer-for-hire of Joel Albrizio |
| **Author Created:** | photograph |
| **Work made for hire:** | Yes |
| **Domiciled in:** | United States |

## Copyright Claimant

| | |
|---|---|
| **Copyright Claimant:** | ADLIFE Marketing & Communications Co., Inc. 38 CHURCH ST, PAWTUCKET, RI, 02860-3906, United States |

## Rights and Permissions

| | |
|---|---|
| **Organization Name:** | SHORES & OLIVER PC |
| **Name:** | Milton M. Oliver. Esq. |
| **Email:** | milton.oliver@shoresoliver.com |
| **Telephone:** | (774)521-3058 |
| **Alt. Telephone:** | (781)910-9664 |
| **Address:** | PO BOX 790 COTUIT, MA 02635-0790 United States |

## Certification

| | |
|---|---|
| **Name:** | MILTON M. OLIVER, Esq. |
| **Date:** | November 14, 2016 |
| **Applicant's Tracking Number:** | 873-057-314 |

| | |
|---|---|
| **Correspondence:** | Yes |
| **Copyright Office notes:** | Regarding publication: date range 1/11/1998-12/14/1998. |



Exhibit "B"

🔒 discovermagazine.com/the-sciences/shrimp-its-whats-for-dinner

E   SHOP                    **SCIENCE THAT MATTERS**              LOGIN   REGISTER   ✉ STA





**RELATED CONTENT**

After Th
Hurrica
Hidden

What Ca
Rex's St
Injuries

4 Ways
Reconst
Military