1  Paul Alan Levy (pro hac vice)
   Public Citizen Litigation Group
2  1600 20th Street NW
   Washington, D.C. 20009
3  (202) 588-7725
   plevy@citizen.org
4
   Stephen Kirby
5  Kirby Law Office, PLLC
   WSBA #43228
6  1312 N. Monroe Street
   Spokane, Washington 99201
7  (509) 795-4863
   kirby@kirbylawoffice.com
8
   Phillip R. Malone (pro hac vice)
9  Juelsgaard Intellectual Property and Innovation Clinic
   Mills Legal Clinic at Stanford Law School
10 Crown Quadrangle, 559 Nathan Abbott Way
   Stanford, California 94305-8610
11 (650) 724-1900
   pmalone@stanford.edu

12                        UNITED STATES DISTRICT COURT
13                   FOR THE EASTERN DISTRICT OF WASHINGTON

14  PREPARED FOOD PHOTOS, INC.,        )
    f/k/a  ADLIFE MARKETING            )
15  & COMMUNICATIONS CO., INC.,        )   No. 2:23-cv-00160-TOR
    a  Florida for profit corporation, )
16                                     )   **DEFENDANT'S REPLY TO**
                   Plaintiff,          )   **PLAINTIFF'S RESPONSE TO**
17                                     )   **STATEMENT OF MATERIAL**
              v.                       )   **FACTS ABOUT WHICH THERE**
18                                     )   **IS NO GENUINE ISSUE**
    POOL WORLD, INC., a Washington for )
19  profit corporation,                )   Hearing: September 2, 2025
                                       )   6:30 PM
20                 Defendant.          )

21          Plaintiff Prepared Food Photos ("PFP") has effectively admitted almost all of the 104

22  material facts that defendant Pool World put forth in its statement, either by specifically

23  stating that the facts are undisputed or by claiming to dispute the facts but then failing to

24  point to any admissible evidence in the record that creates a genuine issue.  Many of the

25  "disputes" only quibble about wording, and many others rest on PFP's self-serving

26  representations about its intent without contradicting the **facts** that Pool World asserted.

Other disputes cite material that either is not admissible evidence, or does not put in genuine issue Pool World's facts, which rest on admissible evidence in the record. Under Local Rule 56(c)(1)(B), those submissions are not sufficient to create genuine issues about the specified material facts.

In the following enumeration, each of the original facts is in plain type; each of PFP's responses is italicized; and each Pool World reply is in bold type.

1. Plaintiff Prepared Food Photos ("PFP") is a company that purports to be in the business of licensing stock photographs of food to commercial users.

Complaint, ¶ 8, DN 1.

**PFP's Response:** *Undisputed.*

2. Since 2016, PFP's main source of revenue, and the main occupation of its staff, has been looking online for alleged infringements of its decades-old photo library, sending demand letters to the alleged infringers, and suing small companies seeking tens of thousands of dollars in damages.

Infra ¶¶ 20-29.

*PFP's Response: Disputed. Undisputed that the main source of revenue has been pursuing infringements of Plaintiff's work. Disputed as to remainder. A large portion of Plaintiff's staff time is dedicated to finding infringements, but Plaintiff's main goal remains attempting to license its library to willing subscribers. See Jones Decl. at ¶ 15.*

**Pool World's Reply:  PFP's cited evidence does not show how much time PFP's staff spend on tasks other than pursuing infringements.  The self-serving  representations**

1  **about what PFP hopes to accomplish, either as stated in PFP's response or averred in**

2  **the Jones Declaration. do not put in issue the facts shown by the record.**

3

4

5  **The Grilled Vegetable Photo and PFP's Licensing Until 2016**

6    3.  PFP claims ownership of a copyright of a stock photograph of vegetables on

7  skewers sitting on a grill ("Grilled Vegetable Photo").  It claims that this is one of the "tens

8  of thousands of professional images" that it offers for licensing in what it calls its "library."

9

10    Complaint ¶¶ 7-8, 11-12 (DN 1).

11  *PFP's Response: Undisputed.*

12

13    4.  In the summer of 2010, defendant Pool World created a website to advertise its

14  sale of grills.  It posted a composite image to that website that included part of the Grilled

15  Vegetable Photo as well as part of a photograph of shrimp sitting on a grill.

16

17    Flynn Affirmation ¶ 4 (DN 55-17 at 202); Answer, Exhibit A (DN 7)

18  *PFP's Response:  Disputed to the extent that Defendant claims that only a part of the Work*

19  *was used on defendant's website, as the entirety of photo was displayed thereon. See Jones*

20  *Decl. at ¶ 26. Undisputed as to the remainder.*

21

22  **Pool World's Reply**: **Pool World accepts this correction.**

23

24    5.  In 2010, and until 2016, PFP (then known as AdLife Marketing and

25  Communications) had an arrangement with iStock, a subsidiary of Getty Images, under

26  which a portion of the photos in its library, including the Grilled Vegetable Photo, were

27  available to license from iStock for as little as $1.

28

Teal Expert Report; Seventh Levy Affirmation (filed with this motion) ¶ 2 and Exhibit LL.

*PFP's Response: Disputed. In 2010, iStock offered either a subscription model (similar to Plaintiff), whereby users would have to pay a monthly fee to iStock to download photographs see https://web.archive.org/web/20100922205305/http://www.istockphoto .com/comp are-payment-plans.php; or, offered an individual credit system where a user could purchase credits and then apply those credits to purchase photographs. See e.g., https://web.archive.org/web/?01011111?3006/http://www.istockphoto.com/buv-stock-cr edits-pay-as-you-go.php; Per iStock's own website, for someone to license a photo for one dollar (which would only provide one extra small file size) that user would have to spend $5,000 to receive the 5,000 credits. See DeSouza Decl. at ¶¶ 28, 29.*

**Pool World's Reply**: **Not only does PFP's response acknowledge the literal veracity of the Material Fact, but the evidence cited shows that for $18.25, a user can buy 12 credits, so that purchase of a single photo could cost $1.52.  There is no genuine issue about this fact.**

6.  The licenses sold by iStock were "perpetual," meaning that the purchaser of the license could use the photo indefinitely in the future, and could provide the photo to its customers for use for any purpose.

Teal Expert Report; Levy Third Aff. ¶¶ 5-6 and Exhibits O & P (DN 55-1 at 30, 55-5, and 55-6)

*PFP's Response:  Undisputed*

7.  iStock did not inform PFP of the identity of the customers who were buying

licenses for the use of PFP's photos; thus PFP had no way of knowing whether any given user of its photos was licensed.

First Levy Aff. ¶ 15 (DN 21-1 at 19).

*PFP's Response: Undisputed.*

8. The Grilled Vegetable Photo was one of approximately 4700 photographs that PFP made available for licensing through iStock.

Seventh Levy Aff. ¶ 3.

*PFP's Response: Undisputed*

9. Between 2010 and 2016, iStock sold hundreds of licenses for use of the Grilled Vegetable Photo.

Seventh Levy Aff. ¶ 2 and Exhibit LL.

*PFP's Response: Undisputed.*

10. The licensees for the Grilled Vegetable Photo were charged as little as ninety-five cents ($.95) for a single license, and PFP's share of those license fees was as little as twelve cents ($0.12) for a single license.

*Id.*

*PFP's Response: Disputed. See response to 5.*

**Pool World's Reply**: **The evidence from iStock's website as of 2010, cited in the response and set forth in Mr. DeSouza's declaration, does not address the actual prices charged for the Grilled Vegetable Photo as shown in the record provided by Getty Images in discovery.   Not does the cited website evidence say anything about the very**

**small fractions of the prices charged that PFP would receive, which represent PFP's**

**actual lost license fee in this case.  There is no genuine issue about this fact.**

11.  In each of the years from 2010 to 2016, iStock paid PFP the following amounts in total license fees for the thousands of PFP photos it was licensing:

| | |
|---|---|
| 2010 | $15,476.88 |
| 2011 | $10,346.00 |
| 2012 | $ 7,715.99 |
| 2013 | $ 9,716.09 |
| 2014 | $16,850.97 |
| 2015 | $13,596.97 |
| 2016 | $ 5,471.91 |

The annual average was slightly more than $11,300.

