# Levy Affirmation
# Adjusted Exhibit RR

exhibit entirely sealed

exhibit entirely sealed

exhibit entirely sealed

# Levy Affirmation Exhibit ZZ

**P21000072495**

_____
(Requestor's Name)

_____
(Address)

_____
(Address)

_____
(City/State/Zip/Phone #)

☐ PICK-UP    ☐ WAIT    ☐ MAIL

_____
(Business Entity Name)

_____
(Document Number)

Certified Copies _____    Certificates of Status _____

Special Instructions to Filing Officer:

Office Use Only



300370280963

2021 AUG 13 PM 9: 24
SEC OF STATE
TALL. FL.

RECEIVED
2021 AUG 13 PM 4: 15
SECRETARY
TALLAHASSEE, FLORIDA

```
CORPORATION SERVICE COMPANY
1201 Hays Street
Tallhassee, FL  32301
Phone: 850-558-1500
```

                ACCOUNT NO. :  I20000000195

                REFERENCE :  949824   7227993

            AUTHORIZATION :

                COST LIMIT :  $ 105.00

-----------------------------------------------------------------

ORDER DATE :  August 9, 2021

ORDER TIME :   1:28 PM

ORDER NO.  :  949824-010

CUSTOMER NO:    7227993

-----------------------------------------------------------------

                    <u>DOMESTIC FILING</u>

          NAME:      PREPARED FOOD PHOTOS, INC.


                  EFFECTIVE DATE:

_____ ARTICLES OF INCORPORATION
_____ CERTIFICATE OF LIMITED PARTNERSHIP
XX_____ ARTICLES OF ORGANIZATION

PLEASE RETURN THE FOLLOWING AS PROOF OF FILING:

_____ CERTIFIED COPY
XX_____ PLAIN STAMPED COPY
_____ CERTIFICATE OF GOOD STANDING

CONTACT PERSON:  Alexxis Weiland - EXT.

                        EXAMINER'S INITIALS:  _____

**COVER LETTER**

**TO:**   New Filing Section
Division of Corporations

**SUBJECT:** **Prepared Food Photos, Inc.**

Name of Resulting Florida Profit Corporation

The enclosed Articles of Conversion, Articles of Incorporation, and fees are submitted to convert the following eligible entity into a "Florida Profit Corporation" in accordance with ss. 607.11933 & 607.0202, F.S.

Please return all correspondence concerning this matter to:

**David Kahan**

Contact Person

**Kahan & Kligler, P.A.**

Firm/Company

**6420 Congress Ave., Ste 1800**

Address

**Boca Raton, FL 33487**

City, State and Zip Code

**david@dkpalaw.com**

E-mail address: (to be used for future annual report notification)

For further information concerning this matter, please call:

**David Kahan**       at ( **561** ) **289-3235**

Name of Contact Person              Area Code and Daytime Telephone Number

Enclosed is a check for the following amount:

☐ $105.00 Filing Fees    ☐$113.75 Filing Fees    ☐$113.75 Filing Fees    ☐$122.50 Filing Fees,
                              and Certificate of          and Certified Copy          Certified Copy, and
                              Status                                                          Certificate of Status

**Mailing Address:**                      **Street Address:**
New Filing Section                        New Filing Section
Division of Corporations                  Division of Corporations
P.O. Box 6327                             The Centre of Tallahassee
Tallahassee, FL 32314                     2415 N. Monroe Street, Suite 810
                                          Tallahassee, FL 32303

78

≡D

**Articles of Conversion**
For
**Converting Eligible Entity**
Into
**Florida Profit Corporation**

2021 AUG 13 AM 9: 24

SECR... ... OF STATE
TAL... A  ... FL

The Articles of Conversion **and attached Articles of Incorporation** are submitted to convert the following **eligible business entity into a Florida Profit Corporation** in accordance with ss. 607.11933 & 607.0202, Florida Statutes.

1. The name of the Converting Entity immediately prior to the filing of the Articles of Conversion is:

# Prepared Food Photos, Inc.

Enter Name of the Converting Entity

2. The converting entity is a **profit corporation**

(Enter entity type. Example: limited liability company, limited partnership, general partnership, common law or business trust, etc.)

first organized, formed or incorporated under the laws of **Rhode Island**

(Enter state, or if a non-U.S. entity, the name of the country)

on **05/12/2015**

Enter date "Converting Entity" was first organized, formed or incorporated.

3. The name of the Florida Profit Corporation as set forth in the **attached Articles of Incorporation:**

# Prepared Food Photos, Inc.

Enter Name of Florida Profit Corporation

4. This conversion was approved by the eligible converting entity in accordance with this chapter and the laws of its current/organic jurisdiction.

5. If not effective on the date of filing, enter the effective date: **filing date**

**(The effective date: Cannot be prior to nor more than 90 days after the date this document is filed by the Florida Department of State.)**

**Note:** If the date inserted in this block does not meet the applicable statutory filing requirements, this date will not be listed as the document's effective date on the Department of State's records.

Signed this __30th__ day of __July__, 20__21__.

**Required Signature for Florida Profit Corporation:**

Signature of Director, Officer, or, if Directors or Officers have not been selected, an Incorporator:

_Douglas Fleurant, Pres_

Printed Name: **Douglas Fleurant** Title: **President**

**Required Signature(s) on behalf of Converting Florida partnerships, limited partnerships, and limited liability companies:** [See below for required signature(s).]

Signature: _Douglas Fleurant, Pres._

Printed Name: __Douglas Fleurant__ Title: __President__

Signature: _____

Printed Name: _____ Title: _____

Signature: _____

Printed Name: _____ Title: _____

Signature: _____

Printed Name: _____ Title: _____

                                         Signature:

_____ _ Printed

Name: _____ Title: _____

Signature: _____
**If Florida General Partnership or Limited Liability Partnership:**
Signature of one General Partner. Title:

**If Florida Limited Partnership or Limited Liability Limited Partnership:**
Signatures of **ALL** General Partners.

**If Florida Limited Liability Company:**
Signature of a Member or Authorized Representative.

**All others:**
Signature of an authorized person.

**Fees:**

| | |
|---|---|
| Articles of Conversion: | $35.00 |
| Fees for Florida Articles of Incorporation: | $70.00 |
| Certified Copy: | $8.75 (Optional) |
| Certificate of Status: | $8.75 (Optional) |

**ARTICLES OF INCORPORATION**
**FOR RESULTING FLORIDA PROFIT CORPORATION**
**In compliance with Chapter 607 and/or Chapter 621, F.S. (Profit)**

**ARTICLE I    NAME**
The name of the corporation shall be: Prepared Food Photos, Inc.

**ARTICLE II    PRINCIPAL OFFICE**
The principal place of business/mailing address is:

| Principal street address | Mailing address, if different is: |
|---|---|
| c/o SRIP Law | |
| 21301 Powerline Rd., Suite 100 | Same as Principal Address |
| Boca Raton, FL 33433 | |

**ARTICLE III    PURPOSE**
The purpose for which the corporation is organized is:
Any lawful purpose.

**ARTICLE IV    SHARES**
The number of shares of stock is: 1,000

**ARTICLE V    OFFICERS AND/OR DIRECTORS**

Name and Title: Douglas Fleurant, President
Address: 73 Old Nasonville Rd.
Harrisville, RI 02830

Name and Title: Joel M. Albrizio, Treasurer
Address: 16 Eagle Dr.
Mashpee, MA 02649

Name and Title: Rebecca Jones, Secretary
Address: 117 John St.
Lincoln, RI 02865

Name and Title: Joel M. Albrizio, Director
Address: 16 Eagle Dr.
Mashpee, MA 02649

Name and Title:
Address:

Name and Title:
Address:

81

## *ARTICLE VI   REGISTERED AGENT*

The **name and Florida street address** (P.O. Box NOT acceptable) of the registered agent is:

Name:    **SRIP Law**

Address:  **21301 Powerline Rd., Suite 100**

**Boca Raton, FL 33433**

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

*Having been named as registered agent to accept service of process for the above stated corporation at the place designated in this certificate, I am familiar with and accept the appointment as registered agent and agree to act in this capacity*

_____          7/30/2021
Required Signature/Registered Agent                    _____
                                                                                Date

