Paul Alan Levy (pro hac vice)
Public Citizen Litigation Group
1600 20th Street NW
Washington, D.C. 20009
(202) 588-7725
plevy@citizen.org

Stephen Kirby
Kirby Law Office, PLLC
WSBA #43228
1312 N. Monroe St.
Spokane, Washington 99201
(509) 795-4863
kirby@kirbylawoffice.com

Phillip R. Malone (pro hac vice)
Juelsgaard Intellectual Property and Innovation Clinic
Mills Legal Clinic at Stanford Law School
Crown Quadrangle, 559 Nathan Abbott Way
Stanford, California 94305-8610
(650) 724-1900
pmalone@stanford.edu

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| PREPARED FOOD PHOTOS, INC., f/k/a ADLIFE MARKETING & COMMUNICATIONS CO., INC., a Florida for profit corporation,<br><br>Plaintiff,<br><br>v.<br><br>POOL WORLD, INC., a Washington for profit corporation,<br><br>Defendant. | No. 2:23-cv-00160-TOR<br><br>**SEVENTH AFFIRMATION OF PAUL ALAN LEVY**<br><br>Hearing August 28, 2025<br>6:30 PM |

1. My name is Paul Alan Levy. I am lead counsel for defendant Pool World. I make this affirmation in support of Pool World's motion for summary judgment on the statute of limitations issue, seeking dismissal with prejudice of the complaint filed by plaintiff Prepared Food Photos ("PFP").

2. During discovery in this case, we obtained a document from Getty Images

showing the prices that Getty's subsidiary iStock charged between 2009 and 2013 for use of the Grilled Vegetable Photo at issue in this case. That document was attached to my Third Affirmation as Exhibit N. The prices ranged from $.95 to $15.00 (for multiple uses). The portion of Exhibit N that showed what part of each license fee was paid to PFP (then known as Adlife) was redacted. Subsequently, Getty Images provided that document with the contents of the redacted column revealed. The share of the license fee that was paid to PFP ranged from twelve cents ($0.12) to $2.76. The unredacted document is attached as Exhibit LL (The lettering is sequential to my previous affirmations).

    3. Getty Images also produced a 45-page listing of all of the photos from PFP that iStock offered for licensing. In all, the listing contained roughly 4700 different photos.

    4. Getty Images also produced documents revealing the total amount of royalties that iStock paid to PFP for the licensing of those roughly 4700 photos. The documents reflect the following total amounts:

```
2010     $15,476.88
2011     $10,346.00
2012     $ 7,715.99
2013     $ 9,716.09
2014     $16,850.97
2015     $13,596.97
2016     $ 5,471.91
```

I have attached those documents as Exhibit MM.

    5. PFP produced a document showing the amounts of revenue it received from iStock and Multi-Ad (another third-party licensing agent) combined. That document

reflects the following amounts:

```
2012  $ 134,000
2013  $ 124,493
2014  $ 113,672
2015  $ 104,428
2016  $ 102,632
```

I have attached that document as Exhibit NN. PFP represented that it could not provide the amounts of licensing revenue from earlier years because it no longer had the documents revealing such information

6. In November, 2023, PFP produced twenty-two subscription agreements for access to its database of 18,000 photos. PFP represented these agreements to be all of the subscription agreements into which it had entered at that time. The first of those agreements, with supermarket chain *Redacted* provided for payments at the rate of $499 per month. This agreement was attached to my Fourth Affirmation as Exhibit HH. Payments of $499 per month from "*Redacted*" are similarly reflected in the bank statements from 2018 to 2024 produced by PFP.

7. Attached as Exhibit OO is a chart that I produced listing the subscriber names and descriptions, dates, and payment amounts of each of the twenty-two subscription agreements. The chart also describes the extent of information known about how the subscription agreements came about and whether documentation of communications with the subscribers leading up to the agreement was provided in discovery.

8. The payment records that PFP has produced do not reflect payments from all of the subscribers for whom PFP has produced subscription agreements. For

example, PFP's records do not reflect payments from *Redacted*, who entered into an agreement in 2019 that required an annual payment of $1188. Counsel for PFP has explained that this subscriber continues to pay annually by check as that contract provided.