Levy Seventh Aff., ¶ 4 and Exhibit M.

*PFP's Response: Undisputed*

12.  The current market value of a license for the Grilled Vegetable Photo is about ten to twelve dollars.

Expert Report of Jessica Teal; First Levy Aff. ¶ 10 (DN 21-1 at 17).

*PFP's Response:   Undisputed that the price of similar photographs on iStock photo are currently available to license for approximately $10-$12. Disputed that such constitutes the fair market value of the Work. See Jones Decl. at ¶ 18.*

**Pool World's Reply: Jones says that she does not agree with fair market value as stated in Rebecca Teal's expert opinion, although she does not say what she believes the market value to be.  Nothing in Jones' declaration shows that she has any expertise in the matter, and nothing shows that she has a basis for offering an admissible opinion**

**about the current fair market value of a license for the Grilled Vegetable Photo. There is no genuine issue about this material fact.**

13. Not all of PFP's photos were licensed through iStock. The remainder were licensed through other companies, including a company called Multi-Ad.

Complaint in *Adlife Marketing & Communications Company, Inc. v. Multi-Ad Solutions, LLC*, No. 1:17-cv-01418, and Exhibits A and B.

*PFP's Response: Undisputed.*

14. The licenses to use photographs sold through Multi-Ad were not "royalty free", but allowed the use of large numbers of photos for a single price.

Levy Fourth Aff. (DN 67-1) ¶¶ 11-13.

*PFP's Response: Undisputed*

15. The total income that PFP received from Multi-Ad and iStock combined in the years 2012 to 2016 was

```
2012  $  134,000
2013  $  124,493
2014  $  113,672
2015  $  104,428
2016  $  102,632
```

PFP stated that it had no records of income from licensing before 2012.

Levy Seventh Aff. ¶ 5 and Exhibit NN.

*PFP's Response: Undisputed*

16. Thus, the bulk of the licensing revenue that PFP received from these two companies combined was from licenses sold for the photos made available through Multi-Ad, not licenses sold for photos made available through iStock.

Supra ¶¶ 11 and 15.

*PFP's Response: Undisputed*

**PFP's 2016 Change of Its Licensing Practices**

17. In 2016, Plaintiff registered copyrights for all its images. It stopped licensing the use of individual photographs through third-party vendors such as iStock and Multi-Ad, and instead began selling licenses itself, but only by subscription to its entire database.

Third Levy Aff. (DN 55-1), ¶ 8 and Exhibit R (DN 55-7).

*PFP's Response: Undisputed that Plaintiff began doing copyright registrations for its library of images in 2016 and that process continued into 2017.*

**Pool World's Reply: Pool World accepts PFP's correction about the first sentence. The second sentence remains undisputed.**

18. As described in a blog post by PFP's owner, he knew that PFP's images were being used without license, and one purpose of this change in business model was to enable PFP to begin making money from claims of copyright infringement.

*Id.*

*PFP's Response: Disputed. The Albrizio blog post is mischaracterized by Defendant. See August 15, 2025 Declaration of Joel Albrizio ("Albrizio Decl.") at ¶¶ 5, 6, attached to Plaintiff' sMemorandum in Opposition to Defendant's Motion for Summary Judgment, as "Exhibit E" thereto; ECF No. 55-7.*

**PoolWorld's Reply: Nothing in the Albrizio declaration contradicts the fact that one**

**of the purposes of the change was to make money from infringement claims.  Indeed, the record shows the exceptional success that PFP has enjoyed at making money from the business of copyright enforcement**.

19.  PFP has not registered copyrights in any photographs created after 2017.

Levy Third Aff. ¶ 48 (DN 55-1 at 46-47).

*PFP's Response: Undisputed*


**PFP's Extensive Reverse-Image Search and Copyright Enforcement Efforts**

20.  PFP is a sophisticated and highly experienced repeat copyright litigant with an extensive enforcement operation.

*See generally infra.*

*PFP's Response:  Disputed. Plaintiff is a small company consisting of both part-time and full-time employees.  Plaintiff does not use sophisticated technology to search for infringements. See Jones Decl. ¶¶ 4, 9.*

**Pool World's Reply: Nothing in the cited paragraphs of the Jones Declaration contradicts the fact shown by the record.  The fact that PFP is a small company and has chosen not to use sophisticated search technology does not make it any less a "sophisticated and highly experienced repeat copyright litigant with an extensive enforcement operation."   PFP's admission that it deliberately eschews the use of sophisticated search technology is noted.**

21.  Since 2016, Plaintiff has been systematically using "reverse image" searches to

identify small businesses using its images on the internet and sending out demand letters

seeking payments in the five figures or high four figures to avoid litigation.

> First Levy Aff., Exhibit B (Answer to Interrogatories 10 and 16, DN 21-4 at B-60-61); Third Levy Aff., ¶ 15 (DN 55-1, at 33).

*PFP's Response: Disputed. Plaintiff, since 2017, has been utilizing Google reverse image*

*searches to search for potential infringements of its photographs. The size of a business is*

*not a factor in determining an infringement. Upon discovery of such, Plaintiff's general*

*practice is to send a cease and desist/demand letter, through its attorney, which seeks*

*payment subject to its violation of the Copyright Act and removal of the infringement from*

*the infringer's website. See Jones Decl. at ¶ 11.*

**Pool World's Reply: Nothing in the cited paragraph of the Jones Declaration, or in**

**PFP's narrative, which presents other characterizations that PFP prefers, contradicts**

**the fact stated.  The paragraph says nothing about size of business.  Hence, there is no**

**genuine issue about this fact.**

22.   PFP has used its own officers and other staff, and four outside search firms,

including the outside law firm of Higbee and Associates, to conduct those searches.  Since

2016, this sophisticated enforcement team has been constantly "search[ing] the entirety of

Plaintiff's image library via google reverse image search to identify" potential infringers.

> Seventh Levy Aff., Exhibit YY (Answer to Interrogatories 10 and 16);  MyNewsFit Prepared Food Photos Article Mar. 27, 2023, Exhibit O, available at https://www.blog.preparedfoodphotos.com/food-photos/dod1pyoq9tv6 f72ytumdh9p4moi5f5.

*PFP's Response: Partially disputed insofar as it refers to plaintiff's sophisticated*

*enforcement team. See response to 20.*

**Pool World's Reply: As with respect to Material Fact No. 20, nothing in the cited paragraphs of the Jones Declaration contradicts this fact, which is supported by the record. There is no genuine issue about this material fact.**

23. Most of the work done by PFP's employees consists of conducting online searches for possible infringements.

Levy Third Aff. ¶ 47 & Exhibit Z (DN 55-1 at 46, DN 55-15 at 196-197).

*PFP's Response: Disputed. Defendant's synthesization of what Plaintiff's employees work consists of is mischaracterized. See Jones Decl. at ¶ 5.*

**Pool World's Reply: Nothing in ¶ 5 of the Jones Declaration contradicts the evidence in the record on which this Material Fact was predicated. Jones admits that "most of the work done by Plaintiff's employees consists of protecting Plaintiff's intellectual property." There is no genuine issue about this material fact.**

24. In response to discovery requests to show records of its searches for infringing images, PFP produced records of searches that found potentially infringing images; it produced no records of unsuccessful searches.

Levy Seventh Aff., ¶ 15

*PFP's Response: Undisputed because Plaintiff does not save searches that yield no results and therefore does not have any documents to produce showing unsuccessful searches. See Jones Decl. at ¶ 15, I 6.*

25. PFP produced one set of spreadsheets showing reverse image searches in 2016, 2017 and early 2019, and another that showed searches that its own staff had conducted from April 2019 to early 2024.

*Id.*

*PFP's Response: Disputed insofar as Defendant describes the spreadsheet as showing searches rather than the result of searches. See Jones Decl. at ¶ 15, 16.*

**Pool World's Reply: Pool World accepts this correction to the wording of this material fact, about which there is otherwise no genuine issue.**

26. The spreadsheet showing searches beginning April 2019 recorded the date of each search, the dates when PFP staff sent demand letters to each alleged infringer, and the amount collected on the successful claims (or, the ledger indicated that the matter had been referred to counsel).