# Levy Affirmation
# Exhibit AAA

Max K. Archer, WSBA #54081
Riverside Law Group, PLLC
905 W. Riverside Ave., Ste. 404
Spokane, WA 99201
mka@riverside-law.com
(509) 504-8714
*Attorneys for Plaintiff*

Lauren Hausman, *pro hac vice*
CopyCat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065
lauren@copycatlegal.com
(877) 437-6228
*Attorney for Plaintiff*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| PREPARED FOOD PHOTOS, INC., f/k/a ADLIFE MARKETING & COMMUNICATIONS CO., INC., a Florida for profit corporation, | NO. |
| Plaintiff, | FIRST AMENDED COMPLAINT |
| v. | JURY DEMAND |
| POOL WORLD, INC., a Washington for profit corporation, | |
| Defendant. | |

COMES NOW, Plaintiff Prepared Food Photos, Inc. f/k/a Adlife Marketing & Communications Co., Inc. ("Plaintiff"), by and through its attorneys of record,

COMPLAINT • Page 1

RIVERSIDE LAW GROUP
905 W. Riverside Ave., Ste. 404
Spokane, WA 99201
Phone: 509-504-8714
E-Mail: mka@riverside-law.com

84

Max K. Archer of Riverside Law Group, PLLC and Lauren Hausman of CopyCat

Legal PLLC, and alleges, avers, and claims as follows:

## I.     **THE PARTIES**

1.     Plaintiff is a corporation organized and existing under the laws of the

State of Florida with its principal place of business located in Broward County,

Florida.

2.     Defendant Pool World, Inc. ("Defendant") is a corporation organized

and existing under the laws of the State of Washington with its principal place of

business located at 13524 E Sprague Ave., Spokane, WA 99216. Defendant's

agent for service of process is Grady Early, 13524 E Sprague Ave., Spokane, WA

99216.

## II.     **JURISDICTION AND VENUE**

3.     This Court has subject matter jurisdiction over this action pursuant to

28 U.S.C. §§ 1331 and 1338(a).

4.      This Court has personal jurisdiction over Defendant because it has

maintained sufficient minimum contacts with Washington such that the exercise of

personal jurisdiction over it would not offend traditional notions of fair play and

substantial justice.

5.     Venue properly lies in this district pursuant to 28 U.S.C. § 1400(a)

because Defendant or its agents reside or may be found in this district. The Ninth

Circuit has interpreted Section 1400(a) to mean that venue is proper in any judicial

COMPLAINT • Page 2

RIVERSIDE LAW GROUP

905 W. Riverside Ave., Ste. 404
Spokane, WA 99201
Phone: 509-504-8714
E-Mail: mka@riverside-law.com

district in which the defendant would be amenable to personal jurisdiction. *Brayton Purcell LLP v. Recordon & Recordon*, 606 F. 3d 1124, 1128 (9th Cir. 2010)). Venue is thus proper in this District because personal jurisdiction exists over Defendant in this District.

## III.    FACTS

**A.    PLAINTIFF'S BUSINESS AND HISTORY.**

6.    Plaintiff is in the business of licensing high-end, professional photographs for the food industry.

7.    Through its commercial website (www.preparedfoodphotos.com), Plaintiff offers a monthly subscription service which provides access to/license of ~~tens of thousands of~~approximately 18,000 professional images.

8.    In late 2016 or early 2017, Plaintiff began offering its library of professional images at a monthly subscription fee of $499.00.  Later in 2017, Plaintiff increased its monthly subscription rate to $999.00.

9.    As of the present date, Plaintiff continues to offer its library of images at a minimum monthly fee of $999.00, with certain of its subscribers paying more than such amount (generally due to the size/reach of such customer) and certain legacy subscribers (who have remained subscribers for 5+ years) paying less than the $999.00 per month.

8.    ~~Plaintiff charges its clients (generally, grocery stores, restaurant chains, food service companies, etc.) a minimum monthly fee of $999.00 for~~

COMPLAINT • Page 3

905 W. Riverside Ave., Ste. 404
Spokane, WA 99201
Phone: 509-504-8714
E-Mail: mka@riverside-law.com

86

1    ~~access to its library of professional photographs.~~

2

3        ~~9.~~ 10.      Plaintiff does not license individual photographs or otherwise

4   make individual photographs available for purchase. Plaintiff's business model

5   relies on its recurring monthly subscription service such that Plaintiff can continue

6

7   to maintain its impressive portfolio.

8        ~~10.~~ 11.      Plaintiff owns each of the photographs available for license on

9

10   its website and serves as the licensing agent with respect to licensing such

11   photographs for limited use by Plaintiff's customers. To that end, Plaintiff's

12   standard terms include a limited, non-transferable license for use of any

13

14   photograph by the customer only. Plaintiff's license terms make clear that all

15   copyright ownership remains with Plaintiff and that its customers are not permitted

16

17   to transfer, assign, or sub-license any of Plaintiff's photographs to another

18   person/entity.

19

20

21

22

23

24

25

26

27

28

905 W. Riverside Ave., Ste. 404
Spokane, WA 99201
Phone: 509-504-8714
E-Mail: mka@riverside-law.com

**B.    THE WORK AT ISSUE IN THIS LAWSUIT.**

11.  12.    In 2001, Plaintiff created a photograph titled

"ProduceVegetableGrilled002" (the "Work"). A copy of the Work is exhibited

below:



12.  13.    The Work was registered by Plaintiff with the Register of

Copyrights on September 29, 2016 and was assigned Registration No. VA 2-019-

412. A true and correct copy of the Certification of Registration pertaining to the

Work is attached hereto as **Exhibit "A."**

13.  14.    Plaintiff is the owner of the Work and has remained the owner

at all times material hereto.

COMPLAINT • Page 5

RIVERSIDE LAW GROUP

905 W. Riverside Ave., Ste. 404
Spokane, WA 99201
Phone: 509-504-8714
E-Mail: mka@riverside-law.com

**C.    DEFENDANT'S UNLAWFUL ACTIVITIES.**

~~14.~~ 15.    Defendant is the largest pool and spa business in the Inland Northwest. It has been in operation since 1976 and has expanded to four (4) store locations with more than sixty (60) employees.

~~15.~~ 16.    Defendant advertises/markets its business primarily through its website (https://poolworld.biz/), social media (e.g., https://www.facebook.com/PoolWorldInc/), and other forms of advertising.

~~16.~~ 17.    On a date prior to Plaintiff's above-referenced copyright registration of the Work, Defendant published the Work on its website (at https://poolworld-grillworld.com/):



## Pool World IS Grill World!!

 

~~17.~~ 18.    A true and correct copy of screenshots of Defendant's website, displaying the copyrighted Work, is attached hereto as **Exhibit "B."**

~~18.~~ 19.    Defendant is not and has never been licensed to use or display the Work. Defendant never contacted Plaintiff to seek permission to use the Work

COMPLAINT • Page 6

RIVERSIDE LAW GROUP    905 W. Riverside Ave., Ste. 404 Spokane, WA 99201 Phone: 509-504-8714 E-Mail: mka@riverside-law.com

in connection with Defendant's website, social media, or for any other purpose.

19. 20.    Defendant utilized the Work for commercial use – namely, in connection with the marketing of Defendant's business.

20. 21.    Upon information and belief, Defendant located a copy of the Work on the internet and, rather than contact Plaintiff to secure a license, simply copied the Work for its own commercial use.

21. 22.    Through its ongoing diligent efforts to identify unauthorized use of its photographs, Plaintiff discovered Defendant's unauthorized use/display of the Work in June 2022. Following Plaintiff's discovery, Plaintiff (through its agents) notified Defendants in writing of such unauthorized use. To date, Plaintiff has been unable to negotiate a reasonable license for the past infringement of its Work.

22. 23.    All conditions precedent to this action have been performed or have been waived.

## IV.    CAUSE OF ACTION

### COUNT 1 – COPYRIGHT INFRINGEMENT

23. 24.    Plaintiff re-alleges and incorporates paragraphs 1 through 22 as set forth above.

24. 25.    The Work is an original work of authorship, embodying copyrightable subject matter, that is subject to the full protection of the United States copyright laws (17 U.S.C. § 101 *et seq.*).