9. Similarly, the provided document reflected no payments from the subscriber DW Green, even though the periodic communications from PFP to its group of subscribers made clear that as of 2024 DW Green was still a subscriber. See Exhibit JJ to my Fifth Affirmation. Therefore, during a meet and confer, we told PFP counsel that we were ready to file an additional motion questioning whether PFP had produced all records of payments from subscribers. PFP's counsel explained that DW Green was not required to pay PFP because it has remained a Bad-Adz customer. Counsel said he did not know whether PFP had a policy of allowing other Bad-Adz customers to have free access to its database of photos.

10. PFP's production also included documentation of lump sum payments from several subscribers received by PFP's current counsel, CopyCat Legal, and communications between CopyCat Legal and legal representatives of subscribers occurring before the subscription agreements were entered. For example, there was a long series of email messages between Lauren Hausman and the in-house attorney of a PFP subscriber in which Ms. Hausman repeatedly represented that PFP charged a strict $999 monthly minimum fee, which she explained was why PFP was insisting on payment of $11,988 for a one-year subscription as settlement of its infringement

claim against the hospital chain. In this regard, PFP lead counsel has represented that he and his firm were unaware that this information was false until that fact emerged in discovery in this case. We accept that representation.

11. Although PFP has produced several documents from the records of its legal counsel, CopyCat Legal, showing that each of the subscription agreements from 2022 going forward was entered as a result of infringement claims handled by its current counsel, PFP has produced no pre-subscription-agreement communications with subscribers whose agreements were entered in 2021 or earlier, at times before Copycat Legal was handling PFP's copyright enforcement portfolio. This is presumably because of PFP's policy of discarding documents after four years.

12. I considered sending a subpoena to Higbee and Associates, a law firm that handled many copyright infringement matters for PFP's predecessor from 2017 onward, for its relevant documents. However, before burdening a third party, I communicated with Mathew Higbee to ascertain what documents his firm still had. He told me that, when his firm's representation of PFP's predecessor ended, it sent the company a copy of all documents in its possession, and disposed of the rest. PFP has not produced any of these documents and does not appear to have preserved them.

13. PFP initially declined to produce data showing the total amount of revenue secured through copyright infringement claims. We filed a motion to compel, which the Court granted only as to information about revenue from claims for infringement of the Grilled Vegetable Photo whose copyright Pool World is alleged to have

infringed. In response, PFP produced the Interrogatory answer that is attached as Exhibit PP. It shows that in 2023, PFP secured a settlement of $10,000 for one or more alleged infringements of the copyright in that photo. That amount is close to the average annual amount of license fees (roughly $11,300) that PFP's predecessor received from iStock for its entire body of 4700 photos licensed through iStock from 2010 to 2016.

14. PFP's responses to other document requests enabled Pool World to reconstruct at least a portion of the other infringement payments made to PFP. Those documents show that, over the past seven years, the vast majority of PFP's revenue comes from making infringement claims, not from licensing use of photos.

15. After we requested documentation of PFP's reverse image searches to identify each occasion on which it searched for the Grilled Vegetable Photo. PFP's answers revealed that PFP keeps records of searches that find potentially infringing images, but does not keep records of unsuccessful searches. It produced one set of spreadsheets showing searches that its own staff conducted in 2016, 2017 and early 2019, and another that showed searches that its own staff had conducted from April 2019 to early 2024 (the time of production). Counsel stated that PFP had no spreadsheet for 2018.

16. In the first set of spreadsheets, PFP redacted the amounts of money gained from the demands following the searches, claiming that the redacted amounts were records of confidential settlements. The spreadsheet showing searches beginning

April 2019, however, recorded the date of each search, the dates when PFP staff sent demand letters to each alleged infringer, and, in many cases, the amount collected on the successful claims.

17. In the first set of spreadsheets, an entry showed that on September 30, 2016, PFP found an allegedly infringing use of "ProduceVegetableGrilled002," PFP's name for the photo at issue in this case. See Complaint ¶ 11. That spreadsheet did not show any other searches for ProduceVegetableGrilled002. The second spreadsheet recorded three search hits on ProduceVegetableGrilled002 before PFP's discovery of Pool World's alleged infringement: on July 10, 2019, again on April 17, 2020, and another on March 30, 2022. I did not locate any other searches for that photo earlier than that date in this spreadsheet.