Levy Seventh Aff. ¶ 16.

*PFP's Response: Disputed. See response to 25.*

**Pool World's Reply: Pool World accepts this correction to the wording of this material fact, about which there is otherwise no genuine issue.**

27. In the first set of spreadsheets, an entry showed that on September 30, 2016, PFP found an allegedly infringing use of "ProduceVegetableGrilled002," PFP's file name for the photo at issue in this case. That spreadsheet did not show any other searches for ProduceGrilledVegetable002.

Levy Seventh Aff. ¶ 17.

*PFP's Response:  Disputed. See response to 25.*

**Pool World's Reply: Pool World accepts this orrection to the wording of this material fact, about which there is otherwise no genuine issue.**

28.  The second spreadsheet recorded search hits on ProduceGrilledVegetable002 on July 10, 2019, April 17, 2020, March 30, 2022, and May 3 and June 1, 2022.  The latter two search hits were from Pool World's website.

*Id.*

*PFP's Response: Undisputed*

29.  PFP produced no documents reflecting any other searches for "ProduceVegetableGrilled002" before June 2020 (three years before the complaint was filed).

*Id.*

*PFP's Response: Undisputed because, as explained above, Plaintiff only logs on the spreadsheet when it actually finds an infringement of a particular photograph, not every search it does for that photograph which yields no results.*

**PFP's Post-2016 Licensing Model**

30.  After registering its copyrights, PFP took the position that the Multi-Ad licenses that users had previously purchased were not "royalty-free" but rather had terminated, and that when Multi-Ad customers used PFP photos that they had obtained from Multi-Ad, they were infringing PFP's copyrights.   PFP accordingly sent demand letters to former Multi-Ad

customers, alleging infringement,

Levy Fourth Aff. ¶¶ 11-12 (DN 67-1 at 16-17).

*PFP's Response: Undisputed*

31.  Several former Multi-Ad customers entered subscription agreements with PFP

following those PFP claims and demand letters.

*Id.*; Fleurant Declaration (DN 71-1) ¶ 8; Levy Third Aff. ¶ 19 (DN 55-1, at 35).

*PFP's Response: Undisputed*

32.  PFP secured its first subscription under its new licensing model in 2017 with a

supermarket chain that subscribed at the rate of $499 per month.  That subscription has

apparently been renewed repeatedly since, and that subscriber continued to pay $499 per

month through 2024.

Levy Fifth Aff. ¶ 11 and Exhibit HH (DN 67-1 at 16-17 and 70-3 at 62-67; Levy
Seventh Aff. ¶ 7 and Exhibit OO.

*PFP's Response: Undisputed*

33.  PFP produced a total of only twenty-two subscription agreements in discovery,

revealing several agreements providing for monthly payments of $1188 per year ($99 per

month), $300 per month, $499 per month, $500 per month, and higher amounts).

Levy Seventh Aff. ¶ 7 and Exhibit OO.

*PFP's Response: Undisputed*

34.  Most of these subscription agreements were with businesses of two types –

supermarket chains and advertising companies that service grocery stores and supermarkets.

*Id.*

1

*PFP's Response: Undisputed*

2

3

    35.  Most of the subscription agreements required the subscribers to provide credit

4

cards to which the monthly subscription payments could be charged automatically.

5

    *Id.*

6

*PFP's Response: Undisputed*

7

8

    36.  The two subscription agreements that were with other businesses – one a hospital

9

chain, and one a single grocery store — were entered after PFP threatened the businesses

10

with suit for infringement.

11

12

    *Id.*

13

*PFP's Response: Undisputed as to the fact that the subscription agreement with the two*

14

*subject entities Defendant references were entered after Plaintiff made an allegation of*

15

16

*infringement. However, in each such instance, it was the alleged infringer, rather than PFP,*

17

*who requested and/or insisted on a subscription to Plaintiff's photo library. See DeSouza*

18

*Decl. at ¶15.*

19

20

**Pool World Reply: The fact that these two businesses, which would generally speaking**

21

**have no use for PFP's database of 18,000 stock photos of food, signed subscriptions as**

22

23

**part of a settlement of infringement claims undercuts any claim by PFP that the**

24

**subscriptions were entered in the ordinary course of business.  Because the grocery**

25

**store subscription was signed in 2019, it is not clear how Mr. DeSouza could have**

26

**personal knowledge of the discussions.  There is no genuine issue about this material**

27

**fact.**

28

37.  Pre-subscription communications produced in discovery, as well as payments in a ledger supplied by CopyCat Legal, reflect that each of the subscription agreements entered in 2021 or later was entered following claims of infringement directed to the subscriber or to one or more clients of the subscriber.

*Id.*  See also Levy Fourth Aff. ¶ 12 (DN 67-1 at 17).

*PFP's Response: Undisputed*

38.  PFP follows a policy of destroying documents after four years.

Levy Fifth Aff. ¶ 5 (DN 69-1 at 13) and Exhibit EE DN 69-3 at 29-30.

*PFP's Response: Undisputed*

39.  PFP has produced no pre-subscription communications with subscribers whose agreements were signed before 2021.

Levy Seventh Aff. ¶ 7 and Exhibit OO.

*PFP's Response: Undisputed*

40.  PFP has produced no bank records from January through May, 2020.

Levy Seventh Aff. ¶ 20.

*PFP's Response:*  Disputed. PFP obtained and produced those records subsequent to the filing of the motion. See DeSouza Decl. at ¶ 6.

**Pool World's Reply: Receipt acknowledged.   Information from those records is addressed in the Levy Ninth Aff.**

41.  PFP produced no bank records from 2017.

Levy Seventh Aff. ¶ 20.

*PFP's Response: Undisputed*

42.  PFP's subscription agreements are not intended for small businesses that need and used access to only a single photograph.

Nygard Aff. ¶ 10 (reporting admission by PFP representative).

*PFP's Response: Disputed. In general, Plaintiff's subscribers are larger grocery stores and/or advertising companies who design weekly ads. Plaintiff's photo library is intended for anyone who wants to license the library, but usual subscriber is as described above. See Jones Decl. at ¶ 17.*

**Pool World's Reply: The general statement that the photo library "is intended for anyone who wants to license the library" does not contradict the more specific admission by PFP's legal representative, in speaking with Justin Nygard, that the subscriptions are not intended for a small business that wants only to access a single photo.  Moreover, as shown in the accompanying Levy affirmation, at ¶ 5, in the same year, 2019, PFP was offering a subscription for small retail establishments at the rate of $29.99 per month – and even then, apparently sold no subscriptions. Hence, there is no genuine issue about this material fact.**

43.  PFP produced a spreadsheet showing monthly subscription payments during calendar years 2023 and 2024 that included monthly payments of $99 per month, $299 per month and other amounts lower than $999 per month.

Levy Fifth Aff. and Exhibit KK (DN 70-3, pages 83-84).

*PFP's Response:  Undisputed, but Defendant purposefully leaves out the fact that most of*
*Plaintiff's subscriptions are for $999.00 per month or above. See Jones Decl. at  18.*

**Pool World's Reply: ¶ 18 of the Jones Declaration does not say that "most of Plaintiff's**
**subscriptions are for $999.00 per month or above."  It refers to "the number of**
**Plaintiff's subscribers paying $999 per month or more."  In fact, fewer than half of the**
**PFP subscriptions that were active at any time between 2018 and 2022, the period for**
**which PFP is now seeking damages at $999 per month, were for $999 or more.**

44.  PFP was unable to produce documentation of the amounts of monthly payments
received from most of its subscribers before 2023, who paid by credit card, because PFP
failed to preserve the document before the company providing credit card services went out
of business.

Fleurant Declaration ¶¶ 8-10 (DN 71-1 at 2-3).