COMPLAINT • Page 7



905 W. Riverside Ave., Ste. 404
Spokane, WA 99201
Phone: 509-504-8714
E-Mail: mka@riverside-law.com

25. 26.    Plaintiff owns a valid copyright in the Work, having registered the Work with the Register of Copyrights and owning sufficient rights, title, and interest to such copyright to afford Plaintiff standing to bring this lawsuit and assert the claim(s) herein.

26. 27.    As a result of Plaintiff's reproduction, distribution, and public display of the Work, Defendant had access to the Work prior to its own reproduction, distribution, and public display of the Work on Defendant's website.

27. 28.    Defendant reproduced, distributed, and publicly displayed the Work without authorization from Plaintiff.

28. 29.    By its actions, Defendant directly infringed and violated Plaintiff's exclusive rights in violation of the Copyright Act, 17 U.S.C. § 501, by reproducing, distributing, and publicly displaying the Work for its own commercial purposes and for the commercial purposes.

29. 30.    Plaintiff has been damaged as a direct and proximate result of Defendant's infringement.

30. 31.    Plaintiff is entitled to recover its actual damages resulting from Defendant's unauthorized use of the Work and, at Plaintiff's election (pursuant to 17 U.S.C. § 504(b)), Plaintiff is entitled to recover damages based on a disgorgement of Defendant's profits from infringement of the Work, which amounts shall be proven at trial.

31. 32.    Defendant's conduct has caused, and any continued infringing

905 W. Riverside Ave., Ste. 404
RIVERSIDE LAW GROUP  Spokane, WA 99201
Phone: 509-504-8714
E-Mail: mka@riverside-law.com

91

conduct will continue to cause, irreparable injury to Plaintiff unless enjoined by the

Court. Plaintiff has no adequate remedy at law. Pursuant to 17 U.S.C. § 502,

Plaintiff is entitled to a permanent injunction prohibiting infringement of Plaintiff's

exclusive rights under copyright law.

## V.    **JURY DEMAND**

Plaintiff demands a trial by jury on all issued so triable.

## VI.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

1.    A declaration that Defendant has infringed on Plaintiff's copyrights in
the Work;

2.    An award of actual damages and disgorgement of profits as the Court
deems proper;

3.    Awarding Plaintiff its costs pursuant to 17 U.S.C. § 505;

4.    Awarding Plaintiff interest, including prejudgment interest, on the
foregoing amounts;

5.    Permanently enjoining Defendant, its employees, agents, officers,
directors, attorneys, successors, affiliates, subsidiaries and assigns, and all those in
active concert and participation with Defendant, from directly or indirectly
infringing Plaintiff's copyrights or continuing to display, transfer, advertise,
reproduce, or otherwise market any works derived or copied from the Work or to
participate or assist in any such activity; and

RIVERSIDE LAW GROUP
905 W. Riverside Ave., Ste. 404
Spokane, WA 99201
Phone: 509-504-8714
E-Mail: mka@riverside-law.com

6.    For such other relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this August 27, 2025~~March 6, 2025~~~~March 5, 2025~~.

RIVERSIDE LAW GROUP, PLLC,

_____

Max K. Archer, WSBA #54081
905 W. Riverside Ave., Ste. 404
Spokane, WA 99201
Telephone: (509) 504-8714
Email: mka@riverside-law.com
*Attorney for Plaintiff*

Lauren Hausman, *pro hac vice*
CopyCat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065
lauren@copycatlegal.com
(877) 437-6228
*Attorney for Plaintiff*

_____
By:    /s/   Lauren   M.   Hausman_
Lauren M. Hausman Esq.

## CERTIFICATE OF SERVICE

I hereby certify that on March ___, 2025, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF, which will electronically serve

all counsel of record.

_____

/s/ Lauren M. Hausman_____
Lauren M. Hausman, Esq.

COMPLAINT • Page 10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COMPLAINT • Page 11

RIVERSIDE LAW GROUP    905 W. Riverside Ave., Ste. 404
Spokane, WA 99201
Phone: 509-504-8714
E-Mail: mka@riverside-law.com

# Levy Affirmation Exhibit BBB



# Levy Affirmation
# Exhibit CCC



# Levy Affirmation
# Exhibit DDD

**From:** Veronica Healey <veronica.langridge@gettyimages.com>
**Sent:** Thursday, April 13, 2023 1:40 PM
**To:** Rebecca Jones <rebecca@preparedfoodphotos.com>; Chloe Colwill <chloe.colwill@gettyimages.com>
**Subject:** RE: [EXTERNAL] Licensing Inquiry - Pool World Inc.

Rebecca,

We have not been able confirm a license with the information provided. As per normal, it is quite possible that the use has been licensed accordingly by an agency or designer.

Regards,
Veronica

**From:** Rebecca Jones <rebecca@preparedfoodphotos.com>
**Sent:** Tuesday, April 11, 2023 12:13 PM
**To:** Chloe Colwill <chloe.colwill@gettyimages.com>; Veronica Healey <veronica.langridge@gettyimages.com>
**Subject:** [EXTERNAL] Licensing Inquiry - Pool World Inc.

Veronica and Chloe,

Please advise if the above named entity has a license for this image:



iStock Asset ID No. 179290342 Our FIle Name: ProduceVegetableGrilled002

Thank you,

Rebecca

*Much of our business is built on referrals from clients like yourself who have been pleased with the services we've provided. If you know of another company that might benefit from the products and services we provide we would be grateful for a referral.*

# Levy Affirmation
# Exhibit EEE

# SUBSCRIBER AGREEMENT

This End-User Subscription Agreement (the "Agreement") is by and between Adlife Marketing &
Communications Company, Inc., with business offices located at 38 Church Street, Pawtucket,
Rhode Island 02860 ("Adlife"), and ▌QW Green Co.,▌Inc,▌ with business offices located at ▌8100 S.
Pr▌est Dr, Suite 101, Tempe AZ, 85284▌ (the "Subscriber"). This Agreement shall be effective as
of the date executed by Adlife and Subscriber ("Effective Date"). Each of Adlife and Subscriber
is a "Party" and together they are the "Parties" to this Agreement.

If you are entering into this Agreement on behalf of a company or other legal entity, you
represent that you have the authority to bind such entity and its affiliates to these terms and
conditions. If you do not have such authority, or if you do not agree with these terms and
conditions, you must not accept this Agreement and may not use the services provided under
this Agreement.

Subscriber further understands that the terms of use are applicable to Subscriber's End-users,
and Subscriber is responsible for (i) communication of the terms and conditions of this
Agreement to all End-users and (ii) failure by the End-user to abide by the terms and conditions
of this Agreement as more fully set forth herein.

Adlife has developed and maintains an Internet based subscription program allowing
subscribers full access to stock photography on the website for the specific purposes of
advertising subject to the conditions in this Agreement (the "Services"), provided said
Subscriber is in good standing.

NOW, THEREFORE, the Parties hereto, for good and valuable consideration, the receipt,
adequacy, and sufficiency of which are hereby acknowledged, and intending to be legally
bound, hereby agree as follows:

1. **License Grant.**

    a) **License to Use Service.** Adlife hereby grants to Subscriber a nonexclusive,
nontransferable license during the Term (the "License") to access and use the
Services in accordance with this Agreement. All rights not expressly granted to
Subscriber under the License are reserved by Adlife. The License granted to
Subscriber pursuant to this Agreement will permit use of the Services by a number
of Subscriber employees or affiliates ("End-users"), not to exceed five (5) End-users.
Subscribers with greater than five (5) End-users should contact Adlife to purchase a
separate Enterprise license.

    b) This license is personal to Subscriber, with no right to sub-license, distribute or
make available to any other person, media or entity for any purpose. Accordingly,
Subscriber agrees not to copy, re-produce, re-sell, re-syndicate, incorporate images
into a new product for resale on a one-time or syndicated basis or otherwise
distribute any of the Adlife Images, by any means or method (Other than the use of
the same by Subscriber in the development of custom advertising materials to a
single user or entity).