18. Our office extracted the settlement amounts reflected in the second spreadsheet and summarized the amounts received in each month, as shown in the Affirmation of Martha Solt and its attachment, which is attached here as Exhibit QQ. It shows the following amounts per year:

```
2019        $317,055
2020         $55,625
2021         $42,249
2022         $11,000
2023         $18,800
2024          $3,000
```

19. Bank records produced in discovery provided an additional way to ascertain the amounts of revenue that PFP was deriving from its copyright enforcement program. The unredacted records included payments from the firm of

Higbee and Associates, a law firm which handled many copyright enforcement matters for PFP's predecessor Adlife beginning in 2017 and continuing until at least 2020. The bank records also reflected many payments from other intellectual property law firms, many payments labeled as "settlement," and many payments from companies not shown to be subscribers by the provision of subscription agreements. I constructed the table attached as Exhibit RR from reviewing the unredacted bank records. Because the records themselves are several hundred pages long, I am not putting them in the record, although I am prepared to do so if needed to resolve disputes about accuracy. The total amounts that appear to be infringement enforcement revenues per year shown in Exhibit RR are as follows:

|      | Higbee Payments | Other Settlements |
|------|-----------------|-------------------|
| 2018 | $72,817.29      | $590,007.60       |
| 2019 | $246,140.60     | $282,624.40       |
| 2020 | none shown      | $13,500           |
| 2021 | none shown      | $31,616           |

Exhibit RR is being filed under seal, and the above figures redacted in the public version of this filing, because the data is drawn from records subject to the protective order.

20. This data is incomplete for several reasons. First, PFP did not preserve its bank statements from 2017, and has not produced bank records from the first five months of 2020. PFP has repeatedly promised to supply the 2020 records, but it has never done so. It is also not clear why no Higbee payments are shown in 2020, because the Higbee firm was still representing AdLife in that year (it was, for

example, counsel for AdLife in *Krueger v. AdLife*, described in my First Affirmation, ¶ 24, which concluded in November 2020). It should be noted that, to the best of my knowledge, during those years the Higbee firm's standard terms for copyright enforcement clients who used the Higbee firm's reverse image search services (as PFP has said it did) were to provide 50% of all revenues to its clients. Thus, the damages extracted from the Higbee firm's enforcement targets were likely twice as much as the payments shown.

21. Ledgers maintained by CopyCat Legal, PFP's current counsel in this case, also reflect revenues from PFP's copyright enforcement efforts. Because PFP's counsel refused to stipulate the accuracy of monthly summaries of the revenues disclosed the CopyCat Legal Ledger, I am attaching the unredacted ledgers as Exhibit SS. The Affirmation from Martha Solt, attached above as Exhibit QQ, includes as Exhibit S2 monthly and annual summary of the copyright infringement revenues that CopyCat Legal received on behalf of PFP, and explains how she extracted the data from the locked spreadsheet that PFP produced in discovery. Exhibit SS and Martha Solt Exhibit S2 are, pursuant to the protective order, being filed under seal. This attachment to the Solt Affirmation shows that the annual revenues from CopyCat Legal's demand letters and copyright litigation on behalf of PFP was as follows.

| | |
|---|---|
| 2022 | $1,612,298.66 |
| 2023 | $2,828,297.32 |
| 2024 | $1,403,515.81 |

These numbers are being redacted in the public version of this filing.

22. There was no ledger produced for 2021, the year CopyCat Legal began representing PFP, because PFP's counsel has advised that CopyCat Legal received no payments from subscribers in that year. However, bank statements from the last three months of 2021 reflect that PFP received payments from CopyCat Legal.

23. So that the Court can compare the total revenues from copyright enforcement as shown in these three sources with the amount received from PFP's subscribers, we have analyzed the subscription payments shown in the redacted bank records that PFP initially produced showing payments that PFP represented to use were deposits from its (defunct) subscriber payment processor. That data is attached as Exhibit TT, and shows that the annual subscription payments were

```
2018        $79,728 (including commingled)
2019        $91,639.07 (including commingled)
2020        $59,766.38
2021        $88,984.20 (including commingled)
2022        $59,833.64
2023        $79,584.44
2024        $67,583.62
```

Because the redacted bank records are not subject to the protective order, Exhibit TT is not filed under seal, and the numbers above are not redacted.