*PFP's Response: Disputed. The Fleurant Declaration makes clear that Plaintiff did not fail*
*to preserve documents, but rather that the documents were deleted as a part of the shutdown*
*of credit card processor. See ECF No. 71-1, pp. 2-3, ,8-10 ("If subscriber's payment is not*
*identified by a line item directly from the Bank of America statement, that would mean the*
*subscriber's payment would be encompassed in either a Stripe payment line item or in*
*records that were maintained by Payeezy (unless such subscription was negotiated as part*
*of an infringement settlement agreement whereby the settlement/subscription payment(s)*
*were received by a law firm on Plaintiff's behalf). As noted above, Plaintiff ceased using*
*Payeezy in approximately April 2023. I have since learned that Payeezy formally shut down*

*by March 2024 with Clover acquiring its assets and/or accounts. In connection with*

*Defendant'' discovery requests, I attempted to gain access to the Payeezy credit card*

*processing records for Plaintiff. I was unable to log into Payeezy (likely given its shut*

*down) and therefore unable to retrieve any records therefrom. Following this, I called*

*Clover, described the records I was seeking, and was told by Clover that it was unable to*

*provide access to Payeezy's records to Plaintiff. I have searched Plaintiff's own paper and*

*electronic records and have confirmed, to the best of my knowledge, that Plaintiff has not*

*maintained any of Payeezy's records/reports other than what was available logging into*

*Payeezy's portal (which Plaintiff no longer has access to)."*

**Pool World's Reply:    The above quotation does not put in issue the fact that PFP**

**failed to preserve these records.   PFP received a request for payment records in**

**February 2024.   Fleurant does not say that he did anything to search for those**

**documents at that time (or indeed at any time until after the Court granted Pool**

**World's motion to compel).   Moreover, for years before the document request was**

**served, PFP has been basing its claims for infringement damages on the existence of**

**subscribers paying a minimum of $999 per month.   These payment records would have**

**revealed which subscribers were paying which amounts under $999 in which of the**

**months for which PFP is claiming $999 in damages, and would have shown which**

**subscriptions ended after just one year (thus supporting an inference that the only**

**reason for signing was to settle an infringement claim).   PFP should have recognized**

**that someone might challenge the veracity of the factual predicate for its damages**

claims, especially given that PFP knew that its claims of a $999 minimum were false. There is no genuine issue about this material fact.

45.  PFP did not produce subscription agreements from most of the companies whose monthly payments were reflected in the 2023 / 2024 ledger.

Levy Sixth Aff. ¶ 8 (DN 72-1 at 14).

*PFP's Response: Disputed to the extent Defendant is generalizing/synthesizing its belief as to document product. See Jones Decl. at ¶ 25.*

**Pool World's Reply:  ¶ 25 of the Jones declaration makes no statements about the 2023/2024 ledger, and indeed only states PFP's "belief."  There is no genuine issue about this material fact.**

46.  The customer whose subscription payments were $1188 per year, pursuant to a subscription agreement signed in 2019, continued to pay that amount annually.

Levy Seventh Aff. ¶ 8.

*PFP's Response: Undisputed*

47.  The advertising company whose subscription payments were $500 per month if it used Bad-Adz services, but $999 per month if it does not, pursuant to a subscription agreement signed in 2020, in fact has been accorded access to the database of photos without paying anything to PFP because it buying services from a different company, Bad-Adz, that is owned by the same man who owns PFP.

Levy Seventh Aff. ¶ 9.

*PFP's Response:  Disputed. Bad-adz is a commonly owned sister company to Plaintiff, which designs weekly ads and other advertisements for its customers. The object company subscribes to Bad-Adz, and Bad-Adz (not the customer) has access to Plaintiff's library to use such photographs for creating ads for that subject customer. The customer itself does not have any access to Plaintiff's photos. See Jones Decl. at ¶ 19.*

**Pool World's Reply: This company's subscription agreement from 2020, which is attached to the accompanying affirmation, was with AdLife (PFP's former name), not with Bad-Adz, and provided that the company would have access to the photos.  If a new agreement has been signed changing those terms, PFP has failed to produce it.  In any event, the response makes clear that the company continues to have use of PFP's photos as selected by Bad-Adz, even if it cannot download them itself, and hence continued to pay $500 per month throughout the damages period.  Moreover, PFP has now conceded that Bad-Adz uses its access to PFP's photo database for the benefit of all of its customers, even though no subscription agreement between Bad-Adz and PFP has been produced and even though PFP has not identified any subscription payments as having been made by Bad-Adz to PFP.  It appear that the monthly cost to Bad-Adz for access to the database is zero dollars.  There is no genuine issue about this material fact.**

**PFP's Income from Subscriptions and from Copyright Enforcement**

48.  Most of PFP's photo-based income during the period 2018 through 2024 was

provided by settlements of claims for copyright infringement.

Infra ¶ 49-51.

*PFP's Response: Undisputed*

49.  The amounts of claimed subscription income in each of the years from 2018 to 2024, as revealed in redacted bank records produced in discovery, was as follows:

```
2018        $79,728
2019        $91,639.07
2020        $59,766.38
2021        $88,984.20
2022        $59,833.64
2023        $79,584
2024        $67,583.62
```

The amounts reported for 2018, 2019 and 2021 included bank statements on which it appears that PFP added a legend to the original documents indicating that the sums included funds commingled with Bad-Adz or "agency receipts."

Levy Seventh Aff. ¶ 23 and Exhibit TT; examples of the added legends appear at DN 70-3, pages 34 and 41.

*PFP's Response: Undisputed*

50.  The amounts of subscription income in each of the years from 2018 to 2023, claimed in response to an interrogatory in 2023, was as follows:

```
2018        $ 78,828
2019        $192,879
2020        $180,345
2021        $ 71,162
2022        $ 94,157
2023        $ 70,484
```

Exhibit B to First Levy Aff., Answer to Interrogatory 13, DN 21-4 at page B-60

*PFP's Response: Undisputed*

51.  PFP documents produced in discovery show the following amounts having been

secured through claims for copyright infringement in each of the years 2018, 2019, 2022, 2023, and 2024. These amounts are dramatically higher than PFP's income from subscriptions in the same years:

| 2018 | $ *Redacted* |
| 2019 | $ *Redacted* |
| 2022 | $ *Redacted* |
| 2023 | $ *Redacted* |
| 2024 | $ *Redacted* |

Levy Seventh Aff. ¶¶ 9, 13, 19, 21 & Exhibits PP, RR, SS; Solt Aff. & Exhibits S1 and S2.[1]

*PFP's Response: Undisputed.*

**Note that PFP's Response to the Statement of Material Fact appears to respond to the redacted version of the Statement of Material Fact, in that PFP has the word "REDACTED" in lieu of the numbers above. Pool World asked PFP to respond to the sealed version showing the actual numbers. PFP has not responded to that request.**

**Pool World Reply: In the 2024 figure, the numbers 0 and 4 were mistakenly transposed. The correct figure is $*Redacted*. Levy Ninth Affirmation ¶ 11.**

**PFP's Deceptive and Coercive Demand Letter to Pool World**

52. PFP sent a demand letter to Pool World dated September 16, 2022, stating that PFP had detected the Grilled Vegetable Photo on Pool World's website.

Answer to Complaint, Exhibit A (DN 7).

---

[1] The Levy Seventh Affirmation explained why available data from 2020 to 2021 was incomplete. More data was received after the Motion was filed.

*PFP's Response: Undisputed.*

53.  The demand letter to Pool World demanded, in bold letters and blocked text, that Pool World pay $30,000 in damages within twenty-one (days) to avoid being sued.

Answer to Complaint, Exhibit A (DN 7).

*PFP's Response:  Disputed in part. The bold, blocked text specifically (and only) reads You shall pay Thirty Thousand Dollars ($30,000.00) within twenty-one (21) days of the date first written above and shall immediately cease and desist from any further use of our client's work(s)." See ECF No. 86.*

**Pool World's Response: Later in PFP's demand letter, at the cited docket number, PFP stated, "Otherwise, a lawsuit will be filed . . .."   There is no genuine issue about this material fact.**

54.  This bold-lettered demand (or similarly worded versions) is standard in demand letters sent by PFP's current law firm, CopyCat Legal.

Levy Seventh Aff., ¶ 27; Levy Third Aff. ¶ 10 (DN 55-1 at 32-33).