    SUBSCRIBER SHALL BE RESPONSIBLE FOR THE FAILURE OF ANY SUBSCRIBER
EMPLOYEE, AFFILIATE OR OTHER END-USER TO PERFORM ITS OBLIGATIONS
UNDER THIS AGREEMENT. UPON TERMINATION OF THIS AGREEMENT,

103



SUBSCRIBER AND ITS EMPLOYEES, AFFILIATES AND END-USERS SHALL
IMMEDIATELY CEASE USE OF ANY AND ALL ADLIFE IMAGES.

c) **Designated End-users.** Each End-user will be designated as an End-user within the
subscription Services structure. The License to use the Services by each End-user
may not be shared or used by more than five (5) End-users, but may be re-issued
from time to time to new End-users upon prior written notification to and
acceptance by Adlife. Any unauthorized access to Services, or other abuse or
impermissible activity on the Site or in connection with the Services may result in
immediate suspension or termination of End-user accounts pursuant to Section 6 of
this Agreement or for damages as set forth below. Subscriber will promptly notify
Adlife of any unauthorized use of the Services in breach of this Agreement, any
unauthorized use of accounts, or any other known or suspected breach of security.

d) **Limitations on Use.** The Services are for use only by Subscriber and its assigned
End-users. Except as permitted by this Agreement, the Services may not be
transferred, distributed, resold, sublicensed, or used to create any derivative works.
Subscriber may use the Site and Services only for its internal business purposes and
shall not use the Services in association with sending spam or otherwise duplicative
or unsolicited messages; use the Services in association with infringing, obscene,
threatening, libelous, or otherwise unlawful or tortuous material, including material
harmful to children or material in violation of third party privacy rights; or attempt to
gain unauthorized access to the Site, Services, or its related systems or networks.
Subscriber is responsible for ensuring that all Subscriber employees, affiliates and
End-users have a copy of this Agreement and/or are advised in writing of the terms
and conditions, and the penalties for breach, including without limitation termination,
suspension or penalty of $8,000 per image, medium/channel of use.

e) **Download Management.** Adlife provides Subscriber access to its entire
library.  Accordingly, Adlife does not keep track of which
images Subscriber downloads or utilizes for purposes of avoiding any violation of
Adlife's copyright rights should this subscription ever be terminated, Adlife strongly
encourages Subscriber to keep track of which images Subscriber and its users
download.  Subscriber should contact Adlife at least 90 days in advance if
Subscriber anticipates difficulty in isolating and discontinuing use Adlife's images.

f)  **Release of Past Claims.**  In consideration for payment of one year of Subscription
Fees in accordance with the terms of Section 5 of this Agreement, Adlife hereby
expressly releases and discharges Subscriber from any and all claims arising from or
related to actual or alleged copyright infringement in connection with Subscriber's
past use of images owned by or licensed to Adlife or its predecessors.

## 2. Service Details.

The subscription plan enables the Subscriber to download vector files or JPG images
(each a "Work" or "Works") of any available size. The Subscriber has the right to move a
file (or files containing it) physically, but copies can be made only for back-up or archival
purposes. Files downloaded from the Site may be used by the Subscriber for advertising
or similar purposes as permitted by the License Agreement.

If a Work is in violation of a third-party right, Adlife may instruct Subscriber to cease all
use, distribution and possession of such Work, and Subscriber must promptly comply
with such instructions. Adlife reserves all rights not expressly granted in these terms.

2

105

**Permitted Usage:**

- Prints, posters and other reproductions for personal use, advertising and promotional applications, including printed files, product packaging, presentations, film and video presentations, commercials, catalogues, brochures, promotional greeting cards and promotional postcards (provided they are not for resale, license or other distribution);

- Print media applications, such as books and book covers, magazines, newspapers, editorials, and newsletters;

- On–line or electronic publications, including web pages, electronically distributed newsletters and email correspondence, provided, that Subscriber takes all reasonable actions to prevent website visitors from downloading or revising Work that is published on a website; or

- Any other uses approved in writing by Adlife.

Subscribers with questions as to the permitted usage of a specific file should immediately contact Adlife.

**Subscriber shall not:**

- Use files on products for sale, such as t-shirts, cups, posters, etc., or in places designed for the sale or promotion of such products;

- Use files or their elements as a part of a trademark or trade sign (in full or in part), a company's name, a logo, or a product's trade name;

- Post the Work online in a downloadable format;

- Use files in such a way that would allow a third party to download, transmit, distribute, or perform some other similar means of file exchange, including but not limited to the use of portable storage devices; or

- Use the Services to directly compete with Adlife or to solicit customers or accounts of Adlife.

Subscriber may use the license granted under this Agreement for the benefit of one of its clients, provided that Subscriber's client must also comply with these terms and comply with all license and use restrictions. Subscriber is solely responsible and liable for any and all use of the Work by its client. If Subscriber intends to use the same Work for the benefit of clients with more than twelve (12) locations or if Subscriber intends to use the same Work with more than twelve (12) unique clients, then Subscriber must purchase a separate Enterprise license.

Clients of Subscribers may only use licensed Works as long as the Subscriber maintains an active subscription to the Service. Upon termination, Subscriber and Subscriber's clients must discontinue use of the Works, except that clients of Subscribers may continue to distribute pre-printed stock items containing the Work or Works for a period of six months following the termination of the Subscriber's subscription.

106

Each client of Subscriber must be designated, in writing, to Adlife as a client of the Subscriber. Any unauthorized access to Services, or other abuse or impermissible activity on the Site or in connection with the Services may result in immediate suspension or termination of Subscriber accounts pursuant to Section 6 of this Agreement. Subscriber will promptly notify Adlife of any unauthorized use of the Services in breach of this Agreement, any unauthorized use of accounts, or any other known or suspected breach of security.

3. **Adlife Proprietary Information.** The Site, Services, and its Contents ("Adlife IP") are owned or licensed by Adlife and protected by U.S. and international copyright, trademark, service mark, patent and/or other proprietary rights and laws. Except as expressly provided in this Agreement, nothing contained herein shall be construed as conferring to Subscriber any license or right under copyright or other intellectual property law. No part of the Adlife IP may be altered, copied, photocopied, reproduced, translated or reduced to any electronic medium or machine- readable form, in whole or in part, except as specifically provided in this Agreement. Subscriber shall not take any action that shall interfere with or diminish Adlife's right in any of the Adlife IP.

4. **Term, Suspension, and Termination.**

a) **Term.** Unless terminated earlier pursuant to this Section 5 of this Agreement, the initial term ("Initial Term") of this Agreement shall be for a period of twelve (12) months from the Effective Date.  The Initial Term and Subsequent Term shall together be known as the "Term".  If this Agreement is continued for one or more Terms, the terms and conditions of this Agreement shall be automatically updated to be consistent with the most current End-User Subscription Agreement on the Site, without any further amendment in writing between Adlife and Subscriber.  The most current End-User Subscription Agreement shall be available on the Site.

b) **Suspension with Right to Cure.** In addition to any other rights and remedies outlined in this Agreement, Adlife reserves the right to suspend the License and Subscriber's access to the Services upon ten (10) days' written notice to Subscriber ("Cure Period") if Subscriber's account becomes delinquent by non-payment for more than fifteen (15) days and such delinquency is not cured within the Cure Period or any other default by Subscriber hereof. Delinquent invoices are subject to interest of one percent (1.0%) per month on any outstanding balance, or the maximum permitted by law, whichever is less, plus all expenses of collection. Subscriber will continue to be charged for the remainder of the term for any delinquent accounts or for breach of this Agreement, to the extent applicable.