24. This data is incomplete in part for the reasons discussed above in paragraph 20; PFP did not preserve its 2017 bank records, and it did not produce bank records for the first half of 2020. Moreover, several of the bank records from 2018, 2019 and 2020 contain legends indicating that specific payments represent a mix of payments to PFP and to Bad-Adz, another company owned by Joel Albrizio.

25. Combining the data supplied by the foregoing charts produces the

following table, comparing income from copyright enforcement with income from subscriptions (including subscriptions secured in settlement of infringement claims). The numbers derived solely from records subject to the protective order are being redacted in the public version of this filing.

**PFP Income from Copyright Claims**

|  | Unredacted Bank Statements Higbee Payment | Unredacted Bank Statements Settlements | PFP Search Hit Tracking Sheet 4/19 to 1/24 | CopyCat Ledger | Other | Total |
|---|---|---|---|---|---|---|
| 2018 | 73,345.69 | 589,479.20 |  |  |  | 662,824.89 |
| 2019 | 246,140.60 | 282,624.40 | 317,055 |  |  | 845,820 |
| 2020 | none shown | 13,500 | 55,625 |  | 37000 *redacted* | 106,125 |
| 2021 | none shown | 73,275.69 | 42,249 |  |  | 115,524.69 |
| 2022 |  |  | 11,000 | 1612298.66 |  | 1,623,298.66 |
| 2023 |  |  | 18,800 | 2828297.32 |  | 2,847,097.32 |
| 2024 |  |  | 3,000 | 1403515.81 |  | 1,046,515.81 |

**PFP Claimed Income from Subscribers**

|  | Subscriber Income Shown in Redacted Bank Statements | Subscriber Income Claimed in 2023 Interrogatory Answer (DN21-4, page B-60) |
|---|---|---|
| 2018 | 79,728 (including commingled) | 78,728 |
| 2019 | 91,639.07 (including commingled) | 192,879 |
| 2020 | 59,766.38 | 180,345 |
| 2021 | 88,984.20 (including commingled) | 71,162 |
| 2022 | 59,833.64 | 94,157 |
| 2023 | 79,584.44 | 70,484 |
| 2024 | 67,583.62 | n/a |

26. In my First Affirmation, I set forth several reasons why a detached observer might find statements in PFP's demand letter to Pool World to be both deceptive, and carefully crafted to persuade the owner of a small business to pay a substantial settlement to avoid being sued. My concern is shared by Pool World's expert witness on copyright trolling, Aaron Arce Stark, a lawyer who specializes both

in helping private photographers and in representing the targets of threats from copyright trolls, and whose expert report is being filed with the summary judgment package. I have seen a large number of demand letters sent on behalf of PFP and signed by PFP's current counsel and many of these concerns apply to those demand letters across the board. The demand letter to Pool World was based on a standard letter whose intensity only increased over time.

27. Once thing that is fairly consistent in all of the CopyCat Legal letters on behalf of PFP letters that I have seen is a version of the bold-lettered, single spaced demand for payment of $30,000 within twenty-one days, relying on a false characterization of PFP's subscription program:

> You shall pay Thirty Thousand Dollars ($30,000.00) within twenty-one (21) days of the date first written above and shall immediately cease and desist from any further use of our client's work(s).

The facts described above, however, show that PFP's representations about its subscription program are misleading, if not downright false. The data described above, specifying the income that PFP has secured from its infringement enforcement program before and after CopyCat Legal took over the account and began sending the demand letters, shows just how effective the CopyCat Legal demand letter is.

28. The false allegation of a $999 minimum monthly payment in PFP's original complaint in this case, which is a standard feature of the complaints PFP has filed, plays a significant role in PFP's infringement enforcement scheme. In addition to its impact when an infringement target receives the complaint, as noted below, it enables

PFP to argue, if the suit is not defended. in support of a motion for default judgment, that the Court should assume the truth of this allegation in assessing the amount of damages to be awarded.

29. Early this year, I warned PFP's counsel that Pool World would serve a motion for Rule 11 sanctions if it did not amend its complaint to drop the false allegation that PFP only makes its photos available to those willing to subscribe at the cost of $999 per month for a minimum period of one year. When PFP did not move to amend its complaint, I served the motion for Rule 11 sanctions that is attached as Exhibit UU. Only then did PFP move to amend its complaint, dropping both the allegation of a $999 minimum (¶ 8) and the allegation that PFP is in the business of licensing high-end, professional photographs for the food industry (¶ 6).