*PFP's Response: Undisputed that in 2022, the above quoted language appeared generally in demand letters sent by CopyCat Legal.*

**Pool World's Reply: Evidence in the record (attached to the Nygard, Rimer, and Lingerfelt Affirmations) shows that this and similar language appear in CopyCat Legal's demand letters on behalf of PFP throughout 2022, 2023, and 2024, not just in 2022.**

55.   The demand letter to Pool World claimed that PFP makes its photographs available only by subscription to its entire database of photos, and for $999 per month for a minimum period of one year.   PFP "charges its clients . . . a minimum monthly fee of $999.00 for access to its library of professional photographs" and "does not license individual photographs or otherwise make individual photographs available for purchase . . . [but] relies on its recurring monthly subscription service."

Answer to Complaint, Exhibit A (DN 7).

*PFP's Response:  Undisputed.*

56.   The demand letter then claimed that, because of this supposed subscription model and minimum fee and one-year subscription requirement, PFP's lost license fee, and thus the damages that a court could award, would be $11,988, but that PFP also "believe[d] a 3x multiplier . . . is appropriate, resulting in statutory damages of $35,964" for each year's licensing period that the photo had been on Pool World's website

*Id.*

*PFP's Response: Undisputed.*

57.  At the time the demand letter was sent, PFP's officers knew the actual monthly payments that were being paid by their relatively few subscribers, and consequently they knew that $999 per month was not PFP's actual minimum subscription fee, and had never been the minimum subscription fee.

Levy Fifth Aff. ¶ 16 (DN 69-1 at 13).

*PFP's Response: Disputed. While Plaintiff's officers of course knew what payments were being made by its subscribers, those subscribers paying less than $999.00 per month at the time were legacy subscribers that had been subscribers for many years and/or were afforded special treatment/rates due to prior existing relationships. See Jones Decl. at ¶ 18.*

**Pool World's Reply: The fact that PFP considered some of its subscribers were "legacy subscribers" or that PFP considered that it had some reason to allow subscriptions as low as $99 per month does not make the assertion that $999 was the monthly minimum any less false.  There is no genuine issue about this material fact.**

58.  During the period from 2021 through 2023, PFP had sent thousands of demand letters containing this knowingly false statement about a $999 minimum monthly fee.

Levy Third Aff. ¶ 10 (DN 55-1 at 31).

*PFP's Response: Undisputed that Plaintiff, through counsel, sent approximately 1700 cease and desists/demand letters between 2021-2023. Disputed with respect to the false statement about its monthly fees. See response to 57.*

**Pool World's Reply**: **With respect to the denial that its statement about its minimum monthly fees was false, the fact that PFP considered some of its subscriber were "legacy subscribers" or that PFP considered that it had some reason to allow subscriptions as low as $99 per month does not make the assertion that $999 was the monthly minimum payment any less false.  There is no genuine issue about this material fact.**

59.  The demand letter to Pool World stated that, if the use of its photo continued for more than one year, the damages would include an additional $999 per every additional month of use.

Answer to Complaint, Exhibit A (DN 7).

*PFP's Response: Undisputed.*

60.  The demand letter to Pool World stated that Pool World could be liable for statutory damages instead of actual damages, and that statutory damages awards are generally three to five times the lost license fee.  In particular, the letter stated that "[a]ssuming our client prevails in court, 17 U.S.C. § 504(c)(1) provides our client the right to recover statutory damages . . . [up to] a sum of not more than $150,000."

*Id.*

*PFP's Response: Undisputed*

61.  The demand letter also stated that courts "have not hesitated (where appropriate) to impose substantial statutory damages against copyright infringers."

*Id.*

*PFP's Response:  Undisputed*

62.  The demand letter further threatened that a "3x multiplier (as punishment/deterrent) was appropriate, resulting in statutory damages of $35,964 (**for each annualized licensing period**)." (emphasis in original).

*Id.*

*PFP's Response:  Undisputed*

63. PFP made these statements despite the fact that it could not recover statutory damages against Pool World because Pool World's use began in 2010, long before PFP's copyright was registered in 2016.

> Levy First Aff. ¶ 20 (DN 21-1at 20); Flynn Aff. ¶ 4 (DN 55-17); Stark Expert Report;
> 17 U.S.C. § 412.

*PFP's Response: Undisputed that because Defendant's infringement began in 2010, statutory damages are not available in this case as reflected by both the original and first amended Complaint. Disputed in so far as this paragraph suggests that at time of the demand letter plaintiff knew the infringement began in 2010. See Jones Decl. at ¶ 20. See DeSouza Decl. at ¶¶ 8, 9.*

**Pool World's Reply: PFP does not dispute the material fact stated above.  This material fact does not address the question of what PFP knew or should have known. That is addressed in the next paragraph. There is no genuine issue about this material fact.**

64. PFP should have known that its statements in the demand letter about statutory damages were false, and that statutory damages were unavailable because the presence of the image on  Pool World's website before 2016 was shown in the Internet Archive.

> https://web.archive.org/web/20110208085952/https://poolworld-grillworld.
> com/ (showing use in 2011); Teal Expert Report.

*PFP's Response:  Disputed. Plaintiff did not know whether statutory damages were available, as that information was not readily/clearly available. It is not within Plaintiffs standard procedure to refer to the Wayback Machine at demand stage. See Jones Decl. at*

20.

**Pool World's Reply: The assertion that the date when Pool World's use began "was not readily/clearly available" is incorrect. The undisputed fact is that either PFP or Mr. DeSouza's firm could have obtained that information in about 30 seconds from the Internet Archive, Levy Ninth Affirmation, ¶ 4, and Mr. DeSouza's declaration concedes that he knew how to do this. Moreover, the record shows that Mr. DeSouza regularly uses the Internet Archive to obtain information supporting greater damages for PFP. Levy Seventh Affirmation ¶ 33 (DN 90-3). Based on the undisputed facts in the record, the Court should conclude that there is no genuine issue about whether PFP should have known that statutory damages were not available**.

65.  PFP is familiar with the Internet Archive. When PFP seeks default judgments against accused infringers who do not hire counsel to defend themselves, it commonly uses the Internet Archive to show the length of the allegedly infringing use, thus justifying awards of actual damages at $999 per month for more than one year.

Motion for Default Judgment in *Prepared Food Photos v. EatFood Distributors*, Case No. 1:23-cv-08036-JLR (S.D.N.Y. Jan. 5, 2024), at 13 n.5 available at https://storage.courtlistener.com/recap/gov.uscourts.nysd.606093/gov.uscourts.nysd.606093.15.0.pdf. See also *Prepared Food Photos, Inc. v. Trip Rest. LLC*, 2023 WL 2955298, at *4 (S.D.N.Y. Apr. 14, 2023) (citing Wayback Machine); *Prepared Food Photos v. Chicago-Mkt.-Distributors*, 2023 WL 3570673, at *6 (D. Colo. Apr. 18, 2023), report and recommendation adopted, 2023 WL 3568164 (D. Colo. May 19, 2023) (same).

*PFP's Response: Disputed. While Plaintiff understand that internet archival systems exist (such as the Wayback Machine), Plaintiff did not utilize any internet archival system in 2022 at the time that the demand letter went to Defendant (nor does it utilize any such*

*system currently). As described above, Plaintiff simply lacks the time and/or resources to perform such searches given the substantial number of infringements it staff discover on an annual basis. See Jones Decl. at ¶¶ 20, 21.*

**Pool World's Reply: There is no genuine issue about this material fact.**

66.  As of late 2023, some 1800 demand letters similar to the demand letter to Pool World had been sent to accused infringers by CopyCat Legal, and more were sent in 2024.

Levy Seventh Aff. ¶¶ 26-27; Levy Third Aff. ¶ 10 (DN 55-1 at 31-32).

*PFP's Response: Undisputed*

**Pool World's Reply: Given that this fact is undisputed, it is difficult to understand why the number 1700 appears in PFP's response to ¶ 58.**

67.  The demand letter to Pool World stated that PFP would be able to get its attorney fees awarded against Pool World.  In particular, it stated, "[k]eep in mind that attorneys fees include . . . potentially the attorneys fees/costs we will incur to pursue the matter (which may be awarded) if our client prevails in court."  It also stated that "the above amounts do not account for attorneys' fees which are also recoverable under the Copyright Act."

Answer to Complaint, Exhibit A (DN 7).