5. **Fees and Payment.**
   a) **Subscription Fees.** The Subscription Fees are **$500.00** per month, during the period Subscriber is an active participant in the weekly Bad-Adz Digital Email Program, and the same may be amended from time to time.  Payment is to be made using company credit card provided by Subscriber. In the event the Subscriber discontinues weekly participation in the Bad-Adz Digital Email Program, this subscription fee will automatically increase to $999.00 per month with notice to Subscriber not required.

   b) **Additional End-users.** Subscriber may add End-user licenses at any time during the Initial or Subsequent Terms. Subscriber will be charged in full for any portion of a calendar month during which End-user licenses have been added. Although Subscriber may decrease End-user licenses at any time, there will be no refunds issued to Subscriber, regardless of nonpayment, nonuse, or other conduct or

4

107

inaction, and all Subscription Fees will continue to be due through the end of the
Initial or Subsequent Terms.

c) **Enterprise Licenses.** Enterprise licenses are available for Subscribers who need
greater than five (5) End-user licenses or who need to use any Work for the benefit
of clients with more than twelve (12) locations or with more than twelve (12) unique
clients. Please contact Adlife to obtain a separate Enterprise license.

d) **Taxes and Duties.** Adlife's fees are exclusive of all taxes, levies, or duties imposed
by taxing authorities, and Subscriber will be responsible for payment of all such
taxes, levies, or duties, excluding only United States (federal or state), local, or other
taxes based solely on Adlife's income.

f) **Exclusive, Unlicensed, and Prohibited Use.** Exclusive use of Adlife photography is
available at a rate starting at $8,000 per image, per channel of use, per medium. Any
unlicensed or prohibited use of any Adlife photography by Subscriber, its
employees, affiliates and End-users is deemed a breach of contract and in lieu of
determining damages, the parties agree in advance to damages equal to $8,000 per
image, per channel of use per medium plus interest at 1% per month or 18% per
annum, and attorney's fees and collection/court costs.

It is acknowledged that the Subscriber's unlicensed or prohibited use of
Adlife photography will cause Adlife to incur substantial economic damages
and losses of types including, but not limited to, lost license fees, costs
associated with monitoring and detecting said unlicensed or prohibited
uses, statutory damages for copyright infringement, disgorgement of profits
attributable to said unlicensed or prohibited uses, prelitigation legal fees and
costs, etc. It is acknowledged that such losses will occur in amounts which
are impossible to compute and ascertain with certainty as a basis for
recovery by Adlife, and that liquidated damages represent a fair, reasonable
and appropriate estimate thereof.

6. **Amendments.** The Parties agree that, in order to continually improve its Services, Adlife
may, from time to time, amend its Site and Services in its discretion and will make
commercially reasonable efforts to notify Subscribers of said amendments. Subscriber is
encouraged to continually check the Site for notices of changes, updates, and
improvements.

7. **Disclaimer of Warranties.** Adlife does not represent or warrant that this Site or Services will
be error-free, or free of viruses or other harmful components. The Site and Services are
provided on an "as is" and "as available" basis. Adlife expressly disclaims all warranties,
including the warranties of merchantability, and fitness for a particular purpose and non-
infringement. Adlife disclaims all responsibility for any loss, injury, claim, liability, or damage
of any kind resulting from, arising out of or any way related to (a) any errors in or omissions
from this Site and Services; (b) the unavailability of this Site, Services, or any portion thereof;
(c) Subscriber's use of this Site or Services; (d) Subscriber's use of any equipment or
software in connection with the Site or Services; or (e) any third party web sites or content
therein directly or indirectly accessed through links contained on the Site or through the
Services.

8. **Limitation of Liability; Indemnification.**

108

a) THE LIABILITY OF ADLIFE TO SUBSCRIBER FOR ANY AND ALL CAUSE(S) OF
ACTION, REGARDLESS OF THE FORM OF ACTION (INCLUDING CONTRACT, TORT,
NEGLIGENCE OR ANY OTHER), ARISING OUT OF OR RESULTING FROM THE
PERFORMANCE OR BREACH OF THIS AGREEMENT WILL IN NO EVENT EXCEED THE
AVERAGE MONTHLY SUBSCRIPTION FEES IN THE THEN-CURRENT TERM
CONVERTED TO AN ANNUAL BASIS (I.E. AVERAGE MONTHLY SUBSCRIPTION FEES
X 12).

b) ADLIFE SHALL NOT BE LIABLE TO SUBSCRIBER OR TO ANY THIRD PARTY FOR
ANY SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE, CONSEQUENTIAL DAMAGES, OR
DAMAGES FROM LOST PROFITS, LOST USE, OR ANY OTHER DAMAGES OF ANY
KIND WHATSOEVER IN ANY WAY DUE TO, RESULTING FROM, OR ARISING IN
CONNECTION WITH THIS AGREEMENT OR THE USE OF OR INABILITY TO USE THIS
SITE OR SERVICES, EVEN IF THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY
OF SUCH DAMAGES.

c) Subscriber agrees to indemnify, defend and hold harmless Adlife, its officers,
directors, employees, agents, licensors, suppliers and any third party information
providers to the Site or Services from and against all claims, losses, expenses, damages
and costs, including reasonable attorneys' fees (collectively, "Losses"), resulting from or
in connection with: (i) any breach of any obligation of Subscriber; (ii) violation of any
applicable laws by Subscriber, its affiliates, and their respective officers, directors,
employees, agents, contractors, End-users, or clients ("Subscriber Responsible
Parties"); or (iii) any misuse, loss, damage, corruption, or destruction of the Services by
Subscriber Responsible Parties or any breach of security relating to the same.

9.  **Additional Miscellaneous Provisions.**

a) **Governing Law; Jurisdiction; Venue; Attorney's Fees.** This Agreement shall be
construed in accordance with, and governed by, the laws of the State of Rhode Island,
except for that body of law addressing conflicts of law. The Parties submit to the
jurisdiction of said courts and waive any defense of forum non-convenes. The Parties
waive all rights to jury trials.

b) **Assignments.** This Agreement shall be binding upon and shall be for the benefit of
Adlife and Subscriber and both Parties' respective legal representatives, successors,
and permitted assigns; provided, that Subscriber shall not be entitled to assign,
sublicense, or delegate this Agreement, in whole or in part, without Adlife's prior written
consent. Any attempted assignment, delegation, or assumption of this Agreement not in
accordance with this Section will be of no force or effect.

c) **Personal Information.** Adlife agrees to protect Subscriber's Personal Information, as
that term is defined in Adlife's Privacy Policy, in accordance with the terms of the Adlife
Privacy Policy, which can be found here.
https://preparedfoodphotos.com/privacy.policy.php

d) **Entire Agreement; Waiver; Relationship of the Parties.** This Agreement constitutes
the entire agreement between the Parties as to the subject matter hereof. No waiver of
any provision of this Agreement shall be deemed, or shall constitute, a waiver of any
other provision, nor shall any waiver constitute a continuing waiver. No waiver shall be
binding unless executed in writing by the Parties. Nothing contained in this Agreement
shall be construed as creating a joint venture, partnership, agency, or employment
relationship between the Parties, and neither Party shall have any right to bind the other

6

109

e) **Severability of Terms.** If any provision of the Agreement is found by a court of competent jurisdiction to be invalid, the Parties nevertheless agree that the court should endeavor to give effect to the Parties' intentions as reflected in the provision, and the other provisions of the Agreement remain in full force and effect.

f) **Amendment.** Notwithstanding Section 6, this Agreement may be modified only in writing, signed by a duly authorized representative of each Party.

g) **Notices and Contact Information.** Any demand, notice, or other communication required or permitted hereunder shall be effective if in writing and either delivered to the addressee or the email set forth in the "Contact Us" section of the Site (for Adlife); or, if to Subscriber, at email set forth in the Subscriber registration page. Either Party may change its notice email address by providing the other Party with notice of the change.

10. **Acknowledgement.** You acknowledge that you have read this Agreement, understand it and agree to be bound by its terms and conditions. You further agree that it is the complete and exclusive statement of the agreement between you and Adlife, which supersedes any proposal or prior agreement, oral or written, and other communication between you and Adlife relating to the subject matter of this Agreement.

This Agreement may be executed in counterparts and the Parties agree that electronic signatures are binding. The Parties have caused this Agreement to be executed by their authorized representatives as of the date set forth below.

DW Green Company

By: _____
Title: President
Date: 6/01/20

**Adlife Marketing & Communications Co., Inc.**

By: _____
Title: President
Date: June 2, 2020

110

111

# Levy Affirmation
# Exhibit FFF

Case 2:23-cv-00160-TOR    ECF No. 102-3    filed 08/28/25    PageID.2698    Page
43 of 57
Case 1:23-cv-04359-AKH-VF    Document 8-1    Filed 07/18/23    Page 1 of 15

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------X
                                   :

STRIKE 3 HOLDINGS, LLC,            :

                                  :    Case No. 1:23-cv-04359-AKH

                Plaintiff,       :

                                  :

                  vs.            :

                                  :

JOHN DOE subscriber assigned IP address   :
74.101.199.37,                     :

                                  :

                Defendant.     :
-------------------------------------------------------------------X

**DECLARATION OF DAVE WILLIAMSON IN SUPPORT OF PLAINTIFF'S MOTION**
**FOR LEAVE TO TAKE DISCOVERY PRIOR TO A RULE 26(f) CONFERENCE**

[Remainder of page intentionally left blank]

i

## DECLARATION OF DAVID WILLIAMSON IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO TAKE DISCOVERY PRIOR TO A RULE 26(f) CONFERENCE

1.    My name is David Williamson.

2.    I am over the age of 18 and competent to make this declaration. The facts stated in this declaration are based upon my personal knowledge and, if called and sworn as a witness, I can and competently will testify to all matters contained herein.