30. My Fourth Affirmation discussed (at ¶ 19) how PFP regularly files briefs and affidavits falsely asserting a $999 per month minimum, including in cases seeking default judgments. The complaints contain the false allegation about PFP's minimum monthly subscription fee, and briefs invoke the proposition that factual allegations in a complaint must be taken as true in ruling on default judgments.

31. PFP has regularly cited these fraudulently secured default judgments both in subsequent default judgment motions, and in demand letters to targets of its infringement claims. As noted in the spreadsheet of subscription agreements, they were cited in the demand letters to companies that became subscribers to resolve the infringement claims.

32. But the CopyCat Legal ledger attached as Exhibit SS does not reveal any payments from any of the companies named in the default judgments cited in the Initial Disclosures in this case, or in the demand letters to targets of infringement claims noted above. Apparently those judgments were not collected, just used to persuade other companies to enter expensive settlements.

33. When PFP moves for the entry of default judgments, it commonly invokes the Wayback Machine on the Internet Archive, www.archive.org, to show its claimed entitlement to large amounts of actual damages, by showing how early the infringing use began, and thus for how many months the alleged infringement continued. One such example is its Motion for Default Judgment in Prepared Food Photos v. EatFood Distributors, Case No. 1:23-cv-08036-JLR (S.D.N.Y. Jan. 5, 2024), available at https://storage.courtlistener.com/recap/gov.uscourts.nysd.606093/gov.uscourts.nysd.606093.15.0.pdf, where plaintiff cited the Wayback Machine and contended that it is an appropriate subject for judicial notice. Had PFP consulted the Wayback Machine before sending its demand letter to Pool World, it could easily have found that Pool World's allegedly infringing use long preceded PFP's registration of the copyright in the Grilled Vegetable Photo. However, to the best of my knowledge, PFP counsel do not consult the Wayback Machine before sending demand letters threatening to seek statutory damages and attorney fees.

34. I have seen the form settlement agreements sent on behalf of PFP's predecessor, which include a requirement that the terms be kept confidential (for

example, in the demand package attached to the Archambault Affirmation). The same agreement was sent with the demand letter to the company, identified in Exhibit RR, that entered a subscription agreement at $300 per month. Relevant parts of that demand package are attached as Exhibit VV. Counsel for PFP has cited the confidentiality of its settlement agreements as the reason why it wishes to keep the identities of companies reflected in Exhibit SS under seal. As Debbie Lingerfelt explains in her Affirmation, PFP was willing to settle its claim against her use of its photos for only $750, rather than the $30,000 demanded in the letter, if she agreed to keep the amount of the payment confidential (among other terms). But as she further explains, when she refused PFP's terms but paid $750, it nevertheless did not sue her. I have spoken to many recipients of CopyCat Legal demand letters who have similarly found that unilaterally sending a $750 payment results in the matter being dropped without any "agreement" but also without having their check cashed. Several other targets of CopyCat Legal's infringement demands have similarly found that sending a check for $750 results both in no lawsuit and no cashing of the check.

35. The confidentiality requirement has impeded Pool World's effort to obtain subscriber testimony about how the subscription was secured.

36. When I met and conferred with counsel for PFP about why confidentiality agreements with subscribers had not been produced, he said that his client "doesn't know what you are talking about," which I took as a denial that such confidentiality agreements exist.

37. I attach as Exhibit WW Pool World's answers to PFP's first set of interrogatories and to PFP's requests for admissions.

38. I attach as Exhibit XX PFP's responses to Pool World's Interrogatory No. 22, showing that, even after amending its complaint to withdraw the allegation that PFP charges a minimum of $999 per month for access to its entire database of photos, PFP is seeking damages of $11,988 per year for the years 2018 to the middle of 2022, for a total of $59,940.

39. I attach as Exhibit YY PFP's Answers to Pool World's First Set of Interrogatories with the added verification by Rebecca Jones.

> Pursuant to 28 U.S.C. § 1746, I hereby certify under penalty of perjury that the foregoing is true and correct. Executed on July 11, 2025.
>
> _____
> Paul Alan Levy