*PFP's Response: Undisputed*

68.  PFP made these statements despite the fact that it cannot be awarded attorney fees against Pool World for the same reason it cannot be awarded statutory damages – Pool World's use of the image began in 2010, long before PFP's copyright was registered in 2016.

Stark Expert Report; Levy First Aff. ¶ 21 (DN 21-1 at 20-21); 17 U.S.C. § 412.

*PFP's Response: Disputed. See response to 64.*

**Pool World's Reply: Pool World's response to ¶ 63 is equally applicable here.**

69. The demand letter to Pool World warned that it would be expensive to defend against PFP's lawsuit, stating in part "[c]opyright infringement is a serious matter that potentially exposes you to substantial damages/attorneys fees . . . includ[ing] those you will be forced to incur to mount a defense."

Answer to Complaint, Exhibit A, DN-7.

*PFP's Response: Undisputed*

70. In fact, during the course of this litigation, PFP's owner has contacted Pool World's owner directly, without the consent of counsel, to explicitly threaten the high cost of litigation as a reason for Pool World to accept PFP's settlement terms.

Early Aff., ¶¶ 2-6 and Exhibits E1 to E-4.

*PFP's Response: Disputed.    Plaintiff's owner has reached out to Defendant's ownership/management in an effort to discuss potential resolution of this case on multiple occasions, but never to threaten the high cost of litigation. See Albrizio Decl. at ¶ 4.*

**Pool World's Reply: Although the Albrizio Declaration denies that his purpose in contacting Grady Early was to threaten the high cost of litigation, he does not contest the authenticity of the email attached to the Early Affirmation as Exhibit E1, which refers repeatedly to litigation costs, such as that Early would "be responsible for all costs associated with this litigation," and states "you could be on the hook for some**

serious money in the tens of thousands."  Similarly, in Exhibit E-3, another email

whose authenticity is not contested, Albrizio warns that Pool World will be liable for

"hundreds of thousands" because, he says, this litigation is "wasting a federal court's

time."  There is no genuine issue about this material fact.

71.  In addition, in followups to other demand letters, PFP's representatives cite the

cost of defending against its lawsuits to set the minimum amount that those targets should

be willing to pay in settlement.

Rimer Aff. ¶¶ 4-5 and Exhibit R2; See also Exh. W (DN 53-13), at page 170.

*PFP's Response: Disputed. See DeSouza Decl. at ¶ 18.*

**Pool World's Reply: The email from CopyCat Legal to Richard Rimer, whose
authenticity is not contested, at the record cite above, stated:**

> **From the moment we file the Complaint, that is $403.00 (filing fee) and
> approximately $100.00 (service fee) that we are mandated to recover.
> Assuming the parties take depositions of each other, that is another
> $2,000.00 in recoverable costs. So, without considering judgment amounts,
> Healthy Solutions is starting at a $2,500.00 deficit. We can litigate its
> innocent infringer and valuation defenses, but I would anticipate that
> Healthy Solutions is incurring an additional $15,000 - $30,000 of
> attorneys' fees with your firm. I am thus curious what the justification
> is for a $1,500.00 offer when, on Healthy Solution's best day, it appears to
> be responsible for at minimum $17,500.00 out-of-pocket defending the
> lawsuit, notwithstanding the license fees for the use of the infringing
> photograph.**

> **Please note this isn't our client's first rodeo. They have filed dozens of
> prior lawsuits for copyright infringement when a defendant either does
> not respond or refuses to negotiate in good faith (as here). While the above
> is what I consider to be Healthy Solution's "best case" scenario (which
> ignores entirely our client's license fee), the reality is not quite so
> favorable.**

\* \* \*

**Because I prefer to get down to the brass tacks of this matter, I am authorized to convey a realistic settlement offer of $23,976.00, an amount equal to a two-year license fee. It is an opportunity for Healthy Solution's to extricate itself from this matter prior to incurring substantial fees, costs, and a possibly a monetary judgment.**

**There is no genuine issue about this material fact.**

72.  PFP can afford to rely on the imposition of costs on its targets to compel high settlements because its counsel, CopyCat Legal, takes cases on "pure contingency" meaning that "CopyCat Legal absorb[s] all costs (taxable and non-taxable)."

Declaration of Daniel DeSouza in *PFP v Nofal LLC,* No. 2:22-cv-00642-JPS (E.D. Wis.), available at https://storage.courtlistener.com/recap/gov.uscourts.wied.99393/gov.uscourts.wied.99393.64.2.pdf; Affirmation of Daniel DeSouza in *Harrington v. Dugar*, No. Blaine Harrington, III v. Deepak Dugar (2:22-cv-08230), DN 201-1, ¶ 29, available at https://storage.courtlistener.com/recap/gov.uscourts.cacd.868192/gov.uscourts.cacd.868192.201.1.pdf.

*PFP's Response: Undisputed that CopyCat Legal PLLC took this case and others on a contingency basis. Disputed that Plaintiff is imposing costs on its targets to compel high settlements. See DeSouza Decl. at ¶ 19.*

**Pool World's Reply**: **Regardless of whether PFP is threatening to impose costs on its targets to compel agreement to its settlement terms, as in the emails noted above, it is plain that PFP "can afford" to use that strategy.**

73.  PFP can afford to rely on the imposition of litigation costs on its targets to compel high settlements because as of last summer, its counsel, CopyCat Legal, having handled more than 5000 copyright matters for its clients, had never had to take a case to trial with the single exception of *Harrington v. Dugar*.

*Id.* ¶ 30.

*PFP's Response: Disputed. See response to 72. Undisputed that Harrington v. Dugar vas the **first** copyright infringement case that Copycat Legal PLLC took to trial.*

**Pool World's Reply:  Regardless of whether PFP is threatening to impose costs on its targets to compel agreement to its settlement terms, as in the emails noted above, it is plain that PFP "can afford" to use that strategy.**

**PoolWorld's Reply: See Pool World's Reply to the PFP's Response to Material Fact No. 72.**

74.  The demand letter to Pool World stated that, if PFP had to file a lawsuit to get paid the demanded amount, it would file in federal court in the Southern District of Florida.

Answer to Complaint, Exhibit A (DN-7).

*PFP's Response: Undisputed*

75.  In fact, as of late 2023, PFP had consistently sued for infringement in the federal court for the district where the defendant is located, not in Florida.

Levy First Aff. ¶ 23 (DN 21-1 at 21).

*PFP's Response: Disputed. While plaintiff has generally filed copyright lawsuits in the jurisdiction where the defendant is located, it has also filed lawsuits in Florida 1tilizing Florida's long arm statute. See Jones Decl. at ¶ 22.*

**Pool World's Reply: Pool World acknowledges the three counter-examples out of the hundreds of suits PFP has filed, but three cases out of three hundred does not create**

**a genuine issue about the word "consistently."    Moreover, PFP did not move its incorporation to Florida until eleven years after Pool World posted the Grilled Vegetable Photo.  Levy Ninth Aff. ¶ 2 and Exh. ZZ.  Most of its employees are apparently still located in Rhode Island, and its bank accounts (including its payroll account) still show a Rhode Island address.  *See* DN 69-3, Exhibit FF at p. 36.  There is no genuine issue about this material fact.**

76.   The demand letter to Pool World implies that it knows who has or has not licensed its works. "[T]o their knowledge, [Plaintiff] did not authorize you . . . to use or display the foregoing photograph. Notwithstanding this lack of authorization, our client has [found your use.]" (emphasis in the original) Exhibit B.

Answer to Complaint, Exhibit A (DN-7).

*PFP's Response: Undisputed.*

77.   PFP's June 2, 2023, complaint against Pool World alleged unequivocally and without reservation (as a fact, not on information and belief) that Pool World "is not and has never been licensed to use or display the [Grilled Vegetable] Work."

Complaint ¶ 18.

*PFP's Response:  Undisputed*

78.  In fact, when PFP wrote to Pool World, and when it filed its complaint, those allegations were false, in that PFP had no way of knowing whether Pool World had a proper license to use the Grilled Vegetable photo, because iStock did  not share with PFP the

1   identity of the buyers of licenses for PFP's photos, and in any event the licenses were not

2   limited to the licensees but included the licensees' customers.