### Education and Career

3.    Between 1983 to 1986, I attended Bispham Technical College located in Bispham, Blackpool, United Kingdom, where I studied computer science.

4.    Since completing my studies at Bispham Technical College, I have acquired over 34 years of experience in the Information Technology industry.

5.    My experience ranges from working as a service engineer, a hardware engineer, a developer, a team leader, an IT consultant, an eInfrastructure manager, an Internet consultant, Infrastructure Practice Manager, a Security & Networking Specialty Manager, and a Software Consulting Practice Manager. I was also a UK board member for Sun Microsystems Professional Services Division.

6.    I have worked in many industries, which significantly include the UK Department of Defense (British Aerospace), Sun Microsystems, and AXA Insurance.

7.    As a result of my experience, I have significant technology skills that cross the Microsoft & Unix / Linux platforms. These skills are primarily in the areas of software development, security, and networking.

8.    I am highly competent in networking technologies and information security, and adept at programming in various languages including Java, Javascript, PHP, C, and Assembler.

9.    I also possess significant skills in Databases, Cloud Computing, and other Web

1

114

technologies.

10.    I am currently self employed as an Information Systems and Management
Consultant.  In this role, I work with clients to help them tackle the challenges involved with
scaling their Information Technology Applications.    The process involves using Agile
methodologies to help companies design and re-factor their applications to use the latest
technology.

**Strike 3 Holdings, LLC Background**

11.    As an Information Systems and Management Consultant, I am employed as an
independent contractor by Strike 3 Holdings ("Strike 3" or "Plaintiff"), a Delaware limited liability
company located at 2140 S. Dupont Hwy, Camden, DE.

12.    I have been working with Strike 3 since its inception.  I undertake the role of Chief
Technology Officer (CTO).  Because of the nature of my role with the company, I am generally
familiar with all aspects of the company, and with full knowledge of its Information Technology
Systems.

13.    Strike 3 owns the intellectual property to the *Blacked*, *Blacked Raw, Slayed*, *Tushy*,
*Tushy Raw*, and *Vixen* adult brands, including the copyrights to each of the motion pictures
distributed through *Blacked*, *Blacked Raw, Slayed*, *Tushy*, *Tushy Raw*, and *Vixen* and the
trademarks to each of the brand names and logos.  Strike 3 is owned entirely by General Media
Systems, LLC and has existed since 2015.  I also undertake the role of Vice President of
Technology for General Media Systems, LLC.

14.    Our company has approximately 15 million visitors to our websites per month and
a loyal following.

15.    Our company's philosophies are important.

2

Case 2:23-cv-00160-TOR    ECF No. 102-3    filed 08/28/25    PageID.2701    Page
46 of 57
DocuSign Envelope ID: 486C3810-4BE7-A769-B889-DA3C42B6E0C2  Case 1:23-cv-04359-ARH-VF  Document 8-1    Filed 07/18/23    Page 4 of 15

16.    We always strive to pay artists and models an amount above that being paid by other companies. Indeed, we are known for paying our performers the highest rates ever recorded in the industry. Empowering the artists -- and especially the women we work with -- is at the core of our company's philosophy.

17.    We focus on delivering to our subscribers and fans superior quality adult films and a wonderful customer experience available for a monthly subscription at a fair price. When Strike 3 first began offering this service, conventional wisdom held that it was destined to fail; that people would refuse to pay extra to support the production of high quality adult content they enjoy when lesser quality films are available for free. Now, we have a substantial and loyal customer base that recognize the value of paying a fair price to support the artists that provide the works they enjoy.

18.    We provide jobs for nearly 100 people worldwide. We provide good benefits including health care coverage and have an extremely positive company culture. Our employees include producers, production managers, video editors, marketing specialists, accountants, stylists, content managers, and a full team of highly skilled software developers, system administrators, and a quality assurance department.

19.    Our movies are known for having some of the highest production budgets of any in the industry. We invest in and utilize state of the art cinematic equipment. We film using Hollywood industry standards. And, as our subscriber base grows, we always seek to find ways to invest in value for our customers.

20.    Because of this, we have a subscriber base that is one of the largest of any adult site in the world.

21.    We are also currently the number one seller of adult DVDs in the United States.

22.    Our content is licensed throughout the world, which includes most major cable

3

Case 2:23-cv-00160-TOR    ECF No. 102-3    filed 08/28/25    PageID.2702    Page
47 of 57
DocuSign Envelope ID: 486C3819-48E7-4768-9888-DA2C42B6E0C2    Case 1:23-cv-04359-ARH-VF    Document 8-1    Filed 07/18/23    Page 5 of 15

networks.

23.    Our success has not gone unnoticed.  Indeed, we are very proud that our unique
cinematic films have won many awards.  Some of them include:

   a.  Best New Studio (XBIZ, 2017)

   b.  Studio of the Year (XBIZ, 2018)

   c.  Best Cinematography (AVN, 2016)

   d.  Director of the Year (AVN, 2016-2018 ; XBIZ, 2017-2018)

   e.  Best Director – (XRCO, 2016-2017)

   f.  Best Membership Website (AVN, 2016-2017)

   g.  Adult Site of the Year – (XBIZ, 2015-2017)

   h.  Best marketing campaign – company image (AVN, 2016-2017)

   i.  Marketing Campaign of the Year (XBIZ, 2018)

   j.  Greg Lansky - Lifetime Achievement Award (Nightmoves)

   k.  Vignette Series of the Year (XBIZ, 2018)

24.    We also are routinely featured in mainstream media.  Forbes,[1] The Daily Beast,[2]
CBC Radio,[3] Rolling Stone,[4] AdAge,[5] and Jezebel[6] have all published substantial profiles on us.

---

[1] "How One Pornographer is Trying to Elevate Porn to Art," *Forbes,* July 20, 2017
https://www.forbes.com/sites/susannahbreslin/2017/07/20/pornographer-greg-lansky-interview/#2301d3ae6593
[2] "Meet the Man Making Porn Great Again," *The Daily Beast*, February 18, 2017
http://www.thedailybeast.com/meet-the-man-making-porn-great-again
[3] "Porn-o-nomics: How one director is making a fortune by defying conventional wisdom," *CBC Radio*, February
24, 2017 http://www.cbc.ca/radio/day6/episode-326-sanctuary-cities-la-la-land-vs-jazz-hollywood-in-china-porn-o-nomics-and-more-1.3994160/porn-o-nomics-how-one-director-is-making-a-fortune-by-defying-conventional-wisdom-1.3994167
[4] "Versace, Champagne and Gold: Meet the Director Turning Porn Into High Art." *RollingStone*, April 15, 2018
https://www.rollingstone.com/culture/culture-features/versace-champagne-and-gold-meet-the-director-turning-porn-into-high-art-629908/
[5] "Kanye West's Favorite Pornographer is a Master of SFW Marketing," *AdAge*, August 17, 2018
https://adage.com/article/cmo-strategy/sfw-pornographer/314604
[6] "The One Percent Fantasies of Greg Lansky's Vixen" *Jezebel*, January 9, 2019 https://jezebel.com/jerking-off-to-capitalism-the-1-percent-fantasies-of-g-1829976586

4

25.    We are proud of our impact on the industry. We have raised the bar in the industry - leading more adult studios to invest in better content and higher pay for performers. That is a testament to the entire team, the company we have built, and the movies we create.

26.    Unfortunately, piracy is a major threat to our company. We can compete in the industry, but we cannot compete when our content is stolen.