3        First Levy Aff. ¶ 15 (DN 21-1 at 19).

4

5   *PFP's Response: Disputed. Prior to filing this lawsuit, Plaintiff obtained written confir-*

6   *mation from Getty that it had not provided a license to defendant. See Jones Decl. at ¶ 8.*

7   **Pool World's Reply**: **Because PFP did not write to Getty until long after sending the**

8   **letter, PFP had no knowledge on the subject at that time. Moreover, Getty's response**

9   **to PFP warned, "As per normal, it is quite possible that the use has been licensed**

10  **accordingly by an agency or designer." Levy Ninth Affirmation, Exhibit DDD. There**

11  **is no genuine issue about this material fact.**

12

13

14

15  **PFP Amended Complaint Drops False Allegations After Pool World Serves It with a**
    **Rule 11 Motion.**

16       79.  In the complaint in this case, filed on June 2, 2023, PFP alleged that it

17  "charges its clients a minimum monthly fee of $999.00 for access to its library of

18  professional photographs."

19

20       Complaint ¶ 8.

21

22  *PFP's Response:  Undisputed*

23

24       80.  At the time PFP filed its complaint, it knew that this statement was false.

25       Levy Seventh Aff. ¶ 10.

26

27  *PFP's Response: Disputed. See response to 57.*

28

**Pool World's Reply**: **As noted above regarding Material Fact No. 57, PFP's various excuses do not negate the facts that the statement of a $999 per month minimum was false, and that PFP knew that it was false. There is no genuine issue about this material fact.**

81.  PFP amended its complaint to drop its allegation of a $999 minimum monthly payment only after Pool World obtained discovery showing that the allegation was false, and after Pool World served a motion for Rule 11 sanctions.

Levy Seventh Aff. ¶ 29 and Exhibit UU.

*PFP's Response: Disputed. Plaintiff's allegation is not false for the reasons explained above. See response to 57. In an effort to avoid further motion practice in this case, and because inclusion of the allegation in the Complaint was immaterial, Plaintiff's Counsel agreed to amend and drop the allegation therefrom. See Desouza Decl. at ¶ 21.*

**Pool World's Reply**: **As noted above regarding Material Fact No. 57, PFP's various excuses do not negate the facts that the statement of a $999 per month minimum was false, and that PFP knew that it was false. As for the Rule 11 motion, this Material Fact states a timeline and Mr. DeSouza's averments do not show that the timeline is incorrect. In addition, Mr. DeSouza's averments provide a partial account of an exchange between counsel that had been intended to be off-the-record. More context is set forth in the Levy Ninth Aff. ¶ 3 and Exhibit AAA. There is no genuine issue about this material fact.**

82.  In its June 2, 2023, complaint in this case, PFP alleged, "Plaintiff is in the business of licensing high-end, professional photographs for the food industry."

Complaint ¶ 6.

*PFP's Response:  Undisputed*

83.  PFP amended the complaint to drop this characterization of its business as licensing photographs only after Pool World obtained discovery showing that PFP's main business is making claims of copyright infringement, and served a motion for Rule 11 sanctions, beginning the running of the twenty-one day safe harbor period under Rule 11(c)(2).

Levy Seventh Aff., ¶ 29 and Exhibit UU.

*PFP's Response  Disputed. See response to 81:*

**Pool World's Reply: See Pool World's Reply to PFP's dispute of Material Fact No. 81.**

84.  In its initial disclosures in this case, dated August 15, 2023, PFP stated that it was seeking $11,988 in actual damages for its lost license fee for each year the Grilled Vegetable Photo was published "prior to the date of copyright registration for the photograph," that its "entire library [of photos] is offered at a starting price of $999.00/month with a 12-month minimum commitment," and that it "would calculate its actual damages by multiplying the license it would have charged (a minimum of $999.00/month) by the number of years the photograph was published."

Levy Third Aff. ¶ 7 and Exhibit Q (DN 55-1 at 30 and 53-7 at 116-118).

*PFP's Response:  Undisputed*

85.  At the time these initial disclosures were served, PFP knew that its assertion about the minimum subscription fee was false.

Levy Seventh Aff. ¶ 10.

*PFP's Response: Disputed. See response to 57.*

**Pool World's Reply:  As noted above regarding Material Fact No. 57, PFP's various excuses do not negate the facts that the statement of a $999 per month minimum was false, and that PFP knew that it was false.   There is no genuine issue about this material fact.**

86.  At the time these initial disclosures were served, PFP knew that it had not entered into its first subscription agreement until 2017, seven years after the allegedly infringing use had begun.

Levy Seventh Aff., Exhibit OO.

*PFP's Response:  Undisputed*

**PFP Studiously Avoids Contested Litigation Over Damages in Cases About the Infringement of a Single Photo, but Lost in a Recent Trial of That Issue**

87.  For several years, PFP avoided testing its damages theory in adversarial litigation over alleged infringements of a single photo.

First Levy Aff. ¶ 8 (DN 26-1)*;* Levy Third Aff. ¶ 35 (DN 53-1, at p. 41).  See also Levy Third Aff., Exhibit W (DN 53-13), at page 174 (PFP counsel Megan Medacier email stating that there are no rulings in contested cases on damages "as no one has thought it wise to litigate one of these things to the end").

*PFP's Response: Disputed to the extent Defendant characterizes Plaintiff as avoiding testing its damages theory. From January 1, 2021 through December 31, 2023, Plaintiff filed approximately 250 lawsuits for copyright infringement in courts across the country. In every case Plaintiff files, it intends to proceed to final judgment. That a defendant does not appear, or does appear and wishes to settle the matter, is beyond Plaintiff's control. See Jones Decl. at ¶ 23.*

**PoolWorld's Reply**: **The disclaimers in the Jones Declaration about PFP's intent notwithstanding, the fact remains that PFP was able to avoid testing its damages theory in every case until the Wisconsin case cited in Material Fact No. 88. There is no genuine issue about this material fact.**

88.  In October 2024, PFP went to trial for the first time how its damages theory applied to alleged infringement of a single photo.  PFP sought $23,976 in actual damages; the jury awarded $200 in damages.  The defendant in that case did not present evidence of the actual market value of PFP's individual stock photos, or challenge the veracity of the testimony of Rebecca Jones about actual minimum monthly fees.

*Prepared Food Photos v. Jaber*, 2025 WL 1025174, at *6 (E.D. Wis. Apr. 7, 2025) (denying PFP's motion to amend judgment); *Prepared Food Photos v. Jaber*, Trial Transcript at pages 291-293, available at https://storage.courtlistener.com/recap/gov. uscourts.wied.99393/gov.uscourts.wied. 99393.58.0.pdf (showing request for actual damages); see generally Trial Transcript in That Case.

*PFP's Response:  Undisputed*

**PFP's Citation to Uncontested Default Judgments in Other Cases**

89.  The initial disclosures cited ten court rulings adopting PFP's damages theory to award actual and statutory damages in multiples of $11,988.

Levy Third Aff. ¶ 7 and Exhibit Q (DN 55-1 at 30 and 53-7 at 116-118).

*PFP's Response:  Undisputed*

90.  Each of the court rulings cited in the Initial Disclosures was a default judgment. Revealed by the Westlaw citations to each.

*PFP's Response:   Undisputed*

91.  Each of those default judgments was obtained based on, among other things, complaints containing the false allegation about PFP's minimum monthly subscription fee, and the principle that factual allegations in a complaint must be taken as true in ruling on default judgments.

Levy Seventh Aff. ¶ 30.