27.    We have discovered that when we put videos online for paid members to view, it is often less than a day before our movies are illegally available to be downloaded on torrent websites. We have attempted to identify the initial seeders of the pirated content. However, due to our significant customer base, it is virtually impossible to 100% identify the actual individual who initially distributes our content via the torrent network. We do regularly scan our records for people who appear to be abusing our service, and take action to prevent further abuse.

28.    The issue of pirated content is a significant one; the Global Innovation Policy Center released a report[7] in June 2019, and found that digital video piracy conservatively causes lost domestic revenues of at least $29.2 billion and as much as $71.0 billion. It also found that it results in losses to the U.S. economy of between 230,000 and 560,000 jobs and between $47.5 billion and $115.3 billion in reduced gross domestic product (GDP) each year. We certainly feel this pain, as do our paying customers, who are cheated out of access to even more films that our company does not have the resources to make when pirates freeload off the system instead of contributing their fair share to pay for the works they enjoy.

29.    We put a tremendous amount of time, effort and creative energy into producing and distributing valuable content for our paid customers. It crushes us to see it being made available for free in just minutes.

---

[7] "IMPACTS OF DIGITAL VIDEO PIRACY ON THE U.S. ECONOMY" https://www.theglobalipcenter.com/wp-content/uploads/2019/06/Digital-Video-Piracy.pdf

5

30.    Our movies are typically among the most pirated television shows and movies on major torrent websites.

31.    We send on average 50,000 Digital Millennium Copyright Act notices a month but it does virtually nothing to stop the rampant copyright infringement.

32.    The most, if not the only, effective way to stop the piracy of our movies on BitTorrent networks is to file lawsuits like this one.

33.    We are mindful of the nature of the works at issue in this litigation. Our goal is not to embarrass anyone or force anyone to settle unwillingly, especially anyone that is innocent. We are proud of the films we make. We do not want anyone to be humiliated by them.

34.    Because of this, our company and our legal team strives to only file strong cases against extreme infringers. Each lawsuit seeks to stop only those infringers who engage not only in illegal downloading, but also in large scale unauthorized distribution of our content.

35.    We also do not seek settlements unless initiated by the defendant or their counsel. We do not send demand letters.

36.    We are careful not to proceed with a case against a defendant unless we feel we have a strong case and a good faith basis for doing so. We will not pursue defendants that provide substantiated exculpatory evidence. Nor will we pursue defendants that have proven hardships. Our clear objective is to be mindful and reasonable with each case.

37.    We are a respected entertainment company that makes nearly all of its revenue from sales of subscriptions, DVDs, and licenses. Our goal is to deter piracy and redirect the infringement back into legitimate sales. Proceeds we receive from settlements go back into making our company whole.

6

Case 2:23-cv-00160-TOR    ECF No. 102-3    filed 08/28/25    PageID.2705    Page
50 of 57

DocuSign Envelope ID: 486C3819-48E7-4769-B889-DA36426BE0C2
Case 1:23-cv-04359-AKH Document 8-1    Filed 07/18/23    Page 8 of 15

38.     We believe a consumer's choice of what content to enjoy, whether it be adult

entertainment or otherwise, is a personal one to that consumer.  Therefore, it is our policy to keep

confidential the identity of not only our subscribers, but even those we are pursuing for copyright

infringement.  We typically only reveal a defendant's identity if the defendant does not contact

Strike 3 to participate in the request to the Court to permit them to proceed anonymously, or if

the Court in a particular action does not allow a defendant to proceed anonymously.

39.     Our copyrights are the foundation of our livelihood.  Our copyrights enable us to

open our office doors each day, pay employees, make a difference in our community, and create

motion pictures that raise the industry standard.  We have to protect them.

### Strike 3 Holdings, LLC's Infringement Detection System

40.     I oversaw the design, development, and overall creation of the infringement

detection system called VXN Scan ("VXN") which Strike 3 both owns and uses to identify the IP

addresses used by individuals infringing Plaintiff's movies via the BitTorrent protocol.

41.     It took approximately six months to develop VXN.

42.     As explained below, VXN has several components and processes.

### The Torrent Collector/Scrapper

43.     The first component of VXN is the Torrent Collector.

44.     Torrent websites host .torrent files or list magnet links referring to .torrent files,

which contain torrent metadata.  In order to download content through BitTorrent, a user will first

download a BitTorrent client (*i.e.*, software that enables the BitTorrent protocol work), and then

will search for and acquire .torrent files from  torrent websites.  The BitTorrent client reads the

.torrent file's metadata, specifically its "Info Hash,"[8] and uses that information to download pieces

---

[8] The "Info Hash" is the data that the BitTorrent protocol uses to identify and locate the other pieces of the desired
file across the BitTorrent network. To be clear, the "Info Hash" is not the hash value of the complete file nor its

7

Case 2:23-cv-00160-TOR    ECF No. 102-3    filed 08/28/25    PageID.2706    Page
51 of 57
DocuSign Envelope ID: 486C3819-4857-4768-B889-DA2642B6E0C2 Case 1:23-cv-04359-ARR-VF    Document 8-1    Filed 07/18/23    Page 9 of 15

of the desired computer file that correlate to the .torrent file previously acquired.

45.    The Torrent Collector is software that conducts lexical searches of Plaintiff's titles within well-known torrent websites.

46.    The Torrent Collector is serviced at Amazon Elastic Compute Cloud ("Amazon EC2"). Amazon EC2 is a web service that provides secure, resizable compute capacity in the cloud.[9]

### The Downloader

47.    The second component of VXN is a software called Downloader. After the Torrent Collector's lexical search yields a match (*i.e.*, it has located a .torrent file which establishes that the correlating targeted computer file contains the title of one of Plaintiff's works), the Downloader subsequently downloads the .torrent file and a full copy of the targeted computer file from the whole BitTorrent swarm. To be clear, the Downloader does not obtain a full copy from a single infringer.

48.    The targeted computer file is downloaded for human audiovisual verification purposes only. Indeed, downloading the entire targeted computer file is necessary so that Strike 3 can confirm that the targeted computer file, which is downloaded in pieces using the "Info Hash" value in the metadata of the related .torrent file, is in fact an infringing copy of a copyrighted work it owns.

49.    It is impossible for the Downloader to re-distribute or upload any of the retrieved data, since, as written, the program does not contain such a function. To be clear, the downloader will never upload data to other computer systems in the BitTorrent network.

---

correlating .torrent file. Instead, it is a unique identifier contained in the metadata of the .torrent file that provides a "map" so that those pieces can be collected and re-assembled into a complete file (i.e., a playable movie) by a BitTorrent client.

[9] *See* https://aws.amazon.com/ec2/

50.    The Downloader then stores the .torrent file and a full copy of the targeted computer file directly onto a cloud platform account provided by Amazon Web Services ("AWS").

51.    The Downloader is also serviced at Amazon EC2.

### The Proprietary Client

52.    The third component of VXN is a proprietary BitTorrent client ("Proprietary Client").

53.    After the Downloader downloads the .torrent file and targeted computer file as described above, the Proprietary Client connects to peers within the swarm associated with that infringing computer file.  The Proprietary Client connects to these peers using a TCP/IP connection. This connection cannot be spoofed.

54.    Once the connection is established, the Proprietary Client begins the process of downloading a piece or multiple pieces of the infringing computer file from other computers connected to the Internet through IP addresses, which are offering pieces of the infringing computer file for download (i.e., "peers" in the BitTorrent "swarm"). The Proprietary Client accomplishes this by using the Info Hash value in the metadata of the .torrent file, which has already been confirmed to correlate with a digital media file that infringes upon one of Strike 3's copyrighted works. The BitTorrent protocol ensures that, because the Proprietary Client requests file pieces based on this specific Info Hash value, it only receives pieces of the related digital media file. In short, it repeatedly downloads data pieces from peers within the BitTorrent network which are distributing Plaintiff's movies.