*PFP's Response: Disputed with respect to the false allegation of Plaintiff's monthly subscription fee. See response to 57.*

**Pool World's Reply**: **As noted above regarding Material Fact No. 57, PFP's various excuses do not negate the fact that the statement was false.   There is no genuine issue about this material fact.**

92.  Many if not all of those default judgments were obtained by submitting briefs containing the false allegation about PFP's minimum monthly subscription fees, as well as affidavits from Rebecca Jones, PFP's "Director of Intellectual Property," including the false

1  assertion about PFP's minimum monthly subscription fees, an allegation that PFP as an
2  entity, and Jones as the affiant, knew to be false.
3
4       *Id.*; Levy Fourth Aff. ¶ 7 (DN 67-1 at 15).
5  *PFP's Response: Disputed. See response to 57 and 91.*
6  **Pool World's Reply**: **As noted above regarding Material Fact Nos. 57 and 91, PFP's**
7  **various excuses do not negate the facts that the allegation and assertion of a $999 per**
8  **month minimum were false.  There is no genuine issue about this material fact.**
9
10     93.   None of the briefs and affidavits PFP submitted in support of these default
11 judgments addressed the cases that calculate actual damages based on fair market value, not
12 the licensing fee that the copyright holder would have preferred to charge.    *Id.*
13 *PFP's Response: Disputed. To Plaintiff's knowledge, every default judgment motion filed*
14 *by Plaintiff when discussing actual damages includes case law with respect to fair market*
15 *value. See DeSouza Decl. at ¶ 22.*
16 **Pool World's Reply**: **Although the default judgment briefs noted the actual market**
17 **value standard, Mr. DeSouza's declaration does not say that he even once addressed**
18 **in a default judgment motion the specific cases "that calculate actual damages based**
19 **on fair market value, not the licensing fee that the copyright holder would have**
20 **preferred to charge."  There is no genuine issue about this material fact.**
21
22     94.  Many of the default judgments cited in PFP's initial disclosures in this case were
23 also cited in many demand letters signed by counsel for PFP that were sent after the
24 September 2022 demand letter that PFP sent to Pool World.

Levy First Aff. ¶ 25 (DN 21-1 at 22); Levy Fifth Aff. Exhibit W (DN 55-13); Exhibits to the Rimer, Lingerfelt and Nygard Affirmations.

*PFP Response:   Undisputed*

95.  None of the ten default judgments cited in the Initial Disclosures and demand letters was ever collected.

Levy Seventh Aff. ¶ 32 and Exhibit SS.

*PFP's Response: Disputed. Plaintiff has collected on numerous of the default judgments it has obtained. See DeSouza Decl. at ¶ 15.*

**PoolWorld's Reply: Of the three cases cited by Mr. DeSouza's declaration, only one was cited in the initial disclosures, and none were mentioned in the demand letters.  In that one case, Pool World acknowledges that close inspection of Exhibit SS reveals that PFP collected a small fraction of the judgment by garnishing a bank account.  Levy Ninth Aff. ¶ 12.**

**Other Undisputed Facts**

96.  Between August 2016 and December 2024, PFP filed nearly 300 copyright infringement lawsuits.

Levy First Aff. Exhibit C (DN 21-5 at 53-84).

*PFP's Response:  Undisputed*

97.  Inspection of the dockets reveals that most of the lawsuits have ended in a dismissal without any attorney having entered an appearance for the defendant, often after the time for answering is postponed

Levy First Aff. ¶ 6 (DN 21-1 at 16).

*PFP's Response: Undisputed that many of lawsuits have settled or otherwise resolved prior to an attorney appearing for the defendant.*

98.  Sometimes the docket reflects that the parties have reached an agreement; sometimes the docket is silent on the reason for dismissal.

*Id.*

*PFP's Response:  Undisputed*

99.  Both PFP's current law firm, CopyCat Legal, and the firm of Higbee and Associates, which previously represented PFP in sending demand letters and litigatng cases, typically required that settlement agreements be kept confidential.

Seventh Levy Aff. ¶ 35; Lingerfelt Aff., Exh. L4; Archambault Aff., Exh. A1.

*PFP's Response: Disputed.  Plaintiff generally requests confidentiality in its settlement agreements in such term is likewise requested by infringers, their attorneys, and/or their insurance companies. See DeSouza Decl. at ¶ 23. See Jones Decl. at ¶ 24.*

**Pool World's Reply: The admission in the declaration that PFP "generally requests" confidentiality does not contradict the fact, shown by the course of discussions in the Lingerfelt Affirmation, that PFP demands confidentiality.  Neither the Jones nor the DeSouza Declaration specifically denies that PFP insists on this term.  There is no genuine issue about this material fact.**

100.    When the targets of copyright infringement claims have unilaterally sent payments of $750 (the minimum award of statutory damages) in response to PFP claims of copyright infringement, PFP's counsel neither accepted the payment nor filed suit for infringement.

Archambault Aff.; Nygard Aff.; Lingerfelt Aff.; Levy Aff. ¶ 35.

*PFP's Response: Disputed. Counsel for Defendant has, in a small handful of cases, instructed alleged infringers to send Plaintiff a check for $750.00 without any agreement to accept such or agreement on other terms. Plaintiff has not deposited such checks as it did not agree to accept $750.00 to resolve its infringement allegation. And whether Plaintiff has filed — or intends to file — a lawsuit against such alleged infringers is frankly both irrelevant and protected by the attorney- client privilege. See DeSouza Decl. at ¶ 24.*

**Pool World's Reply: Mr. DeSouza's declaration does not show that he has personal knowledge that anyone "instructed" the  targets of demand letters to send checks. The declaration admits that the payments were not accepted, and it does not deny the fact that no suit has been filed. Although Mr. DeSouza invokes the attorney client privilege, the existence of a court filing is not protected by attorney-client privilege; nor is the fact of PFP's intent.  In any event, the Material Fact does not say anything about PFP's future intent.  There is no genuine issue about this material fact.**

101.  Pool World deliberately did not make an insurance claim because it did not want an extortionate settlement paid in its name.

Flynn Aff. ¶ 7, DN 55-17.

*PFP's Response:  Neither disputed nor undisputed. Plaintiff is not in possession of information that would support why Pool World would or would not do something.*

**Pool World's Reply: Flynn's Affirmation, explaining the reason for not notifying the insurance company, is in the record and PFP cites no reason to believe that his account of Pool World's decision is wrong.  There is no genuine issue about this material fact.**

102.  PFP counsel contacted Pool World's insurance company directly, after it was identified in Pool World's initial disclosure, threatening to sue the insurance company directly to collect any awarded damages and attorney fees.

Levy First Aff. ¶¶ 27-28 and Exhibit K (DN 21-1 and 21-13).

*PFP's Response: Disputed to the extent Defendant characterizes Plaintiff's counsel as threatening Defendant's insurance company. See DeSouza Decl. at ¶ 25.*

**Pool World's Reply Although Mr. DeSouza disputes the characterization of Ms. Hausman's communication as a "threat," he acknowledges that she stated the intent to collect on the insurance policy, which means the intent was to demand money directly from the insurance company instead of seeking payment by defendant.**

103.  Despite having withdrawn its allegation that it only makes access to its database of photos available for a minimum monthly fee of $999, PFP is still seeking actual damages of $11,988 per year.

Levy Seventh Aff. ¶ 38 and Exhibit XX.

*PFP's Response:Undisputed, but see response to 81.*

104.  PFP collected $10,000 in 2023 from one or more targets of claims that  its copyright in the Grilled Vegetable Photo had been infringed.

Levy Seventh Aff. ¶ 13 and Exhibit PP.

*PFP's Response:   Undisputed that PFP collected $10,000.00 in 2023 pursuant to a settlement agreement with an alleged infringer in relation to the Work.*

**Pool World's Reply: PFP's interrogatory answer did not make clear whether it was one or more targets.  Pool World accepts the representation, also made in an email to Pool World's counsel after the motion for summary judgment was filed, that the payment was by a single company.**

/s/   Paul Alan Levy
Paul Alan Levy (pro hac vice)
Public Citizen Litigation Group
1600 20th Street NW
Washington, D.C. 20009
(202) 588-7725
plevy@citizen.org

/s/ Stephen Kirby
Stephen Kirby
Kirby Law Office, PLLC
WSBA #43228
1312 N. Monroe Street
Spokane, Washington 99201
(509) 795 4863
kirby@kirbylawoffice.com

/s/ Phillip R. Malone
Phillip R. Malone (pro hac vice)
Juelsgaard Intellectual Property
 and Innovation Clinic
Mills Legal Clinic at Stanford Law School
Crown Quadrangle, 559 Nathan Abbott Way
Stanford, California 94305-8610
Telephone: (650) 724-1900
pmalone@stanford.edu

Attorneys for Defendant

August 28, 2025