55.    In this way, the Proprietary Client emulates the behavior of a standard BitTorrent client.  However, there are two ways in which the Proprietary Client differs from a standard BitTorrent client.  The first is that the Proprietary Client is *incapable* of distributing the infringing

9

Case 2:23-cv-00160-TOR    ECF No. 102-3    filed 08/28/25    PageID.2708    Page
53 of 57
DocuSign Envelope ID: 486C3819-4BE7-4789-8668-DA9C42B6E0C2    Case 1:23-cv-04339-AKH-VF    Document 8-1    Filed 07/18/23    Page 11 of 15

computer files. Thus, it is only able to download data from peers in a swarm and is unable to upload any data to the peers in a swarm. The second exception is that the Proprietary Client is disabled from storing any of the content obtained from the transaction and the Proprietary Client does not itself record evidence of infringement.

56. The Proprietary Client operates on an independent physical server which is located in a professional data center in Florida.

### PCAP Recorder / Capture Card

57. The fourth component of VXN is the PCAP Recorder, which uses a physical PCAP Capture Card.

58. Data sent through the Internet is delivered in the form of "packets" of information. PCAP stands for "Packet Capture." A PCAP is a computer file containing captured or recorded data transmitted between network devices.

59. In this case, Plaintiff sought to record numerous infringing BitTorrent computer transactions in the form of PCAPs. The PCAPs evidence particular IP addresses connecting to the Proprietary Client and sending pieces of a computer file (which contains an infringing copy of Plaintiff's works) to the Proprietary Client.

60. Strike 3's need to record and secure PCAPs is logical since PCAPs contain specific BitTorrent transaction details of evidentiary value.

61. Indeed, a PCAP contains the Internet Protocol (IP) Addresses used in the network transaction, the date and time of the network transaction, the port number[10] used to accomplish each network transaction, and the BitTorrent client used to accomplish the network transaction. All of the above can be useful in identifying an infringer.

---

[10] A port is a communication endpoint. Ports are identified for each protocol and address combination by the port number.

62.    A PCAP also identifies the Info Hash value that was used to obtain the transacted piece. This information identifies the data that was shared in the recorded transaction as a constituent part of a specific digital media file, which, as described above, has been confirmed to be a file that infringes upon one of Strike 3's copyrighted works.

63.    In order to record the PCAPs in real-time for all BitTorrent transactions which the Proprietary Client is involved in, VXN uses a Capture Card called Link™ NT40A01 SmartNIC. This is a network capture card that was developed and manufactured by Napatech™.

64.    Napatech is the leading provider of reconfigurable computing platforms.[11]    It develops and markets the world's most advanced programmable network adapters for network traffic analysis and application off-loading.[12]    Napatech's "family of SmartNICs enables government and military personnel to capture all the data running through their networks[.]"[13]

65.    Within VXN, the Capture Card is connected to the Proprietary Client's network connection via a passive network tap. A passive network tap allows the Capture Card to record perfect copies of all traffic without actively interacting with any other components within the network (i.e., the Proprietary Client). In this manner, the Capture Card retrieves an identical copy of each and every single network packet which is sent[14] and received by the Proprietary Client.

66.    The PCAP Recorder receives that data from the Capture Card and streams the PCAP files directly onto a cloud platform account provided by AWS. More specifically, the cloud platform is known as Amazon Simple Storage Service ("Amazon S3"). Within this Amazon S3 account, Plaintiff has enabled the object lock "legal hold" feature. This feature "prevents an object

---

[11] *See* https://marketing.napatech.com/acton/attachment/14951/f-cce2aadf-5242-49dd-b515-31bd48077066/1/-/-/-/-/Fort%20Huachuca%20Press%20Release.pdf
[12] *See* http://www.networkallies.com/partners/napatech
[13] *See* https://finance.yahoo.com/news/napatechs-family-smartnics-helps-state-130700070.html
[14] The Proprietary Client does not send any data to BitTorrent peers. But even if it did, the Capture Card would record such transactions.

11

version from being overwritten or deleted [...] [which] remains in effect until removed."[15]  Thus, this ensures that the files cannot be modified or deleted.

67.    Plaintiff's "legal hold" feature is currently set for three years.  Therefore, the PCAPs cannot be modified or deleted for three years from the date and time the PCAP was first streamed onto the Amazon s3 cloud.

68.    To be clear, no PCAP data is stored locally on the Capture Card.  Rather, the PCAP data is streamed in real time and stored directly onto Amazon S3.

69.    The Capture Card is synchronized with a time server using the Global Positioning System (GPS).  This ensures that the dates and times within the PCAPs are accurate.  Each recorded transaction is recorded in milliseconds (thousandths of a second).

70.    The independent physical server housing the Capture Card and PCAP Recorder is also located at a professional data center in Florida.

### The PCAP Stamper

71.    The fifth component of VXN is the PCAP Stamper software.

72.    Every 24 hours the PCAP Stamper[16] sends an index of every PCAP file VXN has *ever* recorded within the last 24 hours to a 3rd party provider called DigiStamp, Inc.[17]  DigiStamp, Inc. then signs the index with a qualified timestamp.  This ensures that the PCAPs existed on the date and time listed in the timestamp, and that it has not been modified as of the date and time

---

[15] *See* https://docs.aws.amazon.com/AmazonS3/latest/dev/object-lock-overview.html#object-lock-legal-holds
[16] Though we termed this software the "PCAP Stamper," this term is not descriptive since it is DigiStamp, Inc. that actually signs the PCAP index with a qualified timestamp.
[17] DigiStamp, Inc. provides "tools to prove the authenticity and integrity of electronic records. By the end of 2003, DigiStamp had created more than 1 million timestamps for customers. Not a single DigiStamp timestamp has ever been successfully challenged. In 2005, [DigiStamp] commissioned and completed an external audit so that [its] timestamp meets the highest standards of strong legal evidence for authenticating computer data." Further "state and federal agencies, as well as foreign governments, have sought [DigiStamp's] advice and our products. From the Supreme Court of Ohio to the Department of Defense to the federal governments of Mexico and Australia, [DigiStamp] [is] recognized as reliable experts who offer sound thinking as well as a fine product." *See* https://www.digistamp.com/about-us/aboutus

12

listed in the timestamp.

73.    The PCAP Stamper is located on Amazon EC2.

### The PCAP Analyzer

74.    The sixth component of VXN is the PCAP Analyzer. The PCAP Analyzer is software that: (a) retrieves stored PCAP files from Amazon S3; (b) extracts infringing transaction data from each PCAP; (c) verifies that each retrieved data piece is a part of the .torrent related file (and therefore distributing Plaintiff's copyrighted content) by using cryptographic hashes; and (d) organizes and summarizes the extracted infringing transaction data in a tabular format.

75.    Each line item within the PCAP Analyzer's tabular output *always* references an existing PCAP file. In other words, there is a PCAP recording for every infringing transaction listed in the PCAP Analyzer's tabular output. Thus, Plaintiff is always able to provide the original recording (the PCAPs) for each transaction listed in the tabular output. The tabular format is merely a summary of the PCAP data and is created for better human readability.

76.    The PCAP Analyzer is connected to Maxmind® GeoIP2 Precision Services geolocation database.[18]

77.    Maxmind is "an industry-leading provider of IP intelligence and online fraud detection tools."[19] "Over 5,000 companies use GeoIP data to locate their Internet visitors and show them relevant content and ads, perform analytics, enforce digital rights, and efficiently route Internet traffic."[20] Maxmind is not "software" or technology, but instead it is a database. Maxmind compiles information it receives from Internet Service Providers (ISPs) containing the city and state locations of the users of the ISPs and their respective IP addresses. Maxmind maintains and

---

[18] *See* https://www.maxmind.com/en/geoip2-precision-services
[19] *See* https://www.maxmind.com/en/company
[20] *Id.*

13

updates this list weekly and sells access to it.

78.    VXN connects with the Maxmind database to determine both the Internet Service

Provider that assigned a particular IP address as well as the city and state the IP Address traces to.

The PCAP Analyzer adds this information to the tabular output.

79.    The PCAP Analyzer runs continuously in real-time.

80.    The PCAP Analyzer software is located on Amazon EC2.

81.    The PCAP Analyzer fulfills the same basic function as the well-known software

called Wireshark and follows the same standards.

**PURSUANT TO 28 U.S.C. § 1746**, I hereby declare under penalty of perjury under the

laws of the United States of America that the foregoing is true and correct.

Executed this 18th day of October, 2022.

By:       *Dave Williamson*
           DocuSigned by:
           B5DU4EA38EB34F3...

**DAVID WILLIAMSON**

14